## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARISS FINAN, GLORIA FINAN-BACON, SHAWN BACON, KRISTIN DAYTON, HAILEY DAYTON, C.D., a minor, and ELIZABETH BERRY,<br><br>   Plaintiffs,<br><br>v.<br><br>LAFARGE S.A. and LAFARGE CEMENT SYRIA S.A.,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **COMPLAINT**<br>)<br>)<br>)  **JURY TRIAL DEMANDED**<br>)<br>)<br>) |

## INTRODUCTION

1. On October 18, 2022, the Department of Justice announced its first-ever prosecution of a corporation for providing material support for terrorism.  According to Deputy Attorney General Lisa O. Monaco, Defendants Lafarge S.A. ("Lafarge") and Lafarge Syria S.A. ("LCS") "partnered with [the Islamic State in Iraq and Syria ("ISIS")], one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

2. Based on the heinous conduct underlying their guilty plea, Defendants were sentenced to pay $778 million in criminal fines and forfeiture.

3. As part of their plea agreement, Lafarge and LCS agreed to a 52-page Statement of Facts detailing their unlawful conduct ("Statement of Facts").  *See United States v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10.  Plaintiffs incorporate the Statement of Facts into this Complaint in its entirety as though fully set forth herein.  Lafarge and LCS agreed in their guilty plea that "they will not dispute the Statement of Facts . . . ."

4.      In the Statement of Facts, Defendants made a series of factual admissions establishing their criminal liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2339B(a)(1).  Those same factual admissions also give rise to civil liability under the ATA, 18 U.S.C. § 2333.

5.      In this civil action under the ATA, the families of Americans who were murdered by ISIS seek to collect the treble damages authorized by the ATA for Defendants' violations thereof.

## BACKGROUND

6.      After investing $680 million to construct a cement plant in northern Syria ("Cement Plant"), Defendants faced a critical moment in 2011:  conflict in Syria had devolved into an all-consuming civil war and terrorist groups were imposing their will on the population. Unlike other multinational companies, which halted their Syrian operations and fled the country, Defendants saw a business opportunity.

7.      At the specific direction of the companies' highest management levels—including the CEOs of both Lafarge and LCS—Defendants entered into a multi-faceted and mutually beneficial business relationship with ISIS.  For the explicit purpose of incentivizing ISIS to act in a manner that would promote Defendants' security and economic interests, Defendants' executives agreed to make monthly payments to ISIS, to pay ISIS based on the volume of cement LCS sold, and to purchase raw materials from ISIS-controlled suppliers.  Defendants ultimately solidified their relationship with ISIS by entering into a formal revenue-sharing agreement.  Many of the transactions related to this criminal conspiracy were conducted in U.S. dollars and transferred through and processed in New York.

8.      Defendants received crucial benefits in exchange for these payments.  ISIS permitted access to raw materials sourced from territory under its control so that the Cement

Plant could continue to produce cement; ISIS allowed LCS employees, suppliers, and customer-distributors safe passage through terrorist checkpoints; and ISIS agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey.  ISIS—quite literally—agreed to take out Defendants' competition.

9.      Defendants referred to their "profit" as a "cake," and they were happy to "share" a slice with ISIS so long as ISIS continued to protect and enhance Defendants' economic interests.

10.     Defendants were fully aware that they were transacting with terrorists and that their conduct flagrantly violated U.S. law.   Indeed, Defendants' executives frequently communicated about the challenges of dealing with armed militants who were "classified as terrorists by international organizations and the US."[1]

11.     To avoid detection, Defendants went to great lengths to conceal their relationship with ISIS.  For one thing, rather than directly transacting with terrorists, Defendants preferred to work through intermediaries.  As one LCS security consultant admitted, "it was especially important that the relationship would be handled by [intermediaries], since an exposure of this sort would have been compromising for LCS.  But via [intermediaries], we did in fact contribute to the economy of ISIS."  Relatedly, LCS executives ensured that documents regarding terrorist payments did not reference the word "Lafarge."   For example, LCS's CEO instructed an intermediary that "the name of Lafarge should never appear for obvious reasons in any documents of this nature.  Please use the words Cement Plant if you need but never the one of Lafarge."  In addition, one of Lafarge's in-house lawyers instructed employees to use personal email addresses—rather than Lafarge email addresses—to communicate about their dealings with ISIS.

---

[1] All citations to written correspondence include original spelling, punctuation, and grammar.

12.     Through these intermediaries, Defendants paid the equivalent of at least $5.92 million to ISIS and the terrorist group Al-Nusra Front ("ANF") from 2012 through 2014.  These payments consisted of at least $816,000 of monthly "donations" to ISIS; at least $3,447,528 in payments to ISIS-controlled suppliers; and at least $1,654,466 in payments based on the amount of cement LCS sold.  When ISIS ultimately seized the Cement Plant and forced LCS to evacuate in September 2014, ISIS stole cement that LCS had produced and left behind in furtherance of the conspiracy, and ISIS sold the cement at prices that would have yielded ISIS another $3.21 million.

13.     Defendants' payments to and business partnership with ISIS provided ISIS the seed capital it needed to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans.  They allowed ISIS to create more explosives, capture more territory, recruit new members, and expand to new regions and countries.  Not only were these consequences a foreseeable risk of doing business with ISIS, they were inevitable.  Defendants put their economic self-interest above all else—ultimately making over $70 million in sales through their partnership with ISIS—even while ISIS was slaughtering innocent civilians, including Americans.

14.     Plaintiffs—family members of those killed by ISIS—are entitled to recover for the severe mental anguish, extreme emotional pain and suffering, and loss of their relatives' society, companionship, comfort, advice, and counsel that they experienced as a result of Defendants' criminal misconduct.

## THE PARTIES AND PRINCIPAL CO-CONSPIRATORS

15.     Plaintiffs are survivors and/or heirs and family members of U.S. nationals killed in ISIS terrorist attacks in Syria, Iraq, and Libya.

16.     The Plaintiff family members and the details of each attack are described in Part XII, *infra*.

17.     Defendant Lafarge S.A. is the parent company of a multinational building materials business, which is organized under the laws of France and headquartered in Paris, France.  At pertinent times, Lafarge, together with its subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete, and other building materials at 1,612 production sites in approximately 61 countries, including the United States.  On July 10, 2015, Lafarge merged with its leading competitor, Holcim Ltd., a Zurich, Switzerland-based building materials business.  At the time of the merger, Holcim and Lafarge were the two largest multinational building materials companies in the world.

18.     Defendant Lafarge Syria, S.A. was an indirect subsidiary of Lafarge, organized under the laws of Syria and headquartered in Damascus, Syria.  Lafarge indirectly owned 98.7% of LCS through four subsidiaries.  From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in northern Syria near the Turkish border and between the cities of Manbij and Raqqah, Syria.

19.     Jean Claude Veillard is a citizen and national of France and was Vice President of Security for Lafarge from approximately October 2008 until September 2017.  He was based at Lafarge's headquarters in Paris, France.  Veillard was also a member of Lafarge's Security Committee.

20.     Christian Herrault is a citizen and national of France and was an Executive Vice President of Operations of Lafarge from approximately 2012 to December 2015.  Herrault supervised Lafarge's operating subsidiaries in numerous countries, including Syria.  Herrault was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman

and CEO, Bruno Lafont. Herrault was a member of Lafarge's Security Committee and, beginning on July 4, 2013, served as Chairman of the Board of Directors of LCS.

21.     Bruno Pescheux is a citizen and national of France and was CEO of LCS from approximately 2008 to July 2014. While CEO of LCS, Pescheux was based at LCS's headquarters in Damascus, Syria before relocating to Cairo, Egypt in 2012, and reported directly to Christian Herrault.

22.     Fredric Jolibois is a citizen and national of France who became CEO of LCS in approximately July 2014 and remained in that role until approximately January 2016, and reported directly to Christian Herrault until Herrault left Lafarge S.A.

23.     Guillaume Roux is a citizen of the United States and of France, and was an Executive Vice President of Lafarge until January 2016. Roux was also a member of Lafarge's Security Committee, and a member of LCS's Board of Directors until January 2016 and its Chairman from 2008 until July 4, 2013. Roux was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman of the Board of Directors and CEO, Bruno Lafont.

24.     Bruno Lafont is a citizen and national of France and was Lafarge's Chairman of the Board of Directors and CEO of Lafarge until the completion of the merger with Holcim in 2015. Upon Lafarge's merger, he became Co-Chair of LafargeHolcim's Board of Directors and served there until May 2017. He was based at Lafarge's headquarters in Paris, France.

25.     Firas Tlass is a citizen and national of Syria and was a minority shareholder in LCS until the Syrian government confiscated his shares in LCS in approximately 2012. Tlass was paid by LCS, with Lafarge's knowledge and approval, to provide "security" services to

LCS, which included negotiating with various local armed militants, including ISIS and the ANF. Tlass served as an intermediary between LCS and terrorists.

26.     Amro Taleb is a citizen of Canada and of Syria and a former consultant to LCS who held himself out as a broker capable of sourcing raw materials from ISIS-controlled territories.

27.     Veillard, Herrault, Pescheux, Jolibois, Roux, Lafont, Tlass, and Taleb, among others, acted in concert with, and for the purpose of furthering the criminal objectives of, Lafarge and LCS. In the course of advancing Lafarge's and LCS's interests, they conspired and worked in concert with ANF and ISIS, with the full knowledge of their designation as Foreign Terrorist Organizations ("FTO" or "FTOs"), their terrorist acts, and their purposeful targeting of Americans and others.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(d), and 18 U.S.C. § 2338, as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

29.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b) and (d) and 18 U.S.C. § 2334(a).

30.     Lafarge and LCS are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k).

31.     As explained in greater detail below, Lafarge's and LCS's conduct had a substantial nexus to the United States and to New York, including by virtue of repeated and systematic use of U.S. dollar transactions and banks in New York to pay, conspire with, and aid and abet terrorists. Lafarge and LCS thereby purposefully availed themselves of U.S.

jurisdiction to commit the tortious acts described in the Complaint, which enabled ISIS to carry out terrorist attacks that killed U.S. citizens in Syria, Iraq, and Libya, thereby injuring Plaintiffs.

32.     To carry out their conspiracy, Lafarge and LCS purposefully made U.S.-dollar payments to terrorist intermediaries and others that were wired through New York.  Indeed, Defendants "preferred option" for paying terrorists was to make "bank transfer[s] in USD," which were designed to avoid detection by Defendants' auditors and governmental entities.

33.     By means of example, a lump sum wire transfer of $210,000 from Lafarge's operating account at a financial institution in Paris passed through the Eastern District of New York to intermediary banks in New York City.  The contract pursuant to which that payment was made required Defendants to make ongoing monthly payments of $30,000.

34.     Defendants' executives sent emails confirming that numerous other payments in furtherance of their conspiracy with ISIS were made in U.S. dollars.  International U.S.-dollar banking transfers are cleared through financial institutions that deal in U.S. dollars in New York, known as intermediary banks.

35.     By routinely and purposefully engaging in U.S. dollar-denominated transactions that were processed through New York, Defendants purposefully availed themselves of the benefit of doing business in New York.

36.     In addition, Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their partnership with ISIS.  U.S.-based email service providers are considered more secure than non-U.S.-based providers.

37.     Defendants are also subject to personal jurisdiction given their participation in a conspiracy with ISIS, whose actions were at all relevant times directed at the United States,

including the killing of Americans.

38.   First, Defendants and ISIS were in a conspiracy to provide material support to FTOs in violation of U.S. criminal law, namely, 18 U.S.C. § 2339B.

39.   Second, Defendants participated in that conspiracy by making millions of dollars in payments to ISIS, which allowed ISIS to carry out terrorist attacks and engage in other unlawful acts.

40.   Third, ISIS's terrorist attacks were expressly directed at the United States.  For example, in August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley, and threatened the life of another American journalist, Steven Sotloff, if President Obama did not end military operations in Iraq.  Tellingly, the beheading videos of both Foley and Sotloff (in September 2014) were titled "Message to America" and "A Second Message to America," respectively.  ISIS stated that its killing of Sotloff was specifically in response to U.S. airstrikes targeting it in Iraq.

41.   Likewise, in September 2014, ISIS spokesperson Shaykh Abu Muhammad Al-'Adnani ash-Shami gave a speech entitled "Indeed, Your Lord is Ever Watchful," in which he explicitly spelled out the anti-American objectives of the ISIS movement, stating, for example:

> O Allah, America, France, and their allies transgressed against us. They came with their legions to fight us out of their enmity for your religion. They prevent us from establishing your religion and your hudūd (fixed punishments), and ruling by what you revealed. O Allah, you know our weakness. We have no way to deal with their airplanes. O Allah, you have said what is true, 'So do not weaken and do not grieve, and you will be superior if you are [true]. O Allah, we have believed in you and relied upon you. You are sufficient for us and the best disposer of affairs. O Allah, America and its allies disbelieve in you and associate partners with you.

42.     A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the House Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

43.     The United States has convicted ISIS terrorists based on their targeting of the United States.  For example, on September 2, 2021, former British citizen Alexanda Amon Kotey pleaded guilty in the Eastern District of Virginia to an eight-count indictment consisting of one count of conspiracy to commit hostage taking resulting in death; four counts of hostage taking resulting in the deaths of four Americans (James Foley, Kayla Mueller, Steven Sotloff and Peter Kassig); one count of conspiracy to murder U.S. citizens outside of the United States; one count of conspiracy to provide material support or resources to terrorists resulting in the deaths of U.S., British and Japanese nationals; and one count of conspiracy to provide material support or resources to a designated FTO resulting in the deaths of U.S., British, and Japanese nationals, for his participation in ISIS's hostage-taking and terrorist activities.

44.     On April 14, 2022, a federal jury in the Eastern District of Virginia convicted Kotey's co-conspirator, former British citizen El Shafee Elsheikh, for his participation in the same ISIS scheme.  Witnesses at the trial presented evidence from November 2012 through February 7, 2015 of Elsheikh's participation in torturing the hostages.

45.     ISIS's overt acts targeted the United States and U.S. citizens.  Defendants conspired with ISIS, including towards ISIS's targeting of American citizens.  As a result of the conspiracy between Defendants and ISIS, ISIS's overt acts targeting the United States and U.S. citizens, including Plaintiffs' loved ones, are attributable to Defendants.

46.     Based on conduct that occurred "within the Eastern District of New York and the extraterritorial jurisdiction of the United States," the Department of Justice charged Defendants

with conspiring to provide material support to terrorists. The Department of Justice further charged that "the defendants were brought into and found in the United States, the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce, and the defendants conspired with a national of the United States." Based on these contacts with the United States, Defendants "admit[ted] the Court's jurisdiction over the Defendants and the subject matter of such action . . . ."

## FACTUAL ALLEGATIONS

## I.    ISIS BECOMES THE WORLD'S MOST RUTHLESS TERRORIST GROUP

47.    In March 2011, after anti-government protests associated with the Arab Spring had spread across the region, Syrian police detained and tortured teenage protestors. As mass protests erupted across the country, armed militias arose in the following months, with the goal of overthrowing the Syrian government. Syria quickly descended into a full-scale civil war.

48.    In August 2011, seeing an opportunity among the numerous armed factions battling in Syria, Al-Qaeda in Iraq ("AQI") leader Abu Bakr Al-Baghdadi sent AQI operative Abu Muhammad Al-Julani into northeast Syria to organize the network of militant jihadist cells in Syria into one cohesive group. Al-Julani's Al-Qaeda sub-group in Syria, ANF, wasted no time spreading terror throughout the region. Its first operation was a massive suicide bombing in Damascus, which killed over forty people in December 2011.

49.    On December 11, 2012, the United States amended the FTO and Executive Order (E.O.) 13224 designations for Al-Qaeda to include ANF, under the new aliases: Al-Nusrah Front; Jabhat Al-Nusrah; Jabhet Al-Nusra; The Victory Front; and Al Nusrah Front for the People of the Levant. In its accompanying press release, the Department of State warned that ANF "has sought to portray itself as part of the legitimate Syrian opposition while it is, in fact,

an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes."  To date, ANF remains a designated FTO.

50.     Threatened by ANF's and Al-Julani's increasing power in May 2013, Al-Baghdadi (the Al-Qaeda leader who had originally sent Al-Julani to Syria) declared the formation of *Al-Dawlah Al-Islamiyah fi Al-'Iraq wa Al-Sham* (The Islamic State of Iraq and Syria, "ISIS").  Al-Baghdadi declared that, under ISIS's formation, the Islamic State of Iraq ("ISI") and ANF would merge into a single Sunni Islamist organization.  ISIS's stated goal was to seize control of Iraq and Syria and form a unified religious state.

51.     Al-Julani objected to Al-Baghdadi's declaration, and publicly pledged allegiance to Al-Qaeda leadership.  ANF and ISIS quickly became rivals in the jihadist community, competing for international legitimacy and Syrian territory.  Through brute force, ISIS took the upper hand and rapidly seized Raqqah and other cities and villages across Syria and Iraq.

52.     ISIS controlled these cities using violence and fear, rather than legitimate governance.  Its fighters patrolled the streets with weapons and suicide vests.  To sow fear among the local populations, ISIS shot opponents from behind (including children), beheaded them, lit them on fire, and hung them in public squares.

53.     In Iraq, ISIS murdered approximately five thousand people of the Yazidi ethnic minority, burying men in mass graves, including some while alive, trafficking hundreds of women into sexual slavery, and subjecting pregnant women to forced abortions.

54.     ISIS also kidnapped and murdered journalists and aid workers from countries around the globe.  Their victims were frequently beheaded, sometimes on videos broadcasted online for the world to watch in horror.

55.     It is with this group—and at around this time—that Defendants chose to enter into a multi-faceted set of multi-million dollar financial arrangements with ISIS for their mutual benefit.

56.     Throughout 2014, ISIS took over more and more territory in Iraq and Syria, ultimately controlling forty percent of Iraq and thirty percent of Syria.

57.     Over 40,000 foreign fighters interested in ISIS's extreme jihadist ideology flocked to join its ranks in Iraq and Syria.  They included members of terrorist groups that had fought in civil conflicts in their own countries in the chaos following the Arab Spring.  For example, following Libya's collapse, Libyans with violent Islamist ideologies joined ISIS in Syria, hoping to help Syrians depose their own leader.  By December 2013, Libyans were in the top five foreign nationalities fighting with ISIS in Syria.  Not only did these foreign fighters become well-connected within ISIS's network, but they learned its heinous techniques, including murdering civilians, seizing property and extorting local populations, and building explosives.

58.     On May 14, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of E.O. 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as an alias of Al-Qaida in Iraq.[2]  The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and Al-Sham ("ISIS," which is how the FTO will be referenced herein); The Islamic State of Iraq and Syria; ad-Dawla Al-Islamiyya fi Al-Iraq wa-sh-Sham; Daesh; Dawla Al Islamiya; and Al-Furquan Establishment for Media Production.  ISIS remains a designated FTO to the present.

---

[2] The United States Secretary of State designated AQI as an FTO on October 15, 2004.

59.     To grow as quickly as it did from a small armed group in 2013 to an international terrorist organization with swathes of territory in 2014, ISIS needed money—and a lot of it. Thus, ISIS robbed the resources under its control, including by exploiting manufacturing plants, looting banks, pumping oil and gas to sell on the black market, taxing agricultural products, selling humans as slaves, and demanding passage tolls and protection payments.

60.     Capturing cement plants was an essential part of ISIS's growth plan.  Between its territory in Syria and Iraq, ISIS seized five cement plants, which could produce a total of $583 million in annual revenue.  Cement plants were a particularly appealing target for a number of reasons, including that they generated significant revenue from which ISIS could pilfer; they contained raw materials that ISIS could use to create explosives; and ISIS had distribution networks it used to sell cement.

61.     Of the five cement plants ISIS seized, Lafarge's Cement Plant was by far the largest.  In fact, the production capacity of the Cement Plant was more than twice as much as that of the second largest plant.  And ISIS did not simply capture and rob the Cement Plant.  Rather, before ISIS overran the Cement Plant and seized all the materials Lafarge left behind, Defendants and ISIS had become close business partners, generating millions of dollars in profit for Lafarge, and millions of dollars in funding for ISIS.

## II.     THE SYRIAN CIVIL WAR THREATENS THE CEMENT PLANT, SO LAFARGE AND LCS PARTNER WITH TERRORISTS

62.     In 2007, Lafarge took a major step in its quest to dominate the Middle Eastern cement market.  That year, Lafarge acquired Egyptian cement multinational Orascom Cement in a deal financed with over €7.4 billion in debt.  As part of the deal, Lafarge purchased the Cement Plant, which Orascom had started to build.

63.     Lafarge and LCS completed the construction of the Cement Plant at the significant cost of $680 million.  When the Cement Plant finally opened for business in May 2010, Lafarge's CEO Bruno Lafont toured the facility with reporters and the French Ambassador to Syria.  The plant produced 160 truckloads of cement a day, amounting to half a million dollars' worth of sales every day.

64.     At the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey.  To address this issue, in December 2010, Pescheux (LCS's CEO) requested that then-minority shareholder Tlass, a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail the importation of competing Turkish cement.

65.     Less than a year later, however, the Cement Plant faced a more existential threat: the civil protests in Syria had erupted into a full-fledged civil war.  In response to this crisis, in September 2011, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions.  The United States forbid import of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals.  And in December 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

66.     In 2012, as the civil war continued, ISIS and ANF gained control over large swaths of Syria and committed brutal terrorist acts.  ISIS killed thousands, among them numerous U.S. citizens, including through graphic and well-publicized beheadings.

67.     As expected, the danger of operating in an active warzone, combined with the actions of the European Union, the United Nations, and the United States, prompted a mass

exodus of multinational corporations from Syria.  For example, in December 2011, two of the largest oil companies in the world—Royal Dutch Shell and Total—announced that they were leaving Syria.

68.    Defendants went in a different direction.  Even though armed conflict had spread to the area immediately surrounding the Cement Plant—indeed, LCS employees were being kidnapped and LCS trucks were being hijacked—Lafarge and LCS doubled down on their $680 million investment and joined forces with the terrorists, instead of ending their operations in Syria.  Not only did Lafarge and LCS want to gain protection from the terrorists, but they wanted to remain in Syria so that they would not lose their investment of over a half a billion dollars and would be positioned to sell cement for higher profits without competition from the businesses that had fled the country.

69.    Pescheux (LCS's CEO) described the plan to Herrault (Lafarge's Executive Vice President of Operations) as follows:

> [p]reserving the integrity of our physical assets (avoiding the plant to be looted), keeping our personnel ready for the end of the crisis (knowing the huge investment we have made in terms of recruitment and competency development), staying in the market (to keep our distributors' network and to prevent to let Turkish imports flooding North and East of Syria), making some profit to at least repay the interests of the loan and giving some assurance to the lenders.

70.    Starting in the summer of 2012, Lafarge and LCS forged ahead with their plan to make financial payments to various armed factions to permit the continued operations of the Cement Plant.

71.    On September 23, 2012, Veillard and Tlass met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the Cement Plant.  Tlass recommended

that LCS make payments to each of the armed militias based on the quantity of cement produced or according to monthly fee.

72.     By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF through Tlass. On November 11, 2012, Tlass notified Pescheux that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we hav now conextion with jabhat al nosra [ANF]."

73.     The situation became more critical in 2013.  By March 2013, ISIS, ANF, and other armed groups had taken over the area around Raqqah and both groups quickly established checkpoints at access roads to the Cement Plant.  ISIS and ANF guarded their checkpoints with snipers, rockets, and homemade artillery.

74.     On April 7, 2013, Tlass recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truckload to ensure continued access to the plant.

75.     Several months later, on August 30, 2013, Pescheux reported to Veillard (Lafarge Vice President of Security) and Herrault: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Tlass] to work on it."

76.     Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations.

77.     For example, in a December 10, 2012 email, Veillard wrote: "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited several Norwegian citizens to fight in Syria."

78.     Similarly, in a March 1, 2013 email, LCS's risk manager warned Pescheux that ANF "follow[s] a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign fighters" and had "ties to al-Qaeda, exemplified by participating al-Qaida veterans,

17

mainly from Iraq, and . . . some of their statements are quickly published in the main al-Qaida news outlet."

79.     Likewise, notes from a September 11, 2013 meeting of Lafarge's Security Committee, which Velliard and Herrault received, stated: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US. The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."

80.     Despite this knowledge, Defendants decided to partner with terrorists to protect their investment, enhance profits, and increase market share.

### III.     LAFARGE AND LCS BEGIN MAKING PAYMENTS TO TERRORISTS

81.     Recognizing that ISIS "demand[ed] that a 'tax be paid,'" Lafarge and LCS proceeded to make millions of dollars in payments to terrorists.  These payments came primarily through four mechanisms: (1) payments per truckload; (2) payments based on cement sold; (3) donations; and (4) fixed monthly security payments.

### a.     Lafarge And LCS Pay Terrorists $150 Per Truck To Pass Through Checkpoints

82.     On August 26, 2013, Pescheux emailed Tlass a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib," but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli, [t]here are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and

also potential problems at Sokhna."  Pescheux summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."

83.     Tlass responded "no probleme let me work on it today . . . i cal u tomorow to breef you."  The next day Tlass emailed Pescheux, "We Negotiate with (DAWLET AL IRAQ WAL SHAM) AL ISLAMIA & AL NUSRA I got a News that the situation In the Plant is Very Good."

84.     The situation was "Very Good" because, by October, Lafarge began paying safe-passage money directly to ANF and ISIS to ensure they would permit trucks to pass.  In early September 2013, Pescheux asked Tlass for updates regarding truck passage to the east of the plant, and Tlass responded "better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them . . ." and on October 14, 2013, an LCS risk manager reported that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant. Each cement truck has to pay 150$."

### b.     LCS Pays Terrorists Based On Cement Sold

85.     As part of a separate agreement, LCS paid ISIS based on the amount of cement that it sold.  This agreement, dated November 6, 2013 and on ISIS letterhead, was between ISIS and LCS.  The agreement provided that ISIS would assess trucks 400 Syrian pounds[3] for each transported ton of cement and, in exchange, ISIS would ensure the safety and free access of the trucks to the cement plant.

86.     Additionally, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees to "pass through after the required work.  This is

---

[3] At this time, the exchange rate of Syrian pounds to U.S. dollars was approximately 112 to 1.

after they have fulfilled their dues to us."

### c.   LCS Makes "Donations" To Terrorists

87.    LCS also made fixed monthly "donation" payments through Tlass to ISIS, ANF, and other armed groups that controlled the area surrounding the Cement Plant.

88.    These payments began as early as July 2012.  By February 2013, at Pescheux's request, Tlass had begun periodically providing lists identifying the armed groups to which he was making payments on LCS's behalf and the amounts he was paying to the groups each month.

89.    Beginning in February 2013 and continuing through at least July 31, 2013, Tlass advised Pescheux that he was making payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," which was a reference to ANF.

90.    In a July 2, 2013 email with the subject line "Donations," Pescheux calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds.

91.    In an August 5, 2013 email with the subject line "Update on donations," Pescheux wrote to Herrault that "some elements on the donations were are paying to [Tlass] and that he is supposed to channel to the various beneficiaries.  As discussed in Dubai end of May and as reminded in my recent mail to you and [Roux], these donations are distinct from the monthly remuneration of our partner."

### d.   LCS Pays Fixed Monthly Security Payments to Terrorists

92.    In November 2013, Lafarge and LCS executives decided that Tlass should make fixed monthly security payments to ISIS as well.  In a November 29, 2013 email, Lafarge and LCS executives exchanged a list of "donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries."  The email contained a "List valid from November 1,

2013," which included a five million Syrian pound monthly payment for "Daesh (ISIS)."  The list showed that the monthly donation payments to all armed groups now totaled 24 million Syrian pounds.

93.     On February 4, 2014, Pescheux directed Tlass to limit the monthly payments to armed groups to 20 million Syrian pounds, including limiting assessments on sales to 200 Syrian pounds per ton.  Tlass responded that his representatives were meeting to discuss the payments with ISIS in Raqqah and with ANF in Aleppo.

94.     Following those meetings, Tlass advised LCS to increase payments to the terrorists. As Tlass explained in a March 31, 2014 email pointing out the extent of LCS's investment and the scope of its current profit:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? The second option is to endure bouts of anxiety and a sense of helplessness for a few moments (believe me, after every Skype with [PYD representative] or with Daich's Amir Minbej or Raga my blood pressure rises to dangerous levels). Yet, I come back and say the loss will be greater for everyone. Even though I'm not completely comfortable in the relationship with Lafarge, I pressure myself to continue and I say tomorrow will be better for all of us, and we have to withstand two or three more years of unsettling circumstance. As long as we are selling and are able to overcome the obstacles, we should continue.

> Remember, we are dealing with militias that have a different thinking style than we do, and we are also dealing with the crazies on the other side

> I repeat, their logic is not like ours, but on my part, I have come to know all their keys and I am dealing with issues calmly, opening not shutting doors. I know I am jeopardizing my health, but prefer continuing with all the uncertainty which is better than stopping and losing everything. We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection. Other factories are paying for protection just to exist, without making the profits we are. One day, I will tell you stories about the requests made by Daich or PYD,[4] carrying their rifles feeling like they own the world. At times I feel like a clown entertaining children!

---

[4] "Daich" and "Daesh" refer to ISIS. "PYD" refers to the Democratic Union Party in Syria, a Kurdish armed faction.

They are all unsatisfied about us if we do what they want in this case we have to pay about 300milion SYP monthly.

95.     LCS's monthly payments to terrorists allowed it to continue producing and selling cement at the Cement Plant into 2014, earning millions of dollars in profits.

96.     On May 8, 2014, Tlass emailed LCS executives advising that LCS's operations were not impeded by local armed groups, stating "(Daesh — PYD — Al Nusra — Abu Issa[5] all we have good relations recently . . . ."  LCS maintained "good relations" with these brutal terrorists by paying them ever increasing amounts.

97.     On September 15, 2014, LCS executives exchanged an email with Tlass's initials as the subject line and containing two attachments.  The first attachment was a document named "List of donations last version.pdf," which listed a monthly payment of 10 million Syrian Pounds to "Daesh" [ISIS] as of May 1, 2014.  In a second attachment to the email, titled "Evolution of the security donations 2012-2013-2014," Pescheux listed, on top of the total amount of LCS's monthly "donation" payments, an additional "10 MSYP paid on April 23 to ISIS to unlock the West road."

## IV.     LCS PURCHASES MATERIALS FROM ISIS-CONTROLLED SUPPLIERS

98.     In addition to making regular payments to terrorists, LCS purchased materials from ISIS-controlled suppliers as part of its conspiracy with ISIS.

99.     As ISIS expanded its control over northern Syria, including quarries of materials LCS needed to continue to produce cement, LCS agreed to purchase raw materials from ISIS-controlled enterprises who paid ISIS based on the amount of their sales to LCS.

100.     On November 6, 2013, LCS and ISIS entered into a written agreement on ISIS

---

[5] "Abu Issa" refers to Liwa' Thuwar Al-Raqqa, an armed militia participating in the Syrian civil war.

letterhead providing that LCS would purchase pozzolana—a type of volcanic ash used to make blended cement—from ISIS for 1,300 Syrian pounds per ton. Under the agreement, ISIS would allow LCS's suppliers who mined and transported the pozzolana from ISIS-controlled quarries near Raqqah to retain some of LCS's payment for the raw material as profit.

101.    Also in late 2013, a Canadian-Syrian named Amro Taleb, with whom LCS had previously worked on environmental licensing, explained to LCS's board that he wished to discuss "[t]he security issue of Lafarge . . . in Syria. I build up strong relationships with civilian and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of . . . Lafarge . . . ." Taleb repeatedly and explicitly identified ISIS as the seller of the raw materials that he brokered.

102.    For example, in a September 24, 2013 email about a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," Taleb informed LCS executives that LCS had already agreed to accept pozzolana sold by ISIS and stated "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state very senstive about this issue ."

103.    In a separate email chain a few days later, Pescheux disputed the intermediary's assertion that LCS had already agreed to purchase, but nevertheless responded that "[a]fter my mail, our Purchasing team has contacted the contractor and the price is confirmed. We will place an order early next week for a limited quantity (probably around 5,000 tons) as we need to see how it will work. If it is OK we will increase the quantity."

104.    As another example, in a September 28, 2013 email, Taleb declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS and Soon for Kurdish. You ll get letter for that . So far im on LCS side but please Im asking kindly to have my Fees ."

105.    Lafarge and LCS executives understood that transacting with ISIS in this manner was illegal under U.S. and Syrian law.

106.    In a December 7, 2013 email, Pescheux informed Herrault that the following activities likely violated Syrian government regulations: "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities."  Nonetheless, Pescheux determined that these activities were "needed for business continuity."

107.    Thus, with Defendants' blessing, Tlass and Taleb negotiated deals in which LCS purchased critical raw materials necessary to the operation of the Cement Plant, including coal, fuel, and pozzolana, from ISIS-controlled sources.

108.    In early 2014, LCS agreed to purchase massive amounts of material from ISIS-controlled suppliers, including 100,000 tons of pozzolana at 1,650 Syrian pounds per ton; another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton; 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton; another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton; 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton; and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal.  Pescheux reported these planned transactions to Lafarge executives and, on February 16, 2014, wrote to Herrault that the "situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil."

## V.    LAFARGE AND LCS GO TO GREAT LENGTHS TO CONCEAL THEIR PARTNERSHIP WITH ISIS

109.    Fully aware that paying millions of dollars to terrorists was a grave violation of law, Defendants took numerous steps to conceal their partnership with ISIS.

110.    First, Lafarge and LCS executives ensured that any documents regarding these terrorist payments did not reference the word "Lafarge."  For example, on September 16, 2013, Pescheux instructed Tlass that "the name of Lafarge should never appear for obvious reasons in any documents of this nature," referring to checkpoint passes from ISIS.  He continued, "[p]lease use the words Cement Plant if you need but never the one of Lafarge."

111.    Similarly, on September 4, 2014, Jolibois, LCS's incoming CEO, complained to Tlass about documents that specifically referred to "Lafarge" by name: "The name Lafarge and the fact that Lafarge 'paid' appears on the laissez-passer passes issued by ISIS. This is completely against our agreement with ISIS. It is clear that these passes were issued for the distributors, not for Lafarge. Could you look into solving this issue?"  Tlass agreed that "we have to change the name or have an alias that all the laissez-passer passes use as well as the distributors because ISIS cannot let all the cements get through, just ours."

112.    Second, and relatedly, Lafarge and LCS had intermediaries—rather than Lafarge or LCS executives—engage directly with the terrorists.  As one of LCS's security consultants put it, "it was especially important that the relationship would be handled by [Tlass's] middlemen, since an exposure of this sort would have been compromising for LCS."  The LSC consultant concedes: "But via [Tlass], we did in fact contribute to the economy of ISIS."

113.    Not only did Lafarge and LCS prefer to work through intermediaries, but they took steps to conceal the payments they made to them.  In fact, Lafarge and LCS executives directed Tlass and Taleb to submit invoices that did not reference their own names or the names of their companies, and that instead referenced payments for donations, unspecified professional fees, or personal expenses.

114.    For example, on December 13, 2012, Pescheux emailed Tlass and directed that

any future invoice should not be on Tlass's company's letterhead, but instead should be on that of a company outside of Syria:

> I would like to remind you that we still need to receive correct invoices from [Tlass's company] for the months of September and October. We discussed this issue many times and you told me it is not a problem so please send them as soon as possible. For the November payment, we cannot take the documents you prepared with [the Intermediary 1 Company] in the title.
>
> As I told you, you need to send us the references of a [new] company located outside of Syria.
>
> This will avoid problems with the Syrian authorities and with our Auditors.
>
> We absolutely need to move forward before the end of the year to be able to present clean justifications for the [] closing of our accounts.

115.   In connection with their efforts to conceal payments and falsify records, LCS executives made clear that they preferred to transact through U.S. dollar bank transfers.  On June 30, 2013, Pescheux emailed Tlass, "[W]e cannot continue the way we are settling the turnover invoices.  Our preferred option would be the one we told you last October:  a bank transfer in USD to the account of a duly registered company," as opposed to a direct payment to Tlass in cash, which would appear more suspicious.   Thus, Defendants instructed their terrorist intermediary to create a new corporate entity so that Defendants could surreptitiously transact in U.S. dollars, transactions that Defendants knew would transfer, clear, and be processed through New York.

116.   Similarly, a February 2, 2014 "External Support Agreement" between LCS and a new company created by Tlass confirmed that payments should be made in U.S. dollars.  LCS agreed to pay the new company "a monthly remuneration of 75.000USD."

117.   Lafarge and LCS executives made similar efforts to disguise the nature of payments to Taleb, including by directing that payments reference only environmental consulting

and be made using U.S. dollars.  For example, on January 12, 2014, Pescheux emailed Taleb:

> Prepare an invoice from [Taleb's company], send to me by email and bring the original next week, for an amount of 4,402 USD just with "Environmental consultancy services for the months of October, November and December 2013" as a justification.
>
> For your understanding hereunder are the details of the calculation:
>
> - pozzolana: 18,270 tons equivalent to 914 USD (he has delivered the first order of 15,000 tons and 3,270 tons out of the order of 100,000 tons)
>
> - HFo: 3,488 tons equivalent to 3,488 USD (he has not yet completed the first order of 4,000 tons, it remains 512 tons to deliver and he has not started the 12.000 tons of standard quality)
>
> Total:4,402 USD

118.    A few weeks later, on February 5, 2014, Pescheux again required that payments reference only environmental consulting and be made in U.S. dollars:

> If you want to have a chance to get paid for pozzolana and HFO, you have to prepare an invoice following my instructions and not your imagination.
>
> So you have to issue an invoice mentioning only:
>
> Consultancy services performed up to January 31,2014 for a total amount of 4,836 USD
>
> This amount has been calculated as follows (up to 31-1-2014) HFO: 3,488 tons out of the order of 4,000tons= 3,488 USD
>
> Pozzolana: 15,000t out of the order of 15,000t (completed) plus 11,964t from the order of 100,000t i.e total 26,964/20= 1348 USD

119.    On February 13, 2014, Taleb sent Pescheux the invoice "[b]ase[d] on your instruction." The invoice, payable to the intermediary's company, purported to be for "[c]onsultancy services."

120.    International financial transactions denominated in U.S. dollars, unlike transactions denominated in Syrian pounds, are cleared through U.S.-based financial institutions located in New York.

121.   In addition, as another way to conceal their partnership with ISIS, Lafarge and LCS executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to coordinate and carry out elements of their partnership with ISIS.

122.   For instance, on September 8, 2014, in connection with a discussion about documents received from ISIS, Jolibois wrote to Veillard, "Thank you for sharing this information with [Herrault], I don't want to write to him about this topic at his professional address (as recommended by [in-house counsel])."   Thus, LCS's own legal counsel had instructed LCS's CEO not to create a Lafarge business record concerning the company's illegal terrorist financing.

## VI.   LAFARGE AND LCS NEGOTIATE A LONG-TERM REVENUE AGREEMENT WITH ISIS AS THEIR BUSINESS TIES DEEPEN

123.   In 2014, Lafarge and LCS executives saw an opportunity to capitalize further on their business relationship with ISIS.   The opportunity was mutually beneficial:  if ISIS could block or tax cement imported from Turkey into Syria, LCS's revenues would go up, and so too would ISIS's share of the revenues.   They negotiated a long-term revenue sharing and market control agreement.

124.   Pescheux proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement."   Such a toll would allow ISIS to gain revenue while simultaneously "reduc[ing] the attractiveness of Turkish cement.  It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."

125.   Lafarge and LCS executives repeatedly expressed their commitment to revenue sharing with ISIS in the hope that it would incentivize the terrorist group to act in LCS's economic interest.  According to a July 23, 2014 email that Herrault (Lafarge's Executive Vice

President of Operations) wrote to Pescheux and Jolibois, LCS's outgoing and incoming CEOs, LCS's profit should be thought of as a "cake" that could be shared with ISIS:

> We have to maintain the principle that we are ready to share the "cake," if there is a "cake." To me, the "cake" is anything that is a "profit", after the amortization and before financial expenses.
>
> Therefore, a tax by the ton is the only one that would make sense in this context.
>
> If we get a fixed tax, unless it's just a symbolic one, it would not make sense because they won't have a vested interest to have the plant run well.

126.   Negotiations continued throughout the summer and into fall 2014.  In August 2014, Tlass emailed Jolibois, LCS's new CEO, to inform him that ISIS wanted a monthly fee in addition to an assessment on each ton of cement sold:

> Negotiations with ISIS are complex and not easy at all. In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.

127.   Jolibois responded: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price."  In response, Tlass said that ISIS was prepared to stop importation of Turkish cement upon consummation of a revenue sharing agreement.

128.   On August 5, 2014, Tlass sent Jolibois a draft revenue-sharing agreement between LCS and ISIS.  The next day, Jolibois confirmed Lafarge's and LCS's agreement to a taxation rate of ten percent, in return for the free movement of LCS employees, customers and suppliers, as well as ISIS's agreement to stop importation of Turkish cement in areas under its control, for the following six months:

- As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:

- ISIS will receive the payment of 750SP/ton, by customers, every two weeks

- ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees

- ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.

- The agreement is valid until February 5th, 2015.

I hope the agreement to be signed today, and sales to restart tomorrow.

ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.

129.    ISIS, however, continued to demand more concessions, with which Lafarge and LCS attempted to comply, calculating their "operational margin" with the increased payment ISIS wanted.  The business negotiations between Defendants and ISIS became more complicated on August 15, 2014, when the United Nations Security Council issued a resolution condemning ISIS, ANF, and Al-Qaeda, and calling on U.N. members to prohibit all financial and trade relations with the groups.  On August 18, 2014, the United States Department of State added ISIS member Mohamed Al-Adnani and ANF member Said Arif to its list of Specially Designated Global Terrorists.

130.    Defendants' executives were closely following these developments.  On August 18, 2014, Veillard emailed Herrault and Jolibois with the subject heading "terrorist watch list" and wrote that the United States had designated ISIS's Al-Adnani and ANF's Arif to the list of Specially Designated Global Terrorists.

131.    On August 7, 2014, the United States began airstrikes against ISIS in Iraq, and in September 2014, began strikes against ISIS in Syria.

132.    On August 19, 2014, ISIS executed American journalist James Foley and released a video of the horrific act, entitled "Message to America," online.  Advocates for Foley had approached LCS in 2012 to ask for LCS's assistance in negotiating for Foley's freedom when he was taken hostage, but LCS did not help.  Two weeks later, on September 2, 2014, ISIS released a video of the beheading of Steven Sotloff, another American journalist, titled "A Second Message to America."

133.    Notwithstanding ISIS's heinous acts, including the televised murder of Americans, and the international community's universal condemnation of the terrorist group, LCS ironed out a final revenue-sharing agreement with ISIS on or about August 20, 2014—after consulting with Lafarge's in-house counsel.

134.    The Lafarge executives involved in the negotiations with ISIS updated Lafarge's Executive Committee during a meeting on August 27, 2014.  The notes from the meeting reflect that Herrault highlighted ISIS's agreement to impose costs on imported Turkish cement that were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports."

135.    The notes further reflect that Lafont, Lafarge's CEO, responded that "we have to make sure that what we do is risk free (also vis-à-vis the U.S.)."  Lafarge's Chairman and CEO knew that Defendants' partnership with ISIS was illegal under U.S. law and would have consequences in the United States.  In response, Herrault replied that "the best protection is to keep the plant in operation, sales have resumed, we are maintaining contact with everyone."

136.    Lafarge had now solidified its formal business partnership with ISIS.  In exchange for sharing a slice of LCS's "cake" (*i.e.*, profits), ISIS would block cheaper imported cement to increase LCS's sales.  Defendants stood to benefit enormously from this arrangement, which

incentivized ISIS to act in LCS's economic interest, and had Defendants directly financing ISIS's metastasizing terrorist enterprise.

## VII.   ISIS SEIZES THE CEMENT PLANT AND FORCES LCS TO EVACUATE

137.    As it turns out, terrorists are not trustworthy business partners.

138.    On September 10, 2014, President Obama outlined a strategy for the United States to lead an international coalition to "degrade and ultimately destroy" ISIS through direct military action.  President Obama described ISIS as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."

139.    In the following days, ISIS advanced on the Cement Plant with an eye towards complete control of the region.  Even in the face of this grave threat from ISIS, Lafarge and LCS executives wanted to continue their operations.  Jolibois argued strenuously against shutting down the Cement Plant, saying that if LCS suspended operations "for the next few months until after the completion of the merger [with Holcim] we will surely be watched closely when we seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years."

140.    Likewise, on September 12, 2014, Veillard sent an email to Herrault saying, "I think it's imperative to maintain the plant in working order and to be able to restart quickly." Veillard went on to say, "[i]t seems to me that this option is totally doable, if the strikes of the coalition quickly weaken the jihadist forces.  The plant will no longer be an objective for them."

141.    The Lafarge and LCS executives' desire to remain in the area despite ISIS's control, coalition airstrikes, and danger to their employees meant that they did not implement a safe evacuation plan to shut down the plant machinery and keep it from still being operational in terrorists' hands, or to safely evacuate local staff.  When ISIS informed employees early in the morning of September 18, 2014, that it intended to advance on the plant, Jolibois ordered the

remaining team to "prepare mattresses, food, water, sugar" and shelter in the plant's electrical tunnels. There were no cars at the plant with which the employees could evacuate. The employees who remained to oversee the plant's shutdown had to hitch rides with the fleeing canteen vendors and on local buses. ISIS kidnapped four employees as it swept into the plant.

142. In the chaotic departure, LCS employees were able to begin shutdown procedures but left the plant entirely operational. All start-up technology and hard drives were left in place, and one diesel generator was still running as the machinery cooled when they left. ISIS completed its seizure of the Cement Plant on September 19, 2014, and promptly released propaganda videos showing its militants at the Cement Plant.

143. In the Cement Plant, ISIS secured precisely what it wanted. ISIS seized the cement that LCS had produced in furtherance of the conspiracy, and ISIS ultimately sold that cement for approximately $3.21 million. In addition, ISIS seized the raw materials at the Cement Plant, including hydrazine, a chemical that ISIS could use to produce explosives and commit terrorist attacks.

## VIII. AFTER EVACUATING THE CEMENT PLANT, LAFARGE AND LCS ATTEMPT TO CONCEAL THEIR PARTNERSHIP WITH ISIS

144. After its employees fled the Cement Plant in fear for their lives, and as the international community stepped up its multi-front action against ISIS, Defendants took further steps to conceal their business relationship with ISIS. They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that Tlass's relationship with LCS had been terminated before he conducted negotiations with ISIS in August and September 2014.

145. Specifically, on September 29, 2014, Tlass informed Herrault and Jolibois that, in response to their prior requests, Tlass had opened a bank account in Dubai in the name of a new

company that was not publicly linked to Tlass ("Tlass NewCo").

146.    On October 9, 2014, Jolibois sent an internal email to Pescheux and Lafarge's in-house counsel with the subject "New contract for [Tlass]" and saying that LCS owed Tlass "Monthly fees 2*75kUSD for services in July and August" plus "August sales tax to PYD, already paid by [Tlass] to PYD : 10.5 M SYP = 60kUSD)" totaling "210kUSD."  Jolibois further wrote that the in-house lawyer "would like to terminate the previous contract [with Tlass] on the date of 18th August to show evidence of company reaction to UN resolution, and to get a new contract to start from September 1st, 2014."  In a subsequent email on October 14, Herrault clarified Lafarge would not pay Tlass without a new backdated contract.

147.    Jolibois then sent an email to Tlass with the subject line "Agreement for Regional Security Consulting Services," which attached copies of (1) the new consulting agreement between a holding company created by LCS ("LCS NewCo") and Tlass NewCo, and (2) the backdated Termination Agreement between LCS and Tlass NewCo.

148.    In his cover email, Jolibois explained that the new consulting agreement was "written in such a way as to" take "into account the compensation for termination of the previous contract (210k USD for 202k USD which are actually due)."  A $210,000 lump sum payment compensated ISIS intermediary Tlass for work he had already performed negotiating an agreement with ISIS, and to reimburse him for making fixed monthly "donation" payments to armed groups, including ISIS.

149.    In addition to the lump sum payment, the new consulting agreement required the Defendants to make monthly payments of $30,000 to Tlass on a going-forward basis.

150.    The Termination Agreement was backdated to August 18, 2014, the day LCS employees fled the Cement Plant.  The metadata of the backdated Termination Agreement

indicates that the document was not drafted by Lafarge's in-house lawyer until October 3, 2014, two weeks after LCS had evacuated.

151.    On October 23, 2014, after the parties signed the new consulting agreement and the backdated Termination Agreement, Tlass sent an invoice for $210,000.  Lafarge paid the $210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to Tlass NewCo's account at a financial institution in Dubai.

152.    Lafarge's selection of transactions routed through New York intermediary banks was neither random nor fortuitous, but reflected Lafarge's "preferred option" to transact in U.S. dollars in an effort to stymie its Europe-based auditors and avoid detection of its terrorist financing.

### IX.    WITH ITS DEEP POCKETS, ISIS CONTINUES TO WREAK HAVOC

153.    Flush with cash from its dealings with Lafarge—which included approximately $5.92 million in payments and $3.21 million in seized cement—ISIS continued to commit terrorist attacks.

154.    Improvised explosive devices ("IEDs") were the most important weapon in ISIS's arsenal.  According to Mark Wilkinson of the United Nations Mine Action Service, ISIS's IED production included mortar bombs, air-dropped munitions, suicide belts, missile enhancements, launchers, and entire vehicles that were either remote, self-, or victim-activated, amounting to "a level, scale, and quality of arms manufacturing . . . equivalent to conventional arms manufacturers."

155.    In Manbij, the closest city to the Cement Plant, ISIS left thousands of tiny explosive devices "in doorways and windows, under mattresses and piles of shoes, in

refrigerators and bags of clothes, and in television sets and kitchen sink taps."  The bombs killed

and maimed hundreds, including children and refugees trying to return home.

156.     ISIS deployed IEDs both to kill the U.S.-led coalition forces and to kill, maim,

and terrify civilians and sow distrust among the population, in order to displace, influence, and

intimidate local and foreign governments.

157.     After gaining experience by joining ISIS's takeover and exploitation of major

regions of Iraq and Syria, many of the tens of thousands of ISIS-trained foreign fighters returned

to their home countries during this time.  They planned to establish "provinces" of ISIS that

would stretch far beyond Iraq and Syria.

158.     One of the first provinces was in Libya, where a core cadre of three hundred ISIS

fighters returned in 2014.  According to U.S. intelligence officials, ISIS leadership in Iraq and

Syria formulated a plan to expand ISIS to Libya in 2014. To carry out this plan, ISIS leadership

sent a senior Iraqi commander, Wissam Najm Abd Zayd Al-Zubaydi, to Libya to establish large-

scale terrorist operations there.  ISIS leadership also provided millions of dollars to Libya to

finance the group's operation and expansion in 2014-15.

159.     Following a Syrian and Iraqi delegation's visit in October 2014, Libyan ISIS

fighters pledged formal allegiance to ISIS and Abu Bakr Al-Baghdadi, the leader of ISIS in Syria

and Iraq.  On November 13, 2014, Al-Baghdadi publicly acknowledged ISIS's expansion to

Libya and five other provinces.  By mid-December, ISIS in Libya had a full social media

presence that conformed to the organization's graphics and messaging standards.

160.     In December 2014, ISIS leadership told the ISIS leaders in Libya to stop sending

fighters to Iraq and Syria, and to focus on committing attacks within Libya instead.  The Libyan

members of ISIS heeded this directive.   The following month, ISIS terrorists attacked the

Corinthia Hotel, a five-star hotel in the capital city of Tripoli that hosted diplomats, business leaders, and foreigners, including many Americans.  ISIS killed ten people in the attack, among them one American, David Berry.  ISIS's social media platforms subsequently heavily promoted its Libyan province online, channeling support to its operatives there.

161.   In addition to the attack on the Corinthia, ISIS members committed attacks around the world.  For example, on November 12, 2015, ISIS detonated two bombs in Lebanon, which killed 43 people. And the next day, November 13, 2015, ISIS suicide bombers and operatives created a day of horror in Paris, killing 130 people in multiple attacks at a soccer match, cafes, and a music concert.

162.   As the United States slowly fought back ISIS in Syria and Iraq from 2014 onward, ISIS terrorized the oncoming forces at every step.  Its primary weapons were IEDs planted in buildings, on roadways, and in vehicles.  Individuals specially trained in IED disposal risked their lives daily to defuse IEDs, saving the lives of their fellows.  ISIS bombs killed many of these IED disposal experts, including Chief Petty Officer Jason Finan and Senior Petty Officer Scott Cooper Dayton (see below).  Had ISIS not developed the IED-making expertise and violent capacity it built in 2013-14, based in part on the resources Defendants gave it, it would not have been able to deploy the number of IEDs and commit other attacks that killed American servicemembers.

163.   ISIS was not dislodged from Iraq until October 2017.  It was finally pushed out of all the territory it controlled in Syria in March 2019.  Notwithstanding that, individuals continue to pledge adherence to the terrorist organization to this day, and limited hostilities continue to this day.

## X.   LAFARGEHOLCIM DISCLOSES THAT LAFARGE AND LCS TRANSACTED WITH TERRORISTS

164.    In July 2015, after over a year of negotiations, Holcim completed its merger with Lafarge, which resulted in the combination of the two largest building materials companies in the world.  Lafarge executives who had been aware of Lafarge's payments to ISIS remained in leadership positions in the newly formed company, LafargeHolcim.

165.    On February 19, 2016, a website run by an opposition group to the Syrian regime reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS.  The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

166.    On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging that Lafarge and LCS were in business with terrorists:  as "terrorist groups designated by the US and the EU were expanding into the area" of the Cement Plant, LCS made "payments" to intermediaries to "avoid direct contact with these armed groups."  LafargeHolcim admitted that "LCS management kept Lafarge SA well-informed of developments."

## XI.   LAFARGE AND LCS PLEAD GUILTY TO CONSPIRING TO PROVIDE MATERIAL SUPPORT TO TERRORISTS

167.    On October 18, 2022, the Department of Justice announced that Lafarge and LCS pleaded guilty to a one-count criminal information in the Eastern District of New York charging them with conspiring to provide material support to ISIS and ANF in violation of 18 U.S.C. § 2339(B)(a)(1).  It was the first time the Department of Justice had ever brought such charges against a company.

168.    U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial penalties, including criminal fines and forfeiture, totaling $777.78

million.

169.    In announcing the plea, Deputy Attorney General Lisa O. Monaco said, "The defendants partnered with ISIS, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

170.    Assistant Attorney General Matthew G. Olsen of the Justice Department's National Security Division said: "The defendants routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations—ISIS and al-Nusrah Front in Syria—at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."  He continued: "There is simply no justification for a multi-national corporation authorizing payments to designated terrorist organizations."

## XII.    ACTS OF INTERNATIONAL TERRORISM THAT RESULTED IN THE DEATHS OF PLAINTIFFS' FAMILY MEMBERS

### The Finan Family

171.    Chief Petty Officer Jason Finan was a member of the Navy's Explosive Ordnance Disposal Mobile Unit 3, and domiciled in California.  He was killed by an ISIS-planted IED on October 20, 2016.

172.    Chief Petty Officer Finan was killed while he was attached to an elite SEAL unit that was assisting Iraqi forces with training and with the re-capture of the Iraqi city of Mosul when his vehicle hit the IED.

173.    The device had been planted by ISIS members to explode in an attack that was committed in furtherance of ISIS's campaign of terrorism targeting American service members.

174.    Plaintiff Chariss Finan is a citizen of the United States and domiciled in the state of California.  She is the widow of Chief Petty Officer Finan.

175. Plaintiff Gloria Finan-Bacon is a citizen of the United States and domiciled in the state of California. She is the mother of Chief Petty Officer Finan.

176. Plaintiff Shawn Bacon is a citizen of the United States and domiciled in the state of California. He is the stepfather of Chief Petty Officer Finan. Plaintiff Bacon cohabited with Chief Petty Officer Finan and raised him since he was a young child. Shawn Bacon and Gloria Finan-Bacon remain married.

177. As a result of the attack, and the death of Chief Petty Officer Finan, Plaintiffs Chariss Finan, Gloria Finan-Bacon, and Shawn Bacon have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice, and counsel.

**The Dayton Family**

178. Senior Petty Officer Scott Cooper Dayton was a member of the Navy's Explosive Ordnance Disposal Mobile Unit 2, and domiciled in Virginia. He was killed by an ISIS-planted IED in Ayn Issa, Syria, on November 24, 2016.

179. Senior Petty Officer Dayton was killed while he was serving in Operation Inherent Resolve, an American mission to thwart ISIS terrorist attacks planned in Raqqa.

180. The device had been planted by ISIS members to explode in an attack that was committed in furtherance of ISIS's campaign of terrorism targeting American service members.

181. Plaintiff Kristin Dayton is a citizen of the United States and domiciled in the state of Virginia. She is the widow of Senior Petty Officer Dayton.

182. Plaintiff Hailey Dayton is a citizen of the United States and domiciled in the state of Virginia. She is the daughter of Senior Petty Officer Dayton.

183.   Plaintiff C.D. is a citizen of the United States and domiciled in the state of Virginia.  He is the minor son of Senior Petty Officer Dayton.

184.   As a result of the attack, and the death of Senior Petty Officer Dayton, Plaintiffs Kristin Dayton, Hailey Dayton, and C.D. have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, comfort, advice, and counsel.

**The Berry Family**

185.   Former United States Marine David Berry was a twelve-year combat veteran domiciled in Virginia.  He was killed by an ISIS attack on the Corinthia Hotel, a prominent hotel known to host American and European visitors in Tripoli, Libya, on January 27, 2015.  The attack also killed nine other individuals.

186.   In January 2015, Berry was in Libya working for a security and logistics company.

187.   ISIS members in Libya who had pledged allegiance to ISIS leader Abu Bakr Al-Baghdadi attacked the hotel with gunfire and detonated an explosive device that killed hotel guests and staff as they fled.

188.   Plaintiff Elizabeth Berry is a citizen of the United States and domiciled in the state of Arizona.  She is the widow of David Berry.

189.   As a result of the attack, and the death of David Berry, Plaintiff Elizabeth Berry has experienced severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice, and counsel.

### COUNT ONE: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)

### (JASTA, Aiding and Abetting Liability)

190.   Plaintiffs incorporate their allegations above.

191.    Defendants pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

192.    The United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

193.    The United States has designated ANF as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2012.

194.    ISIS and ANF committed acts that were violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, and that would be a criminal violation if committed within the jurisdiction of the United States or of any State; including the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, and financing terrorism.  ISIS's and ANF's acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.  Defendants, ISIS, and ANF structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A.  Defendants knew that their substantial assistance and material support would be used by FTOs in the preparation for, or in carrying out, the above acts.

195.    ISIS's and ANF's acts appeared to be intended to intimidate or coerce civilian populations of Syria, Iraq, Libya, and the United States, among others, to influence the policy of the Syrian, Iraqi, Libyan, and other governments by intimidation or coercion, and to affect the

conduct of a government by mass destruction, assassination, or kidnapping.

196.    ISIS's and ANF's attacks occurred primarily outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they are accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

197.    Defendants aided and abetted ISIS's and ANF's acts of international terrorism by knowingly providing substantial assistance, including by making cash and covert payments through foreign shell companies and intermediaries to, purchasing raw material from, and making anti-competitive agreements with, the FTOs, and by failing to safely shut down and evacuate the Cement Plant, thereby placing tons of valuable cement and raw materials in the hands of ISIS and ANF.  Defendants knew that this material support was paid to FTOs and would be used to commit acts of international terrorism.

198.    Defendants provided substantial support to ISIS and ANF, knowing that the reasonable and foreseeable risk—and occurrence in fact—was that the FTOs would in turn perform numerous wrongful acts including the murder of thousands of civilians, among them U.S. citizens and relatives of Plaintiffs.  Defendants were generally and specifically aware of FTOs' tortious, terrorist scheme, and their role in it.  Defendants were generally and specifically aware that their actions would put further resources into FTOs' hands to commit further terrorist acts.  Defendants therefore knowingly and substantially aided and abetted the FTOs, including ISIS, in committing the acts of international terrorism that injured Plaintiffs.

199.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors, or heirs

of U.S. nationals who suffered such injuries; or both.

200.    As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT TWO: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)**

**(JASTA, Conspiracy Liability)**

201.    Plaintiffs incorporate their allegations above.

202.    Defendants pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

203.    The United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

204.    The United States has designated ANF as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2012.

205.    Defendants conspired by, in part, making an agreement with FTOs to, among other activities and goals, provide material support for those organizations in violation of 18 U.S.C. § 2339B.  Defendants, ISIS, and ANF structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A.  These FTOs foreseeably attacked civilians, including U.S. civilians, throughout the conspiracy, with Defendants' knowledge.  A foreseeable outcome of that conspiracy was the terrorist acts that caused Plaintiffs' injuries.

206.    It was reasonable and foreseeable that, as part of the conspiracy and in furtherance of the scheme to support acts of international terrorism, ISIS and ANF would, and in fact did, commit acts of international terrorism including acts that were violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, and that would be a criminal violation if committed within the jurisdiction of the United States or of any

State; including the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, and financing terrorism. ISIS's and ANF's acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.  Defendants knew that acts of international terrorism were part of the conspiracy and that FTOs were and would carry out the above acts.

207.    Defendants, by conspiring with ISIS and ANF, unlawfully and willfully conspired with the persons who committed acts of international terrorism, knowing that ISIS and ANF had and continued to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the purpose of ISIS's and ANF's acts was to intimidate the Syrian, Iraqi, Libyan, United States, and other populations, and to compel the United States and other governments to retreat from territory in Syria, Iraq, Libya, and in other countries.

208.    ISIS's and ANF's acts appeared to be intended to intimidate or coerce a civilian population; to influence the policy of the Syrian, Iraqi, American, Libyan, and other governments by intimidation or coercion, and to affect the conduct of a government by mass destruction, assassination, or kidnapping.

209.    ISIS's and ANF's attacks occurred primarily outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they are

accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

210.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors or heirs of U.S. nationals who suffered such injuries; or both.

211.   As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and noneconomic damages, including solatium damages.

## JURY DEMAND

212.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

(a)   Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)   Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(d);

(c)   Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(d);

(d)   Award Plaintiffs prejudgment interest; and

(e)   Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  December 22, 2022

Respectfully submitted,


JENNER & BLOCK LLP

By: /s/ Lee Wolosky_____

Lee Wolosky
Andrew J. Lichtman
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 891-1628
Fax: (212) 891-1699
lwolosky@jenner.com
alichtman@jenner.com

*Attorneys for Plaintiffs*