IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARISS FINAN, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 23-cv-05691-NGG-PK |
| LAFARGE S.A, *et al.*, | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

SUMMARY OF ARGUMENT ..............................................................................................2

ARGUMENT ..........................................................................................................................4

I.     The Attacks Against U.S. Servicemembers Were Acts of International Terrorism ............4

II.    The Attacks Against Plaintiff Ekren Were Acts of International Terrorism .......................6

III.   Plaintiffs Allege A Conspiracy To Provide Material Support to Terrorists .......................7

CONCLUSION ....................................................................................................................10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022)..................................................................................9, 10

*Encino Motorcars, LLC v. Navarro*,
  138 S.Ct. 1134 (2018)..............................................................................................4

*Estate of Klieman v. Palestinian Authority*,
  424 F. Supp. 2d 153 (D.D.C. 2006)........................................................................5

*Freeman v. HSBC Holdings PLC*,
  57 F.4th 66 (2d Cir. 2023) .......................................................................................9, 10

*In re Elec. Books Antitrust Litig.*,
  859 F. Supp. 2d 671 (S.D.N.Y. 2012).....................................................................7

*King v. Habib Bank Ltd.*,
  No. 20 Civ. 4322 (LGS), 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022),
  *reconsideration denied*, 2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) ...................8

*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ....................................................................8, 10

*Miller v. Cartel*,
  No. 1:20-cv-00132, 2022 WL 2286952 (D.N.D. June 24, 2022) ............................6

*Morris v. Khadr*,
  415 F. Supp. 2d 1323 (D. Utah 2006).....................................................................6

*Weiss v. Arab Bank, PLC*,
  No. 06-cv-1623, 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007)..............................6

*Weiss v. Nat'l Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014)....................................................................................5

*Weiss v. Nat'l Westminster Bank PLC*,
  278 F. Supp. 3d 636 (E.D.N.Y. 2017) ....................................................................9

**Statutes**

18 U.S.C. § 2331(1)(B)..................................................................................................4, 5

18 U.S.C. § 2336(a) .......................................................................................................6

**Other Authorities**

H.R. Rep. No. 115-858 (2018).................................................................................................6

# INTRODUCTION

Plaintiffs are members of seven American families who suffered devastating losses caused by Defendants' admitted criminal conduct. As explained by Deputy Attorney General Lisa Monaco, Defendants "partnered with ISIS, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war." Defendants agreed to pay $778 million in criminal penalties in connection with the first-ever prosecution of a corporation for bribing terrorists, but Defendants' victims have not received a dollar in compensation. This lawsuit was brought to change that.

This brief incorporates the *Foley* Plaintiffs' opposition to Defendants' motion to dismiss ("*Foley* Opposition" or "*Foley* Opp."). As in *Foley*, the *Finan* Plaintiffs allege in their Second Amended Complaint ("Compl.") that Defendants leveraged their relationship with ISIS for economic advantage, resulting in payments to ISIS and ANF of between $5 and $15 million between 2012 and 2014. Compl. ¶ 180. Defendants concealed these payments through intermediaries, *id*. ¶ 31b, and by deliberately funneling them through New York's banking system, *id*. ¶ 141, relying on New York banks to route U.S. dollars into Dubai, Lebanon, and Syria, *id*. These funds financed terrorist attacks targeting Plaintiffs. *Id*. ¶¶ 184-87, 199. As in *Foley*, the allegations in *Finan* establish personal jurisdiction over Defendants, including because Defendants intentionally caused their U.S.-dollar transactions to clear through New York. *Id*. ¶ 212. They also state a claim under the ATA.

The *Finan* Plaintiffs address here three additional arguments Defendants make in support of dismissal: that (1) the attacks on certain U.S. servicemembers were not acts of international terrorism; (2) the acts against Plaintiff Leyla Ekren were not acts of international terrorism; and (3) Plaintiffs do not allege a conspiracy to provide material support to ISIS.

Each of these arguments fails. Despite ISIS being perhaps the most notorious terrorist group in history, Defendants argue in their motion to dismiss ("Mot.") that certain attacks did not involve "international terrorism" because they did not "appear to be intended" to intimidate a civilian population or government. Mot. at 54-55. Defendants' argument must be rejected because, not only is it premature to assess ISIS's intent at the pleading stage, but also because Plaintiffs allege in painstaking detail the ways in which ISIS carried out its campaign of violence to spread fear among civilians and governments. Moreover, Plaintiffs adequately allege a civil conspiracy between Defendants and the terrorists. In fact, these business partners entered an extensive economic relationship that benefitted both sides handsomely: ISIS received resources to expand its influence and carry out its terrorist attacks, while Defendants' competition was driven out of the market. Defendants' motion to dismiss should be denied.

## SUMMARY OF ARGUMENT

The seven attacks at issue in *Finan* were committed by ISIS in the very region of the world in which Defendants operated and partnered with terrorists: Three attacks occurred in Syria (Dayton, Stacy, and Ekren), two in Iraq (Finan and Keating), one in Libya (Berry), and one in Lebanon (Hassan). Compl. ¶¶ 209-11. Further, the attacks occurred either while Defendants were still making payments to ISIS or shortly after: The attacks against Hassan and Ekren occurred before October 2014, *id.* ¶¶ 304-05, 313-15; the attack against Berry within three months of October 2014, *id.* ¶ 294; the attacks against Finan, Dayton, and Keating within approximately two years of that date, *id.* ¶¶ 264, 271, 287; and the attack against Stacy within three years of that date, *id.* ¶ 278.

Plaintiffs do not seek to hold Defendants liable for ISIS attacks "anywhere, everywhere, and for all time." Mot. at 50. Nor do Plaintiffs allege that Defendants' resources aided "ISIS-inspired" attacks by lone-wolf shooters. *Id*. Rather, Plaintiffs allege that Defendants funded the

*very* ISIS cells that committed each of the attacks. Compl. ¶ 199. For all the reasons discussed in the *Foley* Opposition, Defendants aided these attacks, and the Court should reject Defendants' arguments based on geographic and temporal distinctions. Defendants nonetheless argue that the attacks against certain U.S. servicemembers and Plaintiff Ekren were not acts of "international terrorism." Mot. at 54-55. They are wrong.

U.S. Servicemembers: Defendants do not contest that four of the five attacks against servicemembers in *Finan* were acts of international terrorism. The fifth attack was against Chief Petty Officer Keating IV (and against three servicemembers in *Foley*), a Navy Seal killed by ISIS fire in Tel Askuf, Iraq. Compl. ¶ 287. Keating was serving as part of a training and assistance team to the Kurdish Peshmerga when 300 ISIS fighters, driving armored cars and accompanied by a bulldozer, invaded the area in a planned attack on American and Kurdish forces. *Id.* ¶ 288. The circumstances of Keating's tragic death were similar to those of other servicemembers who were killed by ISIS during active duty, including, for example, Chief Petty Officer Jason Finan (killed by an IED while assisting Iraqi forces with training, *id.* ¶ 265) and Senior Chief Petty Officer Scott Dayton (killed by an IED while serving in Operation Inherent Resolve, *id.* ¶ 272). Defendants try to manufacture a distinction between military deaths involving direct physical contact with ISIS and those involving IEDs. Mot. at 52-53. But the law does not recognize such a distinction, which is precisely why Defendants do not cite any cases to support it.

Leyla Ekren: ISIS and its predecessor ANF used their attacks to spread terror, inspire fear, and recruit supporters—including Americans—to join their causes. *Id.* ¶ 206. Leyla Ekren's American-born mother was one such recruit. *Id.* ¶ 313. She was radicalized and took Ekren's family from Kansas to Syria to join ANF when Ekren was 10 years old. Shortly thereafter, Ekren was sold to an ISIS fighter for marriage and was treated as his sex slave for nearly two years,

3

during which she was tortured, raped, and forced to become pregnant at age 14—all during time periods Defendants are alleged to have funded ISIS. *Id.* ¶ 315. Ekren's story is a powerful example of ISIS's brutality and how it used fear and violence to recruit members, expand its influence and control, and commit even more terrorist attacks in a devastating and vicious cycle.

Defendants are also incorrect that Plaintiffs fail to state a claim for civil conspiracy liability. Drawing on Defendants' own admissions in pleading guilty to conspiracy, Plaintiffs allege in detail how and when Lafarge agreed with ISIS, ANF, and intermediaries to make monthly payments and share profits with ISIS; Defendants' subsequent provision of capital that fueled ISIS's terrorist attacks; and Defendants' and ISIS's shared interest in ISIS maintaining control of areas in which Defendants operated. *Id.* ¶¶ 11, 19, 31, 50, 107, 108, 123, 160, 257. These alleged facts establish a territorial-control conspiracy, as discussed in the *Foley* Opposition. They also establish a conspiracy to provide material support to ISIS, discussed further below.

## ARGUMENT

### I. The Attacks Against U.S. Servicemembers Were Acts of International Terrorism

Section 2331(1) defines "international terrorism" as activities that "appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(B).[1]

As a threshold matter, Defendants' argument that certain of the attacks perpetrated by ISIS were not acts of international terrorism, Mot. at 54-55, cannot be resolved on a motion to dismiss.

---

[1] Plaintiffs need only plausibly allege one of these three requirements. The statute uses the word "or" to connect the three required outcomes. The use of the term "or" is "almost always disjunctive." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018). In other words, the use of "or" to join the three outcomes (intimidate a civilian population; influence the policy of a government; *or* affect the conduct of a government by certain types of attacks) means that an act is an act of "international terrorism" if it entails any *one* of those outcomes.

4

Whether an attack constitutes "international terrorism"—as Plaintiffs allege—is predicated on an objective analysis of the attacker's apparent intent, *see Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (describing an "objective standard to recognize the apparent intentions of actions"), a highly fact-intensive inquiry. As one court explained in denying a motion to dismiss under similar circumstances, determining a terrorist's intent in committing an attack "is a question for trial, or at a minimum, for summary judgment." *Estate of Klieman v. Palestinian Authority*, 424 F. Supp. 2d 153, 167 (D.D.C. 2006). Defendants' cursory argument about ISIS's apparent intent—resting on factual assertions about what ISIS wanted—is premature at best.

But if this Court is inclined to reach the merits of Defendants' arguments on international terrorism—that "there is no allegation that civilians were the intended targets" of the so-called "Combat Incidents" and Plaintiffs "do not identify a basis to conclude that these incidents were intended to 'influence the policy of a government by intimidation or coercion,'" Mot. at 55—it should reject them. Plaintiffs specifically allege that ISIS, like its predecessor AQI, targeted U.S. citizens to "influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(1)(B); *see* Compl. ¶¶ 323, 336. Fueled by a desire to "horrify Americans" and to "discourage increased U.S. military involvement" in the region, *Foley* Complaint ¶ 43, ISIS declared its intent to attack U.S. citizens (including within the U.S. homeland), *id.* ¶¶ 40-43.

For example, ISIS released "kill lists" publicly announcing the names of hundreds of U.S. citizens whom it encouraged its operatives to execute around the globe. *Id.* ¶ 40. And ISIS "made good" on its promises by attacking and injuring or killing Americans in Syria, Iraq, the United States, Turkey, and Niger. *Id.* ¶¶ 40, 43, 363. ISIS planned and organized its attacks—both on civilians and military targets—as a means to display its strength and authority and to intimidate civilians and governments in ways that would further cement its power. Compl. ¶¶ 19, 24, 258-60.

5

These attacks plainly satisfy the definition of "international terrorism" under the ATA. *See Miller v. Cartel*, No. 1:20-cv-00132, 2022 WL 2286952, at *16 (D.N.D. June 24, 2022) (holding that cartel's acts constituted acts of international terrorism because they were part of a campaign of "planned and organized" attacks on civilians, public servants, police, and military targets to instill fear and chaos with the intention of intimidating their targets into submission and causing terror).

Indeed, if Defendants' argument were to be accepted, it would nullify restrictions Congress placed on the ATA's "act of war" defense. 18 U.S.C. § 2336(a). The ATA has a specific provision designed to exclude ineligible combat attacks: one that bars claims for injuries caused by an "act of war," *id.*, which includes attacks occurring in armed conflicts between "military forces," *id.* § 2331(4)(C). But Congress excluded designated terrorist organizations, like ISIS, from the reach of that defense. *See id.* § 2331(6)(A)(i); H.R. Rep. No. 115-858, at 4-5 (2018) (describing Congress's intent to impose ATA liability for aiding attacks "carried out by a designated terrorist organization"). Defendants' theory that ISIS was not committing "terrorism" when it attacked U.S. servicemembers in violation of the laws of war is an end-run around Congress's limitation. *See Weiss v. Arab Bank, PLC*, No. 06-cv-1623, 2007 WL 4565060, at *4-5 (E.D.N.Y. Dec. 21, 2007) (confirming act of war defense does not apply to combat attacks by FTO); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1333 (D. Utah 2006) (same).

## II. The Attacks Against Plaintiff Ekren Were Acts of International Terrorism

Plaintiffs also sufficiently allege that the acts against Ekren were acts of international terrorism. According to Defendants, although ISIS's treatment of Ekren was "reprehensible," ISIS's acts were "not alleged to have been done to 'intimidate or coerce a civilian population' or 'to influence the policy of a government by intimidation or coercion.'" Mot. at 54. This argument fails for similar reasons to those just discussed.

6

For one thing, for the reasons discussed above, it is too early to assess ISIS's "apparent intent" on a motion to dismiss. Moreover, ISIS's sexual violence against Ekren was part of its coordinated plan to achieve greater power, influence, and territory. Compl. ¶¶ 211, 315-17. ISIS instituted a campaign of indiscriminate violence—including the widespread rape of innocent girls—to spread fear, and to intimidate and coerce civilians into submitting to ISIS rule. ISIS sought to achieve these results by, among other means, forcing individuals to convert to ISIS's warped interpretation of Islam; join ISIS's ranks upon peril of being killed, kidnapped, or raped; and/or pay ISIS ransom money to get their loved ones back. *Id.* ¶¶ 19, 24, 48, 53, 77-78, 203, 211, 258-60. The heinous mistreatment of Ekren constitutes acts of international terrorism.

### III.   Plaintiffs Allege a Conspiracy To Provide Material Support to Terrorists

In addition to stating an aiding-and-abetting claim against Defendants, Plaintiffs assert related conspiracies to maintain and expand ISIS's territorial control and to provide material support to ISIS. The *Foley* Opposition explains Defendants' conspiracy to maintain ISIS's territorial control over Syria and Iraq. *Foley* Opp. at 51-53. Defendants pleaded guilty to agreeing with ISIS to supply ISIS with money and cement, which, as alleged in both *Foley* and *Finan*, furthered both parties' interests in ISIS's territorial control. *Id*.

As for the related conspiracy to provide material support to ISIS, Defendants argue that Plaintiffs fail to allege both an "agreement" and an "overt act in furtherance" of a common scheme. Mot. at 59, 62. Regarding the "agreement" prong, Defendants claim "[t]here are no allegations that the Defendants and ISIS or ANF had a 'common intent' or 'shared purpose' to provide the FTOs material support." Mot. at 58. This argument fails for the same reasons discussed in the *Foley* Opposition. That the conspirators may have had different reasons for joining the conspiracy is irrelevant. *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012) ("[D]ifferent motivations for joining the conspiracy . . . does not undermine the existence of the

7

conspiracy itself."); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 584 (E.D.N.Y. 2005) (conspiracy liability was available where defendant and terrorist organizations were "participants in a common plan" through which defendant would provide financial services to organizations "which would themselves perform the violent acts"). Further, Defendants "need not even have planned or known about the injurious actions" so long as their purpose "was to advance the overall object of the conspiracy." *King v. Habib Bank Ltd.*, No. 20 Civ. 4322 (LGS), 2022 WL 4537849, at *11 (S.D.N.Y. Sept. 28, 2022), *reconsideration denied*, 2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) (quoting *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983)).

*King* is illustrative. There, the court held that plaintiffs' allegations that the defendant bank shared al-Qaeda's goal of driving the U.S. military out of Afghanistan were sufficient to allege that defendant joined a conspiracy whose object involved a "campaign of terrorism furthered by specific attacks." *Id.* at *10-11. Similarly, Plaintiffs here allege Lafarge joined a conspiracy whose object necessitated a campaign of terrorism. Compl. ¶¶ 255-62. ISIS committed attacks to fuel its cycle of intimidation, expansion, and control, and to ensure it could fulfill its corrupt bargain with Defendants. *Id.* ¶ 61; *Foley* Compl. ¶¶ 220-21. Defendants conspired knowing of and intending to enable this cycle, in order to control markets and increase profits. Compl. ¶ 61.

Likewise, Plaintiffs allege that the co-conspirators committed overt acts in furtherance of the conspiracy to provide material support, and those allegations are sufficient. In furtherance of the conspiracy, Defendants made payments and provided resources to ISIS, which in turn used that money to coordinate and carry out terrorist attacks against Plaintiffs. Compl. ¶¶ 7, 11, 49, 51, 237. The terrorist attacks were in furtherance of the conspiracy because they expanded ISIS's dominance and reach, kept Defendants' rivals out of the market, and ensured that Lafarge and others would continue to make corrupt payments. *Id.* ¶ 61; *see also Foley* Compl. ¶¶ 220-21. The

8

"terrorist acts that caused Plaintiffs' injuries" were also the "foreseeable outcome" of this conspiracy to provide material support. Compl. ¶ 333. Because these attacks were foreseeable, Defendants' overt acts proximately caused the attacks resulting in the deaths of and injuries to Plaintiffs. *See Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 642, 651 (E.D.N.Y. 2017) (denying summary judgment because precedent does not foreclose the possibility that defendant's contribution of financial services to terrorist organization proximately caused terrorist attacks).

Defendants characterize the Second Circuit's decision in *Freeman* as foreclosing "reliance on mere 'foreseeability' to 'meet the in-furtherance-of requirement.'" Mot. at 62 (quoting *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 82 (2d Cir. 2023)). They are incorrect. *Freeman*'s holding—that allegations regarding the foreseeable consequences of overt acts are not sufficient to satisfy the requirement that the acts were done in furtherance of the conspiracy—applies only when foreseeable consequences are "wholly detached from the shared conspiratorial plan." *Freeman*, 57 F.4th at 82. As discussed in the *Foley* Opposition, there was no common object uniting the disparate aims alleged in *Freeman*. *Foley* Opp. at 53. Here, the terrorist attacks resulting in Plaintiffs' injuries were an integral part of the conspiracy and benefitted both Defendants and ISIS. Compl. ¶¶ 262, 326, 333.

Defendants also are incorrect that the alleged overt acts in furtherance of the material-support conspiracy are insufficient because *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022), limits JASTA overt acts only to acts of international terrorism that injured Plaintiffs.[2] Mot. at 61-62. Plaintiffs are aware of no case within this Circuit that has limited overt

---

[2] Defendants concede that the overt acts in furtherance of the territorial-control conspiracy satisfy this standard. Plaintiffs therefore limit the argument above to overt acts in furtherance of the material support conspiracy.

9

acts to only a terrorist act that caused injury. In *Freeman*, decided after *Bernhardt*, the Second Circuit defined an overt act under JASTA as one that furthers the "overall object" of the conspiracy—that is, one that furthers the agreement between the defendant and the primary wrongdoer. *Freeman*, 57 F.4th at 82. Defendants' alleged overt acts did so: Defendants provided resources to ISIS to further the conspiratorial agreement to maintain a flow of material support to ISIS. But even if *Bernhardt* can be read to limit JASTA overt acts to only terrorist attacks, including for a material-support conspiracy, Plaintiffs' allegations satisfy that requirement. ISIS committed the terrorist attacks that harmed Plaintiffs in furtherance of the conspiracy's overall object, that of securing material support for additional acts of terror.

The overt acts here are a far cry from those in *Bernhardt*, where the defendant-bank was accused of conspiring with a terrorist organization because it evaded sanctions, thereby helping its *customers* provide services to terrorist organizations. *Bernhardt*, 47 F.4th at 862-63. Under those facts, there was at least one more link in the chain between defendants and the terrorist organization. Here, by contrast, Defendants themselves paid terrorist organizations *and* are alleged to have done so knowing and intending that the terrorist organization would carry out terrorist attacks. Under the facts of this case, the allegations suffice. *See Linde*, 384 F. Supp. 2d at 584 (plaintiffs adequately alleged conspiracy liability against defendant bank and that they were injured by overt acts done in furtherance of conspiracy).

## CONCLUSION

For all the reasons set forth in the *Foley* Opposition and above, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss.

10

Dated:  January 22, 2024

    Respectfully submitted,

    JENNER & BLOCK LLP
    By: /s/ *Lee Wolosky*
    Lee Wolosky
    Katya Jestin
    Andrew J. Lichtman
    JENNER & BLOCK LLP
    1155 Avenue of the Americas
    New York, NY 10036
    Telephone: (212) 891-1628
    Fax: (212) 891-1699
    lwolosky@jenner.com
    kjestin@jenner.com
    alichtman@jenner.com

    J.E. Shreve Ariail
    Alyssa G. Bernstein
    JENNER & BLOCK LLP
    1099 New York Avenue
    Washington, DC 20001
    202-639-6871
    sariail@jenner.com
    abernstein@jenner.com

    Todd C. Toral
    JENNER & BLOCK LLP
    515 South Flower Street
    Los Angeles, CA 90071-2246
    213-239-2294
    ttoral@jenner.com

    *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 22, 2024, a true and correct copy of the foregoing was served via electronic mail upon counsel on record for Defendants at the following addresses:

Jay K. Musoff
jmusoff@loeb.com

Sarah Levitan Perry
sperry@loeb.com

John Anthony Piskora
jpiskora@loeb.com

*Counsel for Plaintiffs*

/s/ Lee Wolosky