**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

CHARISS FINAN, *et al.*,

          Plaintiffs,

             v.

LAFARGE S.A., *et al.*,

          Defendants.

: 22-cv-07831 (NGG) (PK)

: **Oral Argument Requested**

------------------------------------------------------- x

TAMARA FIELDS, *et al.*,

          Plaintiffs,

             v.

LAFARGE S.A., *et al.*,

          Defendants.

: 23-cv-00169 (NGG) (PK)

: **Oral Argument Requested**

------------------------------------------------------- x

DIANE FOLEY, *et al.*,

          Plaintiffs,

             v.

LAFARGE S.A., *et al.*,

          Defendants.

: 23-cv-05691 (NGG) (PK)

: **Oral Argument Requested**

------------------------------------------------------- X

**COMBINED SUPPLEMENTAL MEMORANDUM
OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS THE
<u>PLAINTIFFS' COMPLAINTS FOR LACK OF PERSONAL JURISDICTION</u>**

Jay K. Musoff
John Piskora
Chloe Gordils
**LOEB & LOEB LLP**
345 Park Avenue
New York, NY 10154
Telephone:     212-407-4212
Facsimile:     212-407-4990

*Attorneys for Lafarge S.A.,
Lafarge Cement Holding Limited, and
Lafarge Cement Syria S.A.*

Served on October 1, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................v

PRELIMINARY STATEMENT ....................................................................................1

PROCEDURAL BACKGROUND...................................................................................2

LEGAL STANDARD....................................................................................................4

ARGUMENT ................................................................................................................5

I.     The Court Lacks Personal Jurisdiction Under New York's Long-Arm Statute. .................6

     A.     The ATA Claims Do Not Arise From The Use of Correspondent Accounts in NY....................................................................................................................7

          1.     The ATA Claims Do Not Arise From The 12 Intercompany Transfers. .........................................................................................9

          2.     The ATA Claims Do Not Arise From The Two LMEA Deposits Made by LCS Customers. ...........................................................13

          3.     The ATA Claims Do Not Arise From the Reimbursement Transfer.........15

     B.     Defendants Did Not Purposefully Avail Themselves of New York.....................16

          1.     Defendants' general knowledge that U.S. dollar wire transfers typically require New York clearing does not show purposeful availment........................................................................................18

          2.     Defendants' routine receipt of electronic notices and general use of payment software does not show purposeful availment. ...........................20

          3.     LCS's actions related to the Intercompany Transfers does not show purposeful availment...............................................................22

          4.     LCS's conduct related to the LMEA Transfers does not show purposeful availment...............................................................23

          5.     Lafarge's conduct related to the Reimbursement Transfer does not show purposeful availment. .......................................................23

          6.     Defendants' conduct related to irrelevant transactions does not show purposeful availment. .......................................................25

          7.     The purported benefits of New York clearing do not show purposeful availment...............................................................26

II.     The Court Lacks Jurisdiction Under Rule 4(K)(2) ............................................................27

III.    In All Events, Exercising Jurisdiction Over Defendants Would Be Unreasonable. ..........29

CONCLUSION ......................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*In re Aegean Marine Petroleum Network, Inc. Securities Litigation*,
    529 F. Supp. 3d 111 (S.D.N.Y. 2021) .................................................................6

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ........................................................................................17

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990) ...........................................................................4, 5

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021) ........................................17, 18, 23, 24

*Bristol-Myers Squibb Co. v. Superior Court of California*,
    582 U.S. 255 (2017) .......................................................................................6, 15

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) ............................................................................29

*Cohen v. Facebook, Inc.*,
    252 F. Supp. 3d 140 (E.D.N.Y. 2017), *aff'd in part, dismissed in part sub nom.*
    *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) ........................................5

*DiStefano v. Carozzi North America, Inc.*,
    286 F.3d 81 (2d Cir. 2001) ................................................................................4

*Ehrenfeld v. Bin Mahfouz*,
    9 N.Y.3d 501 (2007) ...........................................................................................6

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*,
    No. 19-cv-05394-BMC, 2023 WL 4850999 (E.D.N.Y. July 28, 2023) .........8, 9

*Fischbarg v. Doucet*,
    9 N.Y.3d 375 (2007) .........................................................................................16

*Fischl v. Armitage*,
    128 F.3d 50 (2d Cir. 1997) ................................................................................5

*Gallelli v. Crown Imports, LLC*,
    701 F. Supp. 2d 263 (E.D.N.Y. 2010) ..............................................................5

*Henkin v. Qatar Charity*,
    No. 21-CV-5716 (AMD) (VMS), 2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023) ............20

*Hungerstation LLC v. Fast Choice LLC*,
    No. 19-cv-05861-HSG, 2020 WL 137160 (N.D. Cal. Jan. 13, 2020), *aff'd*, No. 20-15090, 2021 WL 963777 (9th Cir. Mar. 15, 2021), *amended and superseded on denial of reh'g by* 857 F. App'x 349 (9th Cir. 2021) ........................................28

*Kosakow v. New Rochelle Radiology Associates, P.C.*,
    274 F.3d 706 (2d Cir. 2001) ........................................................................5

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012) .....................................................................6, 28

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012) ..........................................................................6, 7, 8

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) .........................................................19, 28, 29

*Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016) .....................................................................17

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on September 11, 2001)*,
    714 F.3d 659 (2d Cir. 2013) ........................................................................5

*Paroni v. General Electric UK Holdings Ltd.*,
    No. 19 Civ. 1034 (PAE), 2021 WL 3501234 (S.D.N.Y. Aug. 9, 2021) ............5

*Przewozman v. Qatar Charity*,
    No. 20-CV-6088 (NGG) (TAM), 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023)..8, 15, 16, 18

*Sole Resort, S.A. de C.V. v. Allure Resorts Management, LLC*,
    450 F.3d 100 (2d Cir. 2006) .......................................................................25

*Spetner v. Palestine Investment Bank*,
    70 F.4th 632 (2d Cir. 2023) .............................................................16, 20, 23

*Strauss v. Crédit Lyonnais, S.A.*,
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ...............................................................8

*Tamam v. Fransabank SAL*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010).........................................................30

*United States v. Gigante*,
    94 F.3d 53 (2d Cir. 1996)..............................................................................5

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020)........................................................5, 7

*Waldman v. Palestine Liberation Organization*,
    835 F.3d 317 (2d Cir. 2016)............................................................................28

*Zurich American Life Insurance Co. v. Nagel*,
    571 F. Supp. 3d 168 (S.D.N.Y. 2021)............................................................27

**STATUTES**

N.Y. C.P.L.R. 302(a)(1).............................................................................6, 29

Defendants Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("Lafarge Cyprus"), and Lafarge Cement Syria S.A. ("LCS") (collectively, "Defendants") respectfully submit this combined and supplemental Memorandum of Law in support of their Motions to Dismiss the Plaintiffs' operative complaints in *Finan v. Lafarge S.A.*, No. 1:22-cv-07831 (E.D.N.Y. Aug. 5, 2024) (ECF No. 70) ("*Finan* 3AC"); *Fields v. Lafarge S.A.*, No. 1:23-cv-00169 (E.D.N.Y. Aug. 5, 2024) (ECF No. 55) ("*Fields* 2AC"); and *Foley v. Lafarge S.A.*, No. 23-cv-05691 (E.D.N.Y. Aug. 5, 2024) (ECF No. 68) ("*Foley* AC," together with the *Finan* 3AC and the *Fields* 2AC, the "Amended Complaints"), pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).[1]

## PRELIMINARY STATEMENT

In the nearly two years that these cases have been pending, Plaintiffs have filed several different complaints, amended their allegations and theories at least twice over, and added dozens of new plaintiffs. Early on, the complaints took the position that their allegations—including those relating to Defendants' supposed contacts with the United States—were "not exhaustive," reflecting only what "Plaintiffs have been able to piece together without discovery." (*Foley*, ECF No. 1 ¶ 153.) Plaintiffs speculated that "[d]iscovery will likely uncover many other similar transactions" and that at the end of jurisdictional discovery "it's going to be clear there is jurisdiction." (*Foley*, ECF No. 1 ¶ 153; *Finan*, ECF No. 45, Hr'g Tr. at 35.)

Yet despite the benefit of extensive jurisdictional discovery over the course of three months, Plaintiffs are no closer to demonstrating any basis upon which this Court could properly

---

[1] On March 21, the Court reserved judgment on Defendants' pending motions to dismiss. (*Foley*, ECF No. 37; *Finan*, ECF No. 44; *Fields*, ECF No. 30.) Pursuant to the Court's June 28, 2024 Order, Defendants now file this opening supplemental brief related to the previously-filed motions solely on the issue of personal jurisdiction. (*Foley*, ECF No. 24; *Finan*, ECF No. 39; *Fields*, ECF No. 25.)

exercise personal jurisdiction. Indeed, the amended pleadings now allege eight *fewer* New York-related transactions than they did before jurisdictional discovery. The Amended Complaints should be dismissed with prejudice for two independent reasons.

*First*, none of the 15 New York-cleared transfers—12 of which took place in ***early 2011***, before ISIS and ANF were even formed—share any nexus with the alleged U.S. dollar payments to Foreign Terrorist Organizations ("FTOs") intermediaries between November 2013 and July 2014. As the discovery record definitively shows, these funds were spent on ordinary business expenses, such as paying down loans and purchasing raw materials, months before the earliest alleged U.S. dollar payment to an FTO intermediary. And in the one instance where a NY-cleared wire transfer was sent to an FTO intermediary in Dubai—in October 2014, more than a month *after* LCS had evacuated Syria and ceased operations—the record is clear that those funds went no further.

*Second*, there is no evidence that Defendants purposefully availed themselves of New York in connection with the 15 transfers. At most, the evidence demonstrates that certain employees may have been aware that Defendants' banks would clear transactions through New York. But in each case, it was Defendants' banks that decided where, how, and when to process wire transfer requests, including whether to clear the relevant funds through New York correspondent banks. It is for this reason that no court has ever exercised jurisdiction over a bank's client based on the technical choices made by its bank. The record here confirms the wisdom of that distinction.

For these reasons, and as discussed below, these cases should be dismissed with prejudice for lack of personal jurisdiction.

## PROCEDURAL BACKGROUND

Between January and July 2023, Plaintiffs commenced these actions, alleging that Defendants are liable under the ATA for attacks perpetrated by FTOs. (*See generally Foley*, ECF

2

No. 1; *Finan*, ECF No. 1; *Fields*, ECF No. 1.)  On July 21, 2023, Defendants served their motions to dismiss the *Finan* and *Fields* complaints.  Rather than oppose those motions, the *Finan* and *Fields* plaintiffs amended their complaints on September 4 and 8, 2023, and (in the case of *Finan* again on November 7, 2023.  (*Finan*, ECF Nos. 23, 37; *Fields*, ECF No. 16.)  On December 7, 2023, Defendants served their motion to dismiss the then-operative complaints in all three actions on grounds of lack of personal jurisdiction and for failure to state a claim.  (*Foley*, ECF No. 24; *Finan*, ECF No. 39; *Fields*, ECF No. 25.)  Plaintiffs opposed that motion on January 22, 2024 (*Foley*, ECF No. 26; *Finan*, ECF No. 41; *Fields*, ECF No. 27), and Defendants replied on February 21, 2024 (*Foley*, ECF No. 27; *Finan*, ECF No. 42; *Fields*, ECF No. 28).

On March 21, 2024, the Court held argument on the motion to dismiss, after which it reserved judgment and ordered the parties to conduct limited jurisdictional discovery for 60 days. (*Foley*, ECF No. 37; *Finan*, ECF No. 44; *Fields*, ECF No. 30.)  The parties did so under the supervision of Magistrate Judge Kuo; on June 4, 2024, Judge Kuo extended jurisdictional discovery until June 21, 2024.  (*Foley*, ECF No. 65; *Finan*, ECF No. 67; *Fields*, ECF No. 52.) With Judge Kuo's assistance—including in resolving the parties' discovery disputes over the course of eight conferences—the parties completed jurisdictional discovery in 90 days.

During the jurisdictional discovery period, Defendants reviewed a large volume of documents in multiple languages (French, Arabic, and English), drawn from the files of 21 custodians and covering the period between January 1, 2011, and December 31, 2015.  Plaintiffs served 27 separate requests for production; in response, Defendants agreed to run well over 100 separate search term strings and produced thousands of documents.  Plaintiffs also propounded 14 interrogatories, many with multiple subparts.  Defendants provided substantive answers (and multiple supplemental responses) to all of them.  Among other things, Defendants disclosed

information about U.S. dollar denominated bank accounts, fund transfers, and the scope of the internal investigation in 2016.

Plaintiffs also obtained discovery from multiple third parties, including six banks and the U.S. Attorney's Office for the Eastern District of New York.  In response to Plaintiffs' subpoenas, the banks produced documents and information relating to Defendants' bank accounts and historical financial transactions.  For its part, the U.S. Attorney's Office produced nearly 2,000 documents from its investigatory file, which included documents obtained from French authorities pursuant to mutual legal assistance treaties.

On August 5, 2024, the Amended Complaints were filed, which cite materials disclosed during jurisdictional discovery.

## **LEGAL STANDARD**

It is always the plaintiff's burden to establish that the court has jurisdiction over the defendant.  *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  But the specific showing a plaintiff must make "varies depending on the procedural posture of the litigation."  *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).  Before discovery, a plaintiff must make a prima facie showing of jurisdiction, which "may be established solely by allegations."  *Id.*  After jurisdictional discovery, however, the plaintiff's showing must include "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."  *Id.*  And if the defendant disputes the plaintiff's "jurisdictional facts," then a hearing is required, "at which the plaintiff must prove the existence of jurisdiction ***by a preponderance of the evidence***."  *Id.* (emphasis added).

Having taken extensive jurisdictional discovery, Plaintiffs here must now meet these elevated standards to establish jurisdiction over Defendants.  Allegations based on "information and belief," inferences, or legal conclusions are no longer viable.  *See Gallelli v. Crown Imps.,*

*LLC*, 701 F. Supp. 2d 263, 270 (E.D.N.Y. 2010); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  Instead, the Amended Complaints must include a "factually supported" showing of jurisdiction using admissible evidence.  *Ball*, 902 F.2d at 197; *see also Paroni v. Gen. Elec. UK Holdings Ltd.*, No. 19-Civ.-1034 (PAE), 2021 WL 3501234, at *9 (S.D.N.Y. Aug. 9, 2021) ("[A]fter jurisdictional discovery, the admissible evidence, not a party's pleading or say-so, controls.").

Here, Defendants contest the "jurisdictional facts" alleged in the Amended Complaints and request a hearing.  Therefore, Plaintiffs must prove these facts and the existence of jurisdiction by a "preponderance of the evidence."  *Ball*, 902 F.2d at 197.  That evidence must be admissible, *see Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 251 n.6 (S.D.N.Y. 2020) (collecting cases), and must prove that the facts supporting jurisdiction are more likely true than not.  *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997).  Plaintiffs, as the parties bearing the burden of proof, will thus "lose in the event that the evidence is evenly balanced."  *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001); *see also United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) (in effect, the preponderance standard is a "tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses.").

## **ARGUMENT**

The Court should dismiss the Amended Complaints because they do not establish personal jurisdiction over Defendants by a preponderance of the evidence.  Establishing personal jurisdiction over a defendant requires that a plaintiff satisfy three elements: "(1) procedurally proper service of process on the defendant; (2) a statutory basis for personal jurisdiction; and (3) [an] exercise of jurisdiction [that is] consistent with 'constitutional due process principles.'"  *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 152 (E.D.N.Y. 2017) (Garaufis, J.) (quoting *Licci*

*ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) (hereinafter "*Licci I*")), *aff'd in part, dismissed in part sub nom.*, *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019). Furthermore, a plaintiff must carry this burden with respect to each defendant. *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 135 (S.D.N.Y. 2021); *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 268 (2017) ("[A]s we have explained, '[t]he requirements of *International Shoe* . . . must be met as to each defendant over whom a . . . court exercises jurisdiction.'" (second and third alterations in original) (citation omitted)).

The Amended Complaints do not meet this burden. Plaintiffs have not established by a preponderance of the evidence that Defendants had sufficient minimum contacts with New York or the United States to support the exercise of personal jurisdiction.

## I. The Court Lacks Personal Jurisdiction Under New York's Long-Arm Statute.

The Amended Complaints assert that New York's long-arm statute, N.Y. C.P.L.R. 302, confers personal jurisdiction over Defendants. (*Foley* AC ¶ 24; *Finan* 3AC ¶ 44; *Fields* 2AC ¶ 61.) That statute permits the exercise of personal jurisdiction over a non-domiciliary if the "cause of action arise[s] from" the party's "transact[ion] [of] any business within the state." N.Y. C.P.L.R. 302(a)(1). Transacting business in this context means purposeful activity—"some act by which the defendant purposefully avails itself of the privilege of conducting activities within [New York]," thus "invok[ing] the benefits and protections of [New York's] laws." *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007) (alterations in original) (citations omitted). And to satisfy the statutory "arise from" requirement, a plaintiff must show "an 'articulable nexus' or 'substantial relationship' between the business transaction and the claim asserted." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012) (internal citations omitted) (hereinafter "*Licci II*").

The Amended Complaints identify 15 fund transfers that, Plaintiffs claim, establish jurisdiction over Defendants because the transfers cleared through correspondent banks in New York. (*Foley* AC ¶ 155; *Finan* 3AC ¶ 221; *Fields* 2AC ¶ 243.)[2] These transfers fall into three categories: (i) 12 intercompany equity and loan transfers from Lafarge to LCS between January and August 2011 (the "Intercompany Transfers"), (ii) two payments from LCS customers that were deposited in an LCS-controlled bank account in 2013 (the "LMEA Transfers"), and (iii) one payment from Lafarge to the Dubai bank account of an intermediary (Tlass) in October 2014 to reimburse him for past work (the "Reimbursement Transfer"). (*Foley* AC ¶ 155; *Finan* 3AC ¶ 221; *Fields* 2AC ¶ 243.)

None of these transfers establishes jurisdiction under New York's long-arm statute.

**A.  The ATA Claims Do Not Arise From The Use of Correspondent Accounts in NY.**

Plaintiffs have not established that their ATA claims "arise from" the use of correspondent accounts in New York. As the New York Court of Appeals explained in *Licci II*, there must be an "articulable nexus" or "substantial relationship" between "the business transaction and the claim asserted." 20 N.Y.3d at 339. "In effect, the 'arise-from' prong limits the broader 'transaction-of-business' prong to confer jurisdiction only over those claims in some way arguably connected to the transaction." *Id.* at 339-40. While this inquiry is "relatively permissive," there must still be a

---

[2]  Having had the benefit of jurisdictional discovery, Plaintiffs can no longer rely upon speculative allegations that more evidence might exist or additional transfers may have occurred; rather, the Court should "limit its jurisdictional analysis to the facts presented." *See Vasquez*, 477 F. Supp. 3d at 251. The Court thus must disregard any suggestion that the universe of transactions somehow is preliminary or incomplete. (*See Foley* AC ¶ 155 ("Plaintiffs have identified *at least* 15 such transfers . . ." (emphasis added)); *Finan* 3AC ¶ 221 (same); *Fields* 2AC ¶ 243 (same); *Foley* AC ¶ 168 ("Defendants similarly used LCS's supply of U.S. dollars to make *at least* five 'commission payments' . . ." (emphasis added)); *Finan* 3AC ¶ 234 (same); *Fields* 2AC ¶ 256 (same); *Foley* AC ¶ 186 ("Paragraph 155 details *two examples* of New York-cleared wires LCS accepted into the LMEA account." (emphasis added)); *Finan* 3AC ¶ 252 (same); *Fields* 2AC ¶ 274 (same).)

"relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the [legal] claim." *Id.* at 339. A connection that is "too attenuated" from, or "merely coincidental" to, the New York transaction cannot support jurisdiction. *Id.* at 340 (citing *Johnson v. Ward*, 4 N.Y.3d 516, 520 (2005)).

As relevant here, a legal claim does not arise from the use of a New York correspondent account without proof that the defendant "used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated." *Przewozman v. Qatar Charity*, No. 20-CV-6088 (NGG) (TAM), 2023 WL 2562537, at *13 (E.D.N.Y. Mar. 17, 2023) (quoting *Daou v. BLC Bank, S.A.L*, 42 F.4th 120, 132 (2d Cir. 2022)). In *Przewozman*, for example, this Court dismissed the plaintiffs' ATA claims for failing to show how New York transfers that occurred in 2015 "were used 'in the course of' the 2019 rocket attacks." *Id.* "This temporal gap leaves the nexus between the Defendants' New York-related acts and Plaintiffs' injuries far too attenuated." *Id.*; *see also Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) ("That nexus would be too attenuated if, contrary to the facts alleged here, Defendant . . . executed the New York transfers at a time far removed from the attacks that caused Plaintiffs' injuries.").

Judge Cogan recently applied the same standard in *Estate of Henkin v. Kuveyt Turk Katilim Bankasi A.S.*, No. 19-CV-05394-BMC, 2023 WL 4850999, at *3 (E.D.N.Y. July 28, 2023). In that case, the plaintiffs alleged that a defendant bank transferred U.S.-cleared dollars to universities affiliated with Hamas "in the years immediately preceding the acts of terrorism at issue." *Id.* (alteration in original). The court dismissed the complaint for lack of jurisdiction, holding that these allegations "fail[ed] to establish any connection between the attacks at issue and the Bank's correspondent bank accounts in New York." *Id.* While causation was not required, there still had

to be a "strong relationship" between the "specific attacks" and the alleged New York contacts to establish personal jurisdiction. *Id.* at *2-4 (citation omitted). Those plaintiffs' allegations of relatedness—premised entirely on the university's affiliation with Hamas—were too weak because it was not clear whether the funds that cleared through New York correspondent accounts "were passed on to Hamas and used to fund terrorist attacks" or "were used to pay [university] professors or one of the innumerable other legitimate costs incurred by a university." *Id.* at *3.

This same standard applies here, and the alleged transfers cannot form the basis of personal jurisdiction because the Amended Complaints do not allege any connection between the alleged transfers and the attacks giving rise to the ATA claims. Nor could they. As discussed below, discovery has established that none of the funds from 14 of the transfers were used to make the alleged payments to FTO intermediaries. And while the Reimbursement Transfer (a single wire) was paid to Tlass in 2014, the record is clear that the payment reimbursed him for past work, and therefore, the funds were not "passed on to [FTOs] and used to fund terrorist attacks." *Id.*

1.    **The ATA Claims Do Not Arise From The 12 Intercompany Transfers.**

The Amended Complaints identify 12 U.S. dollar intercompany transfers that cleared through correspondent bank accounts in New York between January 18, 2011 and August 15, 2011. (*Foley* AC ¶¶ 155, 163; *Finan* 3AC ¶¶ 221, 229; *Fields* 2AC ¶¶ 243, 251.) The Amended Complaints attempt to allege that these Intercompany Transfers were used to make "payments to Tlass and Taleb in U.S. dollars" years later. (*Foley* AC ¶ 167; *Finan* 3AC ¶ 233; *Fields* 2AC ¶ 255.) But Plaintiffs do not even try to show how transfers from 2011 were used in the course of *attacks* giving rise to their ATA claims, as they must to satisfy New York's "arise from" requirement. And even if the payment of U.S. dollars to FTO intermediaries was sufficient itself to establish jurisdiction—and it is not—the Amended Complaints do not draw a ***factual*** connection

9

between the U.S. dollars transferred to LCS in 2011 and the later U.S. dollar payments to FTO intermediaries.

In actuality, Plaintiffs concede in the Amended Complaints that the purpose of the 2011 intercompany transfers was to enable LCS to pay its lenders and avoid defaulting on its debt repayment obligations and related covenants.  (*Foley* AC ¶ 169, n.174-77; *Finan* 3AC ¶ 235 n.67-70; *Fields* 2AC ¶ 257 n.65-68.)  Setting aside this concession, the documentary evidence confirms that LCS received these intercompany proceeds in order to pay down outstanding bank debt and fund working capital.  (*See* Ex. A at -5034 (February 21, 2011 email exchange with Bank Audi noting proceeds of equity contribution earmarked to pay lenders); Ex. B at -384 (April 3, 2011 loan agreement noting purpose to fund LCS "meeting its commitments to pay including the payments to the contractors and suppliers in connection with the completion of construction of the new cement plant owned by the Company"); Ex. C at -584 (July 12, 2012 second amended loan agreement noting purpose to fund LCS "general working capital requirements and financing its debt repayment (principal and interest) and/or debt restructuring").).[3]

Nevertheless, the Amended Complaints allege that LCS used the Intercompany Transfers in 2011 to pay Tlass nine monthly $75,000 "stipends" between November 2013 and July 2014, and Taleb five monthly "commissions" (totaling $10,356) between February 2014 and October 2014 (the "Intermediary Payments").  (*Foley* AC ¶¶ 167-168; *Finan* 3AC ¶¶ 233-34; *Fields* 2AC ¶¶ 255-56.)  However, a tracing exercise dispels any "articulable nexus," a necessary jurisdictional

---

[3]    All references to "Ex. __" are to the supporting Affirmation of John Piskora, which is being filed concurrently with this supplemental brief. All references to "Pls.' Ex. __" are exhibits to *Foley, Finan* and *Fields* Complaints.

showing, between the Intercompany Transfers and these Intermediary Payments.[4]    In fact, according to one of the tracing methodologies, the Intercompany Transfers were expended by ***May 16, 2012***—over a year before the earliest alleged Intermediary Payment.    (*See* Declaration of Gordon MacLeod, dated October 1, 2024 ("MacLeod Decl.") § V.A.)    Moreover, none of the Intercompany Transfers were traced to the Intermediary Payments, no matter the methodology employed.[5]    (*Id*. ¶ 12.)

The Amended Complaints stretch to bridge this gap by advancing two theories that supposedly "amplif[y] the nexus" between the Intercompany Transfers and the later Intermediary Payments.    (*Foley* AC ¶ 169; *Finan* 3AC ¶ 235; *Fields* 2AC ¶ 257.)    First, Plaintiffs allege that LCS's "unique U.S.-dollar liquidity constraints" beginning in 2011 caused it to stockpile the "capital it needed to pay terrorists."    (*Foley* AC ¶ 169; *Finan* 3AC ¶ 235; *Fields* 2AC ¶ 257.)    But there is no evidence whatsoever that LCS sought U.S. dollars in the first half of 2011 to make payments to FTO intermediaries in 2013, particularly when the FTOs themselves had only begun to emerge in Syria "in late 2011."    (*Foley* AC ¶ 32; *Finan* 3AC ¶ 65; *Fields* 2AC ¶ 89.)    As the Amended Complaints readily concede, the actual purpose of these loans was to enable LCS to pay its lenders, without which LCS would have "defaulted on its debt covenants . . . and would likely have had to shut down its Syrian plant altogether."    (*Foley* AC ¶ 169 n. 174-77; *Finan* 3AC ¶ 235 n. 67-70; *Fields* 2AC ¶ 257 n. 65-68.)    This is underscored by the Amended Complaints' separate allegation that LCS faced difficulty in obtaining U.S. dollars—an allegation which directly

---

[4]    The tracing exercise is not intended to, nor does it, address any underlying merits questions, such as whether the Intermediary Payments themselves "substantially assisted" the acts of terrorism that injured Plaintiffs.

[5]    The tracing exercise confirms that the funds were actually used to pay LCS's lenders, suppliers, and various other ordinary business costs. *See id.*

contradicts the notion that Defendants were stockpiling dollars to pay FTO intermediaries years later.  (*Foley* AC ¶ 169; *Finan* 3AC ¶ 235; *Fields* 2AC ¶ 257.)

Second, Plaintiffs offer the far-fetched and unsupported theory that the Intercompany Transfers "were . . . linked to Defendants' terror-financing scheme through their connection to Tlass."  (*Foley* AC ¶ 172; *Finan* 3AC ¶ 238; *Fields* 2AC ¶ 260.)  According to the Amended Complaints, because Tlass was a minority shareholder in LCS as of 2011 and a confidant of the Assad regime, which supported terrorism, certain U.S. dollars deposited in LCS's bank accounts in 2011 "w[ere] linked to Syrian terrorism from the very outset."  (*Foley* AC ¶¶ 21, 173-77; *Finan* 3AC ¶¶ 39, 239-43; *Fields* 2AC ¶¶ 56, 261-65.)  Setting aside whether this chain of inferences even makes sense, it is utterly irrelevant to the jurisdictional issue at hand.  That LCS received U.S. dollars at a time when Tlass was a minority shareholder says nothing about where and how these funds were ultimately expended.

In yet another attempt to connect the Intercompany Transfers to the ATA claims in this case, the Amended Complaints seek to rely on statements cherry-picked from a 2016 report by PwC.  (*Foley* AC ¶¶ 166, 168; *Finan* 3AC ¶¶ 232, 234; *Fields* 2AC ¶ 254, 256.)  As an initial matter, Plaintiffs wrongly distort the report's findings, falsely suggesting that PwC concluded that the Intercompany Transfers in 2011 were the same funds used to make the Intermediary Payments years later.  (*Foley* AC ¶ 166; *Finan* 3AC ¶ 232; *Fields* 2AC ¶ 254.)  In fact, PwC did not address that issue or draw that conclusion.  PwC simply observed that certain LCS bank accounts received U.S. dollars in 2011 and certain payments to intermediaries acting for FTOs were made out of those accounts years later.  PwC did not conduct any tracing exercise on the funds deposited in 2011, as Plaintiffs seek to wrongly imply.  Nor did PwC investigate where these payments originated or whether payments denominated in U.S. dollars were cleared through New York

12

banks.  (Ex. D at -04191 ("Additional financial review would be necessary to determine the total quantity and volume of payments that may have been processed by US financial institutions.").) Rather, the purpose of PwC's work was to investigate the scope of payments made to armed groups and their intermediaries.  (Ex. D at -04225-26.)  For these reasons, Plaintiffs can find no support in the PwC Report for their jurisdictional theories.

### 2. The ATA Claims Do Not Arise From The Two LMEA Deposits Made by LCS Customers.

The Amended Complaints allege that two wires (totaling $499,810) sent by LCS customers and directed into LCS's LMEA account help support personal jurisdiction.[6]  (*Foley* AC ¶ 178; *Finan* 3AC ¶ 244; *Fields* 2AC ¶ 266.)  But they do not even attempt to connect these customer deposits to the attacks giving rise to their ATA claims, as they must to satisfy New York's "arise from" requirement.  Rather, they offer a theory that LCS was "stockpil[ing]" U.S. dollars or using the LMEA bank account as a "slush fund," the proceeds of which were allegedly used to pay Tlass twice on September 1, 2013.  (*Foley* AC ¶¶ 187-190 (citing Pls.' Ex. 9 at -237-38); *Finan* 3AC ¶¶ 253-256 (same); *Fields* 2AC ¶¶ 275-278 (same).)

But there is no evidence that LCS actually paid Tlass with U.S. dollars from the LMEA account on September 1, 2013 or at any time.  What the evidence *actually* shows is that two customer deposits into the LMEA account were used to acquire packaging materials from Egypt Sack Company, pay fees to the Syrian government (*i.e.*, the Aleppo Finance Directorate), and pay down debt owed to the Audi Saradar Group.  (*See* MacLeod Decl. § V.A.)  Although Plaintiffs

---

[6]   Plaintiffs cite the PwC Report to claim there may have been other LMEA transactions.  (*Foley* AC ¶ 183; *Finan* 3AC ¶ 249; *Fields* 2AC ¶ 271.)  For the reasons discussed above, the PwC Report cannot be cited as evidence of New York-cleared transfers.  Moreover, jurisdictional discovery has now yielded a complete record of potentially relevant transactions.  Thus, the Court should only consider the two alleged customer deposits (totaling $499,810) that actually cleared through New York.

reference a September 30, 2013 payment from LCS to Tlass, this was made in *Euros* from a different bank account—not U.S. dollars. (*Foley* AC ¶ 188 (citing Pls.' Ex. 60); *Finan* 3AC ¶ 254 (same); *Fields* 2AC ¶ 276 (same).) To plug this gap, the Amended Complaints hypothesize that LCS "devised" an elaborate "workaround" to pay Tlass in U.S. dollars, by making an "internal book transfer between Audi Lebanon accounts" and then "reimburs[ing] itself on the back-end out of the LMEA account."[7] (*Foley* AC ¶¶ 189, 231; *Finan* 3AC ¶¶ 255, 297; *Fields* 2AC ¶¶ 277, 319.) This naked assertion is directly contradicted by the documentary evidence, which demonstrates that the two U.S. dollar payments by customers into the LMEA account were spent on normal corporate activity and thus could not have been used "to finance Pescheux's payments to Tlass."[8] (*Foley* AC ¶ 189; *Finan* 3AC ¶ 255; *Fields* 2AC ¶¶ 277; MacLeod Decl., §V.B.)

The "stockpiling" allegations in the Amended Complaints are no more than a "fungible dollar" theory of jurisdiction. Under this theory, the New York-cleared U.S. dollars supported terrorism because, even if used for legitimate expenses, they "free[d] up the U.S.-dollar cash" LCS "needed to pay Tlass, Taleb, and the terrorists they were paying." (*Foley* AC ¶ 190; *Finan* 3AC ¶ 256; *Fields* 2AC ¶ 278; *see also Foley* AC ¶ 166 ("By injecting U.S. dollars into LCS, Lafarge enabled LCS to pay Tlass and Taleb in U.S. dollars."); *Finan* 3AC ¶ 232 (same); *Fields* 2AC ¶ 254

---

[7]   Here again, the Amended Complaints misinterpret PwC's report—the only source for their claim that LMEA reimbursed LCS. (*Foley* AC ¶ 189 n. 226; *Finan* 3AC ¶ 255 n. 119; *Fields* 2AC ¶ 277 n. 117.) The PwC report states that the funds flowed the opposite way, from LCS to LMEA, as shown by "receipts within the account that reference Bruno Pescheux." (Ex. D at -4237.) The jurisdictional discovery record confirms that these U.S. dollar payments went from LCS to LMEA, not vice-versa.

[8]   Even if U.S. dollars were transferred to Tlass through the supposed "work-around," this would have no relevance to personal jurisdiction because those U.S. dollars would only have been moved between LCS's foreign bank accounts. Such funds thus would never have reached an FTO intermediary.

(same).)  Taken to its logical conclusion, a single U.S. dollar used to pay for office supplies a decade ago would confer personal jurisdiction over a foreign defendant for events taking place today.  This comes "dangerously close to asserting New York jurisdiction over any financial transaction conducted in U.S. dollars." *Przewozman*, 2023 WL 2562537, at *12.  Accepting Plaintiffs' theory would eviscerate the "nexus" requirement under New York law and the "arise out of or relate to" component of the federal minimum contacts test. *See Bristol-Myers Squibb*, 582 U.S. at 262 ("[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." (citation omitted)).  This Court should decline to adopt such an expansive theory of personal jurisdiction—a theory that, if adopted, would subject nearly every foreign company to jurisdiction in New York.[9]

### 3.    The ATA Claims Do Not Arise From the Reimbursement Transfer.

The $210,000 wire from Lafarge to Tlass in October 2014 also cannot serve as the basis for personal jurisdiction over Defendants.  As the Amended Complaints admit, the Reimbursement Transfer compensated Tlass "for the work he had already performed," "reimburse[d] him" for past security payments to FTOs, and was a "hush money" payment "designed to basically conceal the scheme and pay the intermediary to stay . . . [on] Lafarge's good side."  (*Foley* AC ¶ 162 (citing SOF ¶ 101); *Finan* 3AC ¶ 228 (same); *Fields* 2AC ¶ 250 (same); *see also* 4/12/24 Tr. at 54:17-24 (*Foley*, ECF No. 43, *Finan*, ECF No. 51, *Fields*, ECF No. 36).)  In other words, this New York-cleared payment was intended for an intermediary and no one else.

Indeed, the evidence shows that this payment marked the end of the relationship between Defendants and Tlass.  LCS had evacuated Syria a month earlier, in September 2014.  When LCS

---

[9]    As Plaintiffs point out, U.S. dollars are the "reserve currency for legitimate transactions among established, multinational business."  (*Foley* AC ¶ 222; *Finan* 3AC ¶ 288; *Fields* 2AC ¶ 310.)

paid Tlass in October (a month later), LCS and Tlass signed an agreement formally terminating their consulting arrangement.  (*Foley* AC ¶ 159 (citing Pls.' Ex. 16); *Finan* 3AC ¶ 225 (same); *Fields* 2AC ¶ 247 (same).)  Despite being irregular in some respects, the effect of the contract was unequivocal—upon receiving the $210,000 and signing the termination agreement, Tlass would no longer perform any service for LCS.  (SOF ¶ 102.)  Tlass signed the termination agreement, noting bitterly in a subsequent letter that Lafarge had "chosen to end [the relationship] entirely" and that he would no longer be a partner, shareholder, or advisor.  (Ex. E at 4.)  Given the end of their relationship, the purpose of the funds, and that LCS's evacuation from Syria a month earlier removed any rationale for paying off potential attackers, these funds cannot be said to have been paid to FTOs.

### B.    Defendants Did Not Purposefully Avail Themselves of New York.

The Amended Complaints also do not establish by a preponderance of the evidence Defendants' purposeful availment of New York with respect to any of the alleged transfers.  To "transact[] . . . business" under New York's long-arm statute, a defendant's activities must be "purposeful."  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007).  Purposeful activities are those "with which a defendant, through *volitional* acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Przewozman*, 2023 WL 2562537, at *9 (quoting *Fischbarg*, 9 N.Y.3d at 380).  "Because the touchstone for jurisdiction under New York's long-arm statute is the intent to reach the forum," jurisdiction will not extend to contacts with the forum that are "extraneous or coincidental," rather than purposeful and volitional.  *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 640 (2d Cir. 2023).  As the New York Court of Appeals has clarified, "[i]t is precisely the fact that [a] defendant[] *chose* New York, when other jurisdictions were available, that [will] make[] the New York

connection 'volitional' and not 'coincidental.'" *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016) (emphasis added).

In the correspondent banking context, a defendant acts purposefully if it directs a transfer of funds to clear through a New York correspondent bank account. *See Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 402 (S.D.N.Y. 2021) ("Here, [p]laintiffs have not alleged that Scott directed the use of a New York correspondent account, nor that the transfer of funds through the New York correspondent account was otherwise purposeful."); *Off. Comm. of Unsecured Creditors of Arcapita v. Bahr. Islamic Bank*, 549 B.R. 56, 69 (S.D.N.Y. 2016) (jurisdiction over defendant banks that "*actively directed* the funds at issue into those New York accounts"). A defendant's knowledge or awareness that a New York correspondent account would be used, on the other hand, "is patently insufficient under New York law to constitute the transaction of business." *Berdeaux*, 561 F. Supp. 3d at 403 (holding that jurisdiction would be lacking based upon the alleged use of correspondent banks "even if [defendant] not only knew that a New York correspondent account was being used but actually coordinated the use of a New York correspondent bank.").

That explains why New York and federal courts have only found ***banks***—not their customers, like Defendants here—susceptible to personal jurisdiction based on correspondent banking activities in New York. It is "[b]anks themselves" that "maintain correspondent relationships to facilitate transactions 'that otherwise have no other connection to New York, or indeed the United States.'" *Berdeaux*, 561 F. Supp. 3d at 403 n.25 (citation omitted). And it is banks—*not* their customers—that might evidence purposeful and volitional contact with New York when they affirmatively *choose* to engage with New York correspondent banks. *See Al Rushaid*, 28 N.Y.3d at 327; *see also id.* at 328 ("The focus of the jurisdictional analysis is the foreign bank's conduct vis-à-vis the correspondent bank, meaning how it uses the correspondent

17

accounts . . . .").  Because an "individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account," it is "nonsensical" to "attempt to base jurisdiction" over non-bank defendants "on wire transfers of funds moving through a New York correspondent account."  *Berdeaux*, 561 F. Supp. 3d at 403 n.25; *see, e.g.*, *Przewozman*, 2023 WL 2562537, at *12 n.15, *13 (relying on *Berdeaux* and expressing "serious doubts that Plaintiffs have alleged purposeful actions in New York" where the complaint failed to allege that defendant (which was not a bank) "intended to use or was even aware of the existence" of the specific "correspondent account in New York" used by the bank).

Against all this, the Amended Complaints allege that Defendants, none of which are banks but only *customers* of foreign banks, purposefully availed themselves of New York in connection with the 15 transfers that originated with foreign banks and cleared through New York correspondent banks.  In so doing, Plaintiffs ask this Court to be the very first to exercise personal jurisdiction over a bank customer based solely on its bank's use of correspondent bank accounts.  In seeking to break this new legal ground, the Amended Complaints collect certain facts from jurisdictional discovery, none of which evidences Defendants' purposeful availment of New York.

1.    ***Defendants' general knowledge that U.S. dollar wire transfers typically require New York clearing does not show purposeful availment.***  The bulk of Plaintiffs' evidence seeks to establish Defendants' general understanding that "U.S.-dollar wires typically require New York clearing."  (*Foley* AC ¶¶ 192; 193-203; *Finan* 3AC ¶¶ 258, 259-69; *Fields* 2AC ¶¶ 280, 281-291.)  As described above, the mere awareness that New York correspondent banks were used in dollar-denominated transfers "is patently insufficient under New York law to constitute the transaction of business."  *Berdeaux*, 561 F. Supp. 3d at 402.  Rather, a defendant's use of a correspondent account must be "purposeful" to be "considered a 'transaction of business' under the long-arm

18

statute." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (hereinafter "*Licci III*"). For this reason, the documents cited in the Amended Complaints (*e.g.*, the November 14, 2011, Shearman & Sterling memo, the November 16, 2012, Baker McKenzie alert, and generic alerts from law firms and governments, which conveyed the truism that U.S. dollar wire transfers often clear through New York), do not establish Defendants' purposeful availment.[10] (*Foley* AC ¶¶ 192, 196-98; *Finan* 3AC ¶¶ 258, 262-64; *Fields* 2AC ¶¶ 280, 284-86.)

Even if mere awareness were the standard, which it is not, the Amended Complaints misrepresent many documents supposedly demonstrating it. For example, the Amended Complaints allege that Defendants' experience with "failed U.S.-dollar wires cemented [their] understanding" that U.S. dollar transfers often clear through New York. (*Foley* AC ¶ 194; *Finan* 3AC ¶ 260; *Fields* 2AC ¶ 282.) As supposed support, Plaintiffs cite emails from late 2011, showing that LCS tried to send U.S. dollars to an affiliate's account at HSBC Singapore and an Indian customer's account at Singapore Chartered Bank in New Delhi, only to be told that U.S. dollar transfers made through HSBC's or Standard Chartered's U.S. affiliates/branches would be "blocked" by sanctions against Syria. (*Foley* AC ¶ 194 (citing Pls.' Exs. 70, 71); *Finan* 3AC ¶ 260 (same); *Fields* 2AC ¶ 282 (same).) Yet these documents do not say *why* the banks sought to clear the transactions through U.S. accounts, much less solicit Defendants' direction in re-routing them. (*Foley* AC ¶ 194 (citing Pls.' Exs. 70, 71); *Finan* 3AC ¶ 260 (same); *Fields* 2AC ¶ 282 (same).) The Amended Complaints then cite to an instance in 2015 when a U.S. dollar wire transfer failed "because of an error using 'SCB [Standard Chartered] Frankfurt' as the 'USD correspondent bank.'" (*Foley* AC ¶ 194 (citing Pls.' Ex. 73); *Finan* 3AC ¶ 260 (same); *Fields* 2AC ¶ 282 (same).)

---

[10] There is no evidence (and no basis to infer) that Defendants actually saw the Baker McKenzie alert or the various other cited materials.

This, it is alleged, led "Lafarge" to "quickly discern[]" an issue with the correspondent bank listed and changed it to a New York correspondent bank. (*Foley* AC ¶ 194 (citing Pls.' Ex. 73); *Finan* 3AC ¶ 260 (same); *Fields* 2AC ¶ 282 (same).)  Leaving aside that a 2015 incident cannot be used as proof of Defendants' state of mind in 2011, the reality is that Standard Chartered Bank, the beneficiary, was the one that actually "discerned" the error and asked BNP Paribas, the originating bank, to change the routing.  (Pls.' Ex. 73 at -4797 ("According to SCB team the problem is from PNB.  The funds were transfer to SCB [F]rankfurt instead SCB US.  Accordingly USD funds could not be transacted.  I will further investigate with SCB team.").)  All that can be discerned from these "failed wires" is that Defendants relied on their banks with respect to matters relating to cross-border U.S. dollar transfers.[11]

**2.    *Defendants' routine receipt of electronic notices and general use of payment software does not show purposeful availment.***  The Amended Complaints concede that SWIFT MT103 messages are after-the-fact confirmations of cross-border transactions.  (*Foley* AC ¶ 199; *Finan* 3AC ¶ 265; *Fields* 2AC ¶ 287.)  As a result, these messages cannot evidence Defendants' purposeful availment of New York.  Recognizing this temporal flaw, the Amended Complaints strain to assert that SWIFT messages are "sometimes obtained . . . as part of [the] approval process for the transaction."  (*Foley* AC ¶ 201; *Finan* 3AC ¶ 267; *Fields* 2AC ¶ 289.)  The Amended Complaints cite one "example" of this so-called practice, in which a Lafarge executive "approved" a transaction after receiving a SWIFT message "disclosing that JPMorgan Chase's and Citibank's

---

[11]  For this reason, the originating banks are not Defendants' agents. (*See Foley* AC ¶ 216; *Finan* 3AC ¶ 282; *Fields* 2AC ¶ 304.)  While Defendants may have specified "each transfer's date, amount, and currency denomination" (*Foley* AC ¶ 216; *Finan* 3AC ¶ 282; *Fields* 2AC ¶ 304), they did not "control[] the way [the bank] selected or used the correspondent account." *Compare Henkin v. Qatar Charity*, No. 21-CV-5716 (AMD) (VMS), 2023 WL 2734788, at *8 (E.D.N.Y. Mar. 31, 2023) *with Spetner*, 70 F.4th at 641 (agency for Palestinian bank that "instructed [a Jordanian bank] to make certain transfers 'to the U.S. bank.'" (citation omitted)).

New York branches had routed the payment." (*Foley* AC ¶ 201 (citing Pls.' Ex. 28); *Finan* 3AC ¶ 267 (same); *Fields* 2AC ¶ 289 (same).) But this again mischaracterizes the evidence. In the email from 2011, Lafarge personnel discussed two separate transactions: the transfer of $10 million to LCS at its Bank Audi account in Lebanon and the transfer of $5 million to LCS at its Bank Audi account in Syria. (*Foley* AC ¶ 199 n. 253 (citing Pls.' Ex. 28); *Finan* 3AC ¶ 265 n. 146 (same); *Fields* 2AC ¶ 287 n. 144 (same).) The $10 million transfer was first in time, after which LMEA's treasury department circulated a SWIFT receipt to confirm the deposit in Bank Audi Lebanon. (*Foley* AC ¶ 199 n. 253 (citing Pls.' Ex. 28); *Finan* 3AC ¶ 265 n. 146 (same); *Fields* 2AC ¶ 287 n. 144 (same).) The next day, LCS's treasury department requested and received approval to transfer $5 million to Bank Audi Syria. (*Foley* AC ¶ 199 n. 253 (citing Pls.' Ex. 28); *Finan* 3AC ¶ 265 n. 146 (same); *Fields* 2AC ¶ 287 n. 144 (same).) Of course, that approval related to the $5 million transfer and not to the $10 million transfer that had been deposited in LCS's account. Properly construed, the SWIFT message simply confirmed the completed $10 million transfer, and was never part of any "approval process." (*Foley* AC ¶ 201; *Finan* 3AC ¶ 267; *Fields* 2AC ¶ 289.)

Separately, the generic allegations about Quantum, Lafarge's electronic-payment software, are no more helpful to Plaintiffs. The Amended Complaints assert that each time LCS wanted to transfer funds, it needed to enter or approve the specific correspondent or intermediary bank in LCS payment software before ordering the transfer. (*Foley* AC ¶¶ 202-03; *Finan* 3AC ¶¶ 268-69; *Fields* 2AC ¶¶ 290-291.) The record does not support these allegations. At most, LCS's treasury personnel entered the correspondent bank information once, upon creating a profile for a new bank. (*See Foley* AC ¶ 202 nn. 257-58 (citing Pls.' Ex. 87 ("Regarding the payments to EIB and Proparco, please assist obtaining their bank accounts' information as we will have to setup these

2 counter-parties in our system.")); *Finan* 3AC ¶ 268 nn. 150-51 (same); *Fields* 2AC ¶ 290 nn. 148-49 (same).)  And even then, LCS did not choose the correspondent bank account to put in the system.  LCS's banks provided that information based on their preexisting relationships with correspondent banks, leaving no room for Defendants' consent or input.  (*See* Pls.' Ex. 69 at -0025059 ("Intermediary banks are usually managed by the issuing banks.")[12]; Pls.' Ex. 86 at -0050871, (Bank Audi providing "admin details" including correspondent account number for "EURO transfers to bank Audi SAL").)  As a result, when a treasury department employee added a new profile or ordered a transaction in the payment software involving an existing profile, they simply entered data that reflected the originating banks' preexisting relationships with correspondent banks in New York.  That cannot show Defendants' purposeful availment of New York.

**3.**    ***LCS's actions related to the Intercompany Transfers does not show purposeful availment.***  For similar reasons, the evidence relating to LCS's role in the Intercompany Transfers does not show purposeful availment of New York.  It is true that LCS opened a U.S. dollar bank account in Lebanon in 2011 because of increasing security risks in Syria.  (*Foley* AC ¶ 208; *Finan* 3AC ¶ 274; *Fields* 2AC ¶ 296.)  But this was the extent of LCS's actions with respect to the Intercompany Transfers.  LCS neither requested that Bank Audi Lebanon liaise with New York banks nor required that Bank Audi Lebanon obtain its U.S. dollars via New York.  Like any bank customer, LCS had "no reason to direct its foreign bank to use a New York-based correspondent

---

[12]    Elsewhere in the Amended Complaints, Plaintiffs rely on this exhibit for the proposition that Defendants "had the right to dictate the use of specific correspondent or intermediary banks." (*Foley* AC ¶ 217; *Finan* 3AC ¶ 283; *Fields* 2AC ¶ 305.)  But in this email, treasury personnel describe "managing [the intermediary bank] ourselves" as "surprising" since "intermediary banks are usually managed by the issuing banks" and "manag[ing] ourselves . . . means losing between one hour and one-and-a half hours of cut-off time."  (Pls.' Ex. 69.)

account." *Berdeaux*, 561 F. Supp. 3d at 403 n.25. And like any bank, Bank Audi was responsible for the "*choice* to project itself into New York . . . through the selection and repeated use of a[] . . . correspondent account in the forum." *Spetner*, 70 F.4th at 640 (emphasis added).

**4.      *LCS's conduct related to the LMEA Transfers does not show purposeful availment.*** The mere fact LCS received the two LMEA deposits from customers plainly is not evidence of purposeful activity on the part of any Defendant. In each case, LCS's *customers'* originating banks made the payments, and thus it was those banks (not Defendants) that presumably chose to clear the payments through New York correspondent banks. (*Foley* AC ¶ 186; *Finan* 3AC ¶ 252; *Fields* 2AC ¶ 274.) The proceeds were received into LCS's LMEA account. There is zero evidence that LCS told its customers to instruct their originating banks to use New York correspondent accounts, nor would such instruction make any sense.

**5.      *Lafarge's conduct related to the Reimbursement Transfer does not show purposeful availment.*** The clearing of the Reimbursement Transfer through a New York correspondent account reflects the decision-making of BNP Paribas, not any of the Defendants. The allegations in the Amended Complaints prove the point: while LCS "instruct[ed] BNP Paribas's Paris branch to originate a $210,000 wire transfer," it was "BNP Paribas's Paris branch [that] executed the wire through its New York correspondent account at BNP Paribas's New York branch." (*Foley* AC ¶ 161; *Finan* 3AC ¶ 227; *Fields* 2AC ¶ 249.) Thus, and despite the irregularities surrounding the supporting documentation, the Reimbursement Transfer itself was mundane—it followed the ordinary cross-border process, in which the client denominates the currency and the originating bank chooses where and how to facilitate the transfer.

That LCS employees requested information about the correspondent bank of the beneficiary does not alter this conclusion. As a preliminary matter, even if LCS needed to plug

this information into Quantum, doing so did not reflect LCS's choice to route the transaction through New York. (*See supra* at 22.) The bank of the beneficiary dictated that segment of the routing and LCS had no control over (nor reason to care) whether it chose to clear the transaction through New York or otherwise.

In fact, there is no evidence that Defendants knew the identity or location of the correspondent bank for this transfer. Contrary to the unsourced and ends-driven allegation that Defendants "confirmed that the money needed to go to JPMorgan Chase in New York" (*see Foley* AC ¶ 160; *Finan* 3AC ¶ 226; *Fields* 2AC ¶ 248), Defendants did <u>not</u> reference New York or JPMorgan Chase and did not direct BNP Paribas to clear the transaction through New York, much less through JPMorgan Chase. (*See* Pls.' Ex. 20.) Nor is there evidence that Defendants ever received the SWIFT receipt reflecting that the $210,000 payment had cleared through New York. In fact, it was not until the DOJ produced documents in this litigation that Defendants learned that JPMorgan Chase had cleared the transaction.[13] (*See* Pls.' Ex. 23, Pls.' Ex. 21 (Interrog. Resp. No. 4).) Defendants could not have purposefully availed themselves of New York in the way Plaintiffs suggest if they did not even know a bank in New York was involved in the transaction.[14]

---

[13]  This fact confirms that the clearing process for cross-border funds is clerical, involving relationships and services exchanged between and among banks, outside the purview and control of their customers.

[14]  The Amended Complaints try to infer Defendants' knowledge by citing three isolated and random times when BNP or Defendants referenced BNP's correspondent branch in New York. (*Foley* AC ¶ 205; *Finan* 3AC ¶ 271; *Fields* 2AC ¶ 293.) But these three transactions only show at most Defendants' general awareness of a correspondent relationship, which is "patently insufficient" to establish Defendants' purposeful availment of New York when initiating the specific $210,000 transaction. *See Berdeaux*, 561 F. Supp. 3d at 402. Moreover, the routing for these three transactions bear so little in common with the $210,000 transaction as to be worthless in establishing Defendants' general awareness. (*See* Pls.' Ex. 91 (2012 transaction using BNP New York to <u>receive</u> USD from Africa); Pls.' Ex. 68 (2013 transaction using BNP New York to <u>receive</u> USD from India)).

6. ***Defendants' conduct related to irrelevant transactions does not show purposeful avoilment.*** To make up for the lack of evidence demonstrating purposeful availment for the 15 alleged transfers, the Amended Complaints resort to citing evidence about *any* cross-border transaction—even those unrelated to the case, not denominated in USD, and not cleared through banks in New York or the United States. (*See Foley* AC ¶¶ 214-17; *Finan* 3AC ¶¶ 280-83; *Fields* 2AC ¶¶ 302-05.) None of these documents get any closer to establishing purposeful availment. Evidence relating to transactions cleared outside the United States (*e.g.*, transactions cleared through Australia, Frankfurt, India, and attempted (and failed) through Turkey (*see* Pls.' Ex. 96; Pls.' Ex. 98; Pls.' Ex. 100; Pls.' Ex. 101)) plainly do not show that Defendants purposefully sought to use New York correspondent banks. The same goes for transfers denominated in Euros. Thus, while the Amended Complaints focus on an internal Lafarge email stating that, given sanctions against Syria, "we have to cho[o]se wisely the bank correspondant" [sic.] (*Foley* AC ¶¶ 189, 215 (citing Pls.' Ex. 47 at -0018292); *Finan* 3AC ¶¶ 255, 281 (same); *Fields* 2AC ¶¶ 277, 303 (same)), they fail to mention that the email was discussing the transfer of Euros, not U.S. dollars. In the email chain, Lafarge Treasury personnel noted that although "[n]o transfer in whatsoever currency involving a US financial institution . . . can be effected," they could still "***transfer Euros from Syria, but we have to choose wisely the bank correspondent***." (Pls.' Ex. 47 at -0018291, -0018292.) Read in full context, these documents dispel any notion that Defendants interjected themselves into the choice of New York correspondent banks for U.S. dollar wire transfers.

Finally, evidence purporting to establish purposeful availment for jurisdictionally irrelevant transactions is itself irrelevant. Under the New York long-arm statute, "(1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise

from that business activity." *Sole Resort, S.A. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citing *McGowan v. Smith*, 52 N.Y.2d 268, 273 (1981)).  Plaintiffs have not alleged that the ATA claims arise from (i) a 2013 transfer involving Commerz Bank (Pls.' Ex. 101), (ii) a 2013 loan payment to Proparco (Pls.' Ex. 102), or (iii) a 2015 transfer to China Merchants Bank (Pls.' Ex. 103).  As a matter of law, these documents cannot establish Defendants' purposeful availment in connection with the 15 transfers underpinning Plaintiffs' ATA claims.

       **7.**     ***The purported benefits of New York clearing do not show purposeful availment.***
The Amended Complaints include allegations about supposed benefits of clearing transfers through New York in an unsuccessful effort to prove that Defendants made a "conscious choice" to source U.S. dollars from New York banks.  (*Foley* AC ¶¶ 221-44; *Finan* 3AC ¶¶ 287-310; *Fields* 2AC ¶¶ 309-332.)  These alleged benefits either do not make sense or did not apply to Defendants.

       The Amended Complaints assert that Defendants sought dollars from New York to "legitimize" their payments, "conceal" their illicit purpose, and avoid "unwanted scrutiny."  (*Foley* AC ¶ 222; *Finan* 3AC ¶ 288; *Fields* 2AC ¶ 310.)  Yet commonsense dictates that the act of routing cross-border transactions through the United States brings increased risk of scrutiny and investigation.  (*Foley* ECF No. 32, Ex. A at ¶ 9.)  That is because the United States imposes a number of regulatory requirements that promote financial transparency and deter and detect those who seek to use the financial system for illicit purposes.  (*Foley* ECF No. 32, Ex. A at ¶ 9.)  Thus, even had Defendants intended to conceal their U.S. dollar transactions, it would make no sense for them to do so through the most regulated financial market in the world.

      Setting aside that New York clearing potentially imposes more risk than benefit for companies in LCS's position, the allegedly jurisdictionally relevant transfers here did not need to be legitimized or concealed.  The record is clear, for example, that the 2011 Intercompany

Transfers were used to pay down bank debt and fund LCS's working capital.  (*See* Ex. A at -5034, Ex. B at -384, Ex. C at -584.)  Defendants duly disclosed the intercompany loan transaction to their auditors and the equity transaction to their principal shareholders.  (*See* Ex. F at -2108, Ex. G at -494.)  This dispels any notion that Defendants used New York clearing to "enhance[] the legitimacy of Defendants' U.S.-dollar payments and . . . conceal their scheme from auditors." (*Foley* AC ¶ 229; *Finan* 3AC ¶ 295; *Fields* 2AC ¶ 317.)  The same is true of the two payments made by LCS customers.  These payments were already legitimate, fully disclosed to auditors and shareholders, and otherwise "ordinary bank transfers." (*Foley* AC ¶ 229; *Finan* 3AC ¶ 295; *Fields* 2AC ¶ 317.)

The Amended Complaints also allege that paying in U.S. dollars "protected Defendants and their agents from foreign-exchange risk."  (*Foley* AC ¶ 225; *Finan* 3AC ¶ 291; *Fields* 2AC ¶ 313.)  This too gets it backwards.  Given the rapid depreciation of the Syrian pound, every outbound payment of U.S. dollars exposed Defendants to *more* foreign-exchange risk.  (*See* Pls.' Ex. 63 at -0018621 ("Since the application of US sanctions, we bear heavy exchange losses when effecting any transfer from or to our USD Operating Account.")).  If anything, this risk would have prompted Defendants to conserve U.S. dollars, not spend them.  (Ex. H at -1789-93 (coordinating vendor payment in EUR because of sanctions).)

## II.    The Court Lacks Jurisdiction Under Rule 4(k)(2).

The personal jurisdiction analysis under Federal Rule of Civil Procedure 4(k)(2) mirrors the traditional federal and state jurisdiction analysis, "except the question of whether exercising personal jurisdiction . . . depends on whether the non-resident has sufficient minimum contacts with the United States as a whole." *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 178 (S.D.N.Y. 2021).  As in the original complaints, the Amended Complaints claim jurisdiction is

27

proper because Defendants (i) used New York banks and U.S.-based email service providers, and (ii) allegedly conspired with an FTO that targeted the United States.

For the reasons discussed above, Defendants scant financial contacts with the United States through correspondent accounts in New York are just as insufficient to establish jurisdiction under Rule 4(k)(2).  *See Licci I*, 673 F.3d at 61 n.11 (stating that "[i]n many cases, the jurisdictional analysis under the New York long-arm statute may closely resemble the analysis under the Due Process Clause," and that the "similarity of state-law and constitutional standards appears particularly evident with respect to N.Y. C.P.L.R. § 302(a)(1)"); *Licci III*, 732 F.3d at 170 (stating that it would be "rare" for there to be jurisdiction under N.Y. C.P.L.R. § 302(a)(1) and not under due process analysis).

As for the use of U.S.-based email service providers, the Amended Complaints add only one new allegation: that a Lafarge in-house lawyer advised against communicating "about the conspiracy by email."  (*Foley* AC ¶ 248; *Finan* 3AC ¶ 314; *Fields* 2AC ¶ 336.)  This allegation—which is not even related to the specific use of Gmail or U.S.-based email services—plainly does not change the analysis discussed in Defendants' prior motions to dismiss; namely, the well settled rule that the "the mere location of a third party or its servers is insufficient to give rise to personal jurisdiction."  *Hungerstation LLC v. Fast Choice LLC*, No. 19-cv-05861-HSG, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020) (collecting cases), *aff'd*, No. 20-15090, 2021 WL 963777 (9th Cir. Mar. 15, 2021), *amended and superseded on denial of reh'g by* 857 F. App'x 349 (9th Cir. 2021) (*See also Foley*, ECF Nos. 24, 27; *Finan*, ECF Nos. 39, 42; *Fields*, ECF Nos. 25, 28.)

The same is true for the claim of conspiracy jurisdiction.  The Amended Complaints do not include any facts to show that an FTO's acts that caused their injuries were "expressly aimed at the United States," as is necessary to sustain conspiracy jurisdiction.  *See Waldman v. Palestine*

28

*Liberation Org.*, 835 F.3d 317, 337 (2d Cir. 2016). Nor do the Amended Complaints contain allegations to substantiate the claim of a civil conspiracy between any FTO and any Defendant. Therefore, for the reasons set forth in Defendants' prior motions to dismiss, the Amended Complaints do not adequately allege a conspiracy theory of personal jurisdiction.[15] (*Foley* AC ¶ 24; *Finan* 3AC ¶ 44; *Fields* 2AC ¶ 61.)

## III.    In All Events, Exercising Jurisdiction Over Defendants Would Be Unreasonable.

Even if personal jurisdiction were proper under N.Y. C.P.L.R. 302(a)(1) or Rule 4(k)(2), its exercise here would be unreasonable. A defendant may still "defeat jurisdiction on due process grounds" if it presents "'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Licci III*, 732 F.3d at 173 (citation omitted); *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010) ("[W]e ask whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case."). These considerations include: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.* at 164.

Here, although the United States arguably has an interest in adjudicating the rights of these U.S. Plaintiffs, the remaining factors weigh against jurisdiction. Defendants are foreign

---

[15] The *Fields* and *Foley* Amended Complaints continue to assert personal jurisdiction over Lafarge and LCS (but not Lafarge Cyprus) based on their criminal guilty plea entered in this District. For the reasons provided in the prior motions to dismiss, which are incorporated here, personal jurisdiction in these civil matters may not be established on this basis (*see Foley* ECF No. 25 at 34-35; *Fields* ECF No. 26 at 34-35.)

corporations headquartered in France, Syria, and Cyprus.  (*Foley* AC ¶¶ 12-14; *Finan* 3AC ¶¶ 30-32; *Fields* 2AC ¶¶ 45-49.)  All of the injuries, and the attacks precipitating those injuries, took place abroad.  (*Foley* AC ¶¶ 282-423; *Finan* 3AC ¶¶ 340-94; *Fields* 2AC ¶¶ 363-403.)  And any evidence would be in France and/or Syria.  In other words, it is "clear that the center of this controversy" is not New York or the United States.  *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 733 (S.D.N.Y. 2010) (jurisdiction unreasonable where defendants were not incorporated in the U.S., the bank accounts at issue were in Lebanon, the attacks took place in the Middle East, and "the only real link to this country arises because of its currency").  For these reasons, exercising personal jurisdiction over Defendants would not be reasonable in this case.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Amended Complaints should be dismissed in their entirety with prejudice.  Should the Court determine it necessary to adjudicate any disputed jurisdictional facts, Defendants respectfully request a hearing.

Dated: New York, New York
      October 1, 2024

  /s/ Jay K. Musoff
Jay K. Musoff
John Piskora
Chloe Gordils
**LOEB & LOEB LLP**
345 Park Avenue
New York, NY 10154
Telephone:    212-407-4212
Facsimile:    212-407-4990

*Attorneys for Lafarge S.A.,*
*Lafarge Cement Holding Limited, and*
*Lafarge Cement Syria S.A.*