**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIANE FOLEY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LAFARGE S.A., *et al.*, <br><br> Defendants. | Case No. 23-cv-05691-NGG-PK |
| CHARISS FINAN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LAFARGE S.A., *et al.*, <br><br> Defendants. | Case No. 22-cv-07831-NGG-PK |
| TAMARA FIELDS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LAFARGE S.A., *et al.*, <br><br> Defendants. | Case No. 23-cv-00169-NGG-PK |

**PLAINTIFFS' JOINT SUPPLEMENTAL OPPOSITION BRIEF
ADDRESSING PERSONAL JURISDICTION**

Served On:  October 28, 2024

**TABLE OF CONTENTS**

                                                                **Page**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

      A.      Plaintiffs' Claims And Jurisdictional Allegations ....................................... 3

      B.      Jurisdictional Discovery.............................................................................. 4

STANDARD OF REVIEW ...................................................................................... 6

ARGUMENT .......................................................................................................... 7

I.      NEW YORK'S LONG-ARM STATUTE CREATES PERSONAL
      JURISDICTION ............................................................................................ 7

      A.      Defendants Transacted Business In New York ........................................... 7

            1.      Defendants formed New York contacts by executing 15
                 U.S.-dollar transfers they intentionally caused to clear
                 through New York banks ....................................................................... 7

            2.      Defendants' New York transactions were purposeful ............................... 11

                 a.      Each U.S.-dollar wire reflected volitional contact......................... 11

                 b.      Defendants' knowledge shows they acted volitionally.................. 17

                 c.      Defendants misapply the "purposefulness" requirement............... 23

            3.      Defendants cannot shift their jurisdictional contacts to their banks .......... 25

                 a.      Non-banks are not immune from New York jurisdiction ............. 25

                 b.      Defendants' banks transacted in New York as their agents........... 27

      B.      Plaintiffs' Claims "Arise From" The New York Transactions.............................. 29

            1.      The October 2014 transaction alone creates jurisdiction............................ 30

            2.      The other 14 transactions have a strong nexus to Plaintiffs' claims.......... 31

                 a.      The upstream and LMEA transfers sourced U.S. dollars
                     that played a key role in Defendants' terrorist-financing
                     scheme............................................................................................ 31

b.     Defendants' temporal arguments are unpersuasive ........................34

c.     The MacLeod Declaration deserves no weight.............................36

II.     PERSONAL JURISDICTION EXISTS UNDER RULE 4(k)(2)....................................38

A.     The Court Has Conspiracy-Based Jurisdiction........................................39

B.     Defendants Formed U.S. Contacts By Using U.S.-Based Email Services ............39

C.     Defendants' Position Offends Fair Play And Substantial Justice.........................39

III.     THE COURT SHOULD REMEDY DEFENDANTS' SPOLIATION .............................40

A.     Defendants Spoliated Jurisdictionally Relevant Evidence ....................................40

B.     Defendants' Spoliation Prejudiced Plaintiffs And Warrants A Remedy ..................................................................................................................44

CONCLUSION...................................................................................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*777388 Ontario Ltd. v. Lencore Acoustics Corp.*, 142 F. Supp. 2d 309 (E.D.N.Y. 2001) ..................................................................................................35

*A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir. 1993) ....................................................10

*Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1 (N.Y. 2016) ...............................................23, 26, 30, 35

*Alter v. Rocky Point Sch. Dist.*, 2014 WL 4966119 (E.D.N.Y. Sept. 30, 2014)...........................42

*Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102 (1987) .......................................................39

*Averbach v. Cairo Amman Bank*:

2020 WL 486860 (Jan. 21, 2020) ("*Averbach I*"), *report and recommendation adopted*, 2020 WL 1130723 (S.D.N.Y. Mar. 9, 2020) ......................8, 34

2023 WL 5016884 (June 30, 2023) ("*Averbach II*"), *report and recommendation adopted*, 2024 WL 3677339 (S.D.N.Y. Aug. 6, 2024) ..........6, 7, 8, 9, 32

*Baan Co. Sec. Litig., In re*, 245 F. Supp. 2d 117 (D.D.C. 2003) .....................................................7

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629 (S.D.N.Y. 2012)..................................................................................38

*Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020)...................................................................................8, 10, 32

*Belen v. Herman*, 2024 WL 182588 (Jan. 27, 2024), *recon. denied*, 2024 WL 1345791 (S.D.N.Y. Mar. 28, 2024)...............................................10, 22, 23, 29

*Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379 (S.D.N.Y. 2021)..........................................26, 27

*Binder v. Long Island Lighting Co.*, 57 F.3d 193 (2d Cir. 1995) ..................................................43

*Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718 (Mar. 7, 2023), *recon. denied*, 2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) .......................................8, 10

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).................................................................39

*Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010)................................6, 31

*Daou v. BLC Bank, S.A.L.*:

2021 WL 1338772 (S.D.N.Y. Apr. 9, 2021), *aff'd*, 42 F.4th 120 (2d Cir. 2022)..........................................................................................................11

42 F.4th 120 (2d Cir. 2022) ..............................................................................11, 31, 35

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 850 N.E.2d 1140 (N.Y. 2006)........................31

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013) ..........................6, 7, 39

*DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839 (N.D. Ill. 2021)....................................................................................................43

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 397 F. Supp. 3d 323 (S.D.N.Y. 2019), *aff'd in relevant part*, 40 F.4th 56 (2d Cir. 2022) ........................25

*Est. of Henkin v. Kuveyt Türk Katilim Bankasi A.Ş.*, 2023 WL 4850999 (E.D.N.Y. July 28, 2023) ("*Henkin II*").....................................................................33

*Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167 (S.D.N.Y. 2022)....................................45

*Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2019 WL 6838672 (S.D.N.Y. Dec. 16, 2019) ..................................................................................45

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021)......................................32

*Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001) ....................................................42

*Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161 (D.C. Cir. 2013)....................................................42

*Ginsberg v. Gov't Props. Tr., Inc.*, 2007 WL 2981683 (S.D.N.Y. Oct. 10, 2007)..........................6

*Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66 (2d Cir. 2017) ........................................29

*Henkin v. Charity*, 2023 WL 2734788 (E.D.N.Y. Mar 31, 2023) ("*Henkin I*")............8, 28, 32, 34

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................................30

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696 (N.Y. 2002) ..................10, 35, 36

*JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247 (S.D.N.Y. 2005) ................................19

*Khodeir v. Sayyed*, 348 F. Supp. 3d 330 (S.D.N.Y. 2018) ............................................................29

*King v. Habib Bank Ltd.*, 2022 WL 4537849 (Sept. 28, 2022), *recon. denied*, 2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) ........................................................................8

*King v. Wang*, 2021 WL 5232454 (S.D.N.Y. Nov. 9, 2021)..........................................................20

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*:

   984 N.E.2d 893 (N.Y. 2012) ("*Licci III*")..............................11, 15, 26, 27, 29, 30, 32, 36

   732 F.3d 161 (2d Cir. 2013) ("*Licci IV*")..............................8, 9, 11, 25, 27, 36, 38, 39, 40

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) ................................................12

*Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055
　　(S.D.N.Y. Mar. 12, 2018) ..............................................................................................45

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160
　　(2d Cir. 2015) ................................................................................................................19

*McNamee v. Clemens*, 762 F. Supp. 2d 584 (E.D.N.Y. 2011) .......................................................35

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996) .................................39

*Mfg. Auto. & Software Sys., Inc. v. Hughes*, 2018 WL 5914238
　　(C.D. Cal. Aug. 20, 2018) ......................................................................................... 42-43

*Miroglio S.P.A. v. Conway Stores, Inc.*, 2007 WL 391565 (Feb. 6, 2007),
　　*report and recommendation adopted*, 2008 WL 4600984 (S.D.N.Y.
　　Oct. 15, 2008) ...............................................................................................................22

*Naples v. Stefanelli*, 2015 WL 541489 (E.D.N.Y. Feb. 7, 2015)...................................................39

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
　　549 B.R. 56 (S.D.N.Y. 2016)..........................................................................................23

*Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570 (S.D.N.Y. July 2017).....................45

*Przewozman v. Qatar Charity*, 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023)................7, 8, 9, 10,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　11, 24, 31, 33, 34

*Puerto Rico Tel. Co. v. San Juan Cable LLC*, 2013 WL 5533711
　　(D.P.R. Oct. 7, 2013) ......................................................................................................42

*Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253 (2d Cir. 1999) ...................................................44

*Renren, Inc. Deriv. Litig., In re*, 127 N.Y.S.3d 702 (N.Y. Sup. Ct. 2020) ...................................25

*Rosa v. Genovese Drug Stores, Inc.*, 2017 WL 4350276 (E.D.N.Y. July 31, 2017) .....................44

*Schansman v. Sberbank of Russia PJSC*:

　　565 F. Supp. 3d 405 (2021), *recon. denied*, 2022 WL 4813472
　　(S.D.N.Y. Sept. 30, 2022)...........................................................................................8, 10

　　2024 WL 1468414 (S.D.N.Y. Mar. 28, 2024) ................................................................8

*Siani v. State Univ. of N.Y.*, 2010 WL 3170664 (E.D.N.Y. Aug. 10, 2010)..................................42

*Singer v. Bank of Palestine*, 2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ..................................32

*Spetner v. Palestine Inv. Bank*, 70 F.4th 632 (2d Cir. 2023) .............................7, 8, 9, 10, 11, 12, 14, 16, 20, 22, 23, 26, 27, 28, 29, 32, 34, 38, 40

*Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..............8, 10, 31, 34, 39, 40

*Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010)................................................40

*Tether & Bitfinex Crypto Asset Litig., In re*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021)......................25

*United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986)....................................36

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ...................................................................20

*United States v. Heras*, 609 F.3d 101 (2d Cir. 2010)......................................................................18

*United States v. Kaylor*, 2019 WL 5188950 (E.D.N.Y. Oct. 15, 2019) ..........................................9

*United States v. Loe*, 248 F.3d 449 (5th Cir. 2001) .......................................................................36

*United States v. Quinn*, 403 F. Supp. 2d 57 (D.D.C. 2005)............................................................18

*United States v. Weisberg*, 2011 WL 4345100 (E.D.N.Y. Sept. 15, 2011) ..............................36, 37

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776 (2d Cir. 1999)...............................................40

*Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301 (E.D.N.Y. 2023)...................................8, 10, 25, 38


STATUTES AND RULES

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(a)(6), 130 Stat. 852, 852 (2016)..............................................................................................40

N.Y. C.P.L.R. § 302(a)(1)....................................................................7, 11, 23, 25, 27, 29, 31, 32

Fed. R. Civ. P.:

  Rule 4(k)(2)..........................................................................................................................7, 38

  Rule 12(g)(2)..........................................................................................................................39

  Rule 12(h) ..............................................................................................................................39

  Rule 26(b)(3)(A) ....................................................................................................................42

  Rule 37 adv. comm. note to 2015 amendment.......................................................................45

  Rule 37(e)....................................................................................................................40, 42, 43

Rule 37(e)(1) ............................................................................................44, 45

Rule 37(e)(2)(A) .............................................................................................45

Fed. R. Evid.:

Rule 801(d)(2).............................................................................................7, 9

Rule 801(d)(2)(A) ............................................................................................9

Rule 801(d)(2)(D) ............................................................................................9

Rule 803(6) ................................................................................................7, 9

Rule 803(8) .....................................................................................................7

Rule 803(17) .................................................................................................20

2d Cir. R. 32.1.1(a) .......................................................................................29


OTHER MATERIALS

*Belen v. Herman*, No. 1:22-cv-6455 (S.D.N.Y.):

Decl. of Ariel E. Belen, Dkt. 40-1 (Dec. 13, 2022) ...........................................29

Decl. of Lane Wooley, Dkt. 26 (Oct. 21, 2022)................................................29

Restatement (Second) of Torts (1965)........................................................................18

Restatement (Third) of Agency (2006)........................................................................29

## INTRODUCTION

Discovery has confirmed that this Court has personal jurisdiction over all three Defendants. As Lafarge[1] admitted in its shocking guilty plea, Defendants "routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations – ISIS and al-Nusrah Front [("ANF")] in Syria." AC ¶ 1. That crime involved substantial New York and U.S. contacts. Defendants not only used U.S.-based email services and conspired with terrorists targeting the United States, but also used New York banks. Jurisdictional discovery focused on the latter. And discovery left no doubt that Defendants' criminal scheme purposefully exploited New York's banking system. Indeed, Defendants no longer dispute that they executed at least 15 wire transfers that cleared through New York correspondent banks.

Those 15 transactions create jurisdiction under settled precedent. New York's long-arm statute is a "single act statute," so identifying even one relevant New York transfer is enough. The evidence easily clears that bar. It pinpoints the details of Defendants' repeated U.S.-dollar wires; reveals why Defendants chose to transact in U.S. dollars; and depicts how they benefited from routing those dollars through New York. It also shows that Defendants emailed constantly about the New York correspondent accounts they used. Just before wiring $210,000 to their ISIS cutout Firas Tlass, for example, Lafarge's accounting manager verified "the US correspondent bank" after seeing that "the invoice is in USD." AC ¶ 160. Once he confirmed the routing details, he directed Lafarge's dollars through New York and onto Tlass's account in Dubai.

Defendants disavow those contacts by continuing to blame the transfers on their banks. But discovery has made that argument untenable. The evidence now confirms that Defendants

---

[1] "Lafarge" is Defendant Lafarge S.A. Dkt. 67-1 ("AC"), ¶ 12. The other Defendants are Lafarge Cement Holding Limited and Lafarge Cement Syria S.A. ("LCS"). *Id.* ¶¶ 13-14. All complaint and docket cites are to the *Foley* action. This brief is submitted jointly on behalf of the *Foley*, *Finan*, and *Fields* Plaintiffs, whose jurisdictional allegations are materially identical.

monitored their banks obsessively, stayed in continuous contact with them, and often injected themselves directly into the execution process.  They did so because they found non-New York options for attaining U.S. dollars less attractive – slower, costlier, and riskier – than ordinary bank wires.  So they went to great lengths to pursue the latter.  They even opened two phony accounts – one held by an Egyptian affiliate, the other by a Tlass front company – to evade U.S. sanctions and gain (in their words) the ability to "enter the US Financial System."  AC ¶ 192. And when Defendants executed via those accounts, they used standard settlement instructions they knew would route through New York banks.  That is textbook purposeful availment.

All these New York transfers had a close nexus to Plaintiffs' claims.  Defendants have admitted that the $210,000 wire they paid to Tlass was pivotal to their criminal scheme.  And the other 14 wires injected LCS with scarce U.S. dollars that helped it fund the terrorist payoffs. Defendants respond with a flawed "tracing exercise" purporting to disprove a one-to-one tie between the individual dollars received and the individual dollars given to terrorists.  That analysis is riddled with errors.  But it is also irrelevant:  money is fungible, and jurisdiction does not demand a causal link between the New York wires and the terrorist payoffs anyway.  So even if Defendants were tracing their money properly – which they are not – it would be beside the point.  Further, Defendants intentionally spoliated key evidence bearing on the assumptions that underpin their tracing analysis.  The Court should preclude it for that reason alone.

In the end, however, the Court need not reach those issues.  That is because Defendants have almost nothing to say about their $210,000 wire, which by itself supplies the "single act" New York law requires.  There is no serious dispute that Defendants spent months orchestrating that wire; that they knew it would clear through New York; that they benefited when it did; and that it was integral to the conspiracy.  Nothing more is needed.  The motion should be denied.

2

## BACKGROUND

### A.     Plaintiffs' Claims And Jurisdictional Allegations

Plaintiffs earlier described the merits of their claims in detail.  Dkt. 26 at 3-11.  Most relevant here, Defendants conspired with ISIS and ANF to boost their profits from their Syrian cement plant near Jalabiyeh.  AC ¶¶ 45-51, 79-86, 88.  In furtherance of the conspiracy, Defendants intentionally gave the terrorists millions of dollars in cash and cement.  *Id.* ¶¶ 54-78.

Defendants used two main "intermediaries" – Firas Tlass and Amro Taleb – to deliver their payments to ISIS and ANF and to obscure their own involvement.  *Id.* ¶¶ 21-22, 52-53, 72-73, 89.  They also generated fake invoices for the payments, *id.* ¶ 91; used pseudonyms and other code words, *id.* ¶¶ 82, 91; and funneled the money through a web of 54 hard-to-trace bank accounts, *id.* ¶ 224.  A Lafarge lawyer similarly instructed company executives to discuss the scheme over personal email, to keep the evidence off Lafarge's corporate servers.  *Id.* ¶¶ 5, 246-48.  Throughout, LCS CEO Bruno Pescheux was the conspiracy's leading architect.  *Id.* ¶¶ 18, 51, 55, 75, 90-92.  Working with Lafarge executives, he devised ways to minimize "suspicion in connecting LCS and [Tlass]."  Ex. 59.[2]  He also orchestrated the terrorist payoffs, telling Tlass that "bank transfer[s] in USD" were Defendants' "preferred option" for payment.  Ex. 1 at 2.

Plaintiffs plead three bases for personal jurisdiction.  AC ¶¶ 148-273.  The latter two – alleging Defendants' conspiracy with terrorists who targeted the United States, and use of U.S. email providers – alone suffice for jurisdiction.  *Infra* Part II.  But because discovery did not address those theories, this brief focuses on Defendants' use of New York banks.  *Infra* Part I.  As Plaintiffs allege, Defendants' criminal scheme relied on New York's banking system to

---

[2] "Ex." means the exhibits attached to the *Foley* Plaintiffs' First Amended Complaint. "Branson Decl. Ex." means the exhibits attached to the Declaration of Joshua D. Branson. "SOF" means the Statement of Facts appended to Lafarge's guilty plea.  *See* AC ¶ 1 n.1.

3

facilitate their U.S.-dollar transactions.  AC ¶¶ 149-54.  New York banks served as *correspondents* and *intermediaries* for those transactions.  *Id.* ¶¶ 149-50.  That means that, when Defendants ordered wire transfers in U.S. dollars, they relied on New York banks to route the dollars and to facilitate settlement with their counterparties' banks.  *Id.*  This process is often called *dollar clearing*.  *Id.* ¶¶ 151-52.  In transacting in U.S. dollars, Defendants repeatedly executed wire transfers they caused to clear through New York.  *Id.* ¶¶ 155, 159-61, 163-65, 186.

## B.   Jurisdictional Discovery

Defendants moved to dismiss Plaintiffs' first complaints.  Dkt. 25.  The Court reserved judgment and ordered "limited jurisdictional discovery" for "60 days."  Dkt. 37 ¶ 2.  Judge Kuo thus set a protocol for discovery over a "very compressed time period."  4/5/24 Tr. 13:19-21.  That protocol assumed that the "scope of what [Plaintiffs] need to prove" at this stage was "pretty limited" and did not require a "full record."  4/12/24 Tr. 21:20-22:8; *see* 5/2/24 Tr. 21:13-15 ("discovery" was "fairly limited" given "short time period").  Defendants repeatedly (and often successfully) opposed discovery on the ground that it was "limited" and "expedited."[3]

Under Judge Kuo's careful supervision, discovery yielded abundant evidence of Defendants' New York contacts.  But it was also cabined in three material ways.  *First*, Plaintiffs were not permitted to probe the details of Defendants' terrorist payoffs.  As Defendants successfully argued, they did not need to disclose "all the payments [they] made to" Tlass and Taleb, because "cash payments in Syria have nothing to do with personal jurisdiction."  4/23/24 Tr. 11:14-25; *see id.* at 22:6-23:25.  Judge Kuo also ruled that "track[ing] down those

---

[3] *E.g.*, 4/5/24 Tr. 10:23-25 (arguing that requests were "not authorized by the Court's order to take limited jurisdictional discovery"); 5/2/24 Tr. 42:7-8 ("limited jurisdictional discovery"); 5/10/24 Tr. 22:4, 28:3-4 ("expedited" and "limited jurisdictional discovery"); 5/20/24 Tr. 59:1 ("expedited limited discovery"); *id.* at 69:2-3 ("expedited limited jurisdictional discovery").

transactions" would be "burdensome[ ]," given Defendants' statement that they "can't search for those as readily." *Id*. at 23:19-25. The governing principle was that the "details" of payments made "outside the United States" did not "matter for jurisdictional purposes." *Id*. at 23:2-4.

*Second*, Plaintiffs were not permitted to conduct depositions. 4/12/24 Tr. 21:10-22:20. Defendants objected to depositions by representing "that of the dozens and dozens of people involved nobody's left at the company or in the company's control." *Id*. at 20:10-12. Defendants also said those witnesses were "in foreign countries" and "not necessarily amenable to the Court's subpoena power." *Id*. at 20:10-14.[4] Judge Kuo accepted those representations and declined to build depositions into the "aggressive discovery schedule." *Id*. at 21:11-12, 22:9-10.

*Third*, discovery was limited to "whether the defendant transacted business in New York." 4/5/24 Tr. 13:24-14:2. So while the parties focused on Defendants' U.S.-dollar wires that cleared through New York, Plaintiffs did not receive separate discovery about Defendants' conspiracy with ISIS or ISIS's targeting of the United States. *See* 4/5/24 Tr. 22:1-23 (rejecting request for conspiracy documents as too "broad" given "expedited discovery"); *id.* at 21:4-6 (Defendants refusing discovery about "conspiracy and the scope of the conspiracy").

After discovery, Plaintiffs amended their complaints and attached 124 new documents supporting their jurisdictional allegations. Most were produced by Defendants. A few – including emails from conspirators' personal accounts, which Defendants intentionally failed to preserve, *infra* Part III – were produced by the government in response to Plaintiffs' subpoena. Exs. 1, 59, 121. Defendants now have filed a supplemental brief urging dismissal ("Suppl. Br.").

---

[4] Plaintiffs learned during discovery that former Lafarge executive Guillaume Roux, AC ¶ 20, whom Defendants had identified as someone likely to have discoverable information relevant to personal jurisdiction, was in California. They served a document subpoena on him, and were preparing to seek leave to depose him, until they learned via his counsel that he had left the United States and would not be returning before the close of jurisdictional discovery.

**STANDARD OF REVIEW**

After jurisdictional discovery, Plaintiffs need only make "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (per curiam). That post-discovery "burden" is "not heavy." *Averbach v. Cairo Amman Bank*, 2023 WL 5016884, at *6 (June 30, 2023) ("*Averbach II*"), *report and recommendation adopted*, 2024 WL 3677339 (S.D.N.Y. Aug. 6, 2024). It requires merely that Plaintiffs' "showing of jurisdiction" be "factually supported." *Id.*

Defendants err in asserting (at 4-5) that Plaintiffs bear the burden of proving jurisdiction by a "preponderance of the evidence." A preponderance standard applies only if the Court chooses to conduct a "full-blown evidentiary hearing." *Dorchester*, 722 F.3d at 86-87; *see Averbach II*, 2023 WL 5016884, at *10 (rejecting "preponderance" standard); *Ginsberg v. Gov't Props. Tr., Inc.*, 2007 WL 2981683, at *4 n.1 (S.D.N.Y. Oct. 10, 2007) (similar). Given the limited, expedited nature of the discovery taken, *supra* pp. 4-5, the Court should decline Defendants' cursory request (at 4) for such a hearing. Indeed, Judge Kuo made clear that the parties' "limited discovery" was "not for purposes of trial." 5/20/2024 Tr. 20:21-22, 22:11-13. And Defendants avoided depositions by asserting that their fact witnesses were beyond the Court's subpoena power anyway. 4/12/24 Tr. 20:4-14, 22:11-20. Without fact witnesses, an evidentiary hearing would add little to the written record and would needlessly delay the case.[5]

The Court thus should follow the normal practice in this circuit and require only a "prima facie showing" of jurisdiction. *Averbach II*, 2023 WL 5016884, at *9; *see Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (applying prima-facie standard after

---

[5] If the Court does hold a hearing, Plaintiffs will seek leave to subpoena Defendants' current and former employees (such as Pescheux and Khodara) for depositions and live testimony. Plaintiffs will also seek to examine witnesses about Defendants' spoliation. *Infra* Part III.

"extensive discovery"). The complaints properly attach "documents produced in discovery" to make that showing. *Averbach II*, 2023 WL 5016884, at *7.[6] In evaluating that evidence, the Court should resolve any factual disputes in Plaintiffs' favor. *See Dorchester*, 722 F.3d at 85.

## ARGUMENT

Personal jurisdiction exists under two long-arm statutes and constitutional due-process principles. *See Przewozman v. Qatar Charity*, 2023 WL 2562537, at *7 (E.D.N.Y. Mar. 17, 2023) (Garaufis, J.) (noting "two steps of analysis"). Plaintiffs' lead theory invokes New York's long-arm statute. *Infra* Part I. Alternatively, jurisdiction exists under Rule 4(k)(2). *Infra* Part II.

## I.      NEW YORK'S LONG-ARM STATUTE CREATES PERSONAL JURISDICTION

Personal jurisdiction first arises from N.Y. C.P.L.R. § 302(a)(1), which covers persons who "transact[ ] any business" in New York directly or "through an agent." Both its elements are met here: (A) each Defendant transacted business in New York by "avail[ing] itself of the benefits of the New York financial system," and (B) the New York contacts had an "articulable nexus" to Plaintiffs' claims. *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 643 (2d Cir. 2023).

### A.      Defendants Transacted Business In New York

#### 1.      Defendants formed New York contacts by executing 15 U.S.-dollar transfers they intentionally caused to clear through New York banks

Defendants purposefully used New York correspondent banks to clear the U.S.-dollar transactions at the heart of their terrorist-financing scheme. AC ¶¶ 8, 148-244. The "use of a correspondent bank account" can "involve[ ] transacting business" in New York. *Spetner*, 70

---

[6] Defendants are wrong (at 5) that Plaintiffs must adduce "admissible evidence" at this stage. *See Averbach II*, 2023 WL 5016884, at *10 (rejecting need for "admissible evidence"); *In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 125 n.9 (D.D.C. 2003) (similar); *see also* 5/20/24 Tr. 22:11-13 (Judge Kuo instructing Plaintiffs that "admissibility" was "not the issue"). At any rate, Defendants do not challenge the admissibility of the discovery documents and public records the complaints cite to support personal jurisdiction. AC ¶¶ 148-273; *see* Fed. R. Evid. 801(d)(2), 803(6), 803(8). Any evidentiary objections have thus been forfeited.

F.4th at 639.  Using "a New York correspondent bank account, standing alone," creates

jurisdiction when "use of the correspondent account was purposeful."  *Licci ex rel. Licci v.*

*Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci IV*").

In recent years, "a series of terrorism-financing cases in the Second Circuit" have applied

*Licci* to uphold jurisdiction over foreign actors that "executed funds transfers in New York."

*King v. Habib Bank Ltd.*, 2022 WL 4537849, at *2 (Sept. 28, 2022), *recon. denied*, 2023 WL

8355359 (S.D.N.Y. Dec. 1, 2023).[7]  Those cases reflect the principle that using "New York's

banking system" to route U.S. dollars to fund terrorist actors reflects "purposeful availment of

the privilege of doing business in New York."  *Licci IV*, 732 F.3d at 171 (cleaned up).

That principle applies to Defendants, which repeatedly executed U.S.-dollar wires they

caused to clear through New York banks.  AC ¶¶ 153-56.  The complaints supply ample

"specificity regarding the scope and extent of the use of the [New York bank] account[s]" and

"indication[s] of *why* the transfers were made 'through' New York."  *Przewozman*, 2023 WL

2562537, at *12.  They detail 15 U.S.-dollar wire transfers that Defendants executed through

New York; specify the date and amount of each wire; trace each one to Lafarge's originating or

beneficiary bank; and pinpoint the New York banks that cleared each one.  AC ¶ 155.  The

complaints also cite (¶¶ 159-61, 163, 165, 186) admissible evidence – including interrogatory

---

[7] *See Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 331-32 (E.D.N.Y. 2023); *Bonacasa v. Standard Chartered PLC*, 2023 WL 2390718, at *5-7 (Mar. 7, 2023), *recon. denied*, 2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023); *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 412-14 (2021), *recon. denied*, 2022 WL 4813472 (S.D.N.Y. Sept. 30, 2022); *Schansman v. Sberbank of Russia PJSC*, 2024 WL 1468414, at *2-4 (S.D.N.Y. Mar. 28, 2024); *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *5-6 (E.D.N.Y. Nov. 25, 2020); *Averbach v. Cairo Amman Bank*, 2020 WL 486860, at *4-9 (Jan. 21, 2020) ("*Averbach I*"), *report and recommendation adopted*, 2020 WL 1130723 (S.D.N.Y. Mar. 9, 2020); *Averbach II*, 2023 WL 5016884 at *4-11; *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 18-30 (E.D.N.Y. 2016); *see also Henkin v. Charity*, 2023 WL 2734788, at *11-13 (E.D.N.Y. Mar 31, 2023) ("*Henkin I*") (authorizing discovery).

responses,[8] transaction records,[9] SWIFT messages,[10] and contemporaneous emails[11] – confirming the wire details.  They cite similar evidence that Defendants consciously chose to execute these wires in U.S. dollars, *id*. ¶¶ 157-62, 166-69, 178-82, 221-27, and intended them to clear through New York banks, *id*. ¶¶ 191-220, 228-44.  All this evidence depicts Defendants' "purposeful" choice "to gain convenient access to New York's financial system."  *Spetner*, 70 F.4th at 642.

Defendants' New York contacts easily surpass the jurisdictional threshold.  Section 302(a)(1) is a "single act statute, meaning one transaction in New York is sufficient if it bears the markers of a purposeful transaction."  *Przewozman*, 2023 WL 2562537, at *13.  Defendants' 15 wire transfers far exceed that one-act threshold.  Their "frequency and deliberate nature" support personal jurisdiction under settled precedent.  *Licci IV*, 732 F.3d at 168.

To start, Defendants' New York transactions were quantitatively significant.  For each of the 15 wires that Defendants cleared through New York, the complaints detail "how, why, when, and how much money was transferred."  *Przewozman*, 2023 WL 2562537, at *13; *see* AC ¶¶ 157-90.  Defendants do not "submit[ ] controverting evidence showing that these transfers did not occur or that they were not routed through New York."  *Averbach II*, 2023 WL 5016884, at *7.  It is thus *undisputed* that Defendants executed at least 15 U.S.-dollar wires, totaling

---

[8] Ex. 21 (Resps. to Interrog. Nos. 4-5).  Defendants' verified interrogatory responses are admissible as a statement of a party opponent.  *See* Fed. R. Evid. 801(d)(2).

[9] Defendants' bank records and other transaction data (Exs. 10, 20, 56) are admissible as statements of a party opponent, including via its agent.  *See* Fed. R. Evid. 801(d)(2)(A), (D).  The third-party bank records the complaints cite (Exs. 22-23) are also admissible as business records.  *See* Fed. R. Evid. 803(6); Branson Decl. Exs. 136, 137 (declarations from custodians of records).

[10] Exs. 12-15, 28, 58.  SWIFT refers to the standard protocol for sending cross-border wire-transfer messages.  AC ¶ 199.  These SWIFT messages appear in Defendants' emails, which makes them admissible as statements of a party opponent.  *See* Fed. R. Evid. 801(d)(2); *United States v. Kaylor*, 2019 WL 5188950, at *7 (E.D.N.Y. Oct. 15, 2019) (collecting cases).

[11] Exs. 16-18, 24-26, 55.  Such emails are admissible because they were sent by Defendants' employees or agents.  *See* Fed. R. Evid. 801(d)(2); *Kaylor*, 2019 WL 5188950, at *7.

$61,902,605, that cleared through New York banks.  AC ¶ 155.[12]  The "volume and frequency" of those transfers amply confirm purposeful availment.  *Przewozman*, 2023 WL 2562537, at *11.

Other cases have found jurisdiction based on less.  One court exercised jurisdiction without a single concrete New York transfer alleged.  *See Bonacasa*, 2023 WL 2390718, at *6 ("complaint does not point to specific, [terror]-related transactions in New York").  Another court upheld jurisdiction based on "at least one" transaction "for each Defendant."  *Bartlett*, 2020 WL 7089448, at *5 n.2.  Another cited a single "$400,000 bribe . . . cleared by a U.S. bank."  *Zobay*, 695 F. Supp. 3d at 331.  Yet another cited just "two identified transfers."  *Schansman*, 565 F. Supp. 3d at 414.  Still others relied on five or six transfers.  *See Strauss*, 175 F. Supp. 3d at 23 ("five New York Transfers"); *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 701 (N.Y. 2002) (six).  And one recently based jurisdiction on "fifteen wire transfers" through "Citibank in New York."  *Belen v. Herman*, 2024 WL 182588, at *2-3 (Jan. 27, 2024), *recon. denied*, 2024 WL 1345791 (S.D.N.Y. Mar. 28, 2024).  In most of those cases, the transaction volumes did not even approach the $62 million here.  *See, e.g.*, *Schansman*, 565 F. Supp. 3d at 414 ("transfers amounting to $300"); *Strauss*, 175 F. Supp. 3d at 21 ("just $205,000"); *Zobay*, 695 F. Supp. 3d at 331 ("$400,000").  So the tens of millions of dollars here readily "establish the minimum contacts necessary to show" purposeful availment.  *Belen*, 2024 WL 182588, at *4.

Recent Second Circuit precedent confirms the point.  Before 2023, a minority of district courts in this circuit had refused jurisdiction in cases involving a "relatively small number of

---

[12] The transaction data reveals three other U.S.-dollar transactions that likely cleared through New York, as the accompanying declaration of Sarah Runge ("Runge Decl.") explains.  Runge Decl. ¶¶ 25-28.  Ms. Runge is an expert in correspondent banking and terrorist financing, and her declaration addresses the industry custom and practice for cross-border payments.  *See Spetner*, 70 F.4th at 638 n.5, 641 n.22 (citing similar declaration in addressing jurisdiction); *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 82-83 (2d Cir. 1993) (same).  Although those three other transfers are unnecessary for jurisdiction, full discovery would confirm them.

specific correspondent transactions." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022); *see Daou v. BLC Bank, S.A.L.*, 2021 WL 1338772, at *8 (S.D.N.Y. Apr. 9, 2021) (citing cases). But the Second Circuit rejected that reasoning (while affirming on other grounds). Observing that § 302(a)(1) is a "single act statute," the Second Circuit emphasized that even "one transaction in New York is sufficient to invoke jurisdiction." *Daou*, 42 F.4th at 129. It then held that banks had "transacted business" in New York by using "New York correspondent accounts to execute transactions" on "at least four occasions." *Id*. at 130. If four transactions are frequent enough to show purposeful availment, 15 wire transfers are more than enough.

### 2. Defendants' New York transactions were purposeful

Defendants' 15 U.S.-dollar wire transfers were also "sufficiently purposeful to satisfy New York's long-arm statute." *Spetner*, 70 F.4th at 642.

#### a. Each U.S.-dollar wire reflected volitional contact

i. Defendants' wire transfers through New York banks reflected "volitional acts." *Przewozman*, 2023 WL 2562537, at *9. Lafarge was a major multinational company with a sophisticated corporate treasury team that often needed to quickly move U.S. dollars across borders. AC ¶¶ 192-95, 214, 212-20. When it did, it followed the industry's standard practice by exploiting the speed and efficiency of New York clearing. *Id*. ¶¶ 149-56; Runge Decl. ¶¶ 9-19. Such conduct typically "'show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York.'" *Licci IV*, 732 F.3d at 168 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893, 900 (N.Y. 2012) ("*Licci III*")).

Defendants sought those benefits (and others) here. They did so because their criminal scheme depended on U.S. dollars. AC ¶¶ 153-54, 221-28. Defendants consciously chose to transact in U.S. dollars – calling "bank transfer[s] in USD" their "preferred option" for paying

11

terrorists, *id.* ¶¶ 153, 222 (citing Ex. 1) – for several reasons.  Concealment was chief among them.  Because Syria was subject to strict international sanctions, *id.* ¶¶ 49 & n.23, 169 & n.176, transacting in Syrian pounds risked extra scrutiny from auditors and regulators, *id.* ¶¶ 222-24, 229-30.  So Defendants preferred to transact in U.S. dollars – the global reserve currency for legitimate business dealings – to minimize "any suspicion" of their terrorist payoffs.  *Id.* ¶ 223 (citing Ex. 59).  Using U.S. dollars also mitigated their Syria-specific foreign-exchange risk and supplied ISIS with the type of currency it coveted.  AC ¶¶ 225-27.  Plaintiffs now have adduced substantial evidence to bolster their allegations on these points.  *See* AC ¶¶ 153, 222-27 (citing, *e.g.*, Exs. 1, 3-4, 40, 59, 105-09); Runge Decl. ¶¶ 20-21; Levitt Decl. at 47-48.[13]

ii.  Defendants' need for dollars led them to use New York banks.  For all three categories of U.S.-dollar wires at issue, *see* AC ¶¶ 155-56, Defendants realized that "bypass[ing] the United States to clear dollars" would be risky and expensive, *Spetner*, 70 F.4th at 641.

**Firas Tlass.**  On October 24, 2014, Defendants wired $210,000 to Tlass through two New York banks.  AC ¶¶ 159-62.  The payment followed 16 months of negotiations in which Defendants implored Tlass to accept payment via "a bank transfer in USD" to a "duly registered company."  Ex. 1 at 2; *see* AC ¶¶ 229-36 (detailing negotiations).  Defendants knew that such a transfer would involve New York clearing, consistent with standard practice.  *Id.* ¶¶ 160, 191-206.  In fact, that was the point:  Defendants' desire to execute an ordinary-looking wire – cleared through ordinary New York banking channels – drove their negotiations.  AC ¶¶ 229-36.

---

[13] "Levitt Decl." is the accompanying Declaration of Matthew Levitt.  Dr. Levitt is an expert in terrorism and terrorist financing, and his declaration supports Plaintiffs' allegations about ISIS's operational and financial practices.  Courts have repeatedly accepted Dr. Levitt's expert analysis as the "gold standard in the field of international terrorism."  *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 325 (E.D.N.Y. 2013).

Defendants' history with Tlass spurred them to pay him via a New York-cleared wire. Defendants needed to cover Tlass's $75,000 monthly stipend for paying off terrorists. AC ¶¶ 93-94, 157. But they had long struggled to effect payment, because U.S. sanctions blocked New York banks from clearing wires to Syrian persons like Tlass. *Id*. ¶¶ 187-89, 230-42. So Defendants first had to devise a convoluted "book transfer" procedure for sourcing U.S. dollars into Lebanon and depositing them into Tlass's personal account at Bank Audi. *Id*. ¶¶ 189, 231. Although that procedure allowed Defendants to circumvent New York banks for a time, it was cumbersome to implement. *Id*. ¶¶ 232-39. It also raised red flags with Lafarge's auditors, prompting Christian Herrault, Lafarge's EVP of Operations, to complain that their unusual payment process "puts the company at risk and it has to stop." *Id*. ¶ 233 (citing Ex. 105).

Defendants' $210,000 payment solved those concerns. AC ¶¶ 228-36. To evade U.S. sanctions and trick New York banks into processing their wire, Defendants first convinced Tlass to open a Dubai bank account for a fake company called "North Logistics." *Id*. ¶¶ 159-61, 236. Then they executed a sham consulting agreement with North Logistics – drafted by Jean-Jerome Khodara, a Lafarge in-house lawyer – and told Tlass to issue a $210,000 invoice in North Logistics' name. *Id*. ¶ 159. With the fake invoice in hand, Defendants initiated a U.S.-dollar wire transfer to North Logistics, emphasizing the need for the invoice to "be paid quickly if possible." *Id*. ¶ 160 (citing Ex. 18). Richard Benattar, Lafarge's accounting manager, stressed that the U.S.-dollar wire would require a U.S. correspondent bank, telling his colleagues: "I just need the invoice with the original [Herrault] signature ***and the US correspondent bank of [Tlass's] bank (the invoice is in USD)***." Ex. 19 at -739 (emphasis added).

Benattar then verified the New York routing details and typed them into Quantum, Lafarge's electronic payment system. AC ¶¶ 160, 202-03. After that, he instructed BNP Paribas's Paris branch to originate the wire. *Id*. ¶¶ 160-61. Following Lafarge's direction, BNP

13

Paribas Paris executed the $210,000 wire via BNP Paribas's New York branch, through

JPMorgan Chase New York, and onto Tlass's bank in Dubai. *Id.* ¶ 161 (citing Exs. 22-23).

Defendants' conscious refusal to pay this wire through "alternative channels" shows their

conduct was "purposeful." *Spetner*, 70 F.4th at 642. After all, Defendants knew exactly how to

move dollars "outside of the U.S.," *id.* – they had done just that in paying Tlass's stipends in the

preceding months, AC ¶¶ 167, 189, 231. But they viewed that convoluted process as "less

attractive," *Spetner*, 70 F.4th at 642, than an ordinary bank wire cleared through customary New

York channels, AC ¶¶ 229-36. Indeed, Defendants' emails documented their decision to discard

their non-New York workaround as too risky. *Id.* ¶¶ 232-35 (citing Exs. 59, 105, 113-18). The

emails also documented Defendants' desire to route the money to Tlass "quickly." *Id.* ¶ 160

(citing Ex. 18). New York clearing ensured that Defendants' $210,000 wire settled quickly and

efficiently. AC ¶¶ 160-61, 244; Runge Decl. ¶¶ 30-32. In all those ways, Defendants acted to

"gain convenient access to New York's financial system." *Spetner*, 70 F.4th at 642.

**Upstream Payments.** Defendants also executed 12 intercompany payments that wired

U.S. dollars to LCS through New York banks. AC ¶¶ 155-56, 163-65. Eight were equity

contributions; the other four were loan disbursements. *Id.* ¶¶ 163-65. Defendants designed each

transfer to inject LCS with badly needed U.S.-dollar liquidity. *Id.* ¶¶ 166-69, 238-39.

Defendants directed these wires to LCS's accounts at Bank Audi in Syria and Lebanon. *Id.*

¶ 165. And they executed each through a correspondent account at Citibank New York (and, in

one instance, JPMorgan Chase New York). *Id.* ¶¶ 163, 165 (citing Exs. 12-15, 21, 25-26, 28).

These upstream wires again gave Defendants "convenient access to New York's financial

system." *Spetner*, 70 F.4th at 642. Due to Syria's collapsing currency and U.S. sanctions, LCS

had to devote considerable energy to managing its cross-border U.S.-dollar transfers. AC

¶¶ 169-71, 179, 214-15, 225, 238-42. Defendants thus carefully planned their intercompany

wires, *id.* ¶¶ 163-65, 169, 214-20, 243; scrutinized the SWIFT messages they received, *id.* ¶¶ 188, 199-201, 207; and even opened a special U.S.-dollar account at Bank Audi Lebanon to facilitate the wires, *id.* ¶¶ 208-10.  Defendants also prioritized speedy execution, expressing "urgency" and warning against delays.  AC ¶ 244 (citing Ex. 41).  New York clearing advanced those interests. AC ¶¶ 237-44; Runge Decl. ¶¶ 20, 29, 32.  In making their upstream transfers through New York, Defendants witnessed first-hand that New York clearing was "cheaper and easier" than LCS's "other options" for sourcing U.S. dollars in Syria.  *Licci III*, 984 N.E.2d at 901.

**LMEA Payments.**  Defendants accepted the remaining two New York-cleared wires into their "LMEA account."  AC ¶¶ 178-86.  Defendants named that account for Lafarge's Egyptian subsidiary, Lafarge Middle East & Africa Building Materials.  *Id.* ¶ 178.  The Egyptian company nominally owned the account, but "Lafarge Syria solely ha[d] all the rights" in it.  Ex. 48 § 3.  It thus offered Defendants an elegant way to evade U.S. sanctions on Syria:  a U.S.-dollar account LCS could use while pretending it was for a non-sanctioned Egyptian affiliate instead.  *Id.* ¶¶ 179-82.  Defendants knew this sanctions evasion was illegal.  Indeed, LCS's main bank – Bank Audi – had refused to open the account, leading Defendants to fear that "no bank" would overlook the " 'compliance' limitation" Bank Audi had invoked in saying no.  Ex. 45 at -302. Yet Defendants forged ahead by lobbying other banks to open it anyway, while their personnel warned each other to avoid "communicating by email" about it.  AC ¶ 181 (citing Ex. 45).

On July 15, 2013, LCS convinced National Societe Generale Bank's ("NSGB") Egypt branch to open the LMEA account.  *Id.* ¶ 182.  LCS then used it to conduct at least 73 outgoing and 111 incoming U.S.-dollar transactions.  *Id.* ¶ 183.  According to PwC's forensic review, done at Defendants' direction, "[a]t least some of the payments in and out" of that account were "likely to have been processed by a US financial institution."  Ex. 9 at -191.  PwC was correct.

15

Discovery revealed at least two U.S.-dollar wires into the LMEA account, both of which cleared through The Bank of New York Mellon in New York. *Id*. ¶¶ 155, 186.[14]

These New York-cleared wires benefited Defendants by supplying LCS with a stockpile of scarce U.S. dollars. *Id*. ¶¶ 187-90. LCS's liquidity crunch had grown especially severe by June 2013, prompting Pescheux to warn that the "scarcity of USD" in Syria was "really a nightmare." *Id*. ¶ 239 (citing Ex. 7). Defendants attributed that scarcity to LCS's inability to "enter the US Financial System," which meant "no USD transfer involving Lafarge Cement Syria can be made." *Id*. ¶ 189 n.224 (citing Ex. 47); *see id*. ¶ 192. So Defendants engineered the LMEA account to bypass that restriction. *Id*. ¶¶ 179-80. Armed with a new account capable of accessing the U.S. financial system, LCS instructed its customers to direct their U.S.-dollar payments into that account. *Id*. ¶ 182 & n.208 (citing Ex. 50). And Defendants knew those payments would clear through NSGB's U.S.-dollar correspondent account with The Bank of New York Mellon. *Id*. ¶¶ 184-85, 213. Such efforts by Defendants to "inject[ ] [themselves] into the payment process" were "sufficiently purposeful" for jurisdiction. *Spetner*, 70 F.4th at 642.

**iii.**     Defendants fail (at 26-27) to diminish these "benefits of clearing transfers through New York." They insist (at 26) it was not "commonsense" to route U.S. dollars "through the most regulated financial market in the world," but their emails documented their plan to reap the benefits of doing just that. *Supra* pp. 12-14. Common sense or not, Defendants' "preferred option" was to send "bank transfer[s]" in "USD," Ex. 1 at 2, which they knew entailed New York clearing, AC ¶¶ 150-54, 191-98. Indeed, Defendants had already long abandoned common

---

[14] The Court should reject Defendants' spin (at 12-13) on PwC's report, which they redacted heavily for relevance over Plaintiffs' objections. 5/20/24 Tr. 17:10-29:15. Having unilaterally redacted most of the report, Defendants cannot now attack its methodology and disavow its conclusion that the LMEA account made other "payments" through "a US financial institution." Ex. 9 at -191; *see* Runge Decl. ¶¶ 25-28 (identifying additional transfers).

16

sense when they chose to negotiate a revenue-sharing agreement with the world's worst terrorist organization. *Id.* ¶¶ 79-86. At any rate, using New York aided their scheme. Runge Decl. ¶¶ 20-32. The only other feasible option – the "book transfer" procedure backed by irregular foreign-exchange trades on Syria's gray market – had attracted unwanted attention from Defendants' auditors. AC ¶¶ 231-33. The $210,000 wire transfer deflected that attention. *Id.* ¶ 236.

Defendants' suggestion (at 26) that their wires "did not need to be legitimized or concealed" also misses the mark. Their $210,000 wire to Tlass was undisputedly criminal, AC ¶¶ 96, 162; SOF ¶¶ 96-103, and even Defendants now concede (at 16) it was "irregular." The LMEA transactions were also an illegal way to circumvent U.S. sanctions. AC ¶¶ 179-81. As for the upstream payments, New York-routed wires offered the most legitimate-looking way to route U.S. dollars into Syria. *Id.* ¶ 229; Runge Decl. ¶¶ 12, 31. The point is not that the upstream payments themselves were illegitimate; it is that other routing mechanisms would have stood out as unusual and risked unwanted scrutiny of Lafarge's Syria operations. *Cf.* Suppl. Br. 27.

Finally, Defendants' discussion of their "foreign-exchange risk" misapprehends the evidence. *Id.* Although "outbound payment[s] of U.S. dollars" did expose LCS to foreign-exchange risk, *id.*, 14 of the New York-cleared U.S.-dollar wires here were *inbound* payments that *reduced* that risk. AC ¶¶ 155-56, 169, 190. As for the one outbound payment – the $210,000 wire to Tlass – Defendants paid in dollars in part because Tlass demanded it. *Id.* ¶ 225 & nn.306-310. That is because ISIS too wanted "to conserve U.S. dollars," Suppl. Br. 27, prompting Defendants to send payment in the terrorists' preferred currency, AC ¶¶ 226-27; Levitt Decl. at 47-48. Defendants have no answer for the latter point, so their motion ignores it.

**b.      Defendants' knowledge shows they acted volitionally**

Defendants' extensive knowledge of the New York clearing reinforces that they acted intentionally. AC ¶¶ 191-220. The law has long presumed that "a defendant intends the

17

ordinary consequences of his action." *United States v. Heras*, 609 F.3d 101, 108 (2d Cir. 2010). When an actor knows a result is "substantially certain[] to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." Restatement (Second) of Torts § 8A cmt. b (1965). That principle applies here. Defendants instructed their banks to initiate U.S.-dollar wires, AC ¶¶ 160-61, 163, 165 – and instructed LCS's customers to wire U.S. dollars into the illegal LMEA account, *id.* ¶ 182 – knowing the money would route through New York banks. So the Court should presume that Defendants intended exactly that.

Discovery yielded overwhelming evidence of Defendants' knowledge. *First*, Defendants knew cross-border U.S.-dollar wires virtually always cleared through New York. AC ¶¶ 150-54, 192-98. Defendants gained that understanding from their lawyers[15]; consultants[16]; originating banks[17]; and years of experience executing through New York correspondent accounts.[18] All those sources led Defendants to realize that "USD transfer[s]" necessarily required them "to enter the US Financial System." Ex. 47 at -291. Defendants even conveyed that understanding to their counterparties. On one occasion, AC ¶ 193, after a counterparty had proposed using a "European" correspondent bank to process a "USD transfer," Lafarge's international treasurer responded: "we expect it [to] work with a partner bank in the USA." Ex. 69 at -060.[19]

---

[15] AC ¶¶ 192 & nn.230-31, 196 & n.249, 197 & nn.250-51.

[16] AC ¶ 196 & nn.248-49.

[17] AC ¶¶ 193 & n.234, 194 & nn.238-41, 209-10 & nn.272-73, 276.

[18] AC ¶ 195 & nn.244-47, 205 nn.263-64, 266.

[19] Lafarge's treasurer sent that email in January 2015. Defendants assert (at 20) that a separate "2015 incident" cannot prove "Defendants' state of mind in 2011," but they cite no evidence that their knowledge materially shifted over that interval. Their understanding in 2015 that U.S.-dollar wires necessarily involve a "partner bank in the USA," Ex. 69 at -060, thus reinforces that they had the same knowledge years earlier. *See United States v. Quinn*, 403 F. Supp. 2d 57, 67 (D.D.C. 2005) (evidence of defendant's "understanding . . . after all of the allegedly unlawful transactions" is "probative of [his] knowledge . . . at earlier points in time").

Defendants accuse Plaintiffs of "misrepresent[ing] many [of these] documents" but discuss only three of them.  Suppl. Br. 19-20 (citing Exs. 70, 71, 73).  And their spin on those three is unpersuasive.  They say (at 20) Exhibits 70, 71, and 73 show merely that "Defendants relied on their banks," but that misses the point:  even if Defendants relied on their banks, those banks *repeatedly told them* that U.S.-dollar wires required New York clearing.  AC ¶ 194.

Defendants downplay (at 19) the significance of this "truism" about "U.S. dollar wire transfers" generally, disparaging (at 25-26) as "irrelevant" any email that did not specifically discuss the "15 transfers underpinning Plaintiffs' ATA claims."  But Defendants' experience with other wire transfers is highly probative.  Defendants saw over and over that whenever they executed a U.S.-dollar wire, it either cleared through New York or failed to complete.  AC ¶¶ 192-95, 243.  They knew the 15 wires here would follow the same course.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015) (knowledge of "broader conditions in the market" extended to "specific assets" in market); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 255 n.5 (S.D.N.Y. 2005) (inferring "broader knowledge" about "overall" scheme from "emails about particular transactions" in related context).

*Second*, Defendants had bank-specific knowledge that their wires here would route through New York.  AC ¶¶ 204-14.  For example, when Defendants instructed BNP Paribas's Paris branch to wire the $210,000 to Tlass, *id*. ¶¶ 160-61, they knew the bank would execute through its New York affiliate, *id*. ¶¶ 205-06.  In fact, Lafarge had been telling counterparties for years that "BNP Paribas, Paris" relied on a "USD correspondent bank:  BNP NEW YORK."  AC ¶ 205 (citing Ex. 91); *see* Exs. 92 at -787, 93 at -069.[20]  And 16 months before executing the

---

[20] Defendants downplay (at 24 n.14) this evidence as involving "three isolated and random" examples.  But the examples match BNP Paribas's standard settlement instructions.  AC ¶ 206. Defendants invoked BNP Paribas's New York correspondent account on other occasions too. *See* Branson Decl. Exs. 126 at -435, 127 at -970, 128 at -218, 129 at -969, 130 at -727.

19

$210,000 wire, BNP Paribas reminded Lafarge's international treasurer – copying Benattar and others – that Lafarge's "*USD flows transit through our subsidiary BNP Paribas New York*." Ex. 68 at -337 (emphasis added).  Defendants knew their $210,000 wire would flow similarly.

The same was true of Defendants' other banks.  AC ¶¶ 207 (Bank Audi Syria), 208-12 (Bank Audi Lebanon), 213 (NSGB Egypt).  The latter two published their standard settlement instructions in the Bankers' Almanac, an authoritative compendium of bank-routing information. *Id.* ¶¶ 184-85, 211, 213.[21]  Such "public disclosures" alone suggest that Defendants "knew that the[ir] wire transfers had to route through New York."  *Spetner*, 70 F.4th at 638 (citing Bankers' Almanac).  That is especially true because Lafarge's deputy international treasurer knew of "the Bankers Almanac," having consulted it in the past to look up "the USD correspondent" for other transactions.  Ex. 51 at -829.  And for Bank Audi Lebanon, Defendants' knowledge was even more direct.  Two weeks before Defendants wired $10 million into Syria through that account, AC ¶ 164 & n.164, Bank Audi told them the "Correspondent Bank" would be "JP Morgan Chase" in "New York," *id.* ¶ 209 (citing Ex. 94); *see id.* ¶ 210 (citing Ex. 95) (similar).

*Third*, Defendants' execution process gave them transaction-specific knowledge of the New York routing.  *Id.* ¶¶ 202-03.  Before ordering a cross-border wire, Defendants verified the correspondent-bank routing information and entered it into Quantum, their electronic-payment system.  *Id.* ¶ 202 & nn.258-61 (citing Exs. 51, 69, 86-89).  As Lafarge's back-office team explained, they could "properly execute" a wire only once they verified "the intermediary bank

---

[21] The Bankers Almanac is an industry-standard compilation on which persons in the banking field rely.  Runge Decl. ¶ 51 & n.108.  It is thus admissible as a market report.  *See* Fed. R. Evid. 803(17); *King v. Wang*, 2021 WL 5232454, at *14 (S.D.N.Y. Nov. 9, 2021).  And even if not admitted for its truth, the Almanac shows Defendants' knowledge.  *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (statement not hearsay if "offered to show its effect on the listener").

& its details for a USD transfer." Ex. 69 at -060.  That was because they needed to populate Quantum's "Intermediary Bank" tab for any new "Approved Counterparty" in their payment system.  AC ¶ 203 (supplying screenshot from Ex. 90).  And in populating that tab, Defendants entered each correspondent bank's address.  *Id*.  For the 15 New York-cleared wires here, therefore, Defendants input the correspondent bank's New York address.  *Id*. ¶¶ 202-03.[22]

Defendants followed that process in wiring the $210,000 to Tlass.  *Id*. ¶ 160.  On reading Tlass's invoice, Benattar said he "need[ed]" to know the "US correspondent bank of [Tlass's] bank."  Ex. 19 at -739.  That statement reflected Defendants' standard practice of typing a counterparty's correspondent bank into Quantum.  *See* Exs. 51 at -833, 69 at -059-060, 86 at -870, 87 at -476, 88 at -152, 90 at -876.  So when Benattar said "[w]e'll take care of it," Ex. 18 at -474, he meant he would follow Lafarge's standard practice and identify the relevant New York correspondent bank – in that case, JP Morgan Chase – before ordering the wire.  AC ¶ 160.

Defendants still insist (at 24) "there is no evidence" they "knew the identity or location of the correspondent bank for this transfer."  But they offer no other plausible account of Benattar's plan to "take care of" verifying the "US correspondent bank."  Ex. 18 at -474.  Nor do they explain how Lafarge could have wired the money without supplying the banking information their internal process mandated.  AC ¶¶ 202-03.  Instead, they simply assert – citing their own interrogatory response signed by a lawyer, not a witness – that Lafarge only learned of JPMorgan Chase's role "in this litigation."  Suppl. Br. 24 (citing Ex. 21).  The Court should disregard that

---

[22] Defendants assert (at 21) they only "entered the correspondent bank information once, upon creating a profile for a new bank."  Even if true, that would give them direct transaction-specific knowledge for at least the October 24, 2014 Tlass payment and the August 8, 2011 upstream loan disbursement – both of which Defendants directed to a *new* counterparty bank. AC ¶¶ 155, 160-61, 210.  Regardless, even for existing counterparty banks, Defendants used Quantum's "Standard Settlement Instruction" interface, which incorporated the previously entered New York correspondent banking information already in the system.  *Id*. ¶ 203.

assertion.  *See Miroglio S.P.A. v. Conway Stores, Inc.*, 2007 WL 391565, at \*7 (Feb. 6, 2007) (rejecting "interrogatory responses" as "inadmissible" when "not made by someone with personal knowledge"), *report and recommendation adopted*, 2008 WL 4600984 (S.D.N.Y. Oct. 15, 2008).  Regardless, Defendants cannot dispute that Benattar knew at least that the payment "in USD" had to clear through *some* "US correspondent bank."  Ex. 19 at -739.  Even if he never learned "*which* of [the] correspondent accounts" would be used, his advance knowledge that it would be in "the *forum*" shows purposeful availment.  *Spetner*, 70 F.4th at 641.

*Fourth*, Defendants received SWIFT messages confirming the New York routing details for their U.S.-dollar wire transfers.  AC ¶¶ 199-201.  Defendants' "usual" practice was to obtain and review the "swift message" for such transfers.  *Id*. ¶ 199 (citing Ex. 81).  Defendants produced in discovery the SWIFT confirmations for 10 of their 15 wires; they likely destroyed or lost the rest.  *Id*. ¶ 200.  And each of the produced SWIFT messages alerted Defendants to the specific New York bank that had processed the wire.  *Id.* ¶ 200 & n.255.  Defendants' repeated acts to "track[ ]" and "confirm[ ]" the routing of those "wire transfers" further show that they "purposefully availed [themselves] of New York."  *Belen*, 2024 WL 182588, at \*3.

Defendants discern (at 20) a "temporal flaw" in using such "after-the-fact confirmations."  But Defendants' choice to continue executing U.S.-dollar wires – when the SWIFT messages told them all their previous ones had cleared through New York – shows they acted intentionally.  AC ¶¶ 199-201.  On at least one occasion, moreover, Pescheux specifically "[a]pproved" the SWIFT confirmation for Defendants' $10 million loan disbursement through New York.  Ex. 28 at -221-23; *see* AC ¶ 201.  Defendants say (at 21) Pescheux was approving a different wire – the next $5 million disbursement – but they elide the text of the email transmitting the SWIFT message:  "Please find below the swift of the USD 10 Million, and would you please confirm that Mr. Pescheux is ali[gned] with these amounts."  Ex. 28 at -223.  The email string is thus

22

most naturally read to convey Pescheux's approval of *both* wires – the $10 million he knew had cleared through New York, and the next $5 million he knew would follow suit. *See* Ex. 15 at -060 (subsequent SWIFT message likewise confirming the $5 million wire through New York).

### c.    Defendants misapply the "purposefulness" requirement

Defendants argue (at 17) they did not "act[ ] purposefully" because they did not literally "direct[ ]" their banks to use "a New York correspondent bank account." But no such direction was needed. Section 302(a)(1) does not require that a defendant "itself direct the deposits" into a New York account, only that it ensure they occur. *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 10 (N.Y. 2016); *see Belen*, 2024 WL 182588, at *3-4 (upholding jurisdiction without New York direction). That is especially true here. Defendants had no need to say the words "clear these wires through New York" because they had already taken other steps to ensure that result.

Defendants "affirmatively act[ed]" to cause the New York clearing in several ways. *Al Rushaid*, 68 N.E.3d at 10. *First*, Defendants purposefully denominated their transactions in U.S. dollars, knowing that choice entailed use of New York banks. AC ¶¶ 149-54, 221; *see Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 68 (S.D.N.Y. 2016) (upholding jurisdiction over defendants that "selected U.S. dollars as the currency in which to execute"). As shown above, Defendants' scheme depended on U.S. dollars. And once Defendants "chose to [use] dollar-denominated banking services, [they] necessarily . . . utiliz[ed] [their banks'] correspondent bank accounts in New York." *Spetner*, 70 F.4th at 641.

*Second*, Defendants selected banks they knew would execute their U.S.-dollar wires through New York correspondent accounts. AC ¶¶ 205-11, 216. Defendants chose those banks with care. AC ¶¶ 155-56, 180-85 (opening NSGB Egypt account), 208-09 (opening Bank Audi Lebanon account), 214 & n.281 (choosing Audi Syria account rather than Audi Lebanon account), 233-34 (convincing Tlass to open Dubai account). And they monitored their banks

23

constantly, scrutinizing their routing capabilities and tracking their correspondent relationships. *Id*. ¶¶ 214-15 & nn.281-86.  Selecting which one to use on a given U.S.-dollar wire was hardly some "clerical" decision.  Suppl. Br. 24 n.13.  It reflected Defendants' "specific choice[ ]," *Przewozman*, 2023 WL 2562537, at \*12, to benefit from that bank's correspondent network.

Third, Defendants affirmatively directed their banks to follow their standard settlement instructions.  AC ¶ 203; *see id*. ¶ 184 (defining those instructions).  When Defendants input a bank's routing information into Quantum, the "Payment Category" field gave them the option to select "Standard Settlement Instruction."  *Id*. ¶ 203 (citing screen shot from Ex. 90).  So in ordering wires through Quantum, they had to choose whether to follow those standard instructions – already entered in the system – or request an alternate settlement route.  *Id*. ¶¶ 203, 217-18.  Defendants chose the former option for each of the 15 U.S.-dollar wires here.  AC ¶¶ 155, 185-86, 206, 211, 213.  For those transfers, therefore, Defendants did more than "simply enter[ ] data" about their banks' "preexisting relationships with correspondent banks in New York."  Suppl. Br. 22.  They intentionally directed their banks to *use* those New York relationships, in accordance with the standard instructions Defendants had typed into Quantum.

Fourth, Defendants paid the New York correspondent banks for their clearing services. AC ¶¶ 219-20.  Every SWIFT message Defendants produced about their U.S.-dollar wires shows that Defendants – not their originating or beneficiary banks – paid the New York processing fees. *Id*. ¶ 220 & nn.292-93.  And Defendants knew they were paying those fees, observing in one instance that they had covered the "bank charges from Citibank NY."  *Id*. ¶ 220 (citing Ex. 26). Knowingly sending money into New York to pay for the use of a New York correspondent account is a "specific choice[ ] regarding the use of the correspondent account" that reflects purposeful availment of New York.  *Przewozman*, 2023 WL 2562537, at \*12.

### 3.    Defendants cannot shift their jurisdictional contacts to their banks

Defendants also wave away (at 18) their New York contacts because they are not "banks but only *customers* of foreign banks."  Defendants place far too much weight on that distinction.

### a.    Non-banks are not immune from New York jurisdiction

Section 302(a)(1) confers jurisdiction over "any non-domiciliary" that "transacts any business" in New York.  Companies, no less than banks, satisfy that requirement when their "use of [a New York] correspondent account [is] purposeful."  *Licci IV*, 732 F.3d at 168.

Defendants are mistaken (at 17) that "courts have only found ***banks*** – not their customers, like Defendants here – susceptible to personal jurisdiction based on correspondent banking activities."  At least four cases have upheld jurisdiction over non-banks based at least partly on such activities.  *See Zobay*, 695 F. Supp. 3d at 331-32 (applying *Licci* to telecommunications company that routed "$400,000 bribe" through New York); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 88-89 (S.D.N.Y. 2021) (cryptocurrency executive who "facilitate[d] . . . access to the U.S. banking system"); *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 397 F. Supp. 3d 323, 344-46 (S.D.N.Y. 2019) (Nigerian petroleum company that "transact[ed] business in U.S. dollars and use[d] United States bank accounts to . . . transfer funds"), *aff'd in relevant part*, 40 F.4th 56 (2d Cir. 2022); *In re Renren, Inc. Deriv. Litig.*, 127 N.Y.S.3d 702, at *13 (N.Y. Sup. Ct. 2020) (social-media company that used "corresponding bank account[ ]" to collect fees for dividend).  True, these cases did not base jurisdiction "solely on" the "correspondent bank accounts."  Suppl. Br. 18.  But all held the accounts were jurisdictionally relevant.  And the evidence of Defendants' purpose in using such accounts is stronger here, given their sophisticated corporate treasury teams.  AC ¶¶ 216-17.

*Spetner* further undercuts Defendants' banks-only theory of personal jurisdiction.  The Second Circuit there refused to "cabin jurisdiction to only the *owner*" of a correspondent

account. *Spetner*, 70 F.4th at 640. The *Spetner* defendant "did not hold a correspondent banking account in its *own* name with any bank in the United States." *Id.* at 637. Nor did it directly access any New York clearing service. *Id.* at 637-38. Instead, it executed through its "correspondent account" with the "Amman branch" of its Jordanian bank, which in turn routed the money through the Jordanian bank's own "correspondent banking accounts" in New York. *Id.* The Jordanian bank – not the defendant – thus maintained the correspondent relationships in New York and acted to wire the money there. *Id.* Yet the Second Circuit held the defendant's "indirect access to New York's financial system" was enough. *Id.* at 638.

*Spetner* forecloses the distinction Defendants seek to draw. They suggest (at 17) that banks are special because only "[b]anks themselves maintain correspondent relationships" in New York. *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 403 n.25 (S.D.N.Y. 2021). But after *Spetner*, there can be no argument that account *maintenance* is required; indirect account *use* is enough. True, *Spetner* reached that holding in a case where the defendant happened to be another bank. But the Second Circuit did not rely on that coincidence, instead observing more broadly that a "foreign entity can be subject to suit in New York based on the acts of its agent." 70 F.4th at 640. That logic applies to non-banks, too. So long as the executing bank "act[s] as [its client's] agent" in New York, jurisdiction over the client is appropriate. *Id.*

In fact, *Spetner*'s logic applies even more forcefully to non-banks. When a bank wires U.S. dollars through a New York correspondent account, it typically does so "on behalf of a client." *Licci III*, 984 N.E.2d at 900. That was true here. While banks may have logistically routed the funds through New York, they did so at *Lafarge*'s direction to advance *Lafarge*'s interests. The forum contacts they created were "on behalf and for the benefit of [their] customer." *Al Rushaid*, 68 N.E.3d at 9. If New York has jurisdiction over the banks, it surely has jurisdiction over the customer that knowingly orders the New York transactions.

26

Defendants' rule would produce absurd results by restricting ATA jurisdiction to banks while immunizing their more-culpable customers – the ones actually funding terrorists. In *Licci*, for example, "it was Hizballah that directed the wire transfers through LCB's correspondent bank and not [the] defendant [bank]." *Id.* at 10. But under Defendants' theory, personal jurisdiction was limited to the bank and did not reach Hezbollah itself. That cannot be right.

Defendants misplace (at 17-18, 24) reliance on *Berdeaux*, which predates *Spetner* and which addressed a wire transfer that an individual customer did not "direct[ ]" and that was not "otherwise purposeful." 561 F. Supp. 3d at 402. The court found no jurisdiction on those facts but noted there could be "unusual circumstances" where a "customer" purposefully exploits New York clearing. *Id.* at 403 n.25. Those circumstances exist here. Indeed, Defendants did not resemble the "individual bank customer" *Berdeaux* addressed. *Id.* The individuals in *Berdeaux*, *id.* at 403-04, did not have the same sophisticated understanding of cross-border U.S.-dollar clearing that Defendants had here: those individuals lacked large corporate treasury teams to email their banks about correspondent routing, AC ¶¶ 214-18, or to request standard settlement instructions, *id*. ¶ 184 & n.211, or to pore over SWIFT messages, *id*. ¶¶ 199-201. Defendants did all those things – constantly. They did so because they were running a criminal enterprise that hinged on sourcing U.S. dollars for use in perhaps the most heavily sanctioned country in the world. *Id.* ¶¶ 169-71, 214-16. Unlike in *Berdeaux*, they had every "reason" to scrutinize how their dollars moved in and out of Syria. 561 F. Supp. 3d at 403 n.25.

### b.    Defendants' banks transacted in New York as their agents

When Defendants instructed their banks to execute the 15 U.S.-dollar wire transfers, the banks did so as their agents. AC ¶¶ 216-18. Courts give agency a "broad interpretation" under § 302(a)(1). *Spetner*, 70 F.4th at 640 (cleaned up). The agent need only act "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Id.*

27

The evidence establishes knowledge, consent, and benefit for the reasons detailed above. *Supra* Part I.A.2. Defendants' cursory challenge (at 20 n.11) to the control element fails.

The evidence shows that Defendants "exercised 'some control' over" their banks. *Spetner*, 70 F.4th at 641. For the 12 upstream payments and the $210,000 payment to Tlass, AC ¶¶ 155, 161, 163-65, Defendants instructed their banks to execute the wire transfer and specified its recipient, date, amount, and currency, *id*. ¶ 216. The banks were "required to follow [Defendants'] instructions." *Spetner*, 70 F.4th at 641; *see* Runge Decl. ¶¶ 50-51. As for the LMEA transactions, Defendants opened the account to receive incoming U.S.-dollar wires and instructed LCS's customers to pay into that account. AC ¶ 182 (citing Ex. 50). Defendants knew that instruction would entail use of NSGB's standard settlement instructions. *Id*. ¶¶ 184-85. When Defendants' banks executed these U.S.-dollar wires in accordance with Defendants' instructions, their conduct was hardly "unilateral." *Spetner*, 70 F.4th at 641.

Defendants say "they did not 'control the way the bank selected or used the correspondent account.'" Suppl. Br. 20 n.11 (quoting *Henkin I*, 2023 WL 2734788, at *8) (cleaned up). But that overstates the degree of control required. "Section 302(a)(1) does not demand that the principal exercise complete control over every decision." *Spetner*, 70 F.4th at 641. Only "some control" is needed, *id.*, and Defendants exercised *some* control by dictating the currency, amount, and counterparty – thus effectively requiring New York clearing. AC ¶ 216.

Defendants argue (at 20 n.11) that agency requires a defendant to "instruct[ ]" its bank to send money "to the U.S. bank." *Spetner*, 70 F.4th at 641. Defendants did so here by directing their banks to follow standard settlement instructions that they knew involved New York. *Supra* Part I.A.1.c. At any rate, *Spetner* held at most that a "U.S. bank" instruction was sufficient, not necessary. A recent decision in this circuit thus upheld jurisdiction without any such instruction, where one bank used another bank to "execute[ ] the transfers" in New York "as [its] agent."

28

*Belen*, 2024 WL 182588, at \*3.  The defendant never directed its bank to execute through New York; the latter did that on its own.[23]  But the defendant "initiated, tracked, and confirmed" the wires, and it "approv[ed]" their execution.  *Id*. at \*3-4.  The same is true here.

In any event, Defendants had at least *the right* to dictate the correspondent banks used.  AC ¶ 217; Runge Decl. ¶ 50.  Even if Defendants declined to exercise that right, the "right to control," not its exercise, is what matters.  Restatement (Third) of Agency § 1.01 cmt. c (2006); *see Khodeir v. Sayyed*, 348 F. Supp. 3d 330, 345 (S.D.N.Y. 2018) ("it is not essential that the principal make use of the right to control") (cleaned up).  Defendants undisputedly could have directed their banks to stop routing through New York.  AC ¶ 217.  That establishes agency.  *See Spetner*, 70 F.4th at 641 (agency for jurisdictional purposes when defendant "did not direct [its bank] to avoid New York"); *Khodeir*, 348 F. Supp. 3d at 345 (similar for merits).[24]

### B.    Plaintiffs' Claims "Arise From" The New York Transactions

Plaintiffs meet § 302(a)(1)'s "arising from" element because there is an "articulable nexus" between the claims and the forum contacts.  *Spetner*, 70 F.4th at 643.  This element is "relatively permissive," *Licci III*, 984 N.E.2d at 900, and does not demand a "causal connection," *Spetner*, 70 F.4th at 644.  It is met so long as the forum contact is " 'not completely unmoored' from the claim."  *Id.* (quoting *Licci III*, 984 N.E.2d at 900).  A sufficient mooring exists here.

---

[23] *Compare* Decl. of Lane Wooley ¶ 11, *Belen v. Herman*, No. 1:22-cv-6455, Dkt. 26 (S.D.N.Y. Oct. 21, 2022), *with* Decl. of Ariel E. Belen ¶¶ 28-29, *Belen v. Herman*, No. 1:22-cv-6455, Dkt. 40-1 (S.D.N.Y. Dec. 13, 2022).

[24] In one unpublished decision, the Second Circuit stated that § 302(a)(1) requires "the actual exercise of control" rather than "the legal ability to control."  *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017).  That statement has no "precedential effect."  2d Cir. R. 32.1.1(a).  Traditional agency principles do not require control to be exercised, and the Second Circuit more recently gave agency under § 302(a)(1) a "broad interpretation" that is more expansive than common-law "agency relationship[s]."  *Spetner*, 70 F.4th at 640 (cleaned up).

29

## 1.     The October 2014 transaction alone creates jurisdiction

The nexus is the simplest for the $210,000 wire Defendants paid Tlass in October 2014. *Supra* pp. 12-14.  In pleading guilty to conspiring to provide material support to ISIS and ANF, Lafarge admitted that this specific payment formed a key part of its criminal scheme.  SOF ¶¶ 96-103.  That admission alone establishes a sufficient nexus to Plaintiffs' claims.  Indeed, the payment reimbursed Tlass for bribing ISIS and ANF on Defendants' behalf.  AC ¶ 162.  Paying an intermediary for delivering material support to terrorists is "not completely unmoored" from claims about that material support.  *Licci III*, 984 N.E.2d at 900.  Defendants also carefully orchestrated the payment to mask their role in conspiring with terrorists.  AC ¶¶ 159-61, 223, 232-36.  The payment's role in concealing Defendants' scheme from auditors – itself pivotal to the guilty plea, *id.* ¶¶ 5, 87-98 – strengthens the nexus to Plaintiffs' claims.  *See Al Rushaid*, 68 N.E.3d at 6 (jurisdiction based on New York transfers that "concealed" the payment of "bribes").

Defendants contest (at 15-16) the nexus by arguing that the $210,000 was not itself "paid to FTOs."  That distinction is trivial.  Even if these literal dollars never reached ISIS's coffers, they undisputedly reimbursed Tlass for payments that did.  AC ¶ 162.  Because "[m]oney is fungible," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010), the reimbursement was amply connected to the payments.  Nor does the timing weaken the nexus.  Defendants waited until October 2014 to send the wire only because Tlass delayed in opening a bank account capable of receiving it.  AC ¶¶ 233-34.  But Defendants *told* him they would pay him earlier – over the summer in 2014 – to entice him to continue "negotiations with ISIS" on their behalf.  *Id.* ¶ 233 (citing Ex. 115).  Waiting to follow through until Tlass finished work hardly lessened the payment's importance.  That the "payment[ ] w[as] made after" Tlass performed "misses the point," as the "prospect" of an eventual payment was "a substantial factor" in motivating Tlass's

30

conduct earlier.  *Strauss*, 175 F. Supp. 3d at 24 n.9.  The payment also maintained Tlass's silence and reduced the risk he would publicly disclose their illegal scheme.  AC ¶ 96.

This one payment is all the Court needs to exercise jurisdiction.  Section 302(a)(1) is a "single act statute," meaning that even "one transaction in New York is sufficient to invoke jurisdiction."  *Daou*, 42 F.4th at 129.  The Second Circuit thus has upheld jurisdiction based on, for example, a "single act of an out-of-state defendant employee shipping an item into New York."  *Chloé*, 616 F.3d at 165.  This Court, too, has recognized that " 'one transaction in New York is sufficient' if it bears the markers of a purposeful transaction."  *Przewozman*, 2023 WL 2562537, at *13 (quoting *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 850 N.E.2d 1140, 1142 (N.Y. 2006)).  The $210,000 wire to Tlass was undeniably purposeful.  And it was, by itself, enough to pay for all the terrorist attacks in this case.  AC ¶ 162.  The Court need go no further.

> **2.    The other 14 transactions have a strong nexus to Plaintiffs' claims**
>
> > **a.    The upstream and LMEA transfers sourced U.S. dollars that played a key role in Defendants' terrorist-financing scheme**

The remaining 14 U.S.-dollar transfers likewise were "actual, specific transaction[s] through a New York correspondent account" that Defendants executed "in the course of bringing about [Plaintiffs'] injuries."  *Daou*, 42 F.4th at 132.  Those 14 wires supplied LCS with the U.S.-dollar liquidity it needed to cover its U.S.-dollar expenses, including its payments to terrorists. AC ¶¶ 166-71, 187-90.  The scarcity of U.S. dollars in Syria made the nexus especially close.  *Id*. ¶¶ 169-70.  Sanctions had collapsed the Syrian pound and choked off LCS's supply of U.S. dollars, creating a "nightmare" for Defendants' Syrian operation.  *Id*. ¶ 239 (citing Ex. 7).  So Defendants executed these 14 transfers – 12 intercompany payments and two LMEA payments, AC ¶¶ 155-56 – to give LCS the currency it was struggling to obtain, *id*. ¶¶ 238-44.  Meanwhile, LCS was using U.S. dollars to pay Tlass, Taleb, and the terrorists they aided.  *Id*. ¶¶ 157, 166-69,

31

221-27.  A U.S.-dollar wire that sources the capital needed for U.S.-dollar terrorist payoffs is not "completely unmoored" from claims about those payoffs.  *Licci III*, 984 N.E.2d at 900.

Defendants' rejoinders lack merit.  They mainly argue (at 9-10) that these "U.S. dollars transferred to LCS" were not the same dollars later sent "to FTO intermediaries."  Even if that assertion were true, *but see infra* Part I.B.2.c, it assumes the wrong legal standard.  Section 302(a)(1) does not demand a "causal connection" between the claims and the New York transfers.  *Spetner*, 70 F.4th at 644; *see Licci III*, 984 N.E.2d at 900 ("[w]e have consistently held that causation is not required"); *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365-67 (2021) (same under U.S. Constitution).  Defendants' convoluted analysis (at 9-15) of their transfers – straining to disprove a one-to-one tie between the dollars LCS received and the dollars it gave terrorists – seeks to resurrect a causation standard courts have long rejected.

Money's fungible nature reinforces the point.  Defendants' New York wires allowed them to exploit "the dollar as a stable and fungible currency."  *Licci III*, 984 N.E.2d at 900. Because dollars are fungible, courts do not require plaintiffs to trace individual dollars to terrorist attacks.  *See*, *e.g.*, *Henkin I*, 2023 WL 2734788, at *12 (noting plausible "articulable nexus" given "fungible nature of money"); *Averbach II*, 2023 WL 5016884, at *9 (no requirement that wires be "earmarked as being for a terroristic purpose"); *Singer v. Bank of Palestine*, 2021 WL 4205176, at *6 (E.D.N.Y. Apr. 30, 2021) ("plaintiffs need not . . . trace specific dollars to specific attacks"); *Bartlett*, 2020 WL 7089448, at *6 (similar).  Every dollar LCS received through New York – even if used on legitimate expenses – freed up a dollar elsewhere it could give to terrorists.  AC ¶ 190; Runge Decl. ¶¶ 34-36; 48.  Indeed, Defendants themselves say (at 10) they used New York wires to "fund working capital."  Growing LCS's "working capital" gave it more resources with which to fund terrorists.  With or without causation, that nexus is close enough.

32

But the connection was also causal.  Without the intercompany payments, LCS would have defaulted on its loans (because LCS's lenders required U.S.-dollar payments) and thus likely shut down the Jalabiyeh plant altogether.  AC ¶ 169 & n.177.  Had that happened – had Lafarge withdrawn from Syria like every other major company did – it never would have paid ISIS or been able to sell ISIS cement.  *Id*. ¶¶ 49-54, 76-78, 190.  In that way, Defendants' New York wires were not just related to the conspiracy; they were a precondition to its success.

*Estate of Henkin v. Kuveyt Türk Katilim Bankasi A.Ş.*, 2023 WL 4850999 (E.D.N.Y. July 28, 2023) ("*Henkin II*"), which Defendants cite (at 8-9), does not show otherwise.  The allegations there were "conclusory [and] vague," and revealed only an "implied connection" to terrorism that was "far too tenuous."  2023 WL 4850999, at *3.  The plaintiffs did not allege "Hamas itself held an account" with the defendant bank, nor did they "identif[y] the account numbers" held by any Hamas intermediary.  *Id*. at *4.  Given the total dearth of factual specificity, the court reasoned that the unspecified New York transfers might have been used to pay "professors" or other "legitimate costs," rather than terrorists.  *Id*. at *3.  This case is different.  The complaints recite detailed evidence of Defendants' bank accounts, wire transfers, and efforts to source scarce U.S. dollars into a heavily sanctioned country.  AC ¶¶ 166-71, 187-90, 238-44.  Given that factual context – missing from *Henkin II* – the "connection" between the New York wires and the criminal conspiracy was neither "implied" nor "tenuous."  2023 WL 4850999, at *3.

None of this "comes 'dangerously close to asserting New York jurisdiction over any financial transaction conducted in U.S. dollars.'"  Suppl. Br. 15 (quoting *Przewozman*, 2023 WL 2562537, at *12).  Jurisdiction here does not come from "a single U.S. dollar used to pay for office supplies a decade ago."  *Id*.  It comes from $61.9 million Defendants sourced through New York for the specific Syrian cement plant their terrorist payoffs sought to promote.  AC ¶ 155.  Indeed, Lafarge conspired with ISIS to turn a "profit" on that plant and give "some assurance to

the lenders," *id.* ¶ 51 (quoting SOF ¶ 28) – the very lenders whose loans they now say (at 9-12) have no nexus to their conspiracy. And as Defendants concede (at 12), many of the wires directed funds into the very bank accounts then used to pay Tlass and Taleb. AC ¶ 166 (citing Ex. 9 at -227, -238-39). Wiring millions of dollars into the same bank accounts Defendants used to pay terrorists, to cover expenses for the same cement plant whose profits drove them to make those payoffs, has an "articulable nexus" to Plaintiffs' claims. *Spetner*, 70 F.4th at 244.

### b.    Defendants' temporal arguments are unpersuasive

Defendants' analogy (at 8) to *Przewozman*'s four-year "temporal gap" is inapt. Jurisdiction failed there because the New York transfers "occurred, at latest, in 2015, while the rocket attacks did not happen until 2019." 2023 WL 2562537, at *13. The transfer-to-attack window here is at least a year shorter – and for most attacks, even shorter than that. *Compare* AC ¶ 155 (transfers from 2011 to 2014) *with id.* ¶¶ 274-404 (attacks from 2012 to 2017). In fact, the zero-to-three-year window here matches the temporal nexus other ATA cases have upheld.[25] Exercising personal jurisdiction on these facts also tracks the ATA's liability rule, which does not require the cramped temporal nexus Defendants urge. Dkt. 26 at 49-50.

Defendants cannot dispute the temporal nexus for the two LMEA payments, which occurred in 2013. *Compare* AC ¶¶ 178-90 *with* Suppl. Br. 13-15. The records they cite also reveal at least three additional transfers that likely cleared through New York. Runge Decl. ¶¶ 25-28 (identifying them). These three extra transfers occurred in August and September 2013, right when Defendants were paying ISIS and ANF. *Id.* ¶ 25. As for the 2011 transfers,

---

[25] *See Henkin I*, 2023 WL 2734788, at *12 ("[T]here could be an articulable nexus between the transfer of funds that occurred between 2009 and 2015 and the 2018 terrorist attack."); *Strauss*, 175 F. Supp. 3d at 23 (transfers "in 1997" and in "June and July of 2001" had nexus to attacks through "September 2004"); *Averbach I*, 2020 WL 486860, at *1-3, *7 (transfers "through September 2001" and attacks "through August 19, 2003").

Defendants argue (at 11) that U.S. dollars sourced in 2011 could not have funded their ISIS payments "in 2013." A pro rata tracing methodology shows that these dollars did just that. *Infra* Part II.B.2.c. But even if it did not, Defendants' argument focuses too narrowly. Whether or not there was a one-to-one tie between a 2011 transfer and a later ISIS payoff, they all formed part of Defendants' broader scheme: using Tlass to pay terrorists in Syria. AC ¶¶ 157-58, 172-77. Because the 2011 transfers occurred during Defendants' relationship with Tlass, *id.* ¶¶ 157-58, 166-67, 172-73, they have a temporal nexus to Plaintiffs' claims, *see McNamee v. Clemens*, 762 F. Supp. 2d 584, 597 (E.D.N.Y. 2011) (nexus between 2008 tort and 2001 contract despite 7-year gap "in time," where contract was "part of a long relationship"); *777388 Ontario Ltd. v. Lencore Acoustics Corp.*, 142 F. Supp. 2d 309, 320-21 (E.D.N.Y. 2001) (nexus between 1995 contract negotiations and tortious "scheme" that "did not begin" until "three years later").

It makes no difference that the ISIS part of the scheme started in late 2012 or early 2013. AC ¶¶ 52-53, 61. Earlier Tlass was paying other terrorists – the Assad regime – which also foreseeably aided ISIS and its predecessor, al-Qaeda in Iraq ("AQI"). *Id.* ¶¶ 172-77. Indeed, when Defendants first hired Tlass to provide "project support" in Syria, *id.* ¶ 157, they already knew he was an infamous AQI financier, *id.* ¶ 176. Tlass was thus the through-line connecting LCS's U.S.-dollar payments into an overall "unlawful course of conduct" aiding Syrian terrorists. *Daou*, 42 F.4th at 130. That "course of conduct underl[ies] the cause of action." *Id.*

In any event, even if these 14 payments individually lacked a nexus to the claims, they still support jurisdiction by showing a "course of dealing" reinforcing that Defendants' later $210,000 wire to Tlass was purposeful. *See Indosuez*, 774 N.E.2d at 701 ("five prior similar transactions through a New York bank," though not tied to claims, established "course of dealing" to support jurisdiction); *Al Rushaid*, 68 N.E.3d at 8-9 (discussing "course of dealing" in

35

*Indosuez*).  They illustrate that the $210,000 wire was part of Defendants' "repeated use of a correspondent account in New York," which is enough.  *Licci III*, 984 N.E.2d at 900.

### c.   The MacLeod Declaration deserves no weight

Relying on a declaration from Gordon MacLeod ("MacLeod Decl."), Defendants cite a "tracing exercise" they say "dispels" the link between their upstream and LMEA transfers and their terrorist payoffs.  Suppl. Br. 10-15.  That exercise is legally and factually flawed.

To start, Mr. MacLeod excludes from his analysis the $210,000 wire to Tlass, which alone establishes jurisdiction.  *Supra* Part I.B.1.  And for the U.S.-dollar wires he addresses, he assumes the wrong legal standard.  *Supra* Part I.B.2.a.  Analyzing whether the 12 upstream transfers and 2 LMEA transfers "were traced to" the terrorist payoffs directly, MacLeod Decl. ¶¶ 12-13, looks for a "causal link" courts have held unnecessary, *Licci IV*, 732 F.3d at 168.  So Mr. MacLeod's entire tracing exercise – even had he done it properly – is irrelevant.

But he did not do it properly.  *First*, Mr. MacLeod incorrectly rejected the "Pro Rata methodology" for funds tracing.  MacLeod Decl. ¶ 18.  This approach "posits that a withdrawal is allocated proportionally across all deposits in an account at the time of withdrawal."  *Id*.  The "pro rata" approach has a long history in this circuit and is often used to "resolve tracing problems" for commingled trust funds.  *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir. 1986).  It is "more sensitive to the fungible nature of money," *United States v. Loe*, 248 F.3d 449, 467 n.81 (5th Cir. 2001), which prompted this Court to note its "intuitive appeal" in the money-laundering context, *United States v. Weisberg*, 2011 WL 4345100, at *4 n.5 (E.D.N.Y. Sept. 15, 2011) (Garaufis, J.).  The pro rata approach well fits the facts here. Runge Decl. ¶ 36.  And under that approach, many of LCS's criminal payments to Tlass and Taleb were directly traceable to the wires Defendants cleared through New York.  *Id*. ¶¶ 41-42; 48.

36

Mr. MacLeod discarded the pro rata methodology with little explanation.  Without even running the analysis, he said it is "suitable" only when "there is no evidence to distinguish between the funds at issue and all other funds deposited in the account."  MacLeod Decl. ¶ 18.  But given "the fungibility of money," *Weisberg*, 2011 WL 4345100, at \*6, his distinctions between funds are artificial.  Every dollar LCS sourced into Syria freed up a dollar elsewhere: even if LCS spent one incoming dollar to pay a supplier, *cf.* MacLeod Decl. ¶ 14, that just meant the next dollar it obtained no longer needed to go to that supplier – it could go to the terrorists instead.  Runge Decl. ¶ 34.  The pro rata approach reflects these realities.  *Id*. ¶¶ 36.

*Second*, Mr. MacLeod's tracing exercise lacks foundation.  In tracing LCS's outgoing payments, he assumed "the identity of the ultimate payment recipients" by taking at face value the "explanation" and "explanation-remark columns" in LCS's own "general ledgers" and "electronic bank records."  MacLeod Decl. ¶ 23 & n.9.  But Mr. MacLeod cannot validate the accuracy of those descriptions.  After all, LCS pleaded guilty to creating "invoices with false descriptions" and taking other steps "to conceal" its payments and "falsify[ ] records."  SOF ¶¶ 18, 62; *see* AC ¶¶ 87-98 (describing concealment).  Given Defendants' efforts to hide their terrorist payoffs, Mr. MacLeod should not have looked for such payments by simply accepting on faith the "explanations" in records Defendants admittedly falsified.  That is especially true because Plaintiffs did not receive discovery into LCS's cash outlays in Syria.  *Supra* pp. 4-5.  Accordingly, there is no evidence to validate the descriptions Mr. MacLeod took at face value.

*Third*, even accepting the transaction descriptions, Mr. MacLeod's tracing does not show what he says it does.  That is because he coded as legitimate many outlays whose descriptions suggest the opposite.  *See* Runge Decl. ¶¶ 38-48 (detailing this criticism).  For example, each of Mr. MacLeod's methodologies traced the upstream transfers to at least one outlay to Taleb, the

37

admitted ISIS intermediary.[26]  Moreover, Mr. MacLeod traced several payments coded as "Payment to Bruno Pescheux" and assumed they were licit.[27]  But Mr. Pescheux was a key architect of the criminal conspiracy, AC ¶¶ 51, 55, 75, and he often used personal accounts – or those of other LCS employees appearing in Mr. MacLeod's analysis – to hide LCS's payments to terrorists, *id.* ¶ 189; Runge Decl. ¶ 43.[28]  And many other outlays had bare descriptions – like "Payment to Myra" – that are far too vague for Mr. MacLeod to call them legitimate.  *E.g.*, MacLeod Decl. Ex. 3 (Nos. 83, 99, 112, 119, 137, 140, 167-68, 198, 214, 274, 321).  Yet Mr. MacLeod's analysis simply assumed that none was tied to terrorist payoffs.  The Court should "exclude" that analysis because it "rests on faulty assumptions." *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 649 (S.D.N.Y. 2012).

## II.    PERSONAL JURISDICTION EXISTS UNDER RULE 4(k)(2)

Rule 4(k)(2) provides an additional, independent basis for jurisdiction.  *See* Dkt. 26 at 30-35 (addressing this ground for jurisdiction).  For the reasons Defendants' New York contacts satisfy New York's long-arm statute, they satisfy constitutional due process.  *See Spetner*, 70 F.4th at 645; *Licci IV*, 732 F.3d at 170.  And even if the New York transactions were inadequate in isolation, they would suffice when combined with the other U.S. contacts below.  *See Zobay*, 695 F. Supp. 3d at 332 (applying Rule 4(k)(2) to uphold jurisdiction based on New York "financial market contacts" plus other "U.S. contact[s] . . . in the aggregate").  Defendants largely repeat (at 27-29) their prior Rule 4(k)(2) arguments, which remain unpersuasive.

---

[26] *See* MacLeod Decl. Ex. 3 (Nos. 185, 223, 418, 424, 635), Ex. 4 (Nos. 185, 639), Ex. 5 (Nos. 185, 223, 751), Ex. 5a (No. 751).

[27] *See*, *e.g.*, MacLeod Decl. Ex. 3 (Nos. 126, 210, 253, 313, 314, 408), Ex. 4 (No. 126).

[28] *See also* Ex. 9 at -226 (noting "apparent payments via employee advance accounts named 'Bruno Pescheux' and 'Bruno Pescheux – O'"); Branson Decl. Ex. 131 (LCS employee discussing the "risk these payments can impose on us personally" and requesting "alternative solution" for payment mechanism through Lafarge).

### A.    The Court Has Conspiracy-Based Jurisdiction

Conspiracy jurisdiction provides a straightforward way for the Court to deny Defendants' motion. When a "jurisdictional dispute is interwoven with the underlying merits," the court must "leave the jurisdictional issue for the trial." *Dorchester*, 722 F.3d at 87; *see supra* p. 5 (no discovery on conspiracy). So the only jurisdictional challenge Defendants repeat now (at 28) is to deny that ISIS "expressly aimed its conduct at" the United States. *Licci IV*, 732 F.3d at 173. That assertion remains incorrect, as shown by the complaints' detailed allegations, AC ¶¶ 10, 258-73, and buttressed by Dr. Levitt's declaration, *see* Levitt Decl. at 37-47. The Court thus has conspiracy jurisdiction for the reasons explained in Plaintiffs' prior brief. Dkt. 26 at 33-35.

### B.    Defendants Formed U.S. Contacts By Using U.S.-Based Email Services

Defendants also formed U.S. contacts by using U.S.-based email providers to carry out their scheme. AC ¶¶ 9, 245-57. Plaintiffs did not receive discovery on this basis for jurisdiction. Dkt. 37, ¶ 2. Plaintiffs thus stand on their prior briefing. Dkt. 26 at 30-33.

### C.    Defendants' Position Offends Fair Play And Substantial Justice

Personal jurisdiction also "comport[s] with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). This inquiry balances the defendant's burden, the forum's interest, the plaintiffs' interests, judicial efficiency, and social policies. *See Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 113 (1987). "[T]he party challenging jurisdiction bears a heavy burden" to show that these "considerations would render jurisdiction unreasonable." *Strauss*, 175 F. Supp. 3d at 31. "[D]ismissals" on this basis "should be few and far between." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996).

Defendants forfeited their argument (at 29-30) that exercising jurisdiction would be unreasonable, because they omitted it from their first motion to dismiss. *See* Fed. R. Civ. P. 12(g)(2), 12(h); *Naples v. Stefanelli*, 2015 WL 541489, at *5 (E.D.N.Y. Feb. 7, 2015).

Defendants' argument is also meritless. No court in this circuit has decided that New York's long-arm statute applies but still refused jurisdiction as unreasonable. *See Strauss*, 175 F. Supp. 3d at 27. This Court should not be the first. The United States has a weighty interest in "monitoring . . . banking activity to ensure that its system is not used as an instrument in support of terrorism." *Licci IV*, 732 F.3d at 174; *see Spetner*, 70 F.4th at 646. That is why the United States prosecuted Lafarge. It is also why the ATA affords a remedy for U.S. terror victims in U.S. courts. *See Strauss*, 175 F. Supp. 3d at 31 (citing "federal policy underlying Congress' enactment of the ATA"). Indeed, companies that "contribute material support" to terrorists who target Americans "direct their conduct at the United States, and should reasonably anticipate being brought to court" here. Pub. L. No. 114-222, § 2(a)(6), 130 Stat. 852, 852 (2016).

Defendants argue (at 30) that their status as foreign companies, the existence of evidence abroad, and the attacks' occurrence abroad weigh against jurisdiction. But the Second Circuit rejected those arguments more than a decade ago in *Licci*. *See Licci IV*, 732 F.3d at 174 (exercising jurisdiction even though "LCB is based in Lebanon," "many of the documents and witnesses relevant to this litigation are located abroad," and "the injuries and deaths . . . occurred in Israel"). Defendants' passing citation (at 30) to *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010), does not show otherwise. *Tamam* preceded *Licci*, and, regardless, "[n]one of the parties" there "[we]re American citizens." *Id.* at 733. Plaintiffs are U.S. citizens here.

## III.   THE COURT SHOULD REMEDY DEFENDANTS' SPOLIATION

### A.   Defendants Spoliated Jurisdictionally Relevant Evidence

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Because spoliation occurred here, sanctions are warranted under Federal Rule of Civil Procedure 37(e). In

40

particular, the Court should preclude Defendants' tracing analysis characterizing their outgoing payments and infer that the upstream and LMEA transfers funded Defendants' terrorist payoffs.

1.     Defendants failed to preserve relevant evidence. As Defendants admitted, they "actively attempted to conceal their conduct from others within and outside Lafarge" by "us[ing] personal email accounts . . . instead of their LAFARGE corporate email addresses." SOF ¶ 18. To implement that scheme, Khodara "instructed" Lafarge executives to avoid using their "professional address," to eliminate any discoverable "email record of the communications." *Id.* ¶ 88; *see* Ex. 121 at 3; Branson Decl. Ex. 132 at 2-4 (2d Suppl. Resp. to Interrog. No. 8).

Those personal accounts contained evidence highly relevant to jurisdiction. For example, when Pescheux wrote about Defendants' "preferred option" for a "bank transfer in USD," he did so from his Gmail address. Branson Decl. Ex. 125 at 2. Similarly, when Pescheux wrote Herrault about the plan to wire Tlass dollars "to his offshore account from an account LCS is having through LMEA in Egypt," he used personal email. *Id.* Ex. 135. And even the communication reflecting Khodara's "recommendation" to hide evidence was sent via personal email, from a Hotmail account to an AOL account. Ex. 121 at 3. Defendants intentionally kept these emails – and presumably others – off their corporate servers to shield them from discovery. *Id.*

Defendants did not stop at hiding that evidence; they worked to keep it hidden. They admit that, during their 2016 "internal investigation into allegations concerning Defendants' conduct in Syria," they knowingly "did not collect materials directly from individual employees' personal email accounts." Branson Decl. Ex. 133 at 5-6 (Suppl. Resp. to Interrog. No. 9). Defendants then refused discovery requests for the emails because they "were not within Defendants' possession, custody, or control." Branson Decl. Ex. 132 at 6 (2d Suppl. Resp. to Interrog. No. 13). That maneuver obstructed discovery into the most incriminating emails about how Defendants routed payments to terrorists – just the result Khodara intended. SOF ¶¶ 18, 88.

41

**2.** Defendants had a duty to preserve the evidence they hid in the personal email accounts they never collected. *See* Fed. R. Civ. P. 37(e). That duty "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). Litigation need not be "certain," but only "reasonably foreseeable." *Alter v. Rocky Point Sch. Dist.*, 2014 WL 4966119, at *8 (E.D.N.Y. Sept. 30, 2014).

Defendants knew that their criminal scheme was likely to trigger litigation. That is why they hid evidence in the first place. SOF ¶¶ 18, 88; AC ¶¶ 97-108, 248. Defendants' duty to preserve arose in February 2016 at the latest, when Lafarge initiated its internal investigation into the ISIS payoffs. SOF ¶¶ 108-10. That investigation itself created a preservation duty. *See Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 171 (D.C. Cir. 2013) ("duty [to preserve] is triggered . . . by a reasonably foreseeable [internal] investigation"). Indeed, the document collection in which Defendants deliberately refused to preserve personal emails was undertaken for an investigative report marked as "ATTORNEY WORK PRODUCT," Ex. 9 at -181, an acknowledgment that it was prepared "in anticipation of litigation," Fed R. Civ. P. 26(b)(3)(A); *see Siani v. State Univ. of N.Y.*, 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010) (something "reasonably foreseeable for work product purposes" "[i]s reasonably foreseeable for duty to preserve purposes"). That the emails sat in personal, rather than corporate, accounts is no excuse. Defendants' own document retention policy memorialized their duty to preserve personal emails, extending "to all documents pertaining to the company's business, whether located in official files of the company *or the personal files of its employees, agents or representatives*." Branson Decl. Ex. 134 (ATA0021140 at -142) (emphasis added).[29]

---

[29] *See also Puerto Rico Tel. Co. v. San Juan Cable LLC*, 2013 WL 5533711, at *1 (D.P.R. Oct. 7, 2013) ("duty to preserve extended to those personal email accounts"); *Mfg. Auto. &*

Defendants' sole stated reason for refusing to preserve such emails – that "the French criminal code since at least 1994 prohibits employers from accessing their employees' personal email," Branson Decl. Ex. 133 at 5-6 (Suppl. Resp. to Interrog. No. 9) – is a pretext.  French law contains no such prohibition.  As explained in the attached declaration from a French law professor, the cited statute merely bars employers from accessing an employee's *personal* emails in *bad faith*.  Libchaber Decl. ¶¶ 15-25.[30]  Under French law, and as Lafarge's document retention policy made clear, work-related emails are not *personal* emails, no matter what account they are in.  *Id*. ¶¶ 27-28.  Lafarge thus could have collected those emails without acting in bad faith.  *Id*.  Indeed, French courts regularly permit employers to access personal correspondence in similar circumstances, especially when there is evidence of a crime.  *Id*. ¶¶ 20-21, 28.

Having instructed employees to execute the criminal conspiracy via their personal accounts, *see* SOF ¶¶ 18, 88; AC ¶ 248, Lafarge cannot now hide behind French law in refusing to preserve the evidence they intentionally offloaded onto those accounts, Libchaber Decl. ¶¶ 13-30.  Defendants' pretextual reliance on a facially inapplicable French statute shows they were really acting to spoliate evidence.  *See Binder v. Long Island Lighting Co.*, 57 F.3d 193, 200 (2d Cir. 1995) ("Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct.").

**3.**     The evidence Defendants spoliated cannot be obtained elsewhere.  *See* Fed. R. Civ. P. 37(e).  Although the government produced three emails from Defendants' personal accounts, *see* Exs. 1, 59, 121, that is no substitute for searching for and collecting all

---

*Software Sys., Inc. v. Hughes*, 2018 WL 5914238, at \*9 (C.D. Cal. Aug. 20, 2018) (duty to preserve work emails extended to "personal gmail account"); *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 886 (N.D. Ill. 2021) (similar).

[30] "Libchaber Decl." is the accompanying Declaration of Rémy Libchaber, a law professor at Paris I University (Pantheon-Sorbonne).

jurisdictionally relevant documents across all the relevant employees' accounts. That is especially true because Defendants did not fully cooperate with the criminal investigation. AC ¶ 86. And Plaintiffs had no other way to access these accounts during expedited jurisdictional discovery. The executives who used those accounts no longer work for Lafarge, SOF ¶ 107, and Defendants said they are beyond the Court's subpoena power, 4/12/24 Tr. 20:4-14, 22:11-20.

**B.      Defendants' Spoliation Prejudiced Plaintiffs And Warrants A Remedy**

The Court "may order measures" to "cure the prejudice" Defendants' spoliation created, Fed. R. Civ. P. 37(e)(1), and it should do so here. The prejudice is manifest. As detailed above, *supra* Part II.A.2.c, Defendants' nexus arguments depend on factual assertions about LCS's *outgoing* payments. That is because their whole tracing exercise depends on the assumption – which Mr. MacLeod accepted but never validated – that the outgoing payments were both accurately described in Lafarge's records and unconnected to Tlass or Taleb. MacLeod Decl. ¶¶ 23-24 & n.9. The personal emails Defendants spoliated are highly relevant to that assumption. Indeed, one Gmail that Defendants failed to produce discussed Pescheux's plan to use the LMEA account to wire money to Tlass's "offshore account" to "sever[] any suspicion" about their payments. Ex. 59 at 1. The emails Defendants spoliated likely contained other, similar evidence. By intentionally hiding and then failing to preserve the most incriminating evidence about their terrorist payoffs, Defendants obstructed any effort to fully test their tracing analysis.

The Court should remedy that prejudice by precluding Defendants' tracing analysis (at 9-11, 13) characterizing their outgoing payments, and by inferring that the upstream and LMEA transfers funded Defendants' terrorist payoffs. The Court has "'wide discretion'" to select such a remedy. *Rosa v. Genovese Drug Stores, Inc.*, 2017 WL 4350276, at *2 (E.D.N.Y. July 31, 2017) (Garaufis, J.) (quoting *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999)).

44

One available spoliation remedy is "forbidding the party that failed to preserve information from putting on certain evidence" "to offset prejudice caused by failure to preserve other evidence."  Fed. R. Civ. P. 37 adv. comm. note to 2015 amendment; *see Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2019 WL 6838672, at *7 n.13 (S.D.N.Y. Dec. 16, 2019) ("preclusion" can be "remedy needed to cure prejudice under Rule 37(e)(1)").  Another is to permit the Court to draw reasonable inferences, based on evidence that was produced, that the missing evidence would support the prejudiced party's claims.  *See Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *17 (S.D.N.Y. Mar. 12, 2018) (where "there are material gaps in the record[ ]," as a "result of Defendants' deletion of records," then Rule 37(e)(1) allows "reasonable extrapolations or interpolations from the [evidence] that is available"); *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 180 (S.D.N.Y. 2022) (permitting "inferences" under Rule 37(e)(1)).  These remedies are warranted here.  *See Lokai*, 2018 WL 1512055, at *17.[31] Defendants intentionally hid the most incriminating evidence about how exactly they paid terrorists.  They also hid the most incriminating evidence relevant to whether their payments to Tlass stopped with the $210,000 wire in October 2014, despite the open-ended nature of their contract.  Ex. 16 § 3.2 at -162 (setting monthly fee going forward).  The Court should not permit them now to spin those payments based on the incomplete records they chose to preserve.

## CONCLUSION

The Court should deny the motion to dismiss.

---

[31] Because Defendants acted with "intent to deprive another party of the information's use," Rule 37(e)(2)(A) also supports "presum[ing] that the lost information was unfavorable to the party."  *See Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. July 2017) ("intentionally [not] tak[ing] any steps to preserve [relevant] emails . . . satisfies the requisite level of intent required by [Rule] 37(e)").

Dated:  October 28, 2024

Lee Wolosky
Katya Jestin
Andrew J. Lichtman
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel:  (212) 891-1628
Fax:  (212) 891-1699
lwolosky@jenner.com
kjestin@jenner.com
alichtman@jenner.com

J.E. Shreve Ariail
Alyssa G. Bernstein
JENNER & BLOCK LLP
1099 New York Avenue
Washington, D.C. 20001
Tel:  (202) 639-6871
sariail@jenner.com
abernstein@jenner.com

Todd C. Toral
JENNER & BLOCK LLP
515 South Flower Street
Los Angeles, CA 90071-2246
Tel:  (213) 239-2294
ttoral@jenner.com

*Counsel for Finan Plaintiffs*

Joshua D. Arisohn
Matthew A. Girardi
BURSOR & FISHER, P.A.
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Tel:  (646) 837-7150
Fax:  (212) 989-9163
jarisohn@bursor.com
mgirardi@bursor.com

*Counsel for Fields Plaintiffs*

Respectfully submitted,

*/s/ Joshua D. Branson*

Joshua D. Branson (*pro hac vice*)
Andrew E. Goldsmith (No. 4312740)
Lillian V. Smith (*pro hac vice*)
Christopher C. Goodnow (*pro hac vice*)
James A. Ruck (*pro hac vice*)
Chase H. Robinett (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
lsmith@kellogghansen.com
cgoodnow@kellogghansen.com
jruck@kellogghansen.com
crobinett@kellogghansen.com

Ryan R. Sparacino (*pro hac vice*)
Adam J. Goldstein (No. 5123286)
SPARACINO PLLC
1920 L Street, N.W., Suite 835
Washington, D.C. 20036
Tel:  (202) 629-3530
Fax:  (202) 629-3658
ryan.sparacino@sparacinopllc.com
adam.goldstein@sparacinopllc.com

*Counsel for Foley Plaintiffs*