UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARISS FINAN, *et al.*, | **MEMORANDUM & ORDER** |
| Plaintiffs, | **22-CV-7831 (NGG) (PK)** |
| -against- | |
| LAFARGE S.A., *et al.*, | |
| Defendants. | |
| TAMARA FIELDS, *et al.*, | **23-CV-169 (NGG) (PK)** |
| Plaintiffs, | |
| -against- | |
| LAFARGE S.A., *et al.*, | |
| Defendants. | |
| DIANE FOLEY, *et al.*, | **23-CV-5691 (NGG) (PK)** |
| Plaintiffs, | |
| -against- | |
| LAFARGE S.A., *et al.*, | |
| Defendants. | |

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs are comprised of several groups of American nationals and their families, who were killed or injured in terrorist acts conducted by the Islamic State of Iraq and Syria ("ISIS") and al-Nusrah Front ("ANF") between 2012 and 2017.[1] Plaintiffs filed

---

[1] The court defines the two terrorist organizations based on the names used in the pleadings. (*See, e.g.*, First Amended Complaint ¶¶ 32 (defining ANF), 34 (defining ISIS), *Foley v. Lafarge S.A.*, No. 23-CV-5691 (NGG) (PK) (E.D.N.Y. Aug. 5, 2024) (Dkt. 68) ("Foley FAC").) Hereinafter, all citations to docket entries in *Foley* are cited as "[Document Name] (Dkt. [Document Number] in *Foley*)." The court follows the same citation convention for citations to docket

three [2] separate actions against Defendant Lafarge S.A. ("Lafarge"), a French building materials business, and its subsidiaries, Defendant Lafarge Cement Holding Limited ("Lafarge Cyprus") and Defendant Lafarge Cement Syria S.A. ("LCS") (collectively, "Defendants"), seeking damages pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). (*See* Third Amended Complaint ¶¶ 395-418 (Dkt. 70 in *Finan*) ("Finan TAC"); Second Amended Complaint ¶¶ 404-430 (Dkt. 55 in *Fields*) ("Fields SAC"); First Amended Complaint ¶¶ 405-432 (Dkt. 68 in *Foley*) ("Foley FAC").) Defendants seek dismissal of Plaintiffs' operative complaints (the "Complaints")[3] in all three cases on the grounds that this court lacks personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (*See* Defs.' Combined Mem. of Law in Support of Mot. to Dismiss. (Dkt. 40 in *Finan*; Dkt. 26 in *Fields*; Dkt. 25 in *Foley*) ("Combined Mots.").)[4] Plaintiffs in all three cases oppose the motion. (*See* Pls.' Opps. to Defs.'

---

entries in *Fields*, No. 23-CV-169 (NGG) (PK), *Finan*, No. 22-CV-7831 (NGG) (PK), and the four other related cases against Defendants.

[2] A fourth related action was filed on December 14, 2023, a fifth on February 9, 2024, a sixth on December 30, 2024, and a seventh on July 30, 2025, all of which are currently before the undersigned. (*See* Complaint, *Murad v. Lafarge S.A.*, No. 23-CV-9186 (NGG) (PK) (E.D.N.Y. Dec. 14, 2023) (Dkt. 1); Complaint, *Goldman v. Lafarge S.A.*, No. 24-CV-1043 (NGG) (PK) (E.D.N.Y. Feb. 9, 2024) (Dkt. 1); Complaint, *Black v. Lafarge S.A.*, No. 24-CV-8901 (NGG) (PK) (E.D.N.Y. Dec. 30, 2024) (Dkt. 1); Complaint, *Shirley v. Lafarge S.A.*, No. 25-CV-4248 (NGG) (PK) (E.D.N.Y. Jul. 30, 2025) (Dkt. 1).) The court granted stipulations wherein the parties agreed to stay their actions pending this court's ruling on the instant motions to dismiss. (*See* Stipulation & Order ¶ 6 (Dkt. 25 in *Murad*); Stipulation & Order ¶ 6 (Dkt. 10) in *Goldman*); Stipulation & Order ¶ 6 (Dkt. 7 in *Black*); August 15, 2025 Order in *Shirley*.)

[3] The court collectively references the operative complaints, (*see* Finan TAC; Fields SAC; Foley FAC), as the "Complaints."

[4] Hereinafter, references made to Defendants' "combined" papers correspond to docket entries in *Foley v. Lafarge S.A.*, No. 23-CV-5691 (NGG) (PK).

Mots. to Dismiss (Dkt. 41 in *Finan* ("Finan Opp.")); (Dkt. 27 in *Fields* ("Fields Opp.")); (Dkt. 26 in *Foley* ("Foley Opp.")).)[5]

As part of the first round of briefing on Defendants' motions to dismiss, Defendants moved to strike certain portions of the Declaration of Sarah K. Runge, (Jan. 22, 2024 Decl. of Sarah K. Runge (Dkt. 26-1 in *Foley*) ("First Runge Decl.")), submitted in support of the *Foley* Plaintiffs' Opposition to Defendants' Combined Motions to Dismiss. (*See* Defs.' Mem. in Support of their Mot. to Strike Decl. of Sarah K. Runge (Dkt. 32 in *Foley*) ("First Mot. to Strike").) The *Foley* Plaintiffs opposed Defendants' First Motion to Strike. (*See* Pls.' Opp. to First Mot. to Strike (Dkt. 33 in *Foley*).) Defendants replied. (*See* Defs.' Reply Mem. in Further Support of First Mot. to Strike (Dkt. 34 in *Foley*).)

After court-ordered jurisdictional discovery, (Mar. 21, 2024 Order & Minute Entry (Dkt. 37 in *Foley*; Dkt. 44 in *Finan*; Dkt. 30 in *Fields*)), the Plaintiffs further amended their pleadings. (*See* Foley FAC; Fields SAC; Finan TAC.) The parties then submitted supplemental briefing on whether the court has personal jurisdiction over the Defendants. (*See* Defs.' Combined Supplemental Mem. in Support of Defs.' Mots. to Dismiss Pls.' Compls. for Lack of Personal Jurisdiction) (Dkt. 73 in *Foley*) ("Combined PJ Mot. to Dismiss"); Pls.' Joint Supplemental Opp. Brief Addressing Personal Jurisdiction (Dkt. 76 in *Foley*) ("Joint PJ Mot. Opp."); Defs.' Combined Supplemental Reply Mem. in Support of Defs.' PJ Mot. to Dismiss (Dkt. 81 in *Foley*) ("Combined PJ Reply").)[6] Defendants requested oral argument on their motions to dismiss and requested an evidentiary hearing to contest the jurisdictional

---

[5] Hereinafter, and unless otherwise noted, citations and references to the "Foley Opposition" or "Foley Opp." apply to all three sets of Plaintiffs.

[6] Unless otherwise noted, citations to the "Joint PJ Mot. Opp." or "Joint PJ Motion Opposition" apply to all three sets of Plaintiffs.

facts alleged in the Complaints. (Combined PJ Mot. to Dismiss at 5.)

Defendants moved to strike certain allegations contained in the supplemental declaration of Sarah K. Runge, (Oct. 28, 2024 Decl. of Sarah K. Runge (Dkt. 78 in *Foley*; Dkt. 80 in *Finan*; Dkt. 65 in *Finan*) ("Supp. Runge Decl.")), and Matthew Levitt, (Oct. 28, 2024 Decl. of Matthew Levitt (Dkt. 79 in *Foley*; Dkt. 81 in *Finan*; Dkt. 66 in *Finan*) ("Levitt Decl.")), that Plaintiffs submitted in support of their Joint PJ Motion Opposition. (*See* Defs.' Mem. in Support of their Mot. to Strike Portions of the Decls. of Sarah K. Runge & Matthew Levitt (Dkt. 91 in *Foley*) ("Second Mot. to Strike").) Plaintiffs subsequently jointly opposed Defendants' Second Motion to Strike. (*See* Joint Opp. to Second Mot. to Strike (Dkt. 92 in *Foley*).) Defendants replied. (*See* Defs.' Reply Mem. in Further Support of Second Mot. to Strike (Dkt. 93 in *Foley*).)

Plaintiffs also requested sanctions pursuant to Federal Rule of Civil Procedure 37(e), alleging that Defendants spoliated evidence. (*See* Joint PJ Mot. Opp. at 40-45.) Defendants opposed this request. (*See* Combined PJ Reply at 20-25.)

For the reasons set forth below, Defendants' motions to strike are DENIED, and Defendants' motions to dismiss are GRANTED in part and DENIED in part. Defendants' motions to dismiss pursuant to Rule 12(b)(2) are DENIED, Defendants' motions to dismiss Plaintiffs' aiding and abetting claims pursuant to Rule 12(b)(6) are GRANTED, and Defendants' motions to dismiss Plaintiffs' conspiracy claims pursuant to Rule 12(b)(6) are DENIED. Plaintiffs' request for sanctions is DENIED.

## I. BACKGROUND[7]

The three related cases at issue arise out of terrorist attacks in Syria, Iraq, Lebanon, Jordan, Niger, Libya, Turkey, France, and Spain between 2012 and 2017. Plaintiffs are a group of American victims, and the relatives and estates of victims, killed or injured by these attacks. Plaintiffs filed three actions alleging that Defendants were secondarily liable for Plaintiffs' relatives' deaths or Plaintiffs' injuries because they aided and abetted ISIS and ANF by knowingly providing substantial assistance to the terrorist organizations that perpetrated the attacks, in violation of the ATA, 18 U.S.C. § 2333(d), and conspired with ISIS and ANF, in violation of the ATA, 18 U.S.C. § 2333(d). (*See* Foley FAC ¶¶ 405-432; Fields SAC ¶¶ 404-430; Finan TAC ¶¶ 395-418.)

### A. ISIS and ANF

ISIS was established in the early 2000s.[8] ISIS has a long history of conducting anti-American terrorism, and since 2004 has been formally designated as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189. (Fields SAC ¶ 408.)

At the time of the attacks giving rise to this action, ISIS's organizational structure had multiple components or "cells" that are relevant to the claims at issue here. The "Leadership Cell" was ISIS's global center of command and oversaw the planning, coordination, authorization, and execution of ISIS's attacks. (Foley FAC ¶ 124.) It was led by Abu Bakr al-Baghdadi from 2010 until

---

[7] The following facts are taken from the "Complaint[s] and any documents upon which [they] rel[y]," and for the purposes of resolving Defendants' motions to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022).

[8] "In one form or another, ISIS has been designated a Foreign Terrorist Organization since 2004; it has also been known as . . . . al Qaeda in Iraq." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 478 n.1 (2023).

his death in October 2019. (*Id.* ¶ 125.) The Leadership Cell received a meaningful portion of all income ISIS derived from the protection payments or "taxes" it collected in Syria—money it used in planning and committing terrorist attacks. (*Id.* ¶ 126; Fields SAC ¶¶ 225-228.) The "Raqqa Cell," located in Raqqa, Syria, was ISIS's leading cell for both hostage-taking attacks, (Foley FAC ¶ 136), and so-called "external" attacks outside of ISIS's "caliphate" in Syria and Iraq, (*id.* ¶ 134; Fields SAC ¶ 234). It was led by Abu Luqman (a.k.a. Ali Musa al-Shawakh), who also served in ISIS's Leadership Cell and its Intelligence Cell, from early 2014 until his death in April 2018. (Foley FAC ¶ 137; Fields SAC ¶ 231.) The "Intelligence Cell" was involved in recruiting, making propaganda videos, and identifying targets to attack. (Foley FAC ¶¶ 141-145.) All three cells meaningfully participated in the attacks that killed and injured Plaintiffs and their family members. (*See id.* ¶¶ 132, 139, 145.)

As the Syrian civil war continued in 2012, "ISIS and ANF gained control over large swaths of Syria and committed brutal terrorist acts." (Finan TAC ¶ 89.) In 2012, the United States designated ANF as an FTO. (*Id.* ¶ 398; *see also* Foley FAC ¶ ("Continuously since 2004, the United States has designated ISIS and ANF as FTOs, under various names.").)

### B. The Attacks

The three related cases arise from terrorist attacks committed by ISIS and ANF. (*See* Foley FAC ¶ 274; Fields SAC ¶ 3; Finan TAC ¶ 28.) The Plaintiffs in all three cases are American citizens who were killed or injured in attacks committed by ISIS, ANF, or both, and their family members. (*See* Foley FAC ¶¶ 274-404; Fields SAC ¶¶ 362-403; Finan TAC ¶¶ 340-394.)

The *Foley* Plaintiffs or their family members were injured or killed in: four hostage-taking attacks of U.S. civilians in Syria by ISIS and ANF between 2012 and 2015, (*see* Foley FAC ¶¶ 275, 282, 284-290, 293, 294-298, 301, 303-306, 309, 311-312; *see also id.*

¶¶ 132(a), 139(a), 145(a)); five attacks on U.S. servicemembers in Syria and Iraq by ISIS between 2015 and 2017, (*see id.* ¶¶ 314, 316-325, 328-335, 338-343, 345-353, 356-369; *see also* ¶¶ 132(b), 139(b), 145(b)); and two so-called "external" attacks by ISIS—the first in Turkey in 2016, and the second in Niger in 2017, (*see id.* ¶¶ 371, 373-374, 376-377, 379, 381-387, 390-397, 400-402; *see also id.* ¶¶ 132(c), 139(c), 145(c)). The *Fields* Plaintiffs or their family members were injured or killed in three other "external" attacks by ISIS: a 2015 mass shooting in Amman, Jordan, (*see* Fields SAC ¶¶ 363-375); a 2016 cargo truck attack in Nice, France, (*see id.* ¶¶ 376-392); and a 2017 van attack in Barcelona, Spain, (*see id.* ¶¶ 393-403). The *Finan* Plaintiffs or their family members were injured or killed by terrorist attacks and acts of violence in Iraq, Syria, Libya, and Lebanon by ISIS: two 2016 attacks targeting U.S. servicemembers in Iraq, (*see* Finan TAC ¶¶ 341-346, 364-368); two attacks targeting U.S. servicemembers in Syria that took place in 2016 and 2017, respectively, (*see id.* ¶¶ 348-353, 355-362); a 2015 attack on a hotel in Libya, (*see id.* ¶¶ 370-377); a 2014 hostage-taking attack that led to several deaths in Lebanon, (*see id.* ¶¶ 379-385); and various instances of human trafficking, torture, and rape of the daughter of members of ISIS and ANF in Syria that took place between 2012 and 2017, (*see id.* ¶¶ 389-393).

### C.  Role of the Defendants

#### 1.  Defendants

Defendant Lafarge is a multinational building materials business organized under the laws of France, headquartered in Paris, France, and since 2015, is wholly owned by Holcim, Ltd., a Switzerland-based building materials business. (Foley FAC ¶ 12; Finan TAC ¶¶ 30-31.) Defendant Lafarge Cyprus is a direct subsidiary of Defendant Lafarge organized under the laws of Cyprus and headquartered in Cyprus. (Foley FAC ¶ 13.) Defendant LCS was a subsidiary of Lafarge Cyprus and an indirect subsidiary of

Lafarge that was organized under the laws of Syria and head-quartered in Damascus, Syria. (*Id.* ¶ 14.) Lafarge Cyprus is the entity through which Lafarge held the majority of its shares in LCS (until the 2015 merger with Holcim Ltd.) and often routed money to LCS and intermediaries. (*Id.* ¶¶ 13-14; Finan TAC ¶ 32(b).)

Lafarge opened a cement manufacturing plant in Jalabiyeh, Syria in 2010 (the "Jalabiyeh Plant"). (Foley FAC ¶¶ 46-47.) Lafarge operated the Jalabiyeh Plant through LCS from 2010 until September 2014 when Defendants evacuated the plant. (*Id.*; Fields SAC ¶ 48; Finan TAC ¶ 86.) The plant cost Lafarge $680 million to construct, making the project the "largest non-oil foreign investment in Syrian history." (Foley FAC ¶ 46.)

### 2. Defendants' Payments

After 2011, ISIS took control over much of Syria's territory, including where the Jalabiyeh Plant was located. (*See id.* ¶¶ 44, 48.) Rather than close the plant and evacuate its employees, in July 2012, Defendants agreed to make regular payments to ISIS and ANF so that the Jalabiyeh Plant could continue to operate. (*Id.* ¶¶ 50-60.) These payments varied between fixed monthly payments or "donations" between $80,000 and $100,000, (*id.* ¶¶ 61-65), and volume-based payments of $150 per truck, totaling at least $1.65 million, (*id.* ¶¶ 67-68). Later, Defendants made these "volume-based" payments for each ton of cement produced at the plant. (*Id.* ¶¶ 69-70.). Additionally, Lafarge and LCS purchased raw materials from ISIS-controlled suppliers, totaling over $3.4 million. (*Id.* ¶ 71.) In sum, Lafarge ultimately paid ISIS and ANF at least $5.92 million but could have paid over $15 million. (*Id.* ¶ 54; Fields SAC ¶ 12.)

Defendants also provided cement manufactured at the Jalabiyeh Plant to ISIS, which ISIS then used to build tunnels and infrastructure. (Foley FAC ¶¶ 76-77.) Plaintiffs also allege that Defendants used ISIS's territorial control to halt trade from other

8

cement companies in Syria and Turkey, giving Defendants market power in the territory in exchange for continued payments to ISIS. (*Id.* ¶ 79-81.) Finally, in 2014, ISIS seized the Jalabiyeh Plant following Lafarge's evacuation and ISIS subsequently obtained $3.21 million worth of cement from the cement plant in the process. (Fields SAC ¶¶ 4, 189-191.)

Plaintiffs allege that Defendants executed at least 15 transactions through New York banks in connection with their scheme to pay ISIS and ANF. (Foley FAC ¶ 155; Fields SAC ¶ 243; Finan TAC ¶ 221.) Plaintiffs allege that 12 of these transfers were intercompany transfers from Lafarge and Lafarge Cyprus to LCS (the "Intercompany Transfers").[9] (Sealed First Amended Complaint ¶¶ 155-156, 163-166 (Dkt. 67-1 in *Foley*) ("Sealed Foley FAC"); *see also* Fields SAC ¶¶ 243-244; Finan TAC ¶¶ 221-222.) Two of these transactions were payments that LCS accepted into its bank account in Egypt (the "LMEA Transfers"). (Sealed Foley FAC ¶¶ 155-156, 178, 186.) One transfer was a payment to Firas Tlass (the "Reimbursement Transfer"). (Sealed Foley FAC ¶¶ 155-156, 159-162; *see also* Fields SAC ¶¶ 243-244; Finan TAC ¶¶ 221-222.)

Tlass was an original LCS shareholder and Lafarge's first business partner in Syria. (Foley FAC ¶ 157.) Tlass provided "overall advisory services" to Defendants to ensure the "smooth operation" of the Jalabiyeh Plant through relationship-building with "stakeholders and relevant regulators." (Sealed Foley FAC ¶ 157.) Plaintiffs allege that Defendants paid Tlass, who then paid ISIS and ANF on Defendants' behalf. (Foley FAC ¶ 157.) Defendants allegedly made these payments in U.S. dollars and transferred the funds through New York correspondent banking accounts held at Citibank, JP Morgan Chase, BNY Mellon, and BNP Paribas. (Sealed Foley FAC ¶¶ 155, 157.) Plaintiffs allege that

---

[9] Plaintiffs refer to these intercompany transfers as "Upstream Equity and Loan Payments." (Foley FAC ¶ 156.)

Defendants knowingly and purposefully executed these transactions using U.S. dollars to avoid detection by European authorities and prevent operational risk, and because U.S. dollars were ISIS's "preferred currency." (Foley FAC ¶ 8; Fields SAC ¶ 28; Finan TAC ¶ 23.) Plaintiffs also allege that Defendants' employees who were involved in the scheme used Google email addresses linked to United States-based servers as opposed to company-issued email addresses because they knew that using Gmail rather than their corporate emails would make it easier to avoid detection. (*See* Foley FAC ¶ 255; Fields SAC ¶ 343; Finan TAC ¶ 320.)

Plaintiffs allege that Defendants' payments to ISIS and ANF substantially contributed to the terrorist attacks outlined above and therefore contributed to Plaintiffs' injuries and the deaths of Plaintiffs' relatives. This is because ISIS gave its Leadership Cell 20% of ISIS's revenue, which the Leadership Cell then redistributed among ISIS's various causes and cells and ultimately used to plan and execute terrorist attacks. (*See* Foley FAC ¶ 126.) Plaintiffs allege that ISIS leader Luqman was on the "shadow board of Lafarge's factory in Syria." (*Id.* ¶ 138; Fields SAC ¶ 231; Finan TAC ¶ 207.) Plaintiffs also allege that Defendants' payments to ISIS's Intelligence Cell totaled over $1 million, which contributed to terrorist attacks including hostage takings, external attacks, and attacks on U.S. servicemembers. (Foley FAC ¶¶ 141-146.)

On October 18, 2022, Defendants Lafarge and LCS pleaded guilty to a one-count Criminal Information charging them with conspiring to provide material support and resources to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1). (Foley FAC ¶ 1 & 1, n.1 (citing Plea Agreement ¶ 2, *United States v. Lafarge S.A.*, No. 22-CR-4444 (WFK) (E.D.N.Y. Oct. 18, 2022) (Dkt. 10)).) This plea arose from Lafarge and LCS's business dealings with ISIS and ANF—including the payment of at least $5.92 million

to ISIS and ANF between August 2013 and October 2014. (Foley FAC ¶ 54.) Pursuant to their guilty plea, Defendants Lafarge and LCS "admitted" and "stipulated" to a Statement of Facts detailing, among other things, these business dealings and payments. (Foley FAC ¶ 3. *See also id.* at 1, n.1 (citing Statement of Facts, *United States v. Lafarge S.A.*, No. 22-CR-4444 (WFK) (E.D.N.Y. Oct. 18, 2022) (Dkt. 10-1) ("SOF")).)

## II. PROCEDURAL HISTORY

Plaintiffs initially filed suit against Defendants between December 2022 and July 2023. (Compls. (Dkt. 1 in *Finan*; Dkt. 1 in *Fields*; Dkt. 1 in *Foley*).) The *Fields* Plaintiffs amended their initial complaint on September 8, 2023, (First Amended Complaint (Dkt. 16 in *Fields*) ("Fields FAC")), and the *Finan* Plaintiffs amended their initial complaint on September 4, 2023 and further amended their pleadings on November 7, 2023, (*see* First Amended Complaint (Dkt. 23 in *Finan*); Second Amended Complaint (Dkt. 37 in *Finan*) ("Finan SAC")).

On December 7, 2023 Defendants served their motions to dismiss the then-operative complaints for lack of personal jurisdiction and for failure to state a claim. (Combined Mots. at 1 (moving to dismiss the Finan SAC, Fields FAC, and Foley Complaint).) Plaintiffs opposed that motion on January 22, 2024,[10] (Foley Opp.; Fields Opp.; Finan Opp.), and Defendants replied on February 21, 2024, (Defs.' Combined Reply Mem. in Further Support of Combined Mots. (Dkt. 27 in *Foley*; Dkt. 40 in *Finan*; Dkt. 26 in *Fields*)). On March 21, 2024, the court held oral argument on Defendants' Combined Motions to Dismiss, after which it reserved judgment pending limited jurisdictional discovery for 60

---

[10] The *Fields* Plaintiffs "join and adopt" the Foley Opposition, (Fields Opp. at 1), and the *Finan* Plaintiffs "incorporate" the Foley Opposition, (Finan Opp. at 1). Accordingly, the court's references throughout this Memorandum and Order to the "Foley Opposition" or "Foley Opp." apply to Plaintiffs in all three actions.

days under the supervision of Magistrate Judge Peggy Kuo. (Mar. 21, 2024 Order & Minute Entry.)

Following jurisdictional discovery, Plaintiffs further amended their pleadings, alleging that Defendants purposefully availed themselves of New York by choosing New York correspondent banks to clear 15 U.S.-dollar transfers. (*See* Foley FAC, ¶¶ 153-155; Fields SAC ¶¶ 241-243; Finan TAC ¶¶ 219-221.) The parties then submitted supplemental briefing on Defendants' motions to dismiss for lack of personal jurisdiction. (*See generally* Combined PJ Mot. to Dismiss; PJ Mot. Opp.; Combined PJ Reply.) Defendants also renewed their motion to strike parts of Plaintiffs' declarations submitted in opposition to Defendants' motions to dismiss for lack of personal jurisdiction, (*see generally* Second Mot. to Strike; Opp. to Second Mot. to Strike; Reply in Support of Second Mot. to Strike), and Plaintiffs requested sanctions for Defendants' alleged spoliation of jurisdictional evidence, (*see* PJ Mot. Opp. at 40-45; Combined PJ Reply at 20-25). Defendants also renewed their request for oral argument on their motion to dismiss and requested an evidentiary hearing on personal jurisdiction. (*See* Combined PJ Mot. to Dismiss at i, 30.)

Additionally, both parties submitted letters regarding the implications of a recent Supreme Court decision concerning federal courts' exercise of personal jurisdiction over foreign defendants, *Fuld v. Palestine Liberation Organization*, 145 S. Ct. 2090 (2025). (*See* Pls.' Ltr. re Not. of Suppl. Authority (Dkt. 94 in *Foley*); Defs.' Ltr. Resp. to Pls.' Fuld Ltr. (Dkt. 95 in *Foley*).)

### A. Plaintiffs' Claims

The *Foley* Plaintiffs are suing Defendants on three claims: (1) violation of the ATA, 18 U.S.C. § 2331 *et seq.*, as amended by JASTA, 18 U.S.C. § 2333(d), for aiding and abetting an FTO; (2) violation of the JASTA for conspiracy liability, for conspiring to promote an FTO's protection racket within its territory; and (3) violation of the JASTA for conspiracy liability, for conspiring to

provide material support to an FTO. (Foley FAC ¶¶ 405-432.) The *Fields* Plaintiffs are suing Defendants on two claims: (1) violation of the ATA, 18 U.S.C. § 2331 *et seq.*, as amended by the JASTA, 18 U.S.C. § 2333(d), for aiding and abetting a FTO; and (2) violation of the JASTA for conspiracy liability, for conspiring to promote an FTO's protection racket within its territory and conspiring to provide material support to a FTO. (Fields SAC ¶¶ 404-430.) The *Finan* Plaintiffs are suing Defendants on two claims: (1) violation of the ATA, 18 U.S.C. § 2331 *et seq.*, as amended by the JASTA, 18 U.S.C. § 2333(d), for aiding and abetting a FTO; and (2) violation of the JASTA for conspiracy liability, for conspiring to promote an FTO's protection racket within its territory and conspiring to provide material support to an FTO. (Finan TAC ¶¶ 395-418.)

## III. LEGAL STANDARDS

### A. Motion to Dismiss

Rule 12(b) of the Federal Rules of Civil Procedure permits Defendants to move the court to dismiss a complaint by, *inter alia,* asserting that the court "lack[s] [] personal jurisdiction" over the defendants, or that the plaintiffs failed to "state a claim upon which relief can be granted." *See* Fed R. Civ. P. 12(b)(2), (6).

In order to survive a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction "a plaintiff must make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) ("*Licci IV*").[11] In order to make the requisite showing after jurisdictional discovery, a plaintiff must provide "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010); *Dorchester Fin. Sec., Inc. v. Banco*

---

[11] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

*BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (noting that after parties conduct jurisdictional discovery, a plaintiff's *"prima facie* showing must be factually supported"). "The court neither draws argumentative inferences in the plaintiffs['] favor, nor does it accept as true a legal conclusion couched as a factual allegation." *Przewozman v. Charity*, No. 20-CV-6088 (NGG) (TAM), 2023 WL 2562537, at *4 (E.D.N.Y. Mar. 17, 2023).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011). "Although detailed factual allegations are not required, the pleading standard requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Henkin v. Charity*, No. 21-CV-5716 (AMD) (VMS), 2023 WL 2734788, at *4 (E.D.N.Y. Mar. 31, 2023). Thus, courts ruling on a motion to dismiss "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In addition to the factual allegations in the complaint, the court may also consider "documents that are attached to the complaint, incorporated in it by reference, integral to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020).

"Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint." *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. 2008) (collecting cases); *accord Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (*en banc*) ("[L]ogic compel[s] initial consideration

of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim[.]").

### B. Motion to Strike

When presented with Rule 12(b) motions, "courts may consider evidentiary matter 'presented by affidavit or otherwise.'" *Mugno v. Societe Internationale De Telecommunications Aeronautiques, Ltd.*, No. 5-CV-2037, 2007 WL 316573, at *8 (E.D.N.Y. Jan. 30, 2007) (quoting *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010-11 (2d Cir. 1986) (considering affidavit submitted in support of a Rule 12(b)(1) motion) (citing *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1130-31 (2d Cir.1976))). When considering such evidentiary matter, the Second Circuit has directed lower courts to look to Rule 56 of the Federal Rules of Civil Procedure, stating: "the body of decisions under Rule 56 offers guidelines in considering evidence submitted outside the pleadings." *Kamen*, 791 F.2d at 1011; *see also Mugno*, 2007 WL 316573, at *7 (considering motion to strike and/or exclude declarations of plaintiff and plaintiffs' counsel). Under Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The admissibility of expert testimony, however, is governed by Rule 702 of the Federal Rules of Evidence. *See* Fed. R. Evid. 702. Under Rule 702, experts are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). However, experts "may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 165 n.30 (S.D.N.Y. 2012) ("[E]xpert testimony

may not usurp the role of the court in determining the applicable law."), *on recons. in part,* No. 10-CV-2463 (SAS), 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012). Plaintiffs have "the burden to prove by a preponderance of the evidence that their expert's testimony is admissible." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,* 412 F. Supp. 3d 392, 405 (S.D.N.Y. 2019), *aff'd,* 13 F.4th 247 (2d Cir. 2021).

### C.  Motion for Sanctions

Federal Rule of Civil Procedure 37 permits courts to levy sanctions against parties that fail to preserve electronically stored information, a practice often described as "spoliation." *See In re Terrorist Bombings of U.S. Embassies in E. Afr.,* 552 F.3d 93, 148 (2d Cir. 2008) ("Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."). Rule 37(e) requires parties to "take reasonable steps" to preserve "electronically stored information that should have been preserved in the anticipation or conduct of litigation." Fed R. Civ. P. 37(e). "The duty to preserve evidence arises 'most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.'" *Medcenter Holdings Inc. v. Web MD Health Corp.,* 692 F. Supp. 3d 81 (S.D.N.Y. 2023), *amended on recons.,* 734 F. Supp. 3d 303 (S.D.N.Y. 2024) (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998)); *see Jacquety v. Baptista,* 538 F. Supp. 3d 325, 343 (S.D.N.Y. 2021) (concluding that a duty to preserve arises when "litigation in the United States" is reasonably foreseeable). A party seeking sanctions for spoliation has the burden of proving that the offending party failed to meet its obligations under Rule 37(e). *Leidig v. Buzzfeed, Inc.,* No. 16 CIV. 542 (VM)

(GWG), 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017) (noting that courts may order sanctions for spoliation "only when the party seeking such sanctions demonstrates that relevant evidence has been lost").

## IV. DISCUSSION

### A. Declarations of Sarah K. Runge and Matthew Levitt

At the outset, the court must rule on the admissibility of declarations submitted by Plaintiffs in support of Plaintiffs' opposition to Defendants' Combined PJ Motion to Dismiss. (*See* Joint PJ Mot. Opp.).

To support their jurisdiction claims, Plaintiffs submitted a declaration from Sarah K. Runge. (*See generally* Supp. Runge Decl.) Plaintiffs assert that Ms. Runge is an "expert in correspondent banking and terrorist financing, and her declaration addresses the industry custom and practice for cross-border payments." (Joint PJ Mot. Opp. at 10 n.12.) "A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds." *Licci IV*, 732 F.3d at 165 n.3. Through correspondent accounts, banks "facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Id.* Plaintiffs rely on the Supplemental Runge Declaration to argue: that Defendants "had at least *the right* to dictate the correspondent banks" that their banks used for the transfers at issue, (Joint PJ Mot. Opp. at 29 (citing Supp. Runge Decl. ¶ 50) (emphasis in original)); that Defendants relied on wires cleared in New York to make their intercompany or "upstream" transactions look more legitimate because "New York-routed wires offered the most legitimate-looking way to route U.S. dollars into Syria," (*id.* at 17 (citing Supp. Runge Decl. ¶¶ 12, 31)); and that Defendants' transfers received by LCS through New-York cleared transactions

"freed up a dollar elsewhere it could give to terrorists," (*id.* at 32 (citing Supp. Runge Decl. ¶¶ 34-36, 48)). Defendants move to strike paragraphs 2, 20-23, 30-32, and 54 of the Supplemental Runge Declaration, arguing that Ms. Runge improperly opines on Defendants' motive, intent, and state of mind, and states a legal conclusion. (*See* Second Mot. to Strike at 5-7.) Defendants also move to strike paragraphs 39-40, 43, and 45 of the Supplemental Runge Declaration, arguing that these paragraphs "rely on factual speculation unsupported by the record and not based on any specialized knowledge." (*Id.* at 7.)

Plaintiffs also submitted a declaration from Matthew Levitt. (*See generally* Levitt Decl.) Plaintiffs assert that Dr. Levitt is an "expert in terrorism and terrorist financing." (Joint PJ Mot. Opp. at 12 n.13.) Plaintiffs rely on the Levitt Declaration to bolster their arguments that Defendants' U.S. dollar payments to ISIS supplied the FTO with the currency it coveted, (*see id.* at 12 (citing Levitt Decl. ¶¶ 47-48), 17 (citing Levitt Decl. ¶¶ 47-48)), and that ISIS aimed its conduct at the United States, (*see id.* at 39 (citing Levitt Decl. ¶¶ 37-47)). Defendants move to strike pages 9-36 of the Levitt Declaration, arguing that these pages "contain a slew of factual assertions about the supposed history of ISIS that are not relevant to the issue of personal jurisdiction and do not contain any expert opinion." (Second Mot. to Strike at 8.)

Plaintiffs raise procedural and substantive objections to Defendants' motion to strike. Procedurally, Plaintiffs argue as follows: (1) Defendants' motion to strike is an attempt to "give itself extra pages of argument on personal jurisdiction," (2) Rule 12(f) governs motions to "strike," (3) Rule 12(f) permits the court to only strike materials from pleadings (not declarations), and (4) Rule 12(f) requires that such motions be filed "within 21 days after being served with the pleading" and Defendants waited until 30 days after being served with the Supplemental Runge Declaration and the Levitt Declaration to serve its Second Motion to

Strike. (Joint Opp. to Second Mot. to Strike at 1-2.) Plaintiffs also argue that Defendants' motion to strike fails on the merits because motions to strike are disfavored and Defendants offer no persuasive reason why their motion should be granted. (*Id.* at 4-8.)

The court finds Defendants' arguments to be unpersuasive and declines to strike the portions of the Supplemental Runge Declaration and Levitt Declaration challenged by Defendants.

*First*, courts deciding Rule 12(b)(2) motions are permitted to "consider such materials extraneous to the Complaint," including "affidavits and supporting materials." *See Andy Stroud, Inc. v. Brown*, No. 8-CV-8246 (HB), 2009 WL 539863, at *1 n.2 (S.D.N.Y. Mar. 4, 2009). The court will only grant motions to strike "when there is a strong reason for doing so." *Kronenberg v. Allstate Ins.*, No. 18-CV-6899 (NGG) (JO), 2020 WL 1234603, at *6 (E.D.N.Y. Mar. 13, 2020). This is especially true on a Rule 12(b)(2) motion where the court, and not a jury, will determine whether the court has personal jurisdiction over defendants. *See Reyes v. Sprint Holdings, LLC*, No. 17-CV-624 (MKB), 2018 WL 3369672, at *4 n.14 (E.D.N.Y. July 9, 2018) ("The Second Circuit has clarified that 'the factual questions that inform a determination as to federal jurisdiction need not be submitted to a jury and may be resolved by the Court.'") (quoting *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42-43 (2d Cir. 2000)); *see also United States v. Am. Exp. Co.*, No. 10-CV-4496 (NGG) (RER), 2014 WL 2879811, at *2 (E.D.N.Y. June 24, 2014) ("Moreover, the *Daubert* dynamic is slightly altered in a bench trial as there is little risk that the factfinder will be bamboozled by technical evidence of questionable merit.").

Both Ms. Runge and Dr. Levitt are highly qualified in their respective fields and the court finds that both declarations provide reliable expert testimony that aids the court in making its determination as to personal jurisdiction. (*See* Supp. Runge Decl. ¶¶

4-8 (describing Ms. Runge's "15 [collective] years of experience in anti-money laundering ('AML')/countering the financing of terrorism ('CFT')" in the U.S. Department of the Treasury, private sector in global banks and financial technology platforms, and as a consultant offering advisory services to the private sector and foreign governments); Levitt Declaration at 1-8 (discussing Levitt's qualifications and background including in counterterrorism operations with the Federal Bureau of Investigation and the U.S. Treasury Department).) *Accord Linde v. Arab Bank*, PLC, 922 F. Supp. 2d 316, 324-325 (E.D.N.Y. 2013) (noting that "Dr. Levitt is clearly qualified to testify as an expert in terrorist organizations" and that "[h]is methodology has been recognized as the 'gold standard in the field of international terrorism'") (quoting *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (quoting the district court)). And the Second Circuit has cited declarations similar to Ms. Runge's supplemental declaration in cases where plaintiffs asserted that courts had personal jurisdiction over foreign defendants on the basis of financial transactions that allegedly took place in New York. *See, e.g., Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 638 n.5, 641 n.22 (2d Cir. 2023); *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 81-83 (2d Cir. 1993).

*Second*, "the question of whether it is appropriate to strike" portions of the Supplemental Runge Declaration or Levitt Declaration "is distinct from the question of whether [the court] may consider the content of those materials in deciding [Defendants'] dismissal motion." *Chartwell Therapeutics Licensing, LLC v. Citron Pharma LLC*, No. 16-CV-3181 (RPK) (CLP), 2020 WL 7042642, at *10 (E.D.N.Y. Nov. 30, 2020). Defendants seek to strike 28 pages of the 48-page Levitt Declaration solely on relevance grounds, (*see* Second Mot. to Strike at 8), but that argument is unpersuasive. Pages 9-36 of the Levitt Declaration include background on ISIS and ANF's shifting names, structure, attacks, FTO designations, and recruitment strategies. (*See* Levitt

Decl. at 9-36.) Dr. Levitt's analysis provides the court with helpful background on how ISIS and ANF extract and deploy their resources—which is relevant to the court's jurisdictional inquiry—and provides information that is highly relevant to the merits of Plaintiffs' ATA claims. Accordingly, the court denies Defendants' motion to strike pages 9-36 of the Levitt Declaration.

With regard to Defendants' arguments about Ms. Runge's alleged improper "speculation" in paragraphs 39-40, 43, and 45, the court agrees with Plaintiffs that these paragraphs merely explain the shortcomings in the expert declaration submitted by Defendants in support of their motion to dismiss, and do not go beyond the bounds of admissible expert testimony. (*See* Supp. Runge Decl. ¶¶ 39-40, 43, 45; *see also* Oct. 1, 2024 Decl. of Gordon MacLeod (Dkt. 75 in *Foley*) ("MacLeod Decl.").) *See Colon Metro-north Commuter R.R. Co. v. United Illuminating Co.*, No. 13-CV-325 (JAM), 2017 WL 3443830, at *3 (D. Conn. Aug. 9, 2017) ("A frank acknowledgement of . . . uncertainty may even provide reassurance that the expert has stayed within the realm of sound inference and has not taken unfounded speculative leaps."), *aff'd sub nom. Colon v. Metro-N. Commuter R.R. Co.*, 778 F. App'x 7 (2d Cir. 2019).

However, the court takes note of Defendants' concern that certain paragraphs of the Supplemental Runge Declaration improperly draw legal conclusions as to whether Defendants' use of correspondent banks in New York was "purposeful." (Second Mot. to Strike at 5.) Specifically, the court takes issue with paragraph two of the Supplemental Runge Declaration, which states in part that "Defendants appear to have *purposefully* selected U.S. dollars as the currency of choice for these payments, *knowing* they would clear through New York and, for at least some of the 15 transfers, coordinated the use of specific New York correspondent banks and entered this information into Defendants'

electronic payments software for purposes of directing the routing of the associated payments." (Supp. Runge Decl. ¶ 2 (emphases added).)

As discussed *infra* in Part IV.B.1, Defendants must have "purposefully" executed transactions in New York for the court to exercise personal jurisdiction over the Defendants under New York's long-arm statute. "Whether [Defendants'] activities in [New York] were purposeful" under New York's long-arm statute is "primarily a fact-based inquiry." *See Guerrero v. Ogawa USA Inc.*, No. 22 CIV. 2583 (LGS), 2023 WL 4187561, at *5 (S.D.N.Y. June 26, 2023). But the court is entrusted with determining "factual questions that inform a determination as to federal jurisdiction." *See Reyes*, 2018 WL 3369672, at *4 n.14. Because experts "may not give testimony stating ultimate legal conclusions," the court declines to consider paragraph 2 to the extent that it offers a legal conclusion on personal jurisdiction. *See Bilzerian*, 926 F.2d at 1294. However, the court finds that the statements made in paragraphs 20-23, 30-32, and 54 of the Supplemental Runge Declaration fall within the bounds of permissible expert testimony because, as Plaintiffs argue, they provide technical explanation of the benefits that New York clearing and New York correspondent banks allegedly provided to Defendants, ISIS, and ANF. (*See* Supp. Runge Decl. ¶¶ 20-23, 30-32, 54.) *See United States v. All Funds on Deposit in Any Accts. Maintained at Merrill Lynch, Pierce, Fenner & Smith*, 801 F. Supp. 984, 997 (E.D.N.Y. 1992) ("The methods of moving of currency internationally and the maintaining of corporate and bank records are not subjects easily understood without some expert assistance."), *aff'd sub nom. United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993). Accordingly, the court denies Defendants' motion to strike paragraphs 2, 20-23, 30-32, and 54 of the Second Runge Declaration. The

court denies Defendants' Second Motion to Strike in its entirety.[12]

## B.  Personal Jurisdiction

It is undisputed that all three Defendants are domiciled outside of the United States. Plaintiffs allege that: Lafarge is headquartered in France, Lafarge Cyprus is headquartered in Cyprus, and LCS was headquartered in Syria. (*See* Foley FAC ¶¶ 12-14; Fields SAC ¶¶ 45-49; Finan TAC ¶¶ 30-32.) Accordingly, the court must engage in a two-step analysis to determine whether Plaintiffs have sufficiently established personal jurisdiction to survive a motion to dismiss under Rule 12(b)(2):

> *First*, the court applies the long-arm statute used by the forum state. If, as Plaintiffs argue, the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, this first step may rely instead on the plaintiff's proper service of federal claims rather than the state long-arm statute. *Second*, whether relying on the state long-arm statute or Rule 4(k)(2), the court must analyze "whether personal jurisdiction comports with due process protections established under the Constitution."

*Przewozman*, 2023 WL 2562537 at *7 (quoting *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) and citing Fed. R. Civ. P. 4(k)(2)(B)).

Here, the *Foley* and *Fields* Plaintiffs assert that "[p]ersonal jurisdiction exists under Federal Rule of Civil Procedure 4(k)(1)(A) and New York Civil Practice Law and Rules [("N.Y. C.P.L.R.")] §

---

[12] Because the subject and content of both the Runge declarations are substantially similar, (*compare* First Runge Decl. *with* Supp. Runge Decl.), and Defendants' arguments against both declarations are nearly identical, (*compare* First Mot. to Strike *with* Second Mot. to Strike at 5-8), for the avoidance of doubt, the court denies Defendants' First Motion to Strike for the same reasons that the court denies Defendants' Second Motion to Strike.

302(a)(1), based on Defendants' use of New York banks in carrying out their scheme." (Foley FAC ¶ 24; Fields SAC ¶ 61 (same).) The *Finan* Plaintiffs assert that Defendants "are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and N.Y. C.P.L.R. § 302(a)(1) based on Defendants' use of New York banks in carrying out their scheme." (Finan TAC ¶ 44.)[13] In the alternative, Plaintiffs argue this court has personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(2) "based on Defendants' use of New York banks and U.S.-based email service providers in carrying out their scheme." (Foley FAC¶ 24. *See* Fields SAC ¶ 61 (same); Finan TAC ¶ 44 (similar).) The court first addresses personal jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), and then turns to Rule 4(k), Fed. R. Civ. Pro. 4(k)(1)(A) & 4(k)(2).

### 1.   New York's Long-Arm Statute

New York's long-arm statute is codified at N.Y. C.P.L.R. § 302 ("Personal Jurisdiction by Acts of Non-Domiciliaries"). Of relevance here, the statute provides that personal jurisdiction may be

---

[13] None of the Defendants here were served in the United States. Defendant Lafarge was served in France, (*see* Executed Summons (Dkt. 8 in *Finan*) ("Plaintiffs effected service of English- and French-language versions of the Summons (Dkt. 4) and Complaint (Dkt. 1) at Lafarge S.A.'s headquarters in France.")), and Defendants Lafarge Cyprus and LCS waived service, (*see* Stipulation ¶ 5 (Dkt. 33 in *Finan*) ("Plaintiffs agree that [Defendant Lafarge Cyprus] and [Defendant] LCS will not be deemed 'served' in any 'district court of the United States' for the purposes of 18 U.S.C. § 2334(a) as a result of waiving service.").

The *Finan* Plaintiffs cite 18 U.S.C. § 2334(a) as a basis for personal jurisdiction. However, Section 2334(a) is a general venue provision. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 3-MDL-1570 (GBD) (SN), 2020 WL 7043282, at *5 (S.D.N.Y. Dec. 1, 2020) ("Venue is also proper in this district pursuant to 18 U.S.C. § 2334(a)."). And "[e]ven if [Section 23334(a)] could be read to apply to personal jurisdiction, there are no allegations [in the Finan Third Amended Complaint] to support a claim that any Plaintiff resides, or that any Defendant resides or has an agent, in New York." *Przewozman*, 2023 WL 2562537, at *7 n.10. (*See generally* Finan TAC.)

established over a non-domiciliary defendant who: (1) either "in person or through an agent" "transacts any business within the state" and (2) the "cause of action aris[es] from" that transaction. N.Y. C.P.L.R. § 302(a)(1). "Proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Przewozman*, 2023 WL 2562537 at *9. "'Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Henkin*, 2023 WL 2734788, at *5 (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (N.Y. 2007)).

Plaintiffs allege that Defendants transacted business in New York by "purposefully using New York correspondent banks to clear the [15] cross-border U.S.-dollar transactions at the heart of their terrorist-financing scheme."[14] (Foley Opp. at 13 (citing *id.* at 8-11)) Defendants do not dispute that Defendants' correspondent banks cleared these 15 transactions in New York. (*See* Combined PJ Mot. to Dismiss at 18.) As discussed *supra* Part IV.A, correspondent banking allows for banks to transfer currency, including U.S. dollars, across international borders. Here, Defendants' foreign banks (*e.g.*, Bank Audi in Lebanon and Syria, and BNP Paribas in Paris) utilized "correspondent accounts" at New York banks (*e.g.*, Citibank and JP Morgan Chase) to provide Defendants with money transfer and currency exchange services. (Sealed Foley FAC ¶ 155.)

The New York Court of Appeals held that a defendant may "transact business" within New York under N.Y. C.P.L.R. § 302(a)(1)

---

[14] In this context, "to clear" or "clearing" refers to "the process of transmitting, reconciling, and confirming payment on electronic-funds transfers." (Foley FAC ¶ 151.)

by "'use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful.'" *Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 338 (N.Y. 2012) ("*Licci II*")[15] The New York Court of Appeals emphasized the importance of the intent inquiry, but held that as a general matter, "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339.

Applying this principle in the seminal ATA case *Licci IV*, the Second Circuit held that the defendant's use of New York correspondent bank accounts to facilitate its wire transfers "in the dozens and totaled several million dollars" to the Shahid Foundation—a financial arm of the terrorist group Hizballah—demonstrated "deliberate and recurring activity" in New York sufficient to establish purposeful availment and to support the constitutional exercise of personal jurisdiction over the defendant account-holder. *Licci IV*, 732 F.3d at 171. The court concluded that plaintiffs' allegations of defendant's "repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of Shahid, in order to further Hizballah's terrorist goals, are sufficient" for it "should hardly be unforeseeable" to the defendant (the Lebanese Canadian Bank) who "selects and makes use of a particular forum's banking system that it might be subject

---

[15] In *Licci II*, the New York Court of Appeals answered the following question certified by the Second Circuit: "Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect dozens of wire transfers on behalf of a foreign client, constitute a transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?" 20 N.Y.3d at 334.; *see Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 66 (2d Cir. 2012) ("*Licci I*") (certifying question to New York Court of Appeals).

to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." *Id.* at 171-172.

"Since [*Licci IV*], there have been a series of terrorism-financing cases in the Second Circuit concluding that jurisdiction lies over banks that executed funds transfers in New York, either through their New York branch or a correspondent account they maintained in their own name." *See Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-CV-7 (CBA) (VMS), 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (collecting cases and finding plaintiffs' identification of "numerous specific transactions through the New York bank accounts" that "number in the dozens and total millions of dollars" constitute a "volume of transactions—both the number and aggregate dollar-value—are sufficient evidence of purposeful availment to show that Defendants deliberately availed themselves of New York through the use of these correspondent account" on a motion to dismiss). "[D]ozens of transfers over an extended period are not necessary to establish a course of dealing and purposeful use of the New York correspondent accounts." *Averbach v. Cairo Amman Bank*, No. 19-CV-4 (GHW) (KHP), 2020 WL 486860, at *6 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Averbach for Est. of Averbach v. Cairo Amman Bank*, No. 19-CV-4 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020)

Here, the Complaints allege that Defendants purposefully availed themselves of New York by intentionally causing New York banks to clear at least 15 wire transfers. (Foley FAC ¶ 155; Fields SAC ¶ 243; Finan TAC ¶ 221.) Plaintiffs break these transactions down into three broad categories: (1) 13 "upstream" payments and loans that Lafarge and Lafarge Cyprus sent to LCS, (2) two LMEA payments that LCS accepted into its bank account in Egypt, and (3) a single payment to Firas Tlass. (Foley FAC ¶ 155; Fields SAC ¶ 243; Finan TAC ¶ 221.) The court refers to these three categories of transfers as: (1) the "Intercompany Transfers"; (2) the

"LMEA Transfers"; and (3) the "Reimbursement Transfer", respectively. The court analyzes in turn whether any transactions within these three groups can establish personal jurisdiction under C.P.L.R. § 302(a).

### a.  Intercompany Transfers

The Intercompany Transfers do not provide a basis for personal jurisdiction under N.Y. C.P.L.R. § 302(a) because Plaintiffs' ATA claims do not "arise from" these transactions. Defendants have put forward ample evidence to establish that Defendants initiated these transfers "to enable LCS to pay its lenders and avoid defaulting on its debt repayment obligations and related covenants." (*See* Combined PJ Mot. to Dismiss at 10 (citing Feb. 21, 2011 Email from Samia Ibrahim to Sandra G. Timani (Dkt. 74-1 in *Foley*) at ECF pp. 3-4 (Lafarge Treasury Department noting that proceeds of equity contribution were earmarked to pay lenders) and Second Amendment to Apr. 7, 2011 Loan Agreement (Dkt. 74-3 in *Foley*) at ECF p. 3 (noting that the purpose of the loan from Lafarge to LCS was to fund LCS's "general working capital requirements and financing its debt repayment (principal and interest) and/or debt restructuring")); *see also* MacLeod Decl. ¶¶ 11-12 (expert declaration opining that after use of "three well-accepted tracing methodologies," he could trace none of the Intercompany Transfers to the intermediaries that Defendants allegedly used to pay ISIS and ANF).)[16]

---

[16] The court considers Defendants' email exchange and loan agreement attached to the October 1, 2024 Declaration of John Piskora (Dkt. 74 in *Foley*) and Defendants' expert's declaration in order to assess the facts underlying Plaintiffs' assertion that the court has personal jurisdiction over Defendants. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85, 86 (2d Cir. 2013) ("Nor did the district court err in considering materials outside the pleadings, as we have made clear that a district court may do so without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment.").

While Plaintiffs assert that LCS needed the equity and loan transfers from LaFarge to "pay terrorists," (Foley FAC ¶ 169), Plaintiffs have not factually supported this assertion, *see Dorchester Fin. Sec., Inc.*, 722 F.3d at 85. Indeed, the evidence cited by Plaintiffs demonstrates that "LCS faced a severe liquidity crunch" and was at risk of "default[ing] on its debt covenants with its senior lenders" that helped finance the Jalabiyeh Plant. (*See* Foley FAC ¶ 169 nn. 175 (citing Sealed July 2013 Lafarge Emails (Dkt. 67-42 in *Foley*)) & 177 (citing Sealed March 2011 Lafarge Emails (Dkt. 67-43 in *Foley*)).)[17] However, the evidence cited by Plaintiffs does not point to Defendants' relationship with ISIS or ANF. (*See id.*) As a result, Plaintiffs have not made the required factual showing linking the Intercompany Transfers to their ATA claims that would be sufficient to establish personal jurisdiction over Defendants at this stage. *See Chloé*, 616 F.3d at 163. The Intercompany Transfers therefore cannot be a basis for this court's exercise of personal jurisdiction over Defendants.

### b. LMEA Transfers

The LMEA Transfers also do not provide a basis for personal jurisdiction under N.Y. C.P.L.R. § 302(a) because Plaintiffs' ATA claims do not "aris[e] from" these transactions. Plaintiffs fail to allege that any of the attacks at the heart of Plaintiffs' ATA claims were linked to these transactions. The LMEA account was named for Lafarge's Egyptian subsidiary, LaFarge Middle East & Africa Building Materials. (Foley FAC ¶ 178.) Plaintiffs allege that LCS "stockpiled" U.S. dollars in that account, (*id.* ¶ 189), so that it could be used as a "slush fund" of U.S. dollars it could spend, "including for its criminal conspiracy"—for example, to pay Tlass his "monthly $75,000 stipend," (*id.* ¶ 187). (*See id.* ¶¶ 188-190.) However, Plaintiffs have posited no evidence that LCS actually

---

[17] The court may consider documents attached to the Complaints to "assess a plaintiff's jurisdictional allegations." *United States v. Novartis AG,* No. 4-CV-4265 (NGG) (RLM), 2011 WL 13234720, at *3 (E.D.N.Y. Feb. 8, 2011).

paid Tlass with U.S. dollars from the LMEA account through a New York-cleared transaction. Indeed, the two transfers into the LMEA account did not match the alleged $75,000 stipend. (*See* Sealed Foley FAC ¶ 155 (alleging the two LMEA transactions were $200,000 and $299,810, respectively).) And the tracing exercise conducted by Defendants' expert using three different methodologies indicates that these funds were used to acquire packaging materials from Egypt Sack Company, pay fees to the Syrian government, and pay down debt owed to the Audi Saradar Group. (*See* MacLeod Decl. ¶¶ 34-39.) Because Plaintiffs have not made the required factual showing linking these transfers to Plaintiffs' ATA claims, the LMEA Transfers therefore cannot be a basis for this court's exercise of personal jurisdiction over Defendants. *See Chloé*, 616 F.3d at 163.

### c.    Reimbursement Transfer

The Reimbursement Transfer is more closely connected to Plaintiffs' ATA claims. Plaintiffs allege that establishing the "nexus is the simplest for the $210,000 wire Defendants paid Tlass in October 2014" because Lafarge "admitted that this specific payment formed a key part of its criminal scheme." (Joint PJ Mot. Opp. at 30 (citing *id.* at 12-14).) Defendants reject this assertion, arguing that because Tlass was paid in October 2014, after LCS had already evacuated from Syria, the payment could not have arisen from Plaintiffs' ATA claims. (Combined PJ Reply at 5.) That argument is unavailing. In their guilty plea in the criminal case, Defendants Lafarge and LCS admitted that this payment was used to reimburse Tlass for the payments he made to ISIS on Defendants' collective behalf. [18] (SOF ¶ 101 ("Notably, as Executive

---

[18] Plaintiffs plausibly allege that Defendant Lafarge Cyprus supplied Defendant LCS with the funds allegedly used by intermediaries to pay ISIS. (*See* Foley FAC ¶ 58; Fields SAC ¶ 49; Finan TAC ¶ 32.) For the purposes of the court's personal jurisdiction determination, Defendant Lafarge's Cyprus participation can therefore be inferred from LCS's conduct done at Lafarge Cyprus and

4 explained in his email to [Tlass], the $210,000 lump sum payment compensated [Tlass] for the work he had already performed negotiating an agreement with ISIS, and to reimburse him for making the fixed monthly 'donation' payments to armed groups, including ISIS.").)[19] Defendants' argument that the payments were made to Tlass after Defendants had evacuated Syria "misses the point" because the prospect of this payment motivated Tlass to negotiate with ISIS on Defendants' collective behalf, thereby establishing a sufficient nexus between the New York-cleared transactions and Plaintiffs' ATA claims at this stage. *See Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 23 & n.9 (E.D.N.Y. 2016). As such, the claims in these actions could be said to arise, at least in part, from the Reimbursement Transfer, in which case N.Y. C.P.L.R. § 302(a)(1) would confer jurisdiction over Defendants in each action. *See Licci II*, 20 N.Y.3d at 341.

---

Lafarge's direction and with Lafarge Cyprus and Lafarge's approval. *See Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011 (JMF), 2023 WL 2307179, at *16 (S.D.N.Y. Mar. 1, 2023) (noting that "a corporate parent can be held liable for the actions of its subsidiary if the subsidiary was acting as its agent").

[19] The court takes judicial notice of Defendants Lafarge and LCS's guilty plea—including the plea agreement and attached Statement of Facts—and is permitted to consider these filings in deciding Defendants' motions to dismiss brought under Rule 12(b)(2) and Rule 12(b)(6). *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 746 n.3 (S.D.N.Y. 2017) ("The Court is . . . permitted to take judicial notice of the plea agreement and the guilty pleas."); *cf. Strock*, 246 F. Supp. 3d 731 (finding district court's consideration of and reliance on a report inappropriate where: (i) the report was "neither attached to the complaint nor incorporated by reference"; (ii) the report was "not integral to the complaint"; and (iii) reliance was based on the statements for the truth of the matters asserted therein, not merely to determine *what* statements the report contained"). The court considers Defendants Lafarge and LCS's plea agreement and attached Statement of Facts for the limited purpose of noting the two companies' admission to a criminal conspiracy involving the financing of two FTOs and their terrorist attacks consistent with that alleged in the Complaints. The court's consideration of these materials did not, however, affect its resolution of Defendants' motion to dismiss. Defendants' participation in the scheme was already well-pled in the Complaints. (*See, e.g.*, Sealed Foley FAC ¶¶ 155-156, 163-166; Fields SAC ¶¶ 243-244; Finan TAC ¶¶ 221-222.)

Defendants' strongest argument for why this court does not have personal jurisdiction under the New York long-arm statute is that the 15 New York-cleared transactions, including the Reimbursement Transfer, were not sufficiently *purposeful* to satisfy New York's long-arm statute. (*See* Combined PJ Mot. to Dismiss at 16-27.) Defendants argue that Plaintiffs have set forth no evidence that Defendants *directed* their banks to use New York correspondent banks, and that Defendants' alleged *knowledge* that Defendants' banks' would use New York correspondent accounts is insufficient to support purposeful availment. (*See id.* at 18-24.) Lafarge's emails also demonstrate that Defendants' executives even recognized that Defendants' foreign banks, and not Defendants themselves, managed the business relationship with the New York correspondent banks that processed the transactions at issue here. (*See, e.g.*, Jan. 15, 2025 Email from Nicolas Murat to Dan Lisnic (Dkt. 89-69 in *Foley*) at ECF p. 2 ("Intermediary banks are usually managed by the issuing banks, so its surprising that we would want to manage this ourselves.").)[20] Defendants also take issue with Plaintiffs' argument that Defendants' purposefully availed themselves of New York by opening a U.S.-dollar bank account in Lebanon and transferring U.S. dollars across their foreign bank accounts because of the high likelihood that these transfers would go through New York correspondent banks. (Combined PJ Mot. to Dismiss at 22-23 ("Like any bank customer, LCS had 'no reason to direct its foreign bank to use a New York-based correspondent account.'") (quoting *Berdeaux v. OneCoin Ltd.*, 561 F. Supp 3d 379, 403 n.25 (S.D.N.Y. 2021)).) Plaintiffs respond by arguing that non-bank defendants are not immune from New York jurisdiction and cannot shift their jurisdictional contacts to their banks. (Joint PJ Mot. Opp. at 25-27

---

[20] The court may consider documents attached to the Complaints to "assess a plaintiff's jurisdictional allegations." *Novartis AG*, 2011 WL 13234720, at *3.

(citing cases where courts have upheld jurisdiction over non-banks based on correspondent banking activities).)

The court agrees with Plaintiffs that non-bank defendants are not immune from personal jurisdiction based on transactions conducted by their foreign banks through correspondent bank accounts, but those non-bank defendants' contacts with New York must still be purposeful in order for the court to exercise personal jurisdiction under New York's long arm statute. *Spetner*, 70 F.4th at 643 (concluding that defendant "*chose* to transact business in New York—albeit one step removed, through a nesting correspondent mechanism") (emphasis added). Plaintiffs' reliance on *Spetner* is instructive but not directly on point. In *Spetner*, the defendant was the Palestine Investment Bank ("PIB"), which had "no offices, branches, or employees in New York." *Id.* at 637. However, the PIB used New York correspondent accounts maintained by a Jordanian bank to clear transactions through New York banks, which "afforded PIB indirect access to New York's financial system and dollar-based transfer services." *Id.* Here, Defendants are not banks but instead are banking customers with potentially more limited control over how the New York-cleared transfers were made between their various foreign banks. Accordingly, the court hesitates to conclude that Defendants' use of correspondent banking here afforded Defendants "indirect access to New York's financial system and dollar-based transfer services" that would make exercise of personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1) appropriate. *Id.* Nevertheless, because the court has personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2), *see* Part IV.B.2, the court need not and does not decide whether the court also has jurisdiction under N.Y. C.P.L.R. § 302(a)(1).

### 2. Rule 4(k)

Plaintiffs also argue that this court has personal jurisdiction over Defendants under two provisions of Federal Rule of Civil Procedure 4. (*See* Foley FAC ¶ 24 (asserting that personal jurisdiction exists under Rule 4(k)(1)(A) or Rule 4(k)(2)); Fields SAC ¶ 61 (same); Finan TAC ¶ 44 (asserting that personal jurisdiction exists under Rule 4(k)(2).)

Federal Rule of Civil Procedure 4(k)(1)(A) provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" so long as the defendant "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). Because this court is located in New York, the court follows New York's long-arm statute, N.Y. C.P.L.R. § 302(a), in determining the bounds of its jurisdiction over Defendants under Rule 4(k)(1)(A). *See Fuld*, 145 S. Ct. at 2102 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)); *e.g.*, *Segal v. Bitar*, No. 11-CV-4521 (LBS), 2012 WL 273609, at *3 (S.D.N.Y. Jan. 30, 2012) (utilizing N.Y. C.P.L.R. § 302(a) to analyze plaintiffs' claim of personal jurisdiction pursuant to Rule 4(k)(1)(A)). Accordingly, the court's analysis of New York's long-arm statute in Part IV.B.1 also applies to Plaintiffs' claim that this court has personal jurisdiction under Rule 4(k)(1)(A).

Plaintiffs also argue in the alternative that this court has personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2). (*See* Foley FAC ¶ 24; Fields SAC ¶ 61; Finan TAC ¶ 44.) "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). The Second Circuit has explained that

under subsection (A) of Rule 4(k)(2), "a defendant sued under federal law may be subject to jurisdiction based on its contacts with the United States as a whole, when the defendant is not subject to personal jurisdiction in any state." *Lensky v. Turk Hava Yollari, A.O.*, No. 21-CV-2567, 2023 WL 6173334, at *2 (2d Cir. Sept. 22, 2023) (emphasis omitted). Rule 4(k)(2)(B) concerns whether the court's exercise of personal jurisdiction "comport[s] with the Due Process Clause of the Fifth Amendment." *Id.* In analyzing Rule 4(k)(2)(B), the *Lensky* court noted that "[i]t is an 'open question whether the Fifth Amendment imposes the same restrictions [as the Fourteenth Amendment] on the exercise of personal jurisdiction by a federal court.'" *Id.* (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 269 (2017)).

The Supreme Court answered that question in *Fuld*, 145 S. Ct. at 2105.[21] The Court held that "the Fifth Amendment does not impose the same jurisdictional limitations as the Fourteenth [Amendment]," reasoning that the Fourteenth Amendment standard is concerned with preserving the territorial limitations of state power with respect to other states. *Id.* However, because the United States is a "distinct sovereign" that does not have a "constrained sovereign sphere[]" as the states do, the Court explained that the Fourteenth Amendment due process analysis need not always apply to claims arising from federal law brought in federal courts. *Id.* While the Court declined to "delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts," *id.* at

---

[21] In *Fuld*, the plaintiffs sued the Palestine Liberation Organization ("PLO") and Palestinian Authority ("PA") under the ATA. 145 S. Ct. at 2099. While the case was pending, Congress enacted the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), which superseded previous amendments to the ATA regarding jurisdiction and identified the PLO and PA by name, deeming them to have consented to personal jurisdiction in ATA suits if they engaged in specific conduct. *Id.* at 2100. The United States intervened to defend the constitutionality of the PSJVTA. *Id.* at 2101.

2106, it explained that "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority," *id.* at 2105. The Court affirmed the constitutionality of the PSJVTA's provision granting courts personal jurisdiction over the PLO and PA in ATA suits. *Id.* at 2107 ("It is permissible for the Federal Government to craft a narrow jurisdictional provision that ensures, as part of a broader foreign policy agenda, that Americans injured or killed by acts of terror have an adequate forum in which to vindicate their right to ATA compensation.").

The court finds that under the broader reading of federal jurisdiction for matters concerning the United States as a sovereign embraced by the Supreme Court in *Fuld*, Rule 4(k)(2) provides a proper basis for this court's exercise of personal jurisdiction over Defendants. When Congress enacted JASTA it emphasized the unique interest that the United States has in allowing cases like Plaintiffs' to be heard in federal courts:

> The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

JASTA § 2(a)(7). The Court reasoned that it is the political branches' prerogative, and not the courts', to tailor federal courts' jurisdiction in such a way that permits defendants to be sued in federal courts for their "conduct closely related to the United States that implicates important foreign policy concerns." *Fuld*, 145 S. Ct. at 2106. Accordingly, to the extent that Defendants are "not subject to jurisdiction in any state's courts of general jurisdiction," because Plaintiffs claims "aris[e] under federal law" and

36

implicate important foreign policy and national security concerns, this court's exercise of personal jurisdiction over Defendants is consistent with the United States Constitution and laws. *Id.*; *accord* Fed. R. Civ. P. 4(k)(2). Defendants' Rule 12(b)(2) motion to dismiss the Complaints for lack of personal jurisdiction is denied.[22]

## C. Failure to State a Claim

The court now turns to Defendants' Rule 12(b)(6) motion asserting that Plaintiffs have failed to state a claim upon which relief can be granted. (*See* Combined Mots. at 40-63.) Plaintiffs raise two claims against Defendants: (1) that Defendants aided and abetted an FTO in violation of the ATA, and (2) that Defendants conspired with an FTO in violation of the ATA. (*See* Foley FAC ¶¶ 405-32; Fields SAC ¶¶ 404-30; Finan TAC ¶¶ 395-418.)[23] The court addresses Defendants' Rule 12(b)(6) motion as to these two claims in turn.

### 1. Aiding and Abetting

The ATA imposes secondary liability on any person who "aids and abets" organizations that have been designated as FTOs under 8 U.S.C. § 1189. *See* 18 U.S.C. § 2333(d)(2). To state an aiding and abetting claim, plaintiffs must plausibly allege three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury . . . ; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance. . . ; [and]

---

[22] Defendants' request for oral argument and an evidentiary hearing is also denied.

[23] Defendants also argued that the third and fourth claims in the *Fields* First Amended Complaint for primary liability under the ATA fail as a matter of law. (*See* Fields FAC ¶¶ 359-84; Combined Mots. at 63-71.) However, the *Fields* Plaintiffs no longer assert these claims. (*See* Fields SAC.) As the *Fields* Plaintiffs "concede their primary liability claims," (Fields Opp. at 1), Defendants' motion to dismiss these claims is denied as moot.

(3) the defendant must knowingly and substantially assist the principal violation." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (emphases omitted). With regard to the second element on general awareness, the Second Circuit has held that the ATA "does not require proof that the defendant had a specific intent," noting instead that general awareness is "something less than full, or fully focused recognition." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 863 (2d Cir. 2021). With regard to the third element on knowing and substantial assistance, the Supreme Court has noted that the "[t]he point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue." *Taamneh*, 598 U.S. at 506. The Court held that aiding and abetting claims under Section 2333(d)(2) of the ATA "require[] that defendants have aided and abetted the act of international terrorism *that injured the plaintiffs.*" *Id.* at 497 (emphasis added).

### a. *Wrongful act that causes injury*

Plaintiffs have plausibly alleged the first element required for an aiding and abetting claim. ISIS and ANF were designated by the Secretary of State as FTOs in 2004 and 2012, respectively. (Foley FAC, ¶ 407; *Fields* SAC ¶ 408; *Finan* TAC ¶ 398.) Plaintiffs have made a clear showing that ISIS and ANF performed wrongful acts that caused injuries to Plaintiffs and their family members. (*See* Foley FAC ¶¶ 132, 139; Fields SAC ¶¶ 363-403; Finan TAC ¶¶ 340-394.) Defendants also do not allege that Plaintiffs have failed to plausibly allege that ISIS and ANF performed wrongful acts that caused Plaintiffs' and their relatives' injuries. (*See* Combined Mots. at 40 (addressing only the second and third elements of Plaintiffs' aiding and abetting claims).) There is no dispute here that the attacks in which Plaintiffs or their family members were injured were committed by ISIS, ANF, or both. Accordingly, the court finds that the Complaints plausibly allege that ISIS and ANF performed wrongful acts that caused Plaintiffs' injuries.

### b. *General awareness*

Defendants assert that Plaintiffs have not plausibly alleged general awareness because a plaintiff must "establish general awareness of a defendant's role in the *specific terrorist attacks* which caused her injury." (Combined Mots. at 41 (quoting *Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-CV-4400 (HG) (RML), 2022 WL 17993076, at *10 (E.D.N.Y. Dec. 29, 2022), *aff'd sub nom. Ashley v. Deutsche Bank Aktiengesellschaft*, No. 23-132, 2025 WL 2025448 (2d Cir. July 21, 2025)) (emphasis added in briefing).) However, the Second Circuit has twice emphasized that "defendant[s] need not be generally aware of [their] role in the specific act that caused the [plaintiffs'] injury." *Honickman*, 6 F.4th at 496 ("The defendant . . . must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury *was foreseeable*."); *accord Kaplan*, 999 F.3d at 859 ("[T]o be held liable for JASTA aiding and abetting, a defendant must be shown, *inter alia*, to have been generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance."). And the *Wildman* case quoted by Defendants also noted that to be "generally aware," a defendant "'need not know of or intend to bring about the specific attacks at issue.'" 2022 WL 17993076, at *6 (quoting *Freeman v. HSBC Holdings PLC*, No. 18-CV-7359 (PKC) (CLP), 2021 WL 76925, at *5 (E.D.N.Y. Jan. 7, 2021)). The court therefore applies the general awareness standard as announced in *Kaplan* and *Honickman*.

Plaintiffs have plausibly alleged that Defendants were "generally aware" of their role as part of ISIS and ANF's overall scheme to attack the United States by murdering U.S. citizens. Plaintiffs allege that this was ISIS and ANF's avowed purpose. (*See, e.g.*, Foley FAC ¶¶ 36 ("ISIS had a larger goal: the construction of a global terrorist caliphate), 39 ("ISIS and ANF, like their predecessor [al-Queda in Iraq], targeted U.S. citizens to advance their

terrorist objectives.").) Plaintiffs argue that Defendants were generally aware because "when [Defendants] chose to pay millions of dollars to both groups," (Foley Opp. at 37 (citing Foley FAC ¶¶ 55, 61-75, 87-98)), Defendants' executives knew that ISIS was a violent terrorist organization, (Foley FAC ¶ 87). In response, Defendants argue that because the attacks at issue happened after Defendants' alleged payments, the Complaints' failure to "allege a plausible basis for inferring that the Defendants had 'knowingly assumed a role' in these future injury-causing attacks in other countries" is fatal to Plaintiffs' claim. (Combined Mots. at 42-43 (quoting *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019)) (emphasis omitted).) However, Defendants' reliance on *Siegal* is unavailing.

In *Siegal*, defendant HSBC bank provided "banking services" to Al Rajhi Bank ("ARB"), which in turn offered separate banking services to an FTO-designated organization in Iraq. 933 F.3d at 224. The court reasoned that it was "implausible" that HSBC had general awareness of ARB's ties to terrorists because while plaintiffs alleged that ARB was a "large bank with vast operations," plaintiffs did "not allege that most, or even many, of ARB's banking activities [were] linked to terrorists." *Id.* The court also noted that it was "crucial[]" that plaintiffs themselves conceded that HSBC stopped doing business with ARB when it became aware that ARB had ties to a terrorist organization—10 months *before* the attacks at issue there. *Id.* That is not the case here. Plaintiffs allege that Defendants continued to pay ISIS and ANF knowing full well of their mission to advance terrorism through violence in Syria and beyond. (*See* Foley FAC ¶¶ 53-55 (discussing Defendants' early payments to ISIS and ANF), 61-66 (discussing Defendants' fixed monthly payments to ISIS and ANF), 67-70 (discussing Defendants' volume-based payments to ISIS and ANF), 71-75 (discussing Defendants' payments to ISIS-controlled suppliers for raw materials), 76-78 (discussing Defendants' sale

of cement to ISIS).) Defendants even acknowledged this in their plea agreement:

> Executive 2 wanted to know the effect of the agreement with ISIS on LCS's operating margin, and reminded Executive 4 that ISIS was a terrorist organization:
>
> > Can you reiterate to me the agreement . . . with ISIS and how much of our operational margin it is?
> >
> > PS In the same vein, we should not forget that ISIS is a terrorist movement.

(SOF ¶ 82.) Defendants' reliance on the fact that the attacks at issue here happened before ISIS had a presence in Niger, Spain, France, Jordan, Libya, Turkey, or Lebanon and were therefore not foreseeable from Defendants' payments to ISIS in Syria is similarly unavailing because ISIS made its broader ambitions clear early on. Plaintiffs allege that ISIS's leader Abu Bakr al-Baghdadi publicly threatened to strike beyond Syria's border, warning the United States in July 2012: "'You will soon witness how attacks will resound in the heart of your land, because our war with you has now started.'" (Foley FAC ¶ 42 (quoting James Phillips, A Resurgent al-Qaeda in Iraq Threatens U.S. Attack, Heritage Foundation Commentary (July 26, 2012), https://www.heritage.org/terrorism/commentary/resurgent-al-qaeda-iraq-threatens-us-attack [https://perma.cc/9W77-Y522]).) Those violent attacks on Americans came to pass when ISIS and ANF attacked Plaintiffs and their relatives. (*See* Foley FAC ¶¶ 274-404; Fields SAC ¶¶ 362-403; Finan TAC ¶¶ 340-394.) Plaintiffs plausibly allege that Defendants were "generally aware of [their] role in an overall illegal activity from which the act[s] that caused [Plaintiffs'] injury was foreseeable." *Honickman*, 6 F.4th at 496.

### c. *Knowing and substantial assistance*

Plaintiffs' aiding and abetting claim fails because they fail to plausibly plead that Defendants provided knowing and substantial assistance to ISIS and ANF under the standard announced by the Supreme Court in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Plaintiffs seek to hold Defendants secondarily liable for several acts of international terrorism carried out by ISIS or ANF. (*See* Foley FAC ¶¶ 274-404; Fields SAC ¶¶ 362-403; Finan TAC ¶¶ 340-394.) However, in *Taamneh*, the Court clarified that ATA plaintiffs must show that "defendants have aided and abetted the act of international terrorism *that injured the plaintiffs.*" 598 U.S. at 497 (emphasis added). The Complaints fall short of that standard.

Plaintiffs fail to allege that Defendants "culpably associated themselves" with any of the attacks that caused injury to Plaintiffs and their relatives as required by *Taamneh. See id.* at 504. Indeed, the Complaints do not allege any concrete connection between the attacks and any of the alleged payments that Defendants made to ISIS or ANF. The Court clarified that knowing and substantial assistance under the ATA requires a showing beyond allegations that a defendant has "given substantial assistance to a transcendent enterprise separate from and floating above all the actionable wrongs that constitute it." *Id.* at 495. Plaintiffs' allegations that the cement that LCS allegedly sold to ISIS substantially assisted the attacks fall short because Plaintiffs fail to show how this cement assisted with the attacks that caused Plaintiffs' or their relatives' injuries. (*See* Foley FAC ¶ 78; Fields SAC ¶ 155; Finan TAC ¶ 133.)

The Court adopted a rule requiring a "concrete nexus" between defendants' conduct and the terrorist acts that caused plaintiffs' injuries because an alternative rule "would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." *Taamneh*, 598

U.S. at 501. In the absence of a "concrete nexus" between an ATA defendant's assistance and an FTO's specific terrorist attack(s), the Court reasoned that plaintiffs could still plausibly plead an aiding and abetting claim if they can show that defendant's assistance "so systemically and pervasively assisted [the FTO] that [the] defendants could be said to aid and abet every single [FTO] attack." *Id.* While Plaintiffs allege that "Defendants' payments to ISIS in 2013-2014 . . . assumed an outsized role in financing ISIS violence through at least the end of 2017", (Foley FAC ¶ 112), the ATA's pleading standard requires a more specific showing. Plaintiffs' conclusory allegations offered without factual support showing systematic assistance to ISIS or ANF are insufficient to defeat Defendants' Rule 12(b)(6) motion because the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. While Plaintiffs allege that Defendants wrongfully provided financial assistance to ISIS and ANF, "[t]he point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue." *Taamneh*, 598 U.S. at 506. The Complaints do not allege such culpable participation in the attacks at issue here. Accordingly, the court grants Defendants' motion to dismiss Plaintiffs' aiding and abetting claims.

### d.   Leave to Amend

Plaintiffs request leave to amend if the court "discerns any deficiencies." (Foley Opp. at 55 (citing *Przewozman*, 2023 WL 2562537, at *18).) "A party may amend its pleading once as a matter of course," then "only within the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(1)-(2). "The court should freely give leave when justice so requires." *Id.* Generally, requests to amend should be granted absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment"—among others

43

things. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

Plaintiffs have been aware of the pleading standard for aiding and abetting claims under *Taamneh* since the Court announced its decision on May 18, 2023. Plaintiffs have collectively amended their respective complaints six times since that date. However, the Complaints still fail to allege that Defendants provided knowing and substantial assistance to ISIS or ANF under *Taamneh. See supra* Part IV.C.1.c. The court finds that Plaintiffs are unable to demonstrate that they can amend their aiding and abetting claims "in a manner which would survive dismissal." *Hayden*, 180 F.3d at 53. Accordingly, the court denies Plaintiffs' request for leave to amend.

### 2. Conspiracy

The ATA also imposes secondary liability on those who "conspire[]" with an FTO that commits acts of international terrorism. *See* 18 U.S.C. § 2333(d)(2). To establish civil liability for an ATA conspiracy claim, a plaintiff must plausibly allege four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 76 (2d Cir. 2023), *cert. denied*, No. 22-1117, 144 S.Ct. 83 (2023).

Plaintiffs allege that Defendants conspired with ISIS to promote ISIS's protection racket so as to maintain ISIS's territorial control in the region, and conspired with ISIS and ANF to provide material support to ISIS and ANF. (*See* Foley FAC ¶¶ 414-432; Fields

SAC ¶¶ 420-430; Finan TAC ¶¶ 408-418.)[24] Defendants moved to dismiss the conspiracy claims, arguing that Plaintiffs fail to plausibly allege the first and fourth elements of an ATA conspiracy claim concerning an agreement and common scheme.

The court first addresses whether Defendants entered into an agreement with ISIS and ANF. Plaintiffs allege that Defendants "operated a lucrative cement plant in northern Syria . . . [and] decided that bribing Syrian terrorists offered the best way to protect [Defendants'] profits from the plant." (Foley FAC ¶ 4.) As a result, Plaintiffs allege that Defendants entered a "revenue-sharing agreement with ISIS that its executives likened to paying 'taxes.'" (*Id.*) For example, "[t]hroughout 2014, Lafarge sought a 'durable agreement' with ISIS because it perceived that ISIS 'will stay in the region for a long term [sic], so [Defendants had] to deal carefully with them.'" (Foley FAC ¶ 79 (quoting SOF ¶ 71 (quoting July 10, 2014 email from intermediary to Lafarge executives)); *accord* Fields SAC ¶ 171 ("Defendants negotiated a long-term revenue sharing and market control agreement with ISIS.");

---

[24] The *Foley* Plaintiffs bring two separate conspiracy causes of action: (1) "Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory," (Foley FAC ¶ 415); and (2) "Defendants also entered a related conspiracy with ISIS and ANF with the overall goal of providing material support for those organization[s]," (*id.* ¶ 425).

The *Fields* Plaintiffs bring one conspiracy cause of action and alleges that Defendants: "conspired with ISIS, their co-conspirators outlined *supra*, and others to bring about acts of international terrorism against Americans," (*see* Fields SAC ¶ 424); "joined the conspiracy by agreeing, among other things, expressly or tacitly, to raise funds for ISIS although the U.S. government had designated ISIS as an FTO," (*id.* ¶ 425); and "further conspired with ISIS to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory," (*id.* ¶ 426).

The *Finan* Plaintiffs' bring one conspiracy cause of action alleging that "Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory." (Finan TAC ¶ 409.)

Finan TAC ¶ 12 ("Defendants ultimately solidified their relationship with ISIS by entering into a formal revenue-sharing agreement.").) Indeed, Defendants pleaded guilty to entering into a criminal conspiracy with ISIS and ANF. For example, the Statement of Facts attached to Defendant's guilty plea reads as follows:

> By November 2012, ANF's presence in the region surrounding the Jalabiyeh Cement Plant grew, and LAFARGE and LCS executives approved a plan to establish relations with ANF through Intermediary l.

(SOF ¶ 27.)

> [O]n or about April 7, 2013, Intermediary 1 recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truck to ensure continued access to the plant. On or about June 25, 2013, LCS's risk manager wrote to Executive I and Executive 3 reporting that ISIS was gathering strength near the Jalabiyeh Cement Plant.

(SOF ¶ 29.)

> [On] August 6, 2014, Executive 5 confirmed to Intermediary 1 LAFARGE's and LCS's agreement to an equivalent taxation rate of ten percent in return for the free movement of LCS employees, customers and suppliers, as well as ISIS's agreement to stop importation of Turkish cement in areas under its control:
>
> > As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:
> >
> > - ISIS will receive the payment of 75OSP/ton, by customers, every two weeks

46

- ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees

- ISIS will stop import of Turkish cement in the areas under its control

  . . .

ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.

(SOF ¶ 79.)

Defendants cite *Freeman* to argue that in order "[t]o allege an 'agreement' for purposes of civil conspiracy liability, a complaint *first must show* that the defendant and the person who committed the injury-causing act of international terrorism shared a 'common intent,' were 'pursuing the same object,' or had a 'shared purpose.'" (Combined Mots. at 56 (quoting *Freeman*, 57 F.4th at 79) (emphasis added).) However, this argument misstates *Freeman* because the Second Circuit did not reason that alleging a shared purpose was a threshold showing required *before* a plaintiff can allege an agreement. The court simply stated that plaintiffs must allege that defendants had a common intent with a terrorist organization *in addition* to pleading that an agreement existed. *See Freeman*, 57 F.4th at 79 ("While courts may infer an agreement from indirect evidence in most civil conspiracy cases, a complaint must nonetheless allege that the coconspirators were pursuing the same object.") Defendants attempt to collapse the analysis of two separate elements into one and the court declines to follow this approach. The Complaints

47

plausibly plead that Defendants entered into an agreement with ISIS and ANF.[25]

The court now turns to whether Plaintiffs plausibly allege that ISIS and ANF committed an overt act that furthered a shared purpose of its agreement with Defendants. Defendants' argument that Plaintiffs do not allege that Defendants shared in ISIS or ANF's terrorist ideologies does not defeat Plaintiffs' conspiracy claims. (*See* Combined Mots. at 58-59 (noting that Defendants were "economically motivated" in their dealings with ISIS and ANF).) "Co-conspirators' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes." *United States v. Khalupsky*, 5 F.4th 279, 289 (2d Cir. 2021). While Defendants indeed were motivated by an interest in maintaining their cement operations in Syria and excluding competitors from the local market, that interest converged with ISIS's purpose of building and maintaining a geographic stronghold, or "caliphate," from which it could plan terrorist attacks on Americans across the world. *See In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012) ("The [complaint] acknowledges these divergent motives, but plausibly alleges that these motives converged to cause the [defendants] and Apple to join a single conspiracy[.]"). As Plaintiffs aptly argue, "[b]oth sides had their own reasons for intending the same thing: ISIS remaining in power." (Foley Opp. at 53.) And "[i]n furtherance of this conspiracy, ISIS engaged in numerous overt acts both in and expressly aimed at the United States" that caused mortal injuries to Plaintiffs and their relatives. (Foley FAC ¶ 263; *see id.* ¶¶

---

[25] Defendants' argument that the Complaints do not allege that Lafarge Cyprus participated in any alleged conspiracy, (Combined Mots. at 63), is unavailing because Plaintiffs plausibly allege that Lafarge Cyprus supplied LCS with the funds allegedly used by intermediaries to pay ISIS, (*see* Foley FAC ¶ 58; Fields SAC ¶ 49; Finan TAC ¶ 32.) The court imputes liability to Lafarge Cyprus for LCS's conduct done at Lafarge Cyprus's direction and with Lafarge Cyprus's approval. *See Accent Delight Int'l Ltd.*, 2023 WL 2307179, at *16.

274-404 (discussing attacks on *Foley* Plaintiffs), 139 (same);
Fields SAC ¶¶ 363-403 (discussing attacks on *Fields* Plaintiffs*);*
Finan TAC ¶¶ 340-394 (discussing attacks on *Finan* Plaintiffs).)[26]
Plaintiffs are entitled to further discovery that could elucidate the
nature of their alleged conspiracy with ISIS and ANF to provide
material support to ISIS and ANF, and their alleged conspiracy

---

[26] The *Finan* Plaintiffs allege that Plaintiff Leyla Ekren was brought to Syria by
her parents when they joined ANF in 2012 and was later brought to Raqqa
after her parents joined ISIS. (Finan TAC ¶ 390.) Plaintiff Ekren alleges that
she was "subjected to human trafficking, forced to serve as a child soldier, sold
into forced marriage, raped, [and] forced into pregnancy and birth" before she
was brought back to the U.S. in 2017 at fifteen years old. (*See id.* ¶ 392-93.)
Defendants argue that Ekren was not injured by an act of "international terror-
ism" as defined by 18 U.S.C. § 2331. (Combined Mots. at 54.) At the pleading
stage, the court finds that the *Finan* Plaintiffs plausibly allege that Ekren suf-
fered injuries from international terrorism: "ISIS instituted a campaign of
indiscriminate violence—including the widespread rape of innocent girls—to
spread fear, and to intimidate and coerce civilians into submitting to ISIS rule."
(Finan Opp. at 7; Finan TAC ¶¶ 389-394, 414.) This conduct is consistent with
Section 2331(1)'s definition of international terrorism. *See* 18 U.S.C. §
2331(1) (defining "international terrorism" as activities that "appear to be in-
tended" to "intimidate or coerce a civilian population").

Defendants also argue that there are four incidents alleged in the *Foley* and
*Finan* complaints that do not constitute "international terrorism" because in
those attacks, ISIS operatives targeted U.S. soldiers and not civilians. (*See* Com-
bined Mots. at 11, 55; Foley FAC ¶¶ 316-17 (discussing ISIS attack that killed
Master Sergeant Joshua Wheeler in Kirkuk, Iraq), 338-348 (discussing ISIS at-
tack that injured Staff Sergeant Ali Madina, Sergeant First Class Ryan Galdes,
and Senior Chief Petty Officer Nathan Stallter in Manbij, Syria), 379-404 (dis-
cussing ISIS attack that injured Staff Sergeant Bryan Black, Sergeant First Class
Jeremiah Johnson, and Sergeant LaDavid Johnson in Tongo Tongo, Niger);
Finan TAC ¶¶ 364-66 (discussing ISIS attack that killed Chief Petty Officer
Charles Keating IV in Tel Askuf, Iraq).) However, both the *Foley* Plaintiffs and
*Finan* Plaintiffs allege that these attacks on U.S. servicemembers were intended
to influence the governments of various countries, including the United States.
(*See* Foley FAC ¶¶ 420, 429; Finan TAC ¶¶ 184, 400, 404, 414.) Accordingly,
the court rejects Defendants' argument because these acts are also consistent
with Section 2331(1)'s definition of international terrorism. *See* 18 U.S.C. §
2331(1) (defining "international terrorism" as activities that "appear to be in-
tended" to "influence the policy of a government by intimidation or coercion").

with ISIS to maintain an ISIS protection racket ithe region. Plaintiffs have plausibly alleged that these conspiracies advanced Defendants' economic motives while simultaneously advancing ISIS and ANF's political motives by maintaining their foothold in the region. Accordingly, Defendants motions to dismiss Plaintiffs' ATA conspiracy claims are denied.[27]

### 3. Due Process

Defendants argue lastly that that the imposition of secondary liability on Defendants would violate the Due Process Clause of the Fifth Amendment to the Constitution because at least some of Plaintiffs' secondary liability claims are based on attacks that

---

[27] Plaintiffs allege that in light of ANF's growing power in May 2013, ISIS's leader Al-Baghdadi declared his intention to merge ISIS's predecessor with ANF under his leadership to form a "single Sunni Islamist" that would "seize control first of Iraq and Syria and then beyond." (Fields SAC ¶ 85.) The United States formally designated ANF as its own FTO, separate from the other terrorist organizations in the region, in May 2014. (*Id.* ¶ 86.) Plaintiffs allege that around this time, "ANF and ISIS quickly became rivals in the jihadist community, competing for international legitimacy and Syrian and Iraqi territory." (*Id.* ¶ 89.) After it became clear that "ISIS would be more successful than ANF, in part because of its extreme brutality and global ambition. . . ANF leaders began defecting to ISIS." (*Id.* ¶ 97.) One of those defecting ANF leaders was Abu Luqman, who defected in mid-2013, and later became the leader of ISIS's Raqqa cell and member of ISIS's Leadership Cell and its Intelligence Cell. (*See* Foley FAC ¶¶ 137, 140 n. 115; Fields SAC ¶ 231.) Because Luqman defected from ANF to ISIS while receiving payments from Defendants, Plaintiffs allege that "Defendants' payments to Luqman aided ANF's and ISIS's attacks simultaneously." (*See* Foley FAC ¶ 281 n. 405; *see also* Fields SAC ¶¶ 99 ("Lafarge was aware that foreign fighters and defectors from other terrorist groups were increasing ISIS's ranks."), 101 ("Lafarge's security advisor was aware of ANF's and ISIS's designations, observing publicly that 'The ISI [Islamic State of Iraq] and later ISIS/ISIL had been listed as a terrorist group since 2004 by the USA, the UN, and the EU,' and that moreover 'in LCS we knew that Al-Nusra Front had been listed by the Americans . . .').) Given Plaintiffs' allegations about the overlapping group of leaders and fighters between ISIS and ANF, and these two organizations' evolving relationship to each other and to Defendants, the court accepts Plaintiffs' allegations as true and finds that Plaintiffs have "state[d] a [conspiracy claim against ISIS and ANF] that is plausible on its face." *See Iqbal*, 556 U.S. at 678; *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 349.

occurred before the ATA included a secondary liability right of action. (*See* Combined Mots. at 71-74.) Plaintiffs argue that Defendants' due process argument lacks merit. (*See* Foley Opp. at 53-54.)

"Initially, the ATA afforded civil relief only against the principals perpetrating acts of international terrorism. It provided no civil action against secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319-20 (2d Cir. 2018). However, on September 28, 2016, Congress enacted the JASTA, which amended the ATA by providing a private right of action against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). Congress provided that JASTA's secondary liability provisions "shall apply to any civil action—(1) pending on, or commenced on or after, the date of enactment of this Act; and (2) arising out of an injury to a person, property or business on or after September 11, 2001," creating a fifteen-year period of retroactivity. JASTA § 7. Plaintiffs seeking secondary liability can also recover treble damages. *See* 18 U.S.C. §§ 2333(a), (d)(2); *Taamneh*, 598 U.S. at 484.

The Supreme Court has made clear that while legislation ordinarily applies to prospective conduct, statutes with retroactive applications can still comport with due process so long as the retroactive application of the legislation has a "rational legislative purpose." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984) (noting that judicial review is "limited" where Congress enacts retroactive legislation because such applications are a "customary congressional practice" sometimes "required by the practicalities of producing national legislation"); *see also Seidemann v. Pro. Staff Cong. Loc. 2334*, 432 F. Supp. 3d 367, 389

51

(S.D.N.Y. 2020) ("[T]he test of due process for retroactive legislation is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose."), *aff'd sub nom. Seidemann v. Pro. Staff Cong. Loc. 2334, Am. Fed'n of Tchrs. AFL-CIO*, 842 F. App'x 655 (2d Cir. 2021). The court therefore assesses whether JASTA's retroactivity provision has a rational legislative purpose.

The Supreme Court has applied the rational legislative purpose test to hold that legislatures may impose retroactive liability to compensate victims for past injuries. *See, e.g., Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18 (1976) ("We find . . . that the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor the operators and the coal consumers."); *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) ("The retroactive repayment provision of the 1987 statute was a rational means of. . . giving workers injured before 1982 their full benefits without coordination, but not the greater increases given to subsequently injured workers."). Congress specified its legislative purpose in enacting JASTA:

> PURPOSE.—The purpose of this Act is to provide civil litigants with the *broadest possible basis, consistent with the Constitution of the United States, to seek relief* against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(b) (emphasis added). And as recently as June 2025, the Supreme Court opined on the contours of due process under the Fifth Amendment in the context of ATA claims, cautioning

courts not to "cavalierly interfere with the political branches' delicate judgments on matters of foreign affairs." *Fuld*, 145 S. Ct. at 2106-7. JASTA § 7 is a rational legislative measure designed to provide civil litigants with a tool to hold persons that aid or conspire with designated terrorist organizations accountable after the 9/11 terrorist attacks on the United States. *See* JASTA § 7; *Fuld*, 145 S. Ct. at 2107 ("Combating terrorism is, we have recognized, an urgent objective of the highest order . . . The Federal Government, relatedly, has a strong interest in permitting American victims of international terror to pursue justice in domestic courts."). Retroactive application to allow for secondary liability for attacks going back to September 11, 2001 serves this "urgent objective." *See* JASTA § 7; *accord Fuld*, 145 S. Ct. at 2107. Defendants have not met the high burden required of parties asserting that a duly enacted statute concerning foreign affairs violates the U.S. Constitution. *See Fuld*, 145 S. Ct. at 2107 ("[W]hen the Executive and Congress have spoken with one voice in th[e] sphere [of foreign affairs], their coordinate action is 'supported by the strongest of presumptions and the widest latitude of judicial interpretations, and the burden of persuasion would rest heavily upon any who might attack it.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). Accordingly, the court finds that JASTA § 7 and the application of JASTA § 7 to attacks in the Complaints that occurred before JASTA's enactment in September 2016 does not violate the Due Process Clause of the Fifth Amendment.

### D.  Spoliation

In their supplemental briefing on Defendants' motions to dismiss, Plaintiffs also argue that the court should sanction Defendants under Rule 37(e) of the Federal Rules of Civil Procedure because Defendants spoliated jurisdictionally relevant evidence by failing

to preserve emails in the personal email accounts of Lafarge employees where individual Lafarge executives allegedly discussed their scheme to fund ISIS and ANF so they could maintain operations at the Jalabiyeh Plant. (Joint PJ Mot. Opp. at 40-45.) Defendants oppose Plaintiffs' request. (Combined PJ Reply at 20-25.)

Plaintiffs are not entitled to sanctions because Plaintiffs' request is not properly before the court. Local Civil Rule 37.2 provides that "no motion under Fed. R. Civ. P. 26 through 37 inclusive and Fed. R. Civ. P. 45 will be heard unless counsel for the moving party has first requested an informal conference with the court[.]" Joint Local Rules, S.D.N.Y. & E.D.N.Y. Loc. Civ. R. 37.2 (eff. Jul. 1, 2024). Plaintiffs have not requested a pre-motion conference concerning their request for sanctions and therefore have failed to comply with Local Civil Rule 37.2. Accordingly, there is no motion for sanctions before the court that could give rise to sanctions under Rule 37(e). *See id.* "[Plaintiffs'] failure to comply with Local Civil Rule 37.2 [is] reason enough to deny [Plaintiffs'] motion." *See Freedman Normand Friedland, LLP v. Cyrulnik*, No. 21-CV-1746 (JGK), 2024 WL 2306175, at *1 (S.D.N.Y. May 21, 2024). Accordingly, Plaintiffs' request for sanctions is denied.

## V. CONCLUSION

For the reasons set forth above, Defendants' motions to strike are DENIED, and Defendants' motions to dismiss are GRANTED in part and DENIED in part. Defendants' motions to dismiss pursuant to Rule 12(b)(2) are DENIED, Defendants' motions to dismiss Plaintiffs' aiding and abetting claims pursuant to Rule 12(b)(6) are GRANTED, and Defendants' motions to dismiss Plaintiffs' conspiracy claims pursuant to Rule 12(b)(6) are DENIED. Plaintiffs' request for sanctions is DENIED. The parties are DIRECTED to contact Magistrate Judge Peggy Kuo to begin pretrial discovery.

SO ORDERED.


Dated:    Brooklyn, New York
          August 29, 2025


                                        NICHOLAS G. GARAUFIS
                                        United States District Judge