Date of Service: February 17, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHARISS FINAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LAFARGE S.A., *et al.*,<br><br>Defendants. | Case No. 22-cv-07831-NGG-PK<br><br>ORAL ARGUMENT REQUESTED |
| SUSAN SHIRLEY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LAFARGE S.A., et al.,<br><br>Defendants. | Case No. 25-cv-04248-NGG-PK<br><br>ORAL ARGUMENT REQUESTED |
| NADIA MURAD, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LAFARGE S.A., et al.,<br><br>Defendants. | Case No. 23-cv-09186-NGG-PK<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISQUALIFY WILLKIE FARR & GALLAGHER LLP**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

A. For Nearly A Decade, Willkie Has Represented Lafarge's Former CEO and Chairman Bruno Lafont In An Internal Investigation And Ongoing French Proceedings Related To Defendants' Alleged Conduct At The Core Of The Cases Before This Court ........................ 2

B. Concurrent With Willkie's Ongoing Defense Of Lafont, Willkie Represents Plaintiffs Prosecuting Claims Against Lafarge In These Civil Proceedings .......................................... 6

C. Willkie Has Taken Irreconcilable Positions In Its Concurrent Representations Of Bruno Lafont And Plaintiffs .......................................................................................... 7

D. Procedural History ........................................................................................ 10

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT ........................................................................................................ 13

I. Willkie's Concurrent Representation Of Plaintiffs And Lafarge's Former CEO And Chairman With Respect To The Same Events Poses An Irreconcilable Conflict Between Adverse Clients ........................................................................................................ 13

II. Willkie Obtained Defendants' Privileged And Confidential Materials Through Its Representation Of Bruno Lafont, Which Creates An Independent Basis For Disqualification ........................................................................................................ 17

III. Willkie's Responses Are Insufficient ........................................................................ 19

CONCLUSION ........................................................................................................ 23

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Akagi v. Turin Housing Development Fund Co.*,
2017 WL 1076345 (S.D.N.Y. Mar. 22, 2017) ....................17

*Altschul v. Paine Webber, Inc.*, 488 F. Supp. 858 (S.D.N.Y. 1980) ....................22

*Benevida Foods, LLC v. Advance Magazine Publishers Inc.*,
2016 WL 3453342 (S.D.N.Y. June 15, 2016) ....................11

*Cohen v. Strouch*, 2011 WL 1143067 (S.D.N.Y. Mar. 24, 2011) ....................12, 13, 17, 18

*DeAngelis v. American Airlines, Inc.*,
2010 WL 1270005 (E.D.N.Y. Mar. 26, 2010) ....................15

*Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228 (S.D.N.Y. 2010) ....................15

*Dunton v. Suffolk County, N.Y.*, 729 F.2d 903 (2d Cir. 1984),
*amended*, 748 F.2d 69 (2d Cir. 1984) ....................13

*Filippi v. Elmont Union Free School District Board of Education*,
722 F. Supp. 2d 295 (E.D.N.Y. 2010) ....................14

*Galloway v. Cnty. of Nassau*, 589 F. Supp. 3d 271 (E.D.N.Y. 2022) ....................11

*GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*,
618 F.3d 204 (2d Cir. 2010) ....................14

*Hempstead Video, Inc. v. Inc. Village of Valley Stream*,
409 F.3d 127 (2d Cir. 2005) ....................11, 12, 14, 23

*Hiotis v. 1454 Diner*, 2026 WL 279832 (E.D.N.Y. Feb. 3, 2026) ....................22, 23

*Hull v. Celanese Corp.*, 513 F.2d 568 (2d Cir. 1975) ....................11, 15

*Inspire Medical Systems, Inc. v. Nyxoah, Inc.*,
2025 WL 3215657 (D. Del. Nov. 18, 2025) ....................19

*Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir. 1984) ....................22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................22

*Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201 (S.D.N.Y. 2009) ....................11, 12, 14, 19

*Paladino v. Skate Safe, Inc.*, 28 Misc. 3d 1227(A), 958 N.Y.S.2d 62 (Sup. Ct. 2010) ..... 23

*Penson v. Ohio*, 488 U.S. 75 (1988) ..... 16

*Pergament v. Ladak*, 2013 WL 3810188 (E.D.N.Y. July 23, 2013) ..... 23

*United States v. Lafarge S.A.*, No. 22-cr-444 (WFK) (E.D.N.Y. 2022) ..... 4

*United States v. Milton*, 626 F. Supp. 3d 694 (S.D.N.Y. 2022) ..... 22

*Zalewski v. Shelroc Homes, LLC*, 856 F. Supp. 2d 426 (N.D.N.Y. 2012) ..... 17

**STATUTES, RULES, AND REGULATIONS**

New York Rule of Professional Conduct 1.6 ..... 12, 13

New York Rule of Professional Conduct 1.7 ..... *passim*

New York Rule of Professional Conduct 1.10 ..... 21

New York Rule of Professional Conduct 1.9(c) ..... 13

**INTRODUCTION**

A law firm is prohibited from representing adverse clients where doing so requires presenting fundamentally different factual accounts of the same events and taking opposing legal positions. Willkie Farr & Gallagher LLP ("Willkie") is doing exactly that by *defending* Lafarge's former CEO and Chairman, Bruno Lafont, against the same core allegations that Willkie is *prosecuting* on behalf of Plaintiffs here. In this Court, Willkie accuses Lafont of being the top mastermind of a criminal conspiracy, and at the same time is proclaiming his innocence in French criminal proceedings. Willkie asserts simultaneously on behalf of its opposing clients that Lafont—and through him, Lafarge—*did* and *did not* conspire with terrorists, *did* and *did not* provide material support to terrorists, and *did* and *did not* knowingly aid and abet terrorists. Willkie simultaneously claims that the U.S. Plea Agreement and Statement of Facts—the foundation of Plaintiffs' cases—are entirely accurate, while insisting that those same documents contain material factual errors. As far as Defendants are aware—Willkie declined to say otherwise—no one has ever consented to these concurrent adverse representations, which present conflicts that are in any event irreconcilable and unwaivable. Moreover, Willkie, as Lafont's counsel, was privy to Lafarge's highly sensitive, privileged strategy and confidential information uncovered during its privileged internal investigation—raising additional concerns for disqualification that Willkie has not satisfactorily addressed. In these extraordinary circumstances, Defendants respectfully submit that Willkie's disqualification is necessary to protect the interests of all parties, the fairness of the proceedings, and public confidence in the judicial process.

## BACKGROUND

### A. For Nearly A Decade, Willkie Has Represented Lafarge's Former CEO and Chairman Bruno Lafont In An Internal Investigation And Ongoing French Proceedings Related To Defendants' Alleged Conduct At The Core Of The Cases Before This Court

Bruno Lafont served as the CEO of Lafarge from 2006 to 2015. He also served as Lafarge's Chairman from 2007 to 2015 and, following the merger of Lafarge and Holcim to form LafargeHolcim, served as LafargeHolcim's Co-Chairman from 2015 to 2017. In 2016, LafargeHolcim learned of allegations that Lafarge and its Syrian subsidiary, Lafarge Cement Syria ("LCS"), made payments, through intermediaries, to ISIS and other armed groups from 2013 to 2014—while Lafont was CEO and Chairman.

Those allegations prompted LafargeHolcim to commission a privileged internal investigation into Lafarge's former operations in Syria. LafargeHolcim retained the law firm Baker McKenzie to conduct this highly sensitive and privileged internal investigation, called "Project Alpha." During Project Alpha, Baker McKenzie collected millions of potentially relevant documents from Lafarge, its counsel, and its executives, including the contents of Lafont's work email account at Lafarge and other business records. Baker McKenzie also interviewed numerous Lafarge employees, counsel, and document custodians, including Lafont on January 23, 2017.

As is standard practice in internal investigations, Lafont hired counsel to represent him. He engaged Willkie—including Willkie partners Daniel Hurstel and Grégoire Bertrou in Willkie's Paris office—as his counsel. LafargeHolcim's Board approved reimbursement of Willkie's fees for its representation of Board Co-Chair Lafont. Ex. 1, Declaration of Ryan P. Fayhee ("Fayhee Dec.") ¶ 5.

Given Lafont's years of service as Lafarge's CEO and Chairman and his alleged involvement in the events at issue, Willkie needed access to privileged and confidential information belonging to Lafarge, which Baker McKenzie provided. Ex. 1, Fayhee Dec. ¶ 7. Baker McKenzie also provided privileged and confidential draft portions of what ultimately became the investigative report (the "Project Alpha Report"). Ex. 1, Fayhee Dec. ¶ 8. These communications between Willkie and Baker McKenzie were marked "privileged and confidential" and "subject to the attorney work product and attorney-client privileges," and were subject to a common interest between Lafont and LafargeHolcim. Ex. 1, Fayhee Dec. ¶¶ 9-10. To this day, Lafont has denied prior knowledge of payments to ISIS and other armed groups, insisting that he did not learn of the alleged payments until long after the fact, in June 2016. Willkie was heavily involved in the investigation as it advocated on Lafont's behalf and provided input to Baker McKenzie and LafargeHolcim's Board of Directors. Ex. 1, Fayhee Dec. ¶ 9. In April 2017, LafargeHolcim issued a press release announcing Project Alpha's findings of wrongdoing by Lafarge, LCS, and their respective executives.

Around the same time, two European non-governmental organizations, Sherpa and the European Center for Constitutional and Human Rights ("ECCHR"), and eleven Syrian former LCS employees, filed a criminal complaint in France against Lafarge, LCS, Lafont, and others. In June 2017, Paris's Public Prosecutor opened a criminal investigation into the facts alleged in the complaint on counts of financing a terrorist organization and violating E.U. regulations prohibiting commercial relations with Jabhat Al-Nusra and ISIS. In December 2017, Lafont was placed under formal examination for these offenses. Willkie has continued to represent Lafont

throughout the criminal proceedings, which are ongoing.[1]

On February 18, 2022, Lafarge and Holcim sued Lafont and other former Lafarge executives in French civil court for damages arising out of the French criminal investigation. *See* Ex. 2, *Conclusions for the Annulment of the Referral Order* at 13-14 (Oct. 28, 2025).[2] Defendants understand that Willkie represents Lafont in his civil defense in that French proceeding, which is stayed pending resolution of the French criminal proceedings.

In October 2022, Lafarge and LCS pleaded guilty in the United States to conspiring to provide material support to designated "foreign terrorist organizations" and agreed to pay $777.78 million in forfeitures and fines. *United States v. Lafarge S.A.*, No. 22-cr-444 (WFK) (E.D.N.Y. 2022), Plea Agreement (Dkt. No. 10). Pursuant to this plea agreement, Lafarge admitted to a 117-paragraph Statement of Facts, based on the facts known in 2022, detailing Lafarge's and LCS's conduct in Syria and that of its executives. *United States v. Lafarge S.A.*, No. 22-cr-444 (WFK), Attachment A to the Plea Agreement: Statement of Facts (Dkt. No. 10-1) ("Statement of Facts"). The Statement of Facts asserts material facts about Lafont, *i.e.*, "Executive 6," including that he was a principal co-conspirator, had direct knowledge of payments to armed groups, and was involved in discussions with LCS and others regarding such arrangements. *See* Statement of Facts at 1, ¶¶ 8, 86, 92, 94.

The Statement of Facts was evidence in the French criminal investigation and later at trial. Just three months ago, Willkie (as counsel for Lafont) filed a brief in the French proceedings arguing that the French prosecutors and investigating judges' use of the U.S. Plea

---

[1] Defendants understand that Willkie always led Lafont's representation, but that Lafont later retained two additional firms—Temime & Associés and then Haik & Associates—as French trial counsel.

[2] Defendants' exhibits include certified English translations of documents from the French proceedings. Citations refer to the page numbers of the translated versions.

Agreement and Statement of Facts deprived Lafont of the presumption of innocence and that it was improper to use it to support charges against an individual who did not assent to its terms. Ex. 2, *Conclusions for the Annulment of the Referral Order* at 12 (Oct. 28, 2025). Willkie also contested the accuracy of the Statement of Facts, arguing that it was prepared without any opportunity for Lafont or other executives to be heard. Willkie has directly contradicted the Statement of Facts, for example by asserting that Lafont was *not* "'aware that [the Syria] operation notably involved agreed-upon security payments for the benefits of these terrorist entities.'" Ex. 3, *Motion for Dismissal* at 36 (Dec. 15, 2025). According to Willkie, Lafont had "[d]ifficulty in [i]dentifying and [u]nderstanding the [a]rmed [g]roups [f]orming the [r]ebellion." *Id.* at 11. Willkie asserted that the problems with the Plea Agreement and Statement of Facts are so fundamental that the French referral order should be "annulled." Ex. 2, *Conclusions for the Annulment of the Referral Order* at 12 (Oct. 28, 2025). At the same time, Willkie relies on the same Plea Agreement and Statement of Facts as the central predicate for Plaintiffs' civil complaints against Lafarge. *See, e.g.*, *Shirley* Am. Compl. ¶ 4; *accord Finan* 3d Am. Compl. ¶ 2; *Murad* Am. Compl. ¶ 3. Thus, Willkie's pleadings in this Court directly target Lafont and Lafarge with factual allegations that Willkie simultaneously asserts in the French proceedings are inaccurate. *See* Ex. 3, *Motion for Dismissal* at 36 (Dec. 15, 2025).

During the six-week French criminal trial that began on November 4, 2025, where anti-terrorism prosecutors seek a conviction and six-year sentence for Lafont, Willkie advanced the same defense: Lafont had no knowledge of, or involvement in, the alleged payments to terrorist groups in Syria. Lafont testified to these facts on November 19, 2025, directly contradicting the facts Willkie asserts in this Court. *See* Section B., *infra*; *compare Lafont Questioned as Islamic State Financing Trial Begins*, Global Cement Magazine, https://www.globalcement.com/news/

20136-lafont-questioned-as-islamic-state-financing-trial-begins (last accessed Feb. 15, 2026) (noting Lafont "claimed he hadn't been informed about the situation at the Syrian factory"), *with*, *e.g.*, *Shirley Am*. Compl. ¶ 162 ("Lafarge's Chairman, Lafont, knew that Defendants' partnership with ISIS was illegal under U.S. law and would have consequences in the United States.").

### B. Concurrent With Willkie's Ongoing Defense Of Lafont, Willkie Represents Plaintiffs Prosecuting Claims Against Lafarge In These Civil Proceedings

Following Lafarge's guilty plea in the United States, nine civil actions were filed on behalf of individuals who were allegedly injured or killed in terrorist attacks between 2012 and 2017 against Lafarge and subsidiaries under the ATA. Willkie represents nearly 1,000 Plaintiffs in three of these lawsuits—*Shirley et al. v. Lafarge*, *Finan et al. v. Lafarge*, and *Murad et al. v. Lafarge*—through (at least) lead counsel of record Lee Wolosky and Andrew Lichtman, partners in Willkie's New York and Washington offices. These two attorneys began representing the plaintiffs in *Finan* and *Murad* while at Jenner & Block and continued that representation after joining Willkie in 2025. Since then, Willkie has assumed responsibility for prosecuting the claims, including amending pleadings, filing substantive motions, and appearing before this Court. *See, e.g.*, *Finan* Dkt. No. 121. Willkie filed the third, related action—*Shirley*—in July 2025, asserting the same core allegations and claims in the other cases.

Across these cases, the operative complaints, amended most recently in December 2025, rely heavily on factual allegations examined during the privileged Project Alpha investigation and that are simultaneously at issue (and contested by Willkie) in the French criminal proceedings. Moreover, as already noted, Willkie invokes the Statement of Facts (which Willkie argues in France is flawed) as the foundation for Plaintiffs' claims. *See Shirley* Am. Compl. ¶ 4; *Murad* Am. Compl. ¶ 3; *Finan* 3d. Am. Compl. ¶ 2. Thus, for example, the complaints cite the Statement of Facts to allege that Lafarge and its subsidiaries knowingly made payments to ISIS

and other designated foreign terrorist organizations. *See, e.g.*, *Shirley* Am. Compl. ¶¶ 5, 11; *Murad* Am. Compl. ¶¶ 4, 45; *Finan* 3d. Am. Compl. ¶¶ 3, 9. Through Willkie, the complaints allege that Lafont played a central role in authorizing and directing those unlawful payments to terrorists. Each complaint expressly identifies "Lafont" as a "principal co-conspirator" and attributes to him direct knowledge of, and responsibility for, the alleged conspiracy. *See Shirley* Am. Compl. at 11, ¶ 40, ¶ 43; *Finan* 3d. Am. Compl. at 9, ¶ 38, ¶ 41; *Murad* Am. Compl. at 19, ¶ 54, ¶ 62.

### C. Willkie Has Taken Irreconcilable Positions In Its Concurrent Representations Of Bruno Lafont And Plaintiffs

As discussed above, Willkie's prosecution of ATA claims on behalf of nearly 1,000 Plaintiffs against Lafarge in this Court proceeds in direct conflict with its concurrent representation of Lafarge's former CEO and Chairman, Lafont, a defendant alongside Lafarge, in the related French criminal proceedings. Willkie has not only put forward conflicting legal arguments applied to the same facts, but also conflicting *factual* assertions about what happened, why it happened, and Lafont's and Lafarge's alleged conduct and motivations. Crediting either version necessarily disadvantages one client while benefiting the other.

The conflict is at the core of the two representations and cannot be reconciled. In the Amended *Shirley* Complaint, filed by Willkie on December 10, 2025, Plaintiffs allege that Lafont directed, authorized, and knowingly sustained a conspiracy between Lafarge, ISIS, and intermediaries, and that payments to armed terrorist groups reflected deliberate decisions made by the companies' "highest management levels"—with the very highest-ranking "principal co-conspirator" being "Lafont" specifically. *Shirley* Am. Compl. ¶¶ 14, 35-43; *accord Murad* Am. Compl. ¶¶ 8, 54-62; *Finan* 3d. Am. Compl. ¶¶ 8, 33-41. Five days later, in the French criminal trial, Willkie argued that Lafont was not even *informed* of the payments at issue—let alone that

he directed or approved them—and that any such payments were organized and ordered instead by subordinates acting within a confidential management scheme that did not include Lafont. Ex. 3, *Motion for Dismissal* at 36 (Dec. 15, 2025) ("[A]n objective and thorough analysis of the file and of the facts underlying the charges excludes the possibility that Bruno LAFONT was informed of the existence of these payments[.]").

Again, this is not simply a situation where a law firm is advancing different *legal* positions in unrelated proceedings. Willkie has simultaneously advanced opposing *factual* positions as true and opposing legal positions as correct in closely related proceedings involving the same core events and issues. For example:

| Willkie's Allegations for ATA Plaintiffs in These Civil Actions | Willkie's Representations for Lafont in the French Proceedings |
|---|---|
| *At the specific direction of the companies' highest management levels—including the CEOs of* both *Lafarge* [*i.e.*, Lafont] and LCS—Defendants entered into and sustained a multi-faceted and mutually beneficial conspiracy with ISIS and intermediaries.<br><br>*Shirley* Am. Compl. ¶ 14; *accord Murad* Am. Compl. ¶ 8; *Finan* 3d. Am. Compl. ¶ 12. | An objective and thorough analysis of the file and of the facts underlying the charges *excludes the possibility that Bruno Lafont was informed of the existence of these payments*, which were decided upon and organized within the framework of confidential management by his subordinates.<br><br>Ex. 3, *Motion for Dismissal* at 36. |
| *Defendants*, *through* Veillard, Herrault, Pescheux, Jolibois, Roux, *Lafont*, Tlass, and Taleb, among others, *acted in concert with, and for the purpose of furthering Defendants' ISIS's, and ANF's common objectives*.<br><br>*Shirley* Am. Compl. ¶ 43; *accord Murad* Am. Compl. ¶ 62; *Finan* 3d. Am. Compl. ¶ 41. | *Bruno Lafont was not "'aware* that this operation notably involved agreed-upon security payments for the benefit of these terrorist entities.'"<br><br>Ex. 3, *Motion for Dismissal* at 36. |

| | |
|---|---|
| Lafarge's executives were aware that they were in peril, at least legally.... *Lafont knew that Defendants' partnership with ISIS was illegal under U.S. law and would have consequences in the United States*.<br><br>*Shirley* Am. Compl. ¶ 162; *accord Murad* Am. Compl. ¶ 207; *Finan* 3d Am. Compl. ¶ 162. | *Lafont strongly and unequivocally disputes* … that he had … any knowledge of the alleged offenses that are under investigation in France; that he was informed … of the alleged offenses … and that he was acting as "*de facto director*" of LCS.<br><br>Ex. 4, *Official Notice – Indemnification Agreement* at 3. |

There are more examples. Before this Court, Willkie alleges clear and knowing connections between Lafarge, ISIS, intermediaries, and other armed groups, including that Lafont specifically knew of and directed arrangements with ISIS and understood their illegality. But in the French proceedings, Willkie has asserted that the situation on the ground was chaotic and opaque, emphasizing the fog of war and the "[d]ifficulty in [i]dentifying and [u]nderstanding the [a]rmed [g]roups [f]orming the [r]ebellion." Ex. 3, *Motion for Dismissal* at 11 (Dec. 15, 2025). Moreover, Willkie claims on behalf of Plaintiffs that Lafarge chose to continue operations at its plant in Syria and "pay[] ISIS and ANF because doing so increased profits." *Shirley* Am. Compl. ¶ 104. At the same time in the French proceedings, Willkie stated the opposite, claiming "the thesis that the continued operation of the plant was compelled by economic considerations does not withstand analysis." Ex. 3, *Motion for Dismissal* at 31 (Dec. 15, 2025).

The conflict among Willkie's opposing positions is particularly acute when it comes to the accuracy of the Statement of Facts. As described *supra* (in Section B), Willkie relies heavily in this Court on Lafarge's U.S. Plea Agreement and the Statement of Facts, which are the foundation of the operative complaints. As to Lafont, however, Willkie has argued—and continues to argue—in the French proceedings that the Plea Agreement and Statement of Facts deprived him and other executives of the presumption of innocence and failed to afford him and

other executives any opportunity to be heard, underscoring that he and other executives dispute the accuracy of the Statement of Facts as it relates, at minimum, to Lafont's knowledge and conduct. Thus, while Willkie has treated the Plea Agreement and Statement of Facts as authoritative—and, in Willkie's view, dispositive—in the U.S. actions, Willkie simultaneously challenges abroad the Plea Agreement and Statement of Facts as fundamentally flawed, unreliable, and inaccurate. Willkie's diametrically opposed representations of the Plea Agreement and Statement of Facts cannot both be true.

### D. Procedural History

Undersigned counsel for Defendants, who appeared in this case just two months ago (in December 2025), became aware of Willkie's conflict only recently after reviewing the history of these matters and the related French proceedings. Defendants promptly raised the issue with Willkie, identifying the core problems and requesting information concerning the scope of Willkie's representation of Lafont, whether informed consents from clients had been obtained, and what measures, if any, had been put in place to prevent the use or disclosure of Lafarge's confidential and privileged information. *See* Ex. 5, D. Bowker's January 22, 2026 Ltr. to L. Wolosky; Ex. 6 at 3-4, D. Bowker's January 26, 2026 Email to L. Wolosky.

Willkie responded slowly and with little information, and it ultimately denied the existence of any conflict and defended its actions as "fully consistent" with its professional responsibilities. Its first response spoke only about claimed internal "walls" separating the lawyers representing Lafont from those prosecuting the ATA actions. *See* Ex. 6 at 4-5, L. Wolosky's January 26, 2026 Email to D. Bowker. But Willkie has provided little detail regarding the nature or effectiveness of these measures. Defendants sought clarification and additional information, including as to whether Willkie disclosed the conflict to its clients, whether any informed consents were obtained, and how Willkie could justify advancing directly contradictory

factual positions in the U.S. and French proceedings concerning Lafont's alleged conduct. *See id.* at 3-4, D. Bowker's January 26, 2026 Email to L. Wolosky; *id.* at 1-2, D. Bowker's February 6, 2026 Email to L. Wolosky. More than two weeks after Defendants' initial outreach, Willkie responded with a cursory letter, insisting the firm "can and will continue to represent Plaintiffs," but failing to engage meaningfully with any of Defendants' questions and concerns. *See id.* at 4-5, L. Wolosky's January 26, 2026 Email to D. Bowker (promising a "more fulsome response shortly"); *id.* at 2-3, L. Wolosky's January, 30, 2026 Email to D. Bowker (indicating the matter was under review by the firm's General Counsel); Ex. 7, D. Kozusko's February 6, 2026 Ltr. to D. Bowker.

## LEGAL STANDARD

Disqualification is "warranted where an attorney's conduct tends to taint the underlying proceedings." *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 208 (S.D.N.Y. 2009) (collecting cases). Requests for disqualification are serious matters, and the remedy is subject to a "difficult standard" and "'disfavor[ed].'" *Benevida Foods, LLC v. Advance Mag. Publishers Inc.*, 2016 WL 3453342, at *10 (S.D.N.Y. June 15, 2016) (alteration in original). But in those rare circumstances where the "record presents a close question as to whether disqualification would be appropriate, courts 'must resolve any doubts in favor of disqualification.'" *Id.*; *see also Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) ("[I]n the disqualification situation, any doubt is to be resolved in favor of disqualification."); *Galloway v. Cnty. of Nassau*, 589 F. Supp. 3d 271, 277 (E.D.N.Y. 2022). The application of this standard is "discretionary in nature," *Hull*, 513 F.2d at 571, and courts may disqualify attorneys based on the courts' "inherent power to 'preserve the integrity of the adversary process.'" *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005).

In cases of concurrent representation, "it is 'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." *Id.* at 133. This conflict violates New York Rule of Professional Conduct 1.7 (2025) ("N.Y. R. Prof'l Conduct"), which prohibits representation of two clients who are "directly adverse," N.Y. R. Prof'l Conduct 1.7(a)(1), as well as any representation involving a significant risk that the attorney's "independent professional judgment on behalf of a client will be adversely affected by," or where the representation "otherwise will be materially limited by" the lawyer's responsibilities to another client, *id.* 1.7(a)(2). In such cases, the attorney "must be disqualified unless [he] can demonstrate that there is 'no actual or apparent conflict in loyalties' and that the vigor of [his] representation would not be diminished." *Merck Eprova AG*, 670 F. Supp. 2d at 212 (quoting *Hempstead Video*, 409 F.3d at 133). Moreover, an attorney's conflicts are "ordinarily imputed to his firm based on the presumption that associated attorneys share client confidences." *Cohen v. Strouch*, 2011 WL 1143067, at *2 (S.D.N.Y. Mar. 24, 2011).

Finally, a lawyer "shall not knowingly reveal confidential information ... or use such information to the disadvantage of a client." N.Y. R. Prof'l Conduct 1.6(a). "Confidential information" includes "information gained during or relating to the representation of a client, whatever its source, that is [] protected by the attorney-client privilege," that is "likely to be embarrassing or detrimental to the client if disclosed," or "that the client has requested be kept confidential." *Id.* Where Rule 1.6 is implicated, disqualification is appropriate if "the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation." *Cohen*, 2011 WL 1143067, at *2.

## ARGUMENT

### I. WILLKIE'S CONCURRENT REPRESENTATION OF PLAINTIFFS AND LAFARGE'S FORMER CEO AND CHAIRMAN WITH RESPECT TO THE SAME EVENTS POSES AN IRRECONCILABLE CONFLICT BETWEEN ADVERSE CLIENTS

Willkie's conflicting, concurrent representations of Lafarge's former-CEO and Chairman and of more than 1,000 Plaintiffs against Lafarge cannot be squared with the Rules of Professional Conduct. Where, as here, a firm "takes on multiple representations that will require advocating a position for one client that would directly adversely affect another client's interest, there is an 'imminent threat of a serious conflict,' making disqualification appropriate." *Cohen v. Strouch*, 2011 WL 1143067, at *4 (S.D.N.Y. Mar. 24, 2011) (quoting *Dunton v. Suffolk Cnty., N.Y.*, 729 F.2d 903, 907 (2d Cir. 1984), *amended*, 748 F.2d 69 (2d Cir. 1984)).

Plaintiffs' interests in this litigation are adverse to Lafont's, and Willkie's concurrent representations thus violate the New York Rules of Professional Conduct. *See* N.Y. R. Prof'l Conduct 1.7; *id.* 1.10(c).[3] As explained (*supra* Section C), the firm is making mutually inconsistent factual representations—both that Lafont directed—and that he did not direct—the terrorist-financing conspiracy that Willkie claims in these actions caused Plaintiffs' injuries or death. Willkie expressly alleges on behalf of Plaintiffs that Lafarge "conspired and worked in concert with ANF and ISIS … *through* ... *Lafont*." *Shirley* Am. Compl. ¶ 43 (emphasis added).

---

[3] It is not clear, because Willkie would not say, what conflict checks and notifications to affected clients, if any, were made when the lawyers representing Plaintiffs joined the firm in 2025. But under the plain terms of the Rules of Professional Conduct, Willkie was prohibited from taking on these representations at the time. *See* N.Y. R. Prof'l Conduct 1.7; *see also id.* 1.10. cmt. 5 ("[U]nder Rule 1.7 the law firm may not represent a client with interests adverse to those of a current client of the firm. Moreover, the firm may not represent the client where the matter is the same or substantially related to a matter in which (i) the formerly associated lawyer represented the client, and (ii) the firm or any lawyer currently in the firm has actual knowledge of, or has accessed, information protected by Rule 1.6 or Rule 1.9(c) that is material to the matter."); *id.* 1.10(c)(3) (screening will not prevent imputation of conflicts where the newly associated lawyer "either (i) substantially participated in the management and direction of the matter, or (ii) had substantial decision-making responsibility in the matter on a continuous day-to-day basis").

According to Willkie, Lafont is a central figure in Plaintiffs' case—identified as a "principal co-conspirator"—and is personally and directly implicated in the alleged misconduct. Yet, in France, Willkie represents Lafont for nearly a decade in connection with the same underlying conduct—disputing the same factual assertions Willkie claims to be true here. Courts in this Circuit have ordered disqualification for substantially less serious conflicts. *See, e.g.*, *GSI Com. Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 207, 214 (2d Cir. 2010) (affirming disqualification of plaintiffs' firm based on concurrent representation of corporate affiliate of defendant in unrelated matters); *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, 722 F. Supp. 2d 295, 304 (E.D.N.Y. 2010) (granting disqualification of plaintiffs' firm where associate attorney served on school board that was defendant in litigation).[4]

Willkie's concurrent representation of clients with adverse interests threatens to "taint" the proceedings in this Court and to undermine the "integrity of the adversary process." *Hempstead Video*, 409 F.3d at 132. If Willkie continues to represent both Lafont and Plaintiffs, the contradictions will persist. *See Merck Eprova AG*, 670 F. Supp. 2d at 212-213 (disqualification warranted where loyalty to adverse clients put firm in "conflicted position" of advancing contrary positions in separate proceedings). The concurrent representations present clear conflicts rife with factual contradictions that make the firm's continued involvement in this matter "'prima facie improper.'" *Hempstead Video*, 409 F.3d at 133. Indeed, under New York Rule of Professional Conduct 1.7, "absent consent, a lawyer may not advocate in one matter against another client that the lawyer represents in some other matter, *even when the matters are wholly unrelated*." N.Y. R. Prof'l Conduct 1.7, cmt. 6 (emphasis added). Here, far from being

---

[4] Undersigned counsel, upon consultation with French counsel, understand that French law imposes a similar, if not stricter, prohibition on concurrent representation.

wholly unrelated, the criminal and civil matters in France concern the very same set of events, arising from the same alleged conduct at the core of the cases before this Court. Given the "inevitability of conflicting loyalties and their likely impact on presentations made to the court, disqualification ... appears necessary." *DeAngelis v. Am. Airlines, Inc.*, 2010 WL 1270005, at *3 (E.D.N.Y. Mar. 26, 2010) (Garaufis, J.) (ordering law firm to show cause why it should not be disqualified).

Willkie's cursory response to Defendants' concerns only underscores the conflict. Attempting to defend its conduct, Willkie asserted that the allegations it made against Lafont in these proceedings merely "echo[] the first page of Lafarge's guilty plea." Ex. 7, D. Kozusko's February 6, 2026 Ltr. to D. Bowker at 2 n.1. But Willkie ignores that, in the French proceedings, it is vigorously challenging the accuracy of the plea, as substantively and procedurally defective, and violative of its own client's rights. Willkie's attempt to maintain both of these positions simultaneously undermines confidence in the "integrity of the judicial process," *Hull v. Celanese Corp.*, 513 F.2d 568, 572 (2d Cir. 1975), and raises questions about its ability to appear before this Court with the requisite candor and vigor, *see Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 235-236 (S.D.N.Y. 2010). At minimum, "there is significant risk that (i) [Willkie's] independent professional judgment on behalf of a client will be adversely affected by, or (ii) the representation of one or more clients otherwise will be materially limited by, [Willkie's] responsibilities to another client." N.Y. R. Prof'l Conduct 1.7(a)(2).[5] It is impossible for

[5] *See also* N.Y. R. Prof'l Conduct 1.7, cmt. 6 ("the client on whose behalf the adverse representation is undertaken may reasonably fear that the lawyer will pursue that client's case less effectively out of deference to the other client, that is, that the lawyer's exercise of professional judgment on behalf of that client will be adversely affected by the lawyer's … interest in retaining the current client"); *id.* 1.7, cmt. 8 (Even where there is no direct adversity, a concurrent conflict of interest exists "if there is a significant risk that a lawyer's exercise of professional judgment in considering, recommending or carrying out an appropriate course of action for the client will be adversely affected or the representation would otherwise be materially limited by the lawyer's other responsibilities or interests.").

Willkie to advance one of its client's positions without disadvantaging the other.

Willkie's only proffered solution to the fundamental problem posed by its concurrent representation is that its attorneys will not take "Lafont's deposition or examination at trial." Ex. 7, D. Kozusko's February 6, 2026 Ltr. to D. Bowker at 1. This is itself a concession of the conflict, but it is no solution to the inherent conflict between Willkie's opposing factual positions—before this Court and the French tribunal—regarding Lafont's involvement in the underlying events. "The paramount importance of vigorous representation follows from the nature of our adversarial system of justice." *Penson v. Ohio*, 488 U.S. 75, 84 (1988). Although there are appropriate instances where firms may have conflicts counsel question a witness, here the witness is Willkie's own client, whom the firm here accuses of being the principal co-conspirator while asserting in France that this is untrue. Willkie's inability to examine its own client, the supposed top mastermind of the alleged conspiracy it seeks to prosecute for Plaintiffs, underscores its inability to fully discharge its duty of zealous advocacy and materially risks tainting the proceedings, including any trial. *See* N.Y. R. Prof'l Conduct 1.7(a)(2).

Finally, Willkie has refused to confirm whether Lafont or any of the nearly 1,000 Plaintiffs it represents are even aware of the conflict, much less whether each one of them (and Lafont) has provided informed consent—an essential minimum requirement (but not sufficient in this case) to overcome a conflict arising from a concurrent representation. *See* N.Y. R. Prof'l Conduct 1.7(b)(4).[6] Contrary to Willkie's claims, the facts of whether notice was provided and

---

[6] *See also* N.Y. R. Prof'l Conduct 1.7, cmt. 2 ("Resolution of a conflict of interest problem under this Rule requires the lawyer, acting reasonably, to: (i) identify clearly the client or clients, (ii) determine whether a conflict of interest exists, *i.e.*, whether the lawyer's judgment may be impaired or the lawyer's loyalty may be divided if the lawyer accepts or continues the representation, (iii) decide whether the representation may be undertaken despite the existence of a conflict, *i.e.*, whether the conflict is consentable under paragraph (b); and if so (iv) consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing.").

consents were obtained are not privileged.

Even if Willkie had obtained the necessary consents, "in New York, informed written consent, standing alone, does not cure an attorney's concurrent-representation conflict of interest." *Akagi v. Turin Hous. Dev. Fund Co.*, 2017 WL 1076345, at *15 (S.D.N.Y. Mar. 22, 2017); N.Y. R. Prof'l Conduct 1.7(b)(1). "[S]ome conflicts are nonconsentable," in which case "the lawyer should neither ask for the client's consent nor provide representation on the basis of the client's consent. A client's consent to a nonconsentable conflict is ineffective. When the lawyer is representing more than one client, the question of consentability must be resolved as to each client." N.Y. R. Prof'l Conduct 1.7(b)(1), cmt. 14; *see also id.* cmt. 15. Even when "both affected clients have provided [consent] ... New York law 'also requires a belief under a reasonable lawyer standard ... that the attorney will be able to provide competent and diligent representation to each affected client.'" *Cohen v. Strouch*, 2011 WL 1143067, at *5 (S.D.N.Y. Mar. 24, 2011). Defendants respectfully submit that this is a situation where the reasonable lawyer standard is not met. It is unreasonable to simultaneously defend Lafarge's former head as the principal co-conspirator against charges of supporting terrorists while also prosecuting claims against Lafarge for that same alleged support and conspiracy.

## II. WILLKIE OBTAINED DEFENDANTS' PRIVILEGED AND CONFIDENTIAL MATERIALS THROUGH ITS REPRESENTATION OF BRUNO LAFONT, WHICH CREATES AN INDEPENDENT BASIS FOR DISQUALIFICATION

"It would be an unfair disadvantage for Defendants to be confronted by an attorney whom they believe possesses intimate knowledge of their views and impressions of this litigation." *Zalewski v. Shelroc Homes, LLC*, 856 F. Supp. 2d 426, 436 (N.D.N.Y. 2012). As explained, Willkie's longstanding representation of Lafont, Lafarge's former CEO and Chaiman, afforded it years-long access to Lafarge's privileged and confidential information. Willkie had access to Lafont's files as Lafarge CEO and Chairman, as well as confidential documents and

communications concerning the extensive internal investigation into Lafarge's operations and conduct in Syria; Lafarge's litigation strategy; and all manner of sensitive non-public information about Lafarge and its operations. This knowledge is imputed to the entirety of Willkie. *See Cohen*, 2011 WL 1143067, at *2 (S.D.N.Y. Mar. 24, 2011).[7]

Thus, in addition to the conflict discussed above, there is a second independent bar to Willkie's continuing involvement in this matter. "A lawyer shall not knowingly reveal confidential information ... or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person." N.Y. R. Prof'l Conduct 1.6(a). As explained, throughout its defense of Lafont in France, Willkie received, reviewed, and made use of Defendants' privileged and confidential documents. And during the Project Alpha investigation, Defendants provided Willkie access to hundreds of thousands of Lafarge's custodial documents, including confidential and privileged materials. *See* Ex. 1, Fayhee Dec. ¶ 7. In February 2017, Willkie was afforded the opportunity to review and comment on draft portions of Baker McKenzie's report summarizing its findings from the Project Alpha investigation. Ex. 1, Fayhee Dec. ¶ 8. These communications between Willkie and Baker McKenzie were marked "privileged and confidential" and "subject to the attorney work product and attorney-client privileges," and were made pursuant to a common interest between Lafont and LafargeHolcim. Ex. 1, Fayhee Dec. ¶¶ 9-10. Without elaboration, Willkie has denied having such access (Ex. 7, D. Kozusko's February 6, 2026 Ltr. to D. Bowker at 1-2), but the facts speak for themselves. Willkie had access to Defendants' confidential and privileged materials through Lafont and

[7] "A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, or except as permitted or required by these Rules, the lawyer must not knowingly reveal information gained during and related to the representation, whatever its source." N.Y. R. Prof'l Conduct 1.6, cmt. 2. "The confidentiality duty applies not only to matters communicated in confidence by the client, which are protected by the attorney-client privilege, but also to all information gained during and relating to the representation, whatever its source." N.Y. R. Prof'l Conduct 1.6, cmt. 3.

Baker McKenzie during Project Alpha, which places Defendants at a clear strategic disadvantage, *Inspire Med. Sys., Inc. v. Nyxoah, Inc.,*, 2025 WL 3215657, at *2 (D. Del. Nov. 18, 2025) (granting motion to disqualify), and will indelibly "taint" the proceedings, *Merck*, 670 F. Supp. 2d at 208 (same). As discussed below, Willkie has not meaningfully addressed this very serious concern.

## III. WILLKIE'S RESPONSES ARE INSUFFICIENT

In its cursory response to Lafarge's questions and concerns, Willkie insists that its "representation is fully consistent with its professional obligations." Ex. 7, D. Kozusko's February 6, 2026 Ltr. to D. Bowker, 1-2. But Willkie all but ignores the plain and core adversity among its existing clients, and instead makes much of a claimed screen to protect confidential information while also questioning Lafarge's standing. *Id*. Both responses are insufficient and should be rejected.

*First*, Willkie's claim that unidentified Willkie attorneys were "screened" from its representation of Lafont cannot cure the overwhelming taint caused by Willkie's diametrically opposed, concurrent representation of clients with adverse interests prohibited by the Rules of Professional Conduct. *See* Part I; N.Y. R. Prof'l Conduct 1.7(a). At most, the existence of a screen might bear on Defendants' independent argument that Willkie should be disqualified because it obtained Lafarge's privileged and confidential information. *See* Part II. But Willkie bears the burden of showing the timeliness and adequacy of any screen, and its response comes nowhere close to it.

With respect to protection of confidences, screens "may in some circumstances be used to prevent the dissemination of confidences," but a firm "seeking to avoid disqualification by erecting a screen bears the burden of showing that the screen will be effective." *Hum. Elecs.,*

*Inc.*, 375 F. Supp. 2d at 107. Willkie has not made such a showing, providing almost no information about the screens it says it put in place. Willkie asserts that in 2018, "the Firm established an ethical wall around Willkie's representation of Mr. Lafont to ensure that only the lawyers representing Lafont can gain access to documents and files on his matter." Ex. 7, D. Kozusko February 6, 2026 Ltr. to D. Bowker at 1-2. But Willkie began representing Lafont in 2017 (or earlier), leaving a lengthy period in which no such "wall" was in place, meaning that the entire firm would have had access to Defendants' privileged and confidential materials. Moreover, Willkie has not explained who was screened, how the screen operated, or why it was implemented only in 2018, many months after the representation of Lafont commenced. By that point, Willkie had already obtained Lafarge's privileged and confidential documents and participated in extensive privileged discussions concerning the investigation at issue. Indeed, it appears the investigation would have concluded before the screen was imposed. The effect of this belated screening is that knowledge of Lafarge's privileged and confidential information is imputed to all Willkie personnel prior to the 2018 screen. An effective screen would therefore have excluded such personnel from involvement in representing Plaintiffs here, yet there is no indication that is what occurred. By Willkie's own account, the screen applied only to the France-based team, not to all personnel with imputed knowledge of Lafarge's privileged and confidential information.

Willkie has recently encountered similar issues in other matters that are instructive here. Just last year, a judge rejected assertions by Willkie that an "ethical wall" insulated the firm from claims that it had failed to comply with its professional obligations, explaining:

> [W]alls are put in place under the Professional Rules of Conduct so that the knowledge of a group of attorneys is not imputed to the entire firm. In this way, a firm can take a representation it might otherwise be unable to take. But Willkie did not establish a wall for the take-private transaction *until after it had concluded*.

> Thus, the knowledge gained from its representation of Mr. Kahn in the take-private transaction *is imputed to the firm as a whole*.

Transcript at 19:21-20:4, *Franchise Group, Inc. and Freedom VCM Interco, Inc.*, No. 1:24-bk-12480 (D. Del. Feb. 13, 2025), Dkt. No. 975 (emphasis added). Given the comparable limitations in the screen here, which was erected long after Lafarge's privileged and confidential materials were obtained by the firm, Willkie has failed to meet its burden in invoking a screen, which in any event would not cure the overwhelming conflict tainting Willkie's involvement in these actions.

Moreover, the screen Willkie claims to have implemented when it began representing Plaintiffs in "early 2025" is also ineffective. Ex. 7, D. Kozusko's February 6, 2026 Ltr. to D. Bowker at 2. New York Rule of Professional Conduct 1.10 contemplates limited circumstances in which screens may prevent the imputation of a conflict to a newly associated firm, but those provisions are cabined to conflicts arising from an attorney's former representation of a client. *See* N.Y. R. Prof'l Conduct 1.10(a), (c)(2). Even assuming Rule 1.10(c) were applicable (it is not given the concurrent conflict), its requirements are not met. Rule 1.10(c)(3) provides that screening is ineffective where the newly associated lawyer "substantially participated in the management and direction" of the litigation at their former firm. N.Y. R. Prof'l Conduct 1.10(c)(3); *see also id.* cmt. 5F. That exception applies here, where the attorneys in question have exercised "substantial responsibility for the management and direction" of these matters as lead counsel of record for Plaintiffs from the actions' inceptions, including at their prior law firm. *Id.* cmt. 5F; *see, e.g.*, *Finan* Compl. Dkt. No. 1 at 47 (Dec. 22, 2022) (signed and submitted by the attorneys who joined Willkie in 2025); *Murad* Compl. Dkt. No. 1 at 297-98 (Dec. 14, 2023) (same). Accordingly, neither of Willkie's alleged screens effectively cures the conflict.

*Second*, Willkie cannot avoid disqualification by questioning Lafarge's standing.

Willkie's theory appears to be that only Lafont or Plaintiffs may raise complaints about Willkie's conflict of interest, but that is wrong. Standing to seek disqualification is "not limited to former or aggrieved clients," because "'[e]thical misconduct is a matter of public concern implicating the integrity of the bar and any party who is aware of the facts which give rise to the issue is duty bound to [] present the matter to the proper forum.'" *Altschul v. Paine Webber, Inc.*, 488 F. Supp. 858, 860 n.1 (S.D.N.Y. 1980). Thus, courts in this Circuit have held that "parties have standing to seek disqualification of opposing counsel on conflict of interest grounds." *Hiotis v. 1454 Diner*, 2026 WL 279832, at *3 (E.D.N.Y. Feb. 3, 2026) (collecting cases); *accord Kevlik v. Goldstein*, 724 F.2d 844, 847 (1st Cir. 1984).

Willkie's concurrent representation of Plaintiffs and Lafont poses clear and serious issues that warrant disqualification. Moreover, Willkie represents Lafont in his capacity as the former CEO and Chairman of Lafarge, one of the Defendants here. The documents Willkie accessed and reviewed were (and are) Defendant Lafarge's documents, and Lafont's conduct has been imputed to Lafarge and the other Defendants *by Willkie* in these civil actions. Under these circumstances, Willkie should not be heard to claim that Defendants lack a concrete interest sufficient to raise these serious conflict issues that affect not only Defendants' former CEO and Chairman but Defendants themselves. That is because Willkie's extensive access to Defendants' privileged and confidential information directly impairs Defendants' ability to defend themselves in this litigation. Such "concrete and particularized" injury supports Defendants' standing to seek Willkie's disqualification here. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *cf. United States v. Milton*, 626 F. Supp. 3d 694, 700 (S.D.N.Y. 2022) (granting third-party's motion to intervene based on interest in protecting privileged materials from disclosure).[8]

---

[8] Even assuming a standing issue, the Court may still "address the issue of disqualification through the Court's 'inherent power to preserve the integrity of the adversary process.'" *Hiotis*, 2026 WL

## CONCLUSION

The circumstances here are extraordinary, involving clear violations of the Rules of Professional Conduct and undermining the integrity and fairness of these judicial proceedings. Defendants therefore have no choice but to seek relief from this Court. For the reasons stated, Defendants respectfully submit Willkie should be disqualified.

Date of Service: February 17, 2026

Respectfully submitted,

/s/ David W. Bowker

DAVID W. BOWKER
JONATHAN E. PAIKIN
ALBINAS PRIZGINTAS (*pro hac vice*)
MICHAELA S. WILKES KLEIN (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 663-6000 (t)
(202) 663-6363 (f)
david.bowker@wilmerhale.com
jonathan.paikin@wilmerhale.com
albinas.prizgintas@wilmerhale.com

ALYSON ZUREICK
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8875 (t)
(212) 230-8888 (t)
alyson.zureick@wilmerhale.com

*Attorneys for Lafarge S.A., Lafarge Cement Holding Limited, and Lafarge Cement Syria S.A.*

279832, at *3 n.2 (quoting *Hempstead Video*, 409 F.3d at 132). "Courts rarely deny disqualification motions for lack of standing because '[p]rinciples of standing are matters of public policy, and in the area of regulating the practice of law, those principles must be flexible enough to allow a court to insure that the integrity of proceedings before it is maintained, especially where a court recognizes the existence of a conflict.'" *Pergament v. Ladak*, 2013 WL 3810188, at *2 (E.D.N.Y. July 23, 2013) (quoting *Paladino v. Skate Safe, Inc.*, 28 Misc. 3d 1227(A), 958 N.Y.S.2d 62 (Sup. Ct. 2010)).

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this brief complies with the word limits set forth in Local Civil Rule 7.1(c). According to the word-processing system used to prepare this brief, the total word count for all printed text exclusive of the material omitted under Rule 7.1(c) is 7,254.

Dated: February 17, 2026

/s/ David W. Bowker
DAVID W. BOWKER

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by ECF.

Dated: February 17, 2026

/s/ David W. Bowker
DAVID W. BOWKER