**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CHARISS FINAN, GLORIA FINAN-BACON, SHAWN BACON, KRISTIN DAYTON, HAILEY DAYTON, COLE DAYTON, KENTON STACY, LINDSEY STACY, L.S., a minor, M.S., a minor, S.S., a minor, A.S., a minor, CHARLES KEATING III, CASSANDRA KEATING, WILLIAM KEATING, ELIZABETH BERRY JACEK, ANDREW BERRY, NATHAN BERRY, A.B, a minor, N.B., a minor, MOHAMAD EL HAJJ HASSAN, ZEINAB EL HAJJ HASSAN, AYDA AHMAD, and LEYLA EKREN,<br><br>Plaintiffs,<br><br>v.<br><br>LAFARGE S.A., LAFARGE CEMENT HOLDING LIMITED, and LAFARGE CEMENT SYRIA S.A.,<br><br>Defendants. | ) | **FOURTH AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br>**CASE NO. 1:22-cv-07831** |

## INTRODUCTION

1. On October 18, 2022, the Department of Justice announced its first-ever prosecution of a corporation for conspiring to provide material support to a terrorist organization. According to Deputy Attorney General Lisa O. Monaco, Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("Lafarge Cyprus"), and Lafarge Syria S.A. ("LCS") (collectively, "Defendants") "partnered with [the Islamic State in Iraq and Syria ("ISIS")], one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

2. As part of its plea agreement, Lafarge and LCS agreed to a 52-page Statement of Facts detailing their unlawful conduct ("Statement of Facts"), which Plaintiffs incorporate into this First Amended Complaint in its entirety to the extent not inconsistent with the allegations herein.[1] *See United States v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10. Lafarge and LCS agreed in the guilty plea that they "will not dispute the Statement of Facts."

3. Among the facts to which Defendants admitted was that they paid ISIS and Al-Nusra Front ("ANF") nearly $6 million dollars between July 2012 and October 2014. Defendants also admitted that they let ISIS seize over $3.1 million dollars of cement.

4. The money paid by Defendants to ISIS went directly to ISIS's operations, including its acts of international terrorism. As an Assistant Attorney General said in announcing the plea, Lafarge "routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations – ISIS and al-Nusrah Front in Syria – at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."

5. Based on the heinous conduct underlying their guilty plea, U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial penalties, including criminal fines and forfeiture, totaling $777.78 million. At the conclusion of the sentencing hearing, Judge Kuntz said: "This case impacts global communities. This case impacts the national security of the United States. This case impacts the victims of terrorist acts perpetrated by ISIS and ANF."

[1] Plaintiffs' investigation has revealed additional facts beyond those to which Lafarge and LCS have admitted in connection with their guilty plea. Upon information and belief, the factual admissions in connection with the guilty plea were limited by design and carefully crafted in an effort to avoid civil liability like that threatened by the instant proceedings.

6. Documents indicate that Defendants paid millions of dollars more, starting before July 2012 and continuing after October 2014, and did not take steps to unwind the conspiracy until years later, after the criminal conspiracy was publicly exposed.

7. Defendants were able to conceal their conspiracy with ANF, ISIS, and their intermediaries for so long because, among other things, they took extraordinary steps to repeatedly and systematically route financial transactions and email traffic in furtherance of the conspiracy through the United States. They undertook these activities in the United States purposefully to avoid the scrutiny of Lafarge's French auditors and law enforcement officials, and to avoid having to engage in banking transactions in or through Syria and in Syrian currency.

8. On information and belief, Defendants did not begin cooperating with the U.S. Department of Justice until at least 2019 and did not fully disclose their conduct to the U.S. government until a significant time after that. Even then, their cooperation with the U.S. government was incomplete, which the Department of Justice criticized. As the Plea Agreement states, Lafarge's "criminal conduct" was "not voluntarily self-reported to the Department of Justice," which "did not receive timely and full cooperation with [its] investigation."

9. The factual admissions in the Statement of Facts established Defendants' criminal liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2339B(a)(1), and give rise to civil liability under the ATA, 18 U.S.C. § 2333.

10. Because Defendants aided and abetted ISIS's acts of international terrorism and conspired with ISIS and intermediaries, they must pay compensation to the survivors. In this civil action under the ATA, American citizens harmed by ISIS's acts of international terrorism committed in conspiracy with Defendants seek to collect the treble damages authorized by the ATA for Defendants' violations thereof.

## BACKGROUND

11. After investing $680 million to construct a cement plant in northern Syria ("Cement Plant"), Defendants faced a critical moment in 2011. Conflict in Syria had devolved into an all-consuming civil war, and terrorist groups were imposing their will on the population. Unlike other multinational companies, which halted their Syrian operations and fled the country, Defendants saw opportunity in partnering with the terrorists and pursuing shared purposes.

12. At the specific direction of the companies' highest management levels—including the CEOs of both Lafarge and LCS—Defendants entered into and sustained a multi-faceted and mutually beneficial conspiracy with ISIS and intermediaries at the same time ISIS was killing Americans. For the explicit purpose of incentivizing ISIS to act in a manner that would promote their common interests, Defendants' executives agreed to make monthly payments to ISIS and ANF, to pay ISIS based on the volume of cement LCS sold, to purchase raw materials from ISIS-controlled suppliers, and to sell its cement to ISIS. Defendants ultimately solidified their relationship with ISIS by entering into a formal revenue-sharing agreement. Transactions in furtherance of this criminal conspiracy were purposefully made in U.S. dollars and transferred through and processed in New York.

13. Defendants received crucial benefits in exchange for these payments. ISIS permitted access to raw materials sourced from the expanding territory and markets under its control so that the Cement Plant could produce cement; ISIS allowed LCS employees, suppliers, and customer-distributors safe passage through terrorist checkpoints; and ISIS agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey. ISIS—quite literally—agreed to take out Defendants' competition.

14. Defendants' knowing provision of material support to ISIS enabled ISIS to expand the territories and markets under its control, fund low-cost acts of terrorism directed at Americans, and build the infrastructure necessary to kill Americans.

15. Defendants referred to their "profit" as a "cake," and stated they were happy to "share" a slice with ISIS so long as ISIS continued to protect and enhance Defendants' interests.

16. Defendants were fully aware that they were transacting with ANF and ISIS, and that their conduct flagrantly violated U.S. law. Indeed, Defendants' executives frequently and expressly communicated about the challenges of dealing with those who were "classified as terrorists by international organizations and the US."[2]

17. To avoid detection, Defendants went to great lengths to conceal their relationship with ANF and ISIS. For one thing, rather than directly transacting with terrorists, Defendants worked through intermediaries. As one LCS security consultant admitted, "it was especially important that the relationship would be handled by [intermediaries], since an exposure of this sort would have been compromising for LCS. But via [intermediaries], we did in fact contribute to the economy of ISIS." Relatedly, Defendants ensured that documents regarding terrorist payments did not reference the word "Lafarge." For example, LCS's CEO instructed an intermediary that "the name of Lafarge should never appear for obvious reasons in any documents of this nature. Please use the words Cement Plant if you need but never the one of Lafarge." Finally, Defendants purposefully availed themselves of U.S. dollar transactions routed through the U.S. financial system and personal email addresses using services based in the United States—rather than Lafarge email addresses—to conceal their illegal activities from their auditors and French law enforcement authorities.

[2] All citations to written correspondence include original spelling, punctuation, and grammar.

18. Defendants have admitted making payments of at least $5.92 million to ISIS and ANF from 2012 through 2014. These payments consisted of at least $816,000 of monthly "donations" to ISIS; at least $3,447,528 in payments to ISIS-controlled suppliers; and at least $1,654,466 in payments based on the amount of cement LCS sold. Defendants have also admitted to leaving behind cement when they turned over the factory to ISIS, and that ISIS sold the cement at prices that would have yielded ISIS another $3.21 million.

19. On information and belief, Defendants' own documents suggest their total payments to terrorist groups were far higher—exceeding $15 million according to media reports. By way of example, a July 14, 2014 email written to LCS's CEO refers to even more payments "in addition to the ten millions that we pay directly to them, i.e. to ISIS" (see *infra* Part V).[3] In addition, Lafarge entered into a written contract in October 2014, back-dated to September 2014, obligating it to continue to make U.S. dollar payments indefinitely, money destined for terrorists (described *infra* at Part VIII).

20. Defendants' payments to and partnership with ISIS provided ISIS capital to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans. The revenue stream enabled the terrorist attacks that targeted Plaintiffs and their family members. Defendants' money translated directly into fighters, guns, and bombs the terrorists used to plan and execute their terrorist acts against Plaintiffs. It allowed ISIS to create more explosives, capture more territory, recruit new members, and expand to new regions and countries. According to a former U.S. Ambassador to the United Nations, funding enabled ISIS to "pay its followers," create a massive salaried military force that included snipers, planners, and suicide bombers, and "fund attacks around the world."

[3] The email communication likely refers only to one type of payment to ISIS at one point in time. Lafarge made numerous types of payments to ISIS over a lengthy period of time (described *infra* at Parts III and X).

21. Given the low costs of terrorist attacks, Defendants' payments had a substantial impact on ISIS's capabilities. Their multimillion-dollar bribes were enough to finance *thousands* of ISIS terrorist attacks—enough to kill and maim every Plaintiff in this case many times over. These attacks were the foreseeable, obvious and even intended results of doing business with ISIS. Terrorist attacks enabled ISIS to maintain and expand its control over territories and markets. The more territory and markets ISIS controlled, the greater the co-conspirators' profits.

22. Defendants' payments were channeled to ISIS's leadership, under ISIS's centralized and carefully tracked system. ISIS's founder and leader Abu Bakr Al-Baghdadi supervised the collection and disbursement of the "taxes" Defendants paid to it. On information and belief, Al-Baghdadi's ISIS Leadership Cell (described *infra* at Part X(a)) skimmed 20% off the top of the money ISIS collected, including the payments made willingly by Defendants, to help plan, authorize, and commit the terrorist acts alleged below (see *infra* Part XII). In addition, Lafarge was located near the main ISIS headquarters in Raqqa. Raqqa was the largest city ISIS held, its de facto and self-described capital. The rest of Lafarge's money would have gone to the Raqqa province, led by the Raqqa Cell. The Raqqa Cell, in turn, was run by Ali Musa Al-Shawakh, or Abu Luqman, and played a key role in maintaining fighters, funding, and planning the attacks described below. Lafarge, through intermediaries and with knowledge and intent, directly conspired with Abu Luqman's Raqqa Cell, which controlled the local territory around Lafarge's cement plant in northern Syria. The Raqqa Cell collected funds from Lafarge and directed and/or perpetrated the individual attacks that harmed Plaintiffs.

23. Defendants' scheme depended on connections to the United States. Throughout, Defendants exploited New York's banking system by executing at least 15 U.S.-dollar wire transfers they caused to clear through New York. That was no coincidence. Defendants chose to

pay in U.S. dollars – they called "USD" their "preferred option" – and they deliberately routed their wires through New York banks. By using New York correspondent banks to clear those U.S.-dollar wires, Defendants advanced their criminal scheme: they made the payments look legitimate; avoided the operational risks posed by unreliable foreign-clearing options; supplied the terrorists with their preferred currency; and hedged against the foreign-exchange risk posed by the collapsing Syrian pound. New York clearing helped them capture all those benefits. True, Defendants had a sophisticated understanding of the U.S. sanctions, which sometimes forced them to avoid New York banks. But they learned first-hand that doing so made their scheme less effective, more expensive, and harder to conceal. That is why they used New York clearing when they could, and in a manner that was carefully designed to avoid triggering U.S. sanctions. And they knew, as Lafarge's accounting manager explained in one illustrative email, that their U.S.-dollar wires required the involvement of "US correspondent bank[s]."

24. Defendants also formed U.S. contacts by relying on American email providers – mainly Gmail – to communicate about their terrorist payoffs. Again, this was no coincidence. Defendants often coordinated their payments using Gmail, rather than corporate email, so they could hide their conduct from French auditors and regulators. And in using Gmail to do so, Defendants relied on a U.S. service provider and benefited from U.S. infrastructure, U.S. engineering, and U.S. law. Because Gmail is an American service, U.S. legal protections also impeded foreign agencies from easily accessing Defendants' Gmail messages. By sending their emails through the United States, Defendants sought to make it harder for French law enforcement – the authority otherwise most likely to criminally charge their executives (as has now in fact happened) – to discover their scheme.

25. Defendants' conspiracy itself was integrally linked to the United States, as Defendants knew, foresaw, and intended. Harming and killing foreigners, especially Americans, whom ISIS referred to as "crusaders," was a potent way for ISIS to maintain and expand its grip on power, territory and markets. By taking on the world's strongest power, the United States, and killing Americans, ISIS terrorized its subjects, recruited new followers, and deepened its territorial reach. Defendants intentionally, purposefully, and foreseeably benefitted from ISIS's protection, strength, and terrorist acts against Americans as part of their partnership with ISIS to control local markets and increase profits.

26. Thus, Defendants entered a conspiracy with ISIS and intermediaries whose overall object was to maintain and expand ISIS's territorial control of Syria and Iraq and thereby promote ISIS's control of and protection rackets within that territory. ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy by strengthening ISIS's perceived power.

27. Plaintiffs—American citizens harmed by ANF and ISIS, and their family members—are entitled to recover for the economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their relatives' society, companionship, wages, comfort, advice, and counsel that they experienced as a result of Defendants' misconduct. Defendants aided and abetted the ISIS and ANF attacks that killed or injured Plaintiffs and their family members. Defendants also conspired with ISIS, ANF, and intermediaries, making Defendants liable for the terrorist attacks that ISIS and ANF foreseeably committed in furtherance of their conspiracy.

## THE PARTIES AND PRINCIPAL CO-CONSPIRATORS

28. Plaintiffs are U.S. nationals and survivors and/or heirs and family members of individuals harmed by ISIS terrorist acts in Syria, Iraq, Libya, and Lebanon.

29. The Plaintiffs and the details of each attack are described below (see *infra* Part XII).

30. **Defendant Lafarge S.A.** ("Lafarge") is the parent company of a multinational building materials business, which is organized under the laws of France and headquartered in Paris, France. At pertinent times, Lafarge, together with its subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete, and other building materials at 1,612 production sites in approximately 61 countries, including the United States.

31. On July 10, 2015, Lafarge merged with its leading competitor, Holcim, Ltd., a Zurich, Switzerland-based building materials business to create LafargeHolcim. At the time of the merger, Holcim and Lafarge were the two largest multinational building materials companies in the world.[4]

32. During all times pertinent to this First Amended Complaint, Lafarge oversaw and directed the conduct of two Defendant subsidiaries it wholly controlled, LCS and Lafarge Cyprus.

a. **LCS** was a direct subsidiary of Lafarge Cyprus, organized under the laws of Syria and headquartered in Damascus, Syria. Lafarge indirectly owned 98.7% of LCS through four subsidiaries, primary among them Lafarge Cyprus. From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in northern Syria near the Turkish border and between the cities of Manbij and Raqqa, Syria. LCS made agreements and effectuated transactions with ISIS and ANF "at the direction of LAFARGE's and LCS's senior management," including Christian Herrault, a Lafarge Executive Vice President based in Paris. Lafarge executives were thoroughly informed of LCS's decisions and directions in interacting with terrorists. As Herrault wrote in 2017, LCS's "local concessions" to terrorists "were made with the clear and repeated approval" of senior Lafarge leadership. Thus,

[4] LafargeHolcim rebranded itself as Holcim Group in 2021.

when allegations herein refer to LCS or LCS employees, the described conduct occurred at Lafarge's direction and for Lafarge's benefit.

b. **Lafarge Cyprus** is the entity through which Lafarge held the majority of its shares in LCS until Lafarge's 2015 merger with Holcim Ltd. It is organized under the laws of Cyprus and headquartered in Cyprus. Lafarge Cyprus functioned as the corporate instrument through which Lafarge often routed money to LCS and intermediaries, including through international bank transfers that went through New York, and thereby financed Lafarge's payments to ISIS and ANF. Lafarge Cyprus's financing of LCS's transfers was done knowingly and at Lafarge's direction and with Lafarge's approval. In 2014, Lafarge Cyprus executed a consulting agreement with Firas Tlass to conceal Defendants' payments to ISIS.

33. Jean Claude Veillard is a citizen and national of France and was Vice President of Security for Lafarge from approximately October 2008 until September 2017. He was based at Lafarge's headquarters in Paris, France. Veillard was also a member of Lafarge's Security Committee.

34. Christian Herrault is a citizen and national of France and was an Executive Vice President of Operations of Lafarge from approximately 2012 to December 2015. Herrault supervised Lafarge's operating subsidiaries in numerous countries, including Syria. Herrault was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman and CEO, Bruno Lafont. Herrault was a member of Lafarge's Security Committee and, beginning on July 4, 2013, served as Chairman of the Board of Directors of LCS.

35. Bruno Pescheux is a citizen and national of France and was CEO of LCS from approximately 2008 to July 2014. While CEO of LCS, Pescheux was based at LCS's headquarters

in Damascus, Syria before relocating to Cairo, Egypt in 2012 when LCS evacuated its foreign employees in the face of growing unrest around its plant. He reported directly to Herrault.

36. Fredric Jolibois is a citizen and national of France who became CEO of LCS in approximately July 2014 and remained in that role until approximately January 2016, and reported directly to Herrault until Herrault left Lafarge.

37. Guillaume Roux is a citizen of the United States and of France, and was an Executive Vice President of Lafarge until January 2016. Roux was also a member of Lafarge's Security Committee, and a member of LCS's Board of Directors until January 2016 and its Chairman from 2008 until July 4, 2013. Roux was based at Lafarge's headquarters in Paris, France and reported directly to Lafarge's Chairman of the Board of Directors and CEO, Bruno Lafont.

38. Bruno Lafont is a citizen and national of France and was Lafarge's Chairman of the Board of Directors and CEO of Lafarge until the completion of the merger with Holcim Ltd. in 2015. Upon Lafarge's merger, he became Co-Chair of LafargeHolcim's Board of Directors and served there until May 2017. He was based at Lafarge's headquarters in Paris, France.

39. Firas Tlass is a citizen and national of Syria and was a minority shareholder in LCS until the Syrian government confiscated his shares in LCS in approximately 2012. Tlass was paid by LCS, with Lafarge's knowledge and approval, to provide "security" services to LCS, which included negotiating with various local terrorist groups, including ISIS and the ANF. Tlass was paid by LCS, with Lafarge S.A.'s knowledge and approval, to negotiate with and deliver payments to ISIS and ANF.

40. Amro Taleb is a citizen of Canada and of Syria and a former consultant to LCS who held himself out as a broker capable of sourcing raw materials from ISIS-controlled territories. LCS paid Taleb to negotiate with and pay ISIS for raw materials, with Defendants' knowledge and

approval. After ISIS raided the Cement Plant, Taleb negotiated the sale and liquidation of its cement and equipment, while receiving payment from Defendants. As Defendants' paid consultant, he then visited Lafarge's headquarters in Paris in January 2015 to discuss Defendants' further cooperation and conspiracy with ISIS to re-open the Cement Plant.

41. Defendants, through Veillard, Herrault, Pescheux, Jolibois, Roux, Lafont, Tlass, and Taleb, among others, acted in concert with, and for the purpose of furthering Defendants, ISIS's, and ANF's common objectives. They conspired and worked in concert with ANF and ISIS, with the full knowledge of ANF's and ISIS's designation as Foreign Terrorist Organizations ("FTO" or "FTOs"), their terrorist acts, and their purposeful targeting of Americans and others.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(d), and 18 U.S.C. § 2338, as a civil action brought by citizens of the United States who have been killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

43. Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and (d) and 18 U.S.C. § 2334(a).

44. Lafarge, Lafarge Cyprus, and LCS are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and N.Y. C.P.L.R. § 302(a)(1), based on Defendants' use of New York banks in carrying out their scheme. Alternatively, personal jurisdiction exists under Fed. R. Civ. P. 4(k), based on Defendants' use of New York banks and U.S.-based email service providers in carrying out their scheme. Rule 4(k)(2) jurisdiction also exists based on Defendants' conspiracy with ISIS, a terrorist group that purposefully targeted the United States, caused tortious effects on and within the United States, and carried out overt acts in furtherance of the conspiracy within and targeting the United States. If the Court were to find jurisdiction lacking under New York's long-arm

statute, Plaintiffs certify based on the reasonably available information that Defendants would not then be subject to suit in the courts of general jurisdiction of any other state, which would make Rule 4(k)(2) jurisdiction appropriate. Jurisdiction under these provisions is appropriate based on the following:

45. Defendants' conspiracy with ANF and ISIS and intermediaries had a substantial nexus to the United States and to New York, including by virtue of Defendants' and its agents' deliberate, repeated, and systematic use of U.S. dollar transactions and banks in New York to pay, conspire with, and aid and abet terrorists, including via intermediaries. Defendants "preferred option" for paying terrorists was to make "bank transfer[s] in USD," because, among other things, it helped avoid detection by Lafarge's auditors and governmental entities.

46. Specifically, Defendants directed their banks to complete U.S.-dollar-denominated wire transfers to support their scheme to fund ISIS and ANF, and Defendants' officials knew those directions required the use of New York banks. Defendants' wire instructions caused their payments to clear in New York, including through one admitted suit-related transaction in this District. Defendants' executives regularly received specific transaction confirmations alerting them to the particular U.S. correspondent and intermediary banks that routed their transactions. On information and belief, Defendants regularly requested and received confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions.

47. By routinely, purposefully, and knowingly conducting transactions in U.S. dollar-denominated transactions processed through New York, Defendants purposefully availed themselves of the benefit of doing business in the United States generally and New York specifically, and thus are subject to personal jurisdiction.

48. As Defendants knew and intended, Defendants' aiding and abetting of and conspiracy with ANF and ISIS and intermediaries enabled ANF and ISIS to commit the acts of international terrorism that expanded ISIS's power and territorial control that benefitted Defendants, and that injured and killed victims in Syria, Iraq, Lebanon, and Libya, thereby injuring Plaintiffs.

49. In addition, as described further below, Defendants conspired with ISIS and its intermediaries to (a) provide material support to ANF and ISIS, designated terrorist organizations, knowing and intending that ANF and ISIS would use Defendants' material support to commit acts of violence that would endanger human life and would intimidate or coerce a civilian population, in violation of 18 U.S.C. 2333(a); and (b) commit acts of terrorism, knowing and intending that ISIS would target American citizens and American interests, in violation of 18 U.S.C. 2333(d). Defendants and their co-conspirators and agents' conspiracies had a substantial connection to and were in and affecting the United States and, in particular, New York.

50. In furtherance of the conspiracies, Defendants purposefully made numerous U.S.-dollar payments to ISIS through intermediaries and to facilitate the conspiracy with ISIS and intermediaries, payments that were wired through New York. This was done at Lafarge's instruction and with its knowledge, in reliance on the U.S. financial system for efficiency, security, and secrecy.

51. For example, Lafarge has admitted to making a lump sum wire transfer of $210,000 from its operating account at a financial institution in Paris to intermediary banks in New York City through this District. The contract pursuant to which that payment was made, and additional agreements made in the course of the conspiracy, required Defendants to make ongoing payments after October 2014. On information and belief, Defendants did so.

52. Also in furtherance of the conspiracies, Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their partnership with ISIS. U.S.-based email service providers enabled Defendants to conceal their illegal conduct from French auditors and authorities.

53. Further, Defendants are subject to personal jurisdiction given their participation in a scheme and conspiracy with ISIS and intermediaries that was directed at the United States and whose overall object was to maintain ISIS's territorial control of Syria and Iraq.

54. ISIS was public about its intent to commit acts of terrorism against the United States as well as its intentional recruitment from the United States. In July 2012, Al-Baghdadi, ISIS's founder and leader, threatened to strike at the "heart" of America, proclaiming that the United States "will soon witness how attacks will resound in the heart of your land, because our war with you has now started." In January 2014, Al-Baghdadi announced to Americans: "Soon we will be in direct confrontation." And in June 2014, Al-Baghdadi threatened Americans: "You should know, you defender of the cross, that getting others to fight on your behalf will not do for you in Syria as it will not do for you in Iraq," and "soon enough, you will be in direct confrontation—forced to do so, God willing. And the sons of Islam have prepared themselves for this day. So wait, and we will be waiting, too."

55. The threat to U.S. citizens was well-known outside Syria. On June 27, 2014, U.S. senators observed publicly that "[t]he conflict in Syria has deteriorated and spread so dangerously that it is now the source of direct threats to the United States" and that "[t]he leader of ISIS, Abu Bakr al-Baghdadi, has already stated his ambitions to attack the U.S. homeland."

56. The threats to American citizens proved all too real. In August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley, and threatened the life of another if President Obama did not end military operations in Iraq. Tellingly, the beheading videos of both Foley and Steven Sotloff (in September 2014) were titled "Message to America" and "A Second Message to America," respectively. ISIS announced that its killing of Sotloff was specifically in response to U.S. airstrikes targeting it in Iraq. Defendants nonetheless pressed ahead with making payments to ISIS.

57. Likewise, in September 2014, ISIS spokesperson Sheikh Abu Muhammad Al-'Adnani Al-Shami gave a speech entitled "Indeed, Your Lord is Ever Watchful," in which he explicitly spelled out ISIS's anti-American objectives, stating, for example:

> O America, O allies of America, and O crusaders, know that the matter is more dangerous than you have imagined and greater than you have envisioned. . . . O Obama, O mule of the Jews, you are vile. You are vile. You are vile. And you will be disappointed, Obama. Is this all you were capable of doing in this campaign of yours? Is this how far America has reached in incapacity and weakness? Are America and its allies from amongst the crusaders and atheists unable to come down to the ground? . . .
>
> O Allah, America, France, and their allies transgressed against us. They came with their legions to fight us out of their enmity for your religion. . . . We have no way to deal with their airplanes. O Allah, you have said what is true, 'So do not weaken and do not grieve, and you will be superior if you are [true].'

58. A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the House Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

59. The United States has convicted ISIS terrorists based on their targeting of the United States. On September 2, 2021, former British citizen Alexanda Amon Kotey pleaded guilty in the Eastern District of Virginia to an eight-count indictment consisting of one count of

conspiracy to commit hostage taking resulting in death; four counts of hostage taking resulting in the deaths of four Americans (Foley, Sotloff, Kayla Mueller, and Abdul-Rahman (Peter) Kassig); one count of conspiracy to murder U.S. citizens outside of the United States; one count of conspiracy to provide material support or resources to terrorists resulting in the deaths of U.S., British and Japanese nationals; and one count of conspiracy to provide material support or resources to a designated FTO resulting in the deaths of U.S., British, and Japanese nationals, for his participation in ISIS's hostage-taking and terrorist activities.

60. On April 14, 2022, a federal jury in the Eastern District of Virginia convicted Kotey's co-conspirator, former British citizen El Shafee Elsheikh, for his participation in the same ISIS scheme. Witnesses at the trial presented evidence from November 2012 through February 7, 2015 of Elsheikh's participation in torturing the hostages.

61. Other ISIS members have been tried and convicted in this District. For example, in 2013, Mirsad Kandic traveled from Brooklyn to a city outside of Aleppo, Syria to work directly with ISIS leadership. Kandic managed ISIS social media accounts and recruited thousands to ISIS, including from New York. In 2022, Kandic was convicted of five counts of providing material support to ISIS, and one count of conspiracy to do the same. Likewise, Ruslan Maratovich Asainov, a U.S. citizen from Bay Ridge, New York, was convicted in the Eastern District of New York for providing material support to ISIS. Asainov fought with ISIS as a sniper from 2013 until he surrendered in 2019, rising in ISIS's ranks to become the lead trainer and organizer of ISIS's sniper force. He ran a private chat group for ISIS members to sell and trade weapons called "Khilafah (Caliphate) Market," of which Raqqa governor Abu Luqman (see *infra* Part X(b)) was a member.

62. ISIS's overt acts targeted the United States and U.S. citizens. Lafarge bought protection and entered a complex conspiracy with ANF and ISIS and intermediaries, with the awareness that they were terrorist-classified groups. Lafarge conspired with full knowledge of and intent to enable their terrorist acts, including their targeting of the United States and American citizens, in order to control markets and increase profits. As a result of the conspiracy between Defendants, intermediaries, and ISIS, ISIS's overt acts targeting the United States and U.S. citizens, including Plaintiffs and their loved ones, are attributable to Defendants.

63. Based on conduct that occurred "within the Eastern District of New York and the extraterritorial jurisdiction of the United States," the Department of Justice charged Defendants with conspiring to provide material support to terrorists. The Department of Justice further charged that "the defendants were brought into and found in the United States, the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce, and the defendants conspired with a national of the United States." Based on these contacts with the United States, Lafarge and LCS "admit[ted] the Court's jurisdiction over the Defendants and the subject matter of such action . . . ."

## FACTUAL ALLEGATIONS

### I. ISIS BECOMES THE WORLD'S MOST RUTHLESS TERRORIST GROUP

64. In March 2011, after anti-government protests associated with the Arab Spring had spread across the region, Syrian police detained and tortured teenage protestors. As mass protests erupted across the country, armed militias arose in the following months, with the goal of overthrowing the Syrian government. Syria quickly descended into a full-scale civil war.

65. In August 2011, seeing an opportunity among the numerous armed factions battling in Syria, Al-Qaeda in Iraq ("AQI") and Islamic State of Iraq ("ISI") leader Abu Bakr Al-Baghdadi sent AQI operative Abu Muhammad Al-Julani into northeast Syria to organize the network of

militant jihadist cells in Syria into one cohesive group. Al-Julani's Al-Qaeda sub-group in Syria, ANF, wasted no time spreading terror throughout the region. Its first operation was a massive suicide bombing in Damascus, which killed over forty people in December 2011.

66. On December 11, 2012, the United States amended the FTO and Executive Order (E.O.) 13224 designations for Al-Qaeda to include ANF, under the new aliases: Al-Nusrah Front; Jabhat Al-Nusrah; Jabhet Al-Nusra; The Victory Front; and Al Nusrah Front for the People of the Levant. In its accompanying press release, the Department of State warned that ANF "has sought to portray itself as part of the legitimate Syrian opposition while it is, in fact, an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes." To date, ANF remains a designated FTO.

67. Threatened by ANF's and Al-Julani's increasing power in May 2013, Al-Baghdadi (the Al-Qaeda leader who had originally sent Al-Julani to Syria) declared the formation of Al-Dawlah Al-Islamiyah fi Al-'Iraq wa Al-Sham (The Islamic State of Iraq and Syria, "ISIS"). Al-Baghdadi declared that, under his leadership, ISI and ANF would merge into a single Sunni Islamist organization, ISIS. ISIS's stated goal was to seize control first of Iraq and Syria and then beyond, to form a unified religious state across national boundaries, a "caliphate."

68. Al-Julani, ANF's head, objected to Al-Baghdadi's declaration, and publicly pledged allegiance to Al-Qaeda leadership. On May 15, 2014, when the Secretary of State amended AQI's designation to rename it the "Islamic State of Iraq and the Levant," the Secretary also amended that designation to remove ANF's aliases, and at the same time, separately designated ANF as its own FTO and Specially Designated Global Terrorist.

69. ANF and ISIS quickly became rivals in the jihadist community, competing for international legitimacy and Syrian and Iraqi territory. Through brute force, ISIS took the upper hand and rapidly seized Raqqa and other cities and villages across Syria and Iraq.

70. Unlike most of the other militant groups fighting in Syria in opposition to the Syrian government, ISIS did not target Syria alone: its goal, as Defendants knew, was the construction of a self-described "caliphate" or empire. The U.S. government and others categorically rejected any suggestion that ISIS, despite its name, was a "state," that it had any legitimate governmental function, or that it did anything other than propagate terrorist violence. ISIS maintained and expanded its control over civilian populations using violence and fear, rather than legitimate governance. It solidified its control by entering into criminal conspiracies like the one it had with Defendants, and by attacking foreign powers including the United States. Its acts of mass terrorist violence violated international law, including the laws of war, and included kidnapping, human trafficking, and murder.

71. Many of ISIS's acts were intended to intimidate and silence its opponents. Its fighters patrolled the streets with weapons and suicide vests. To sow fear among the local populations, ISIS shot opponents from behind (including children), beheaded them, lit them on fire, and hung them in public squares. According to the U.N. Human Rights Council, ISIS "made calculated use of public brutality and indoctrination to ensure the submission of communities under its control."

72. In Iraq, while Defendants were providing material support to ISIS, ISIS murdered approximately five thousand people of the Yazidi ethnic minority, burying men in mass graves, including some while alive, trafficked hundreds of women into sexual slavery, and subjected pregnant women to forced abortions.

73. ISIS also kidnapped and murdered journalists and aid workers while Defendants were providing it material support. Their victims, including Americans, were frequently beheaded, sometimes on videos broadcasted online for Americans and others to watch in horror.

74. It soon became clear ISIS would be more successful than ANF, in part because of its extreme brutality and global ambition, but also because of its greater resources, including money, weapons, and fighters. ANF leaders began defecting to ISIS.

75. These defecting fighters included Imad Ahmad Jomaa, who publicly announced that he and his faction were joining ISIS in late July 2014. After pledging allegiance to ISIS and Al-Baghdadi, ISIS sent Jomaa's faction weapons, ammunition, and food. ISIS's leadership also sent hundreds of terrorists to join his brigade: after changing allegiances, his brigade went from 40 members to 300.

76. When Lebanese forces and police arrested Jomaa on August 2, 2014, ISIS fighters, joined by ANF members who still supported him, raided the Lebanese village of Arsal. For four days they battled the Lebanese Army, killing numerous Lebanese soldiers and police, and taking dozens hostage. The Lebanese Army counted 14 soldiers killed. Attempting to take over Lebanon was in line with ISIS's vision of a unified empire for itself across large swaths of the world. However, ISIS fighters retreated on August 7, 2014, following a ceasefire agreement with the Lebanese Army. They took dozens of captured Lebanese soldiers as hostages. They beheaded two of the hostages and shared images of their corpses to pressure the Lebanese government and remaining hostages' families to release additional ISIS prisoners.

77. Lafarge was aware that foreign fighters and defectors from other terrorist groups were increasing ISIS's ranks. Its security consultant concluded that the group's membership came at first from Iraqi fighters and ANF defectors, but that as time went on, "jihadi tourists" (as

Lafarge's security consultant called them) came to Syria and Iraq to join the group and commit terrorist attacks. It is with this group that Defendants chose to enter a complex set of multi-million-dollar financial arrangements with ISIS for their mutual benefit.

78. Throughout 2014, ISIS took over more and more territory in Iraq and Syria, ultimately controlling forty percent of Iraq and thirty percent of Syria, ruling over more than 11 million people.

79. Over 40,000 foreign fighters interested in ISIS's extreme jihadist ideology flocked to join its ranks in Iraq and Syria. They included members of terrorist groups that had fought in civil conflicts in their own countries in the chaos following the Arab Spring. For example, following Libya's collapse, Libyans with violent Islamist ideologies joined ISIS in Syria, hoping to help Syrians depose their own leader. By December 2013, Libyans were in the top five foreign nationalities fighting with ISIS in Syria. Not only did these foreign fighters become well-connected within ISIS's network, but they learned its heinous techniques, including murdering civilians, seizing property and extorting local populations, and building explosives.

80. On May 14, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of E.O. 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL").[5] The Secretary of State also added the aliases The Islamic State of Iraq and Al-Sham ("ISIS," which is how the FTO is referenced herein); The Islamic State of Iraq and Syria; ad-Dawla Al-Islamiyya fi Al-Iraq wa-sh-Sham; Daesh; Dawla Al Islamiya; and Al-Furquan Establishment for Media Production. ISIS remains a designated FTO to the present.

[5] The United States Secretary of State designated AQI as an FTO on October 15, 2004.

81. Lafarge's security advisor was aware of ANF's and ISIS's designations, observing publicly that "The ISI [Islamic State of Iraq] and later ISIS/ISIL had been listed as a terrorist group since 2004 by the USA, the UN, and the EU," and that moreover "in LCS we knew that Al-Nusra Front had been listed by the Americans . . . ."

82. To grow as quickly as it did from a small armed group in 2013 to an international terrorist organization with swathes of territory in 2014, ISIS needed money—and a lot of it. ISIS robbed the resources under its control, including by exploiting manufacturing plants, looting banks, pumping oil and gas to sell on the black market, taxing agricultural products, selling humans as slaves, and demanding passage tolls and protection payments.

83. Capturing cement plants was an essential part of ISIS's growth plan. Between its territory in Syria and Iraq, ISIS seized five cement plants, which could produce a total of $583 million in annual revenue. Cement plants were a particularly appealing target for a number of reasons, including that they generated significant revenue from which ISIS could pilfer; they contained raw materials that ISIS could use to create explosives, and cement to build tunnels and other structures used for attacks. ISIS had distribution networks it used to sell cement.

84. Of the five cement plants ISIS seized, Lafarge's Cement Plant was by far the largest. In fact, the production capacity of the Cement Plant was more than twice as much as that of the second largest plant. And ISIS did not simply capture and rob the Cement Plant. Rather, before ISIS overran the Cement Plant and seized all the materials Lafarge left behind, Defendants and ISIS had become close partners, pursuing common objectives, and generating millions of dollars in profit for each.

## II. THE SYRIAN CIVIL WAR THREATENS THE CEMENT PLANT, SO DEFENDANTS PARTNER WITH TERRORISTS

85. In 2007, Lafarge took a major step in its quest to dominate the Middle Eastern cement market. That year, Lafarge acquired Egyptian cement multinational Orascom Cement in a deal financed with over €7.4 billion in debt. As part of the deal, Lafarge purchased the Cement Plant, which Orascom had started to build.

86. Lafarge and LCS completed the construction of the Cement Plant at the significant cost of $680 million. When the Cement Plant finally opened for business in May 2010, Lafarge's CEO Bruno Lafont toured the facility with reporters and the French Ambassador to Syria. The plant produced 160 truckloads of cement a day, amounting to half a million dollars' worth of daily sales.

87. At the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey. To address this issue, in December 2010, Pescheux (LCS's CEO) requested that then-minority shareholder Tlass, a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail imports of competing Turkish cement.

88. Less than a year later, however, the Cement Plant faced a more existential threat: the civil protests in Syria had erupted into a full-fledged civil war. In response to this crisis, in September 2011, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products from Syria, and from engaging in financial or insurance services for such transactions. The United States forbid import of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals. And in December 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

89. In 2012, as the civil war continued, ISIS and ANF gained control over large swaths of Syria and committed brutal terrorist acts. ISIS killed thousands, among them numerous U.S. citizens, including through graphic and well-publicized beheadings.

90. As expected, the danger of operating in an active warzone, combined with the actions of the European Union, the United Nations, and the United States, prompted a mass exodus of multinational corporations from Syria. For example, in December 2011, two of the largest oil companies in the world—Royal Dutch Shell and Total—announced that they were leaving Syria.

91. Defendants, by contrast, saw an opportunity in partnering with the terrorists in the battle for territorial control. Even though armed conflict had spread to the area immediately surrounding the Cement Plant, Lafarge and LCS doubled down on their $680 million investment and joined forces with the terrorists to help them maintain and expand their control, instead of ending their operations in Syria.

92. Pescheux (LCS's CEO) described the plan to Herrault (Lafarge's Executive Vice President of Operations) as follows:

> [p]reserving the integrity of our physical assets (avoiding the plant to be looted), keeping our personnel ready for the end of the crisis (knowing the huge investment we have made in terms of recruitment and competency development), staying in the market (to keep our distributors' network and to prevent to let Turkish imports flooding North and East of Syria), making some profit to at least repay the interests of the loan and giving some assurance to the lenders.

93. Starting in the summer of 2012, Lafarge and LCS forged ahead with their plan to make financial payments to various armed factions.

94. On September 23, 2012, Veillard and Tlass met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the Cement Plant. Tlass recommended

that LCS make payments to each of the armed militias based on the quantity of cement produced or according to monthly fee.

95. By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF through Tlass. On November 11, 2012, Tlass notified Pescheux that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we hav now conextion with jabhat al nosra [ANF]."

96. The situation became more critical in 2013. By March 2013, ISIS, ANF, and other armed groups had taken over the area around Raqqa and both groups quickly established checkpoints at access roads to the Cement Plant. ISIS and ANF guarded their checkpoints with snipers, rockets, and homemade artillery.

97. On April 7, 2013, Tlass recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truckload to ensure continued access to the plant.

98. Several months later, on August 30, 2013, Pescheux reported to Veillard (Lafarge Vice President of Security) and Herrault: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Tlass] to work on it."

99. Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations.

100. For example, in a December 10, 2012 email, Veillard wrote: "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited several Norwegian citizens to fight in Syria."

101. Similarly, in a March 1, 2013 email, LCS's risk manager warned Pescheux that ANF "follow[s] a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign

fighters" and had "ties to al-Qaeda, exemplified by participating al-Qaida veterans, mainly from Iraq, and . . . some of their statements are quickly published in the main al-Qaida news outlet."

102. Likewise, notes from a September 11, 2013 meeting of Lafarge's Security Committee, which Veillard and Herrault received, stated: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US. The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."

103. Despite this knowledge, Defendants decided to dispense with any "limits" and instead to conspire with the terrorists.

## III. DEFENDANTS BEGIN MAKING PAYMENTS TO TERRORISTS

104. Recognizing that ISIS "demand[ed] that a 'tax be paid,'" Defendants proceeded to make millions of dollars in payments to terrorists. These payments came primarily through four mechanisms: (1) payments per truckload for buyer and supplier access to the plant; (2) volume-based payments for cement sold; (3) monthly fixed-rate payments; and (4) payments to ISIS-controlled suppliers. Defendants also knowingly sold cement to ISIS, which ISIS used to plan and carry out its acts of international terrorism.

105. Instead of leaving Syria, as other multinational companies had done, LCS saw the collapse of the country and increasing power of ISIS as an opportunity for further mutual enrichment and entrenchment by cooperating to sell more cement, at higher margins. Defendants continued paying ISIS and ANF because doing so increased profits. Defendants' payments did not protect local employees—in fact, on information and belief, LCS threatened to fire employees who did not come to the factory, insisting that they travel through armed groups' checkpoints to and from Jalabiyeh, and to Aleppo to take out cash from banks. LCS fired an employee after he was abducted.

### A. Lafarge And LCS Pay Terrorists $150 Per Truck To Pass Through Checkpoints

106. On August 26, 2013, Pescheux emailed Tlass a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib," but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli, [t]here are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna." Pescheux summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."

107. Tlass responded "no probleme let me work on it today . . . i cal u tomorow to breef you.". The next day Tlass emailed Pescheux, "We Negotiate with (DAWLET AL IRAQ WAL SHAM) AL ISLAMIA & AL NUSRA I got a News that the situation In the Plant is Very Good."

108. The situation was "Very Good" because, by October, Lafarge began paying money directly to ANF and ISIS to ensure they would permit trucks to pass. In early September 2013, Pescheux asked Tlass for updates regarding truck passage to the east of the plant, and Tlass responded "better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them . . ." and on October 14, 2013, an LCS risk manager reported that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant. Each cement truck has to pay 150$."

### B. LCS Pays Terrorists Based On Cement Sold

109. As part of a separate agreement, LCS paid ISIS based on the amount of cement that it sold. This agreement, dated November 6, 2013, and on ISIS letterhead, was between ISIS and

LCS. The agreement provided that ISIS would assess trucks 400 Syrian pounds[6] for each transported ton of cement and, in exchange, ISIS would ensure the safety and free access of the trucks to the cement plant.

110. Additionally, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees to "pass through after the required work. This is after they have fulfilled their dues to us."

### C. LCS Makes Fixed Monthly "Donations" To Terrorists

111. LCS also made fixed monthly "donation" payments through Tlass to ISIS, ANF, and other armed groups that controlled the area surrounding the Cement Plant.

112. These payments, which, according to Lafarge and LCS's plea, exceeded $816,000 in total, began as early as July 2012, when armed groups started taking over territory around the Cement Plant. Defendants initially gave Tlass between $80,000 and $100,000 per month to distribute to the armed groups around the factory. By February 2013, at Pescheux's request, Tlass had begun periodically providing lists identifying the armed groups to which he was making payments on Defendants' behalf and the amounts he was paying to the groups each month.

113. Beginning in February 2013 and continuing through at least July 31, 2013, Tlass advised Pescheux that he was making payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," which was a reference to ANF.

114. In a July 2, 2013 email with the subject line "Donations," Pescheux calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds, or over $155,000 USD per month.

[6] At this time, the exchange rate of Syrian pounds to U.S. dollars was approximately 112 to 1.

115. In an August 5, 2013 email with the subject line "Update on donations," Pescheux wrote to Herrault that "some elements on the donations were are paying to [Tlass] and that he is supposed to channel to the various beneficiaries. As discussed in Dubai end of May and as reminded in my recent mail to you and [Roux], these donations are distinct from the monthly remuneration of our partner."

**D. LCS Pays Fixed Monthly Security Payments To Terrorists**

116. In November 2013, Defendants decided that Tlass should make fixed monthly security payments to ISIS as well. In a November 29, 2013 email, Lafarge and LCS executives exchanged a list of "donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries." The email contained a "List valid from November 1, 2013," which included a five million Syrian pound monthly payment for "Daesh (ISIS)." The list showed that the monthly donation payments to all armed groups now totaled 24 million Syrian pounds.

117. On February 4, 2014, Pescheux directed Tlass to limit the monthly payments to armed groups to 20 million Syrian pounds, including limiting assessments on sales to 200 Syrian pounds per ton. Tlass responded that his representatives were meeting to discuss the payments with ISIS in Raqqa and with ANF in Aleppo.

118. Following those meetings, Tlass advised LCS to increase payments to the terrorists. As Tlass explained in a March 31, 2014 email pointing out the extent of Defendants' investment and the scope of its current profit:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? … As long as we are selling and are able to overcome the obstacles, we should continue.
>
> … We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection. Other factories are paying for protection just to exist, without making the profits we are.... **in this case we have to pay about 300milion SYP [approximately $2.7 million USD] monthly**.

119. Defendants' monthly payments to terrorists allowed it to continue producing and selling cement at the Cement Plant into 2014, earning millions of dollars in profits for it—and for ISIS.

120. On May 8, 2014, Tlass emailed LCS executives advising that LCS's operations were not impeded by local armed groups, stating "(Daesh — PYD — Al Nusra — Abu Issa[7] all we have good relations recently . . . ." Defendants maintained "good relations" with ISIS and ANF by paying them ever-increasing amounts.

121. On September 15, 2014, LCS executives exchanged an email with Tlass's initials as the subject line, containing two attachments. The first attachment was a document named "List of donations last version.pdf," which listed a monthly payment of 10 million Syrian pounds to "Daesh" [ISIS] as of May 1, 2014. In a second attachment to the email, titled "Evolution of the security donations 2012-2013-2014," Pescheux listed, on top of the total amount of LCS's monthly "donation" payments, an additional "10 MSYP [10 million Syrian pounds] paid on April 23 to ISIS to unlock the West road."

**E. Defendants Purchase Materials From ISIS-Controlled Suppliers And Sell Cement To ISIS**

122. In addition to making regular payments to terrorists, Defendants purchased materials from ISIS-controlled suppliers as part of its conspiracy with ISIS, making additional payments to terrorist-controlled suppliers totaling at least $3,447,528. They also sold cement to ISIS, knowing that ISIS intended to use the cement in terrorist activities.

123. As ISIS expanded its control over northern Syria, it captured quarries of minerals LCS needed to continue to produce cement. LCS agreed to purchase raw materials from ISIS-

[7] "Abu Issa" refers to Liwa' Thuwar Al-Raqqa, an armed militia participating in the Syrian civil war.

controlled enterprises who paid ISIS based on the amount of their sales to LCS. Defendants also purchased oil from ISIS.

124. On November 6, 2013, for example, LCS and ISIS entered into a written agreement on ISIS letterhead providing that LCS would purchase pozzolana—a type of volcanic ash used to make blended cement—from ISIS for 1,300 Syrian pounds per ton. Under the agreement, ISIS would allow LCS's suppliers who mined and transported the pozzolana from ISIS-controlled quarries near Raqqa to retain some of LCS's payment for the raw material as profit.

125. In late 2013, Taleb, an intermediary between Defendants and ISIS who had previously assisted LCS with environmental licensing, explained to LCS's board that he wished to discuss "[t]he security issue of Lafarge . . . in Syria. I build up strong relationships with civilian and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of . . . Lafarge . . . ." Taleb repeatedly and explicitly identified ISIS as the seller of the raw materials that he brokered.

126. For example, in a September 24, 2013 email about a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," Taleb informed LCS executives that LCS had already agreed to accept pozzolana sold by ISIS and stated "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state very senstive about this issue."

127. In a separate email chain a few days later, Pescheux disputed the intermediary's assertion that LCS had already agreed to purchase, but nevertheless responded that "[a]fter my mail, our Purchasing team has contacted the contractor and the price is confirmed. We will place an order early next week for a limited quantity (probably around 5,000 tons) as we need to see how it will work. If it is OK we will increase the quantity."

128. As another example, in a September 28, 2013 email, Taleb declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS and Soon for Kurdish. You ll get letter for that . So far im on LCS side but please Im asking kindly to have my Fees ."

129. Defendants' executives understood that transacting with ISIS in this manner was illegal.

130. In a December 7, 2013 email, Pescheux informed Herrault that the following activities likely violated Syrian government regulations: "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities." Nonetheless, Pescheux determined that these activities were "needed for business continuity."

131. Thus, with Defendants' blessing, Tlass and Taleb negotiated deals in which Defendants purchased critical raw materials for use in the Cement Plant, including coal, fuel, and pozzolana, from ISIS-controlled sources.

132. In early 2014, LCS agreed to purchase massive amounts of material from ISIS-controlled suppliers, including 100,000 tons of pozzolana at 1,650 Syrian pounds per ton; another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton; 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton; another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton; 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton; and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal. Pescheux reported these planned transactions to Defendants' executives and, on February 16, 2014, wrote to Herrault that the "situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil."

133. Defendants did not hand only money to ISIS. They also provided ISIS cement, even before ISIS took over the Cement Plant (see *infra* Part VI). In a 2014 email to Jolibois, an LCS risk manager said ISIS was "looking for distributors in Syria like ours" for 150,000 tons of cement, and Defendants memorialized in an internal company note that ISIS was seeking such cement for its "personal consumption" rather than for "market."[8] News reports confirm that Lafarge and LCS agreed to ISIS's request for cement. A former LCS employee stated in an interview, when the terrorists "needed cement to build their tunnels and trenches," an LCS "manager would give it to them." The same LCS employee continued that it was "not a simple business relationship between a company offering cement and terrorist groups that needed money and cement for their defensive positions and tunnels." Defendants "could do anything. They had deals with ISIS."

134. A former French intelligence analyst testified that Defendants sold cement to ANF and ISIS in Syria. In his words, "ISIS needed primary resources provided by whatever actor. Lafarge was one of them." News reports stated that "With the supplied cement, [ISIS] reportedly constructed fortified shelters and tunnel networks against the US-led coalition." Lafarge's cement helped ISIS extend its reach and ability to commit acts of international terrorism. ISIS used Lafarge's cement to fortify its network of underground tunnels and bunkers, used for hiding from and launching attacks against U.S. and coalition counterterrorism forces, including in northern Syria and near the Syria-Iraq border. It built fortified tunnels—on information and belief, requiring high-grade cement only LCS could provide—to move terrorist operatives, hostages, weapons, and equipment without being detected by U.S. coalition forces and aerial imagery.

[8] Some documents referenced herein are discussed in *Foley et al. v. Lafarge S.A. et al.*, 23-cv-05691 (E.D.N.Y.), a case related to this one, based on similar acts of the same Defendants. Counsel has relied on the well-pleaded allegations as made in *Foley*.

Defendants' cement sales thus directly aided the attacks that injured or killed Plaintiffs and their family members.

135. Likewise, as described below (see *infra* part XI), Defendants knew and intended that it would receive concomitant benefits from their aid of and conspiracy with ISIS, including ISIS's acts of international terrorism.

## IV. DEFENDANTS GO TO GREAT LENGTHS TO CONCEAL THEIR PARTNERSHIP WITH DESIGNATED TERRORIST GROUPS

136. Defendants' support for ANF and ISIS directly and via intermediaries allowed them to dominate the cement market and increase profits. But the conspiracy was not without risks. Fully aware that paying millions of dollars to terrorists violated several jurisdictions' laws, including those of the United States, Defendants and their agents and co-conspirators took numerous steps to conceal their partnership with ISIS.

137. First, Defendants' executives ensured that any documents regarding these terrorist payments did not reference the word "Lafarge." For example, on September 16, 2013, Pescheux instructed Tlass that "the name of Lafarge should never appear for obvious reasons in any documents of this nature," referring to checkpoint passes from ISIS. He continued, "[p]lease use the words Cement Plant if you need but never the one of Lafarge."

138. Similarly, on September 4, 2014, Jolibois, LCS's incoming CEO, complained to Tlass about documents that specifically referred to "Lafarge" by name: "The name Lafarge and the fact that Lafarge 'paid' appears on the laissez-passer passes issued by ISIS. This is completely against our agreement with ISIS. It is clear that these passes were issued for the distributors, not for Lafarge. Could you look into solving this issue?" Tlass agreed that "we have to change the name or have an alias that all the laissez-passer passes use as well as the distributors because ISIS cannot let all the cements get through, just ours."

139. Second, and relatedly, Defendants had intermediaries—rather than Lafarge or LCS executives—engage directly with ISIS and ANF. As one of LCS's security consultants put it, "it was especially important that the relationship would be handled by [Tlass's] middlemen, since an exposure of this sort would have been compromising for LCS." The LSC consultant concedes: "But via [Tlass], we did in fact contribute to the economy of ISIS."

140. Not only did Defendants prefer to work through intermediaries, but they took steps to conceal the payments they made to them. In fact, Lafarge and LCS executives directed Tlass and Taleb to submit invoices that did not reference their own names or the names of their companies, and that instead referenced payments for donations, unspecified professional fees, or personal expenses.

141. For example, on December 13, 2012, Pescheux emailed Tlass and directed that any future invoice should not be on Tlass's company's letterhead, but instead should be on that of a company outside of Syria:

> I would like to remind you that we still need to receive correct invoices from [Tlass's company] for the months of September and October. We discussed this issue many times and you told me it is not a problem so please send them as soon as possible. For the November payment, we cannot take the documents you prepared with [the Intermediary 1 Company] in the title.
>
> As I told you, you need to send us the references of a [new] company located outside of Syria.
>
> This will avoid problems with the Syrian authorities and with our Auditors.
>
> We absolutely need to move forward before the end of the year to be able to present clean justifications for the [] closing of our accounts.

142. Third, in connection with their efforts to conceal payments and falsify records, Defendants purposely availed themselves of the U.S. financial system to funnel U.S. dollars to straw-man companies outside Syria and Iraq. LCS executives made clear that they preferred to

transact through U.S. dollar bank transfers. On June 30, 2013, Pescheux emailed Tlass, "[W]e cannot continue the way we are settling the turnover invoices. Our preferred option would be the one we told you last October: a bank transfer in USD to the account of a duly registered company," as opposed to a direct payment to Tlass in cash, which would appear more suspicious. Thus, Defendants instructed Tlass, their ISIS intermediary, to create a new corporate entity in Dubai so that Defendants could surreptitiously transact in U.S. dollars, transactions that Defendants knew would transfer, clear, and be processed through New York.

143. Pescheux also sent an internal email instructing several LCS employees that "we all have to stop [using] the acronym of an organization which is on terrorist lists" and instead use code words, indicating that he was both aware of and concerned about disclosure of Lafarge's support for FTOs.

144. Similarly, a February 2, 2014 "External Support Agreement" between LCS and a new company created by Tlass in Dubai confirmed that payments should be made in U.S. dollars. LCS agreed to pay the new company "a monthly remuneration of 75.000USD."

145. Lafarge and LCS executives made similar efforts to disguise the nature of payments to Taleb, including by directing that payments reference only environmental consulting and be made using U.S. dollars. For example, on January 12, 2014, Pescheux emailed Taleb:

> Prepare an invoice from [Taleb's company], send to me by email and bring the original next week, for an amount of 4,402 USD just with "Environmental consultancy services for the months of October, November and December 2013" as a justification.
>
> For your understanding hereunder are the details of the calculation:
>
> - pozzolana: 18,270 tons equivalent to 914 USD (he has delivered the first order of 15,000 tons and 3,270 tons out of the order of 100,000 tons)

> - HFo: 3,488 tons equivalent to 3,488 USD (he has not yet completed the first order of 4,000 tons, it remains 512 tons to deliver and he has not started the 12.000 tons of standard quality)
>
> Total:4,402 USD

146. A few weeks later, on February 5, 2014, Pescheux again required that payments reference only environmental consulting and be made in U.S. dollars:

> If you want to have a chance to get paid for pozzolana and HFO, you have to prepare an invoice following my instructions and not your imagination.
>
> So you have to issue an invoice mentioning only:
>
> Consultancy services performed up to January 31,2014 for a total amount of 4,836 USD
>
> This amount has been calculated as follows (up to 31-1-2014) HFO: 3,488 tons out of the order of 4,000tons= 3,488 USD
>
> Pozzolana: 15,000t out of the order of 15,000t (completed) plus 11,964t from the order of 100,000t i.e total 26,964/20= 1348 USD

147. On February 13, 2014, Taleb sent Pescheux the invoice "[b]ase[d] on your instruction." The invoice, payable in U.S. dollars to the intermediary's company, purported to be for "[c]onsultancy services." International financial transactions denominated in U.S. dollars, unlike transactions denominated in Syrian pounds, are cleared through U.S.-based financial institutions located in New York.

148. In addition, as another way to conceal their partnership with ISIS from French auditors and law enforcement authorities, Lafarge and LCS executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to coordinate and carry out elements of their partnership with ISIS.

149. LCS's own legal counsel instructed LCS's CEO not to create business records concerning the company's illegal terrorist financing. On September 8, 2014, in connection with a discussion about documents received from ISIS, Jolibois wrote to Veillard, "Thank you for sharing

this information with [Herrault], I don't want to write to him about this topic at his professional address (as recommended by [in-house counsel])." Lafarge executives used Gmail accounts to communicate about the conspiracy, and thus avoided leaving incriminating evidence on corporate email servers located in France that would be available to French auditors, regulators and law enforcement officials.

## V. LAFARGE AND LCS NEGOTIATE A LONG-TERM REVENUE AGREEMENT WITH ISIS AS THEIR BUSINESS TIES DEEPEN

150. In 2014, Defendants' executives saw an opportunity to capitalize further on their business relationship with ISIS. The opportunity was mutually beneficial: if ISIS could block or tax cement imported from Turkey into Syria, LCS's revenues would go up, and so too would ISIS's share of the revenues. Defendants negotiated a long-term revenue sharing and market control agreement with ISIS.

151. Pescheux proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement." Such a toll would allow ISIS to gain revenue while simultaneously "reduc[ing] the attractiveness of Turkish cement. It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."

152. A July 14, 2014 Gmail message from Tlass to Pescheux discussed these "negotiations with ISIS," proposed providing ISIS with a "monthly statement," and sought input from Pescheux about how much Lafarge's distributors should pay the terrorists "in addition to the **ten millions** that we pay directly to them, i.e. ISIS."[9]

[9] It is unclear from the face of the email to what currency the sender is referring.

153. Negotiations continued throughout the summer and into fall 2014. In August 2014, Tlass emailed Jolibois, LCS's new CEO, to inform him that ISIS wanted a monthly fee in addition to an assessment on each ton of cement sold:

> Negotiations with ISIS are complex and not easy at all. In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.

154. Jolibois responded: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price." In response, Tlass said that ISIS was prepared to stop importation of Turkish cement upon consummation of a revenue sharing agreement.

155. On August 5, 2014, Tlass sent Jolibois a draft revenue-sharing agreement between LCS and ISIS. The next day, Jolibois confirmed Lafarge's and LCS's agreement to a rate of ten percent, in return for the free movement of LCS employees, customers and suppliers, as well as ISIS's agreement to stop importation of Turkish cement in areas under its control, for the following six months:

> - As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:
> - ISIS will receive the payment of 750SP/ton, by customers, every two weeks
> - ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees
> - ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.
> - The agreement is valid until February 5th, 2015.

> I hope the agreement to be signed today, and sales to restart tomorrow.
>
> ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.

156. While Lafarge was aware that ANF and ISIS were classified as terrorist groups by the United States, United Nations, and European Union, business negotiations between Defendants and ISIS became more complicated on August 15, 2014, when the United Nations Security Council passed a resolution condemning ISIS, ANF, and Al-Qaeda, and calling on U.N. members to prohibit all financial and trade relations with the groups. On August 18, 2014, the United States Department of State added ISIS member Mohamed Al-Adnani and ANF member Said Arif to its list of Specially Designated Global Terrorists.

157. Defendants' executives were closely following these developments. On August 18, 2014, Veillard emailed Herrault and Jolibois with the subject heading "terrorist watch list" and wrote that the United States had designated ISIS's Al-Adnani and ANF's Arif to the list of Specially Designated Global Terrorists.

158. On August 7, 2014, the United States began airstrikes against ISIS in Iraq, and in September 2014, began strikes against ISIS in Syria.

159. On August 19, 2014, ISIS executed American journalist James Foley and released a video of the horrific act, entitled "Message to America," online. Advocates for Foley had approached LCS in 2012 to ask for LCS's assistance in negotiating for Foley's freedom when he was taken hostage. Two weeks later, on September 2, 2014, ISIS released a video of the beheading of Steven Sotloff, another American journalist, titled "A Second Message to America."

160. Notwithstanding ISIS's heinous acts, including the televised murder of Americans, and the international community's universal condemnation of the terrorist group, LCS ironed out

a final revenue-sharing agreement with ISIS on or about August 20, 2014—after consulting with Lafarge's in-house counsel.

161. The executives involved in the negotiations with ISIS updated Lafarge's Executive Committee during a meeting on August 27, 2014. The notes from the meeting reflect that Herrault highlighted ISIS's agreement to impose costs on imported Turkish cement that were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports."

162. The notes further reflect that Lafont, Lafarge's CEO, responded that "we have to make sure that what we do is risk free (also vis-à-vis the U.S.)." Also Lafarge's Chairman, Lafont, knew that Defendants' partnership with ISIS was illegal under U.S. law and would have consequences in the United States. In response, Herrault replied that "the best protection is to keep the plant in operation, sales have resumed, we are maintaining contact with everyone."

163. Lafarge had now solidified its shared objectives with ISIS. Each co-conspirator, including Defendants, intermediaries, and ISIS, would make money by having ISIS use force and violence to block cheaper imported cement to increase LCS's sales. The parties thus collaborated to directly finance ISIS's growing terrorist attacks, including those that killed or injured Plaintiffs or their family members.

## VI. ISIS SEIZES THE CEMENT PLANT

164. As it turns out, terrorists are not trustworthy business partners.

165. On September 10, 2014, President Obama outlined a strategy for the United States to lead an international coalition to "degrade and ultimately destroy" ISIS through direct military action. President Obama described ISIS as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."

166. In the following days, ISIS advanced on the Cement Plant with an eye towards complete control of the region. Even in the face of this grave threat from ISIS, Lafarge and LCS executives wanted to continue with the conspiracy. Jolibois argued strenuously against shutting down the Cement Plant, saying that if LCS suspended operations "for the next few months until after the completion of the merger [with Holcim] we will surely be watched closely when we seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years."

167. Likewise, on September 12, 2014, Veillard sent an email to Herrault saying, "I think it's imperative to maintain the plant in working order and to be able to restart quickly." Veillard went on to say, "[i]t seems to me that this option is totally doable…."

168. Lafarge and LCS executives' desire to remain in the area despite ISIS's control, coalition airstrikes, and danger to their employees meant that they did not implement a safe evacuation plan to shut down the plant machinery and keep it from still being operational in terrorists' hands, or to safely evacuate local staff. When ISIS informed employees early in the morning of September 18, 2014, that it intended to advance on the plant, Jolibois ordered the remaining team to "prepare mattresses, food, water, sugar" and shelter in the plant's electrical tunnels rather than evacuate. Indeed, there were no cars at the plant with which the employees could evacuate. The employees who remained to oversee the plant's shutdown had to hitch rides with the fleeing canteen vendors and on local buses.

169. In their departure, LCS employees left the plant entirely operational. All start-up technology and hard drives were left in place, and one diesel generator was still running as the machinery cooled when they left.

170. ISIS completed its seizure of the Cement Plant on September 19, 2014, and promptly released propaganda videos showing its militants at the Cement Plant. In the Cement Plant, ISIS took what it wanted. ISIS seized the cement that Defendants had produced in furtherance of the conspiracy, and ISIS ultimately sold that cement for what Lafarge and LCS's plea deal admitted was approximately $3.21 million. The actual value of the cement and other materials was much higher. According to publicly available French intelligence reports and media reports, ISIS seized materials worth approximately $25 million. It seized raw materials at the Cement Plant included hydrazine, a chemical that ISIS could use to produce explosives for terrorist attacks. Defendants' intermediary Taleb negotiated the disposition of these remaining materials for approximately $11.5 million. Thus, according to French intelligence, following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved." In December 2014, Taleb visited Lafarge's headquarters in Paris to explain the ongoing negotiations relating to materials left at the plant.

## VII. AFTER EVACUATING THE CEMENT PLANT, DEFENDANTS ATTEMPT TO CONCEAL THEIR PARTNERSHIP WITH ISIS

171. After Defendants' employees fled the Cement Plant, and as the international community stepped up its multi-front action against ISIS, Defendants took further steps to conceal their conspiracy with ISIS. They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that Tlass's relationship with LCS had been terminated before he conducted negotiations with ISIS in August and September 2014.

172. Specifically, on September 29, 2014, Tlass informed Herrault and Jolibois that, in response to their prior requests, Tlass had opened a bank account in Dubai in the name of a new company that was not publicly linked to Tlass ("Tlass NewCo").

173. On October 9, 2014, Jolibois sent an internal email to Pescheux and Lafarge's in-house counsel with the subject "New contract for [Tlass]" and saying that LCS owed Tlass "Monthly fees 2*75kUSD for services in July and August" plus "August sales tax to PYD, already paid by [Tlass] to PYD : 10.5 M SYP = 60kUSD)" totaling "210kUSD." Jolibois further wrote that the in-house lawyer "would like to terminate the previous contract [with Tlass] on the date of 18th August to show evidence of company reaction to UN resolution, and to get a new contract to start from September 1st, 2014." In a subsequent email on October 14, Herrault clarified Lafarge would not pay Tlass without a new backdated contract.

174. Jolibois then sent an email to Tlass with the subject line "Agreement for Regional Security Consulting Services," which attached copies of (1) the new consulting agreement between a holding company created by LCS ("LCS NewCo") and Tlass NewCo, and (2) the backdated Termination Agreement between LCS and Tlass NewCo.

175. In his cover email, Jolibois explained that the new consulting agreement was "written in such a way as to" take "into account the compensation for termination of the previous contract (210k USD for 202k USD which are actually due)." A $210,000 lump sum payment compensated ISIS intermediary Tlass for work he had already performed negotiating an agreement with ISIS, and to reimburse him for making fixed monthly "donation" payments to terrorist groups, including ISIS.

176. In addition to the lump sum payment to compensate him for work he had already performed, Defendants continued to pay its intermediaries to work with ISIS. Those payments for ISIS, including to or through Taleb, continued after Lafarge left the Cement Plant, according to a post-dated contract and reports. The new consulting agreement with Tlass required the Defendants to make monthly payments of $30,000 on a going-forward basis.

177. The Termination Agreement with Tlass was backdated to August 18, 2014, the day LCS employees fled the Cement Plant. The metadata of the backdated Termination Agreement indicates that the document was not drafted by Lafarge's in-house lawyer until October 3, 2014, two weeks after LCS had evacuated.

178. On October 23, 2014, after the parties signed the new consulting agreement and the backdated Termination Agreement, Tlass sent an invoice for USD $210,000. Lafarge paid the $210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to Tlass NewCo's account at a financial institution in Dubai (see *infra* Part XI).

179. On information and belief, any additional U.S. dollar payments due under the Consulting Agreement were paid after October 2014 in the same manner.

180. Legal proceedings against Lafarge in France revealed that intermediary Taleb continued to negotiate with Lafarge for payment for materials in the plant. According to a publicly available French intelligence report, at a meeting between the parties in December 2014, Lafarge handed over 65,000 tons of cement, worth $6.5 million. At the meeting, ISIS representatives signed a contract for an additional $5 million of the cement left at the plant. Following October 2014, "[t]he dismantling of the Lafarge factory in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved," stated the intelligence report.

## VIII. WITH ITS DEEP POCKETS, ISIS CONTINUES TO WREAK HAVOC

181. Flush with cash from its dealings with Lafarge—at a minimum $5.92 million to as much as $15 million in cash and more in kind—ISIS continued to build improvised explosive devices ("IEDs") and commit terrorist attacks.

182. IEDs were the most important weapon in ISIS's arsenal. According to Mark Wilkinson of the United Nations Mine Action Service, ISIS's IED production included mortar bombs, air-dropped munitions, suicide belts, missile enhancements, launchers, and entire vehicles that were either remote, self-, or victim-activated, amounting to "a level, scale, and quality of arms manufacturing . . . equivalent to conventional arms manufacturers."

183. In Manbij, the closest city to the Cement Plant, ISIS left thousands of tiny explosive devices "in doorways and windows, under mattresses and piles of shoes, in refrigerators and bags of clothes, and in television sets and kitchen sink taps."

184. ISIS deployed IEDs both to kill the U.S.-led coalition forces and to kill, maim, and terrify civilians and sow distrust among the population, in order to displace, influence, and intimidate local and foreign governments.

185. After gaining experience by joining ISIS's takeover and exploitation of major regions of Iraq and Syria, many of the tens of thousands of ISIS-trained foreign fighters returned to their home countries during this time. They planned to establish "provinces" of ISIS that would stretch far beyond Iraq and Syria.

186. One of the first provinces was in Libya, where a core cadre of three hundred ISIS fighters returned in 2014. According to U.S. intelligence officials, ISIS leadership in Iraq and Syria formulated a plan to expand ISIS to Libya in 2014. To carry out this plan, ISIS leadership sent a senior Iraqi commander, Wissam Najm Abd Zayd Al-Zubaydi, also known as Abu Nabil Al-Anbari, to Libya to establish large-scale terrorist operations there. Al-Anbari had previously been governor of ISIS's Salahuddin Governorate in Iraq, the same province from which ISIS's leader Al-Baghdadi hailed. ISIS's Leadership Cell (described *infra* at Part X(a)) provided millions

of dollars to finance the group's operation and expansion in Libya in 2014-15, in addition to providing direct training, strategy, and tactical knowledge.

187. Following a Syrian and Iraqi delegation's visit in October 2014, Libyan ISIS fighters pledged formal allegiance to ISIS and Abu Bakr Al-Baghdadi, the leader of ISIS in Syria and Iraq and head of ISIS's Leadership Cell. On November 13, 2014, Al-Baghdadi publicly ordered ISIS to expand to Libya and five other provinces and sent some of his most trusted leaders to Libya. By mid-December, ISIS in Libya had a full social media presence that conformed to the organization's graphics and messaging standards, indicating that ISIS in Libya was receiving not only funding but personnel and capacity building support from the Leadership Cell. During the relevant time period, ISIS's funding was highly centralized. ISIS's headquarters in Iraq and Syria sent money, including the funds Defendants gave it, to its new provinces, foremost among them Libya. ISIS's social media platforms heavily promoted its Libyan province online, channeling support to its operatives there.

188. Orders from ISIS's centralized leadership in Raqqa leadership followed the money. In December 2014, ISIS leadership ordered its fighters in Libya to focus on attacks within the country, rather than on fighting in Iraq and Syria. The Libyan members of ISIS heeded this directive. The next month, following direction from by ISIS's main leadership, including its Leadership Cell, and led by Iraqi commander Al-Anbari, ISIS fighters launched an attack on the Corinthia Hotel, a five-star hotel in the capital city of Tripoli that hosted diplomats, business leaders, and foreigners, including many Americans. The attack targeted Americans specifically: ISIS claimed the attack was in revenge for the death of Abu Anas Al-Libi, an operative captured by U.S. special forces in 2013 on suspicion of involvement in the bombing of U.S. embassies in Africa who had died earlier that month in a hospital in New York following medical complications.

ISIS killed ten people in the attack on the Corinthia in Al-Libi's name, among them one American, David Berry.

189. As the United States slowly fought back ISIS in Syria and Iraq from 2014 onward, ISIS terrorized and targeting the oncoming forces at every step. Its primary weapons were IEDs planted in buildings, on roadways, and in vehicles. Individuals specially trained in IED disposal risked their lives daily to defuse IEDs, saving the lives of their fellows. ISIS bombs killed and injured many of these IED disposal experts, including Chief Petty Officer Jason Finan, Senior Chief Petty Officer Kenton Stacy, and Senior Chief Petty Officer Scott Cooper Dayton (see *infra* at Part XII). Had ISIS not developed the IED-making expertise and violent capacity it built in 2013-14, materially supported by the resources Defendants provided it, ISIS would not have been able to deploy the IEDs and commit other attacks that killed American servicemembers.

190. ISIS was not dislodged from Iraq until October 2017. It was finally pushed out of all the territory it controlled in Syria in March 2019.

## IX. LAFARGEHOLCIM DISCLOSES THAT LAFARGE AND LCS TRANSACTED WITH TERRORISTS

191. In July 2015, after over a year of negotiations, Holcim completed its merger with Lafarge, which resulted in the combination of the two largest building materials companies in the world. The payments to terrorists were not disclosed to Holcim or its representatives during pre-acquisition due diligence meetings. Lafarge executives who had been aware of Lafarge's payments to ISIS remained in leadership positions in the newly formed company, LafargeHolcim.

192. On February 19, 2016, a website run by an opposition group to the Syrian regime reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS. The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

193. On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging for the first time that Lafarge and LCS made payments to terrorists: as "terrorist groups designated by the US and the EU were expanding into the area" of the Cement Plant, LCS made "payments" to intermediaries to "avoid direct contact with these armed groups." LafargeHolcim admitted that "LCS management kept Lafarge SA well-informed of developments."

## X. DEFENDANTS' PAYMENTS AND COOPERATION SUBSTANTIALLY ASSISTED THE ACTS OF INTERNATIONAL TERRORISM THAT INJURED PLAINTIFFS AND KILLED THEIR FAMILY MEMBERS

194. Defendants made payments to ISIS and ANF that financed their operations, including acts of international terrorism that injured Plaintiffs. Without funding, terrorist attacks cannot be planned, fighters cannot be paid, and propaganda cannot be generated, edited, and distributed. But more than that, Lafarge sought to partner with ISIS *because of* its ruthlessness and brutality. Lafarge did not only pay into the protection racket ISIS enforced. It sought to partner as closely as possible with ISIS, to pay percentages of its sales to ISIS, purchase materials from ISIS and sell its cement to ISIS, and ultimately to enter an agreement for ISIS to block its competitors in exchange for a slice of all of the Cement Plant's profit. In return, ISIS carried out exactly the types of attacks that had made it such an enticing business partner in the first place: terrorist attacks to expand and maintain its control of territory and markets.

195. The millions of dollars Defendants gave ISIS materially enhanced ISIS's and ANF's ability to expand or sustain their power and territorial control by committing the terrorist attacks described in this First Amended Complaint, as Defendants foresaw and intended for their own financial benefit. The cost of ISIS's and ANF's individual attacks, and salaries for their fighters, paled in comparison to the funding provided to those groups by Defendants.

196. ISIS fighters received a base pay of $200-400 per month. Just $5,000 to ISIS or ANF could have paid 20 terrorists (at $200 per fighter) and three commanders (at $333 per commander) in the field for a month. $5,000 could purchase dozens of bomb components or finance multiple complex attacks. ISIS publicly confirmed in a video that it deployed its "taxes," that is, money collected from its territory, including from Defendants, to support "[t]he mujahidin and jihad"—that is, its fighters and its fight. The money ISIS got from Lafarge was used to pay fighters, control territory and markets, and commit terrorist attacks.

197. Lafarge pled guilty and admitted giving ISIS and ANF $5.92 million, though the actual payments are believed to be much higher. Lafarge also left millions of dollars of cement in ISIS's hands, or sold it to them directly. ISIS recruited tens of thousands of foreign fighters to commit attacks. The limiting factor on its attacks was money, not manpower. As Mustafa Abu al-Yazid, an al-Qaeda financing chief, said: "There are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of jihad." Defendants' payments, given at a time when ISIS was looking to expand and commit attacks, materially strengthened the terrorists' ability to commit the attacks that killed and injured Plaintiffs. Indeed, following the payments by Defendants, ISIS attacks against Americans increased. These attacks began with its beheadings of American journalists and humanitarian workers in 2014, which ISIS announced as horrific 'Message[s] to America.' ISIS's targeting of Americans rapidly expanded, following and utilizing Defendants' payments, to killing Americans in Libya, Syria, Iraq, and other countries around the world.

198. The money Defendants admitted to placing in ANF's and ISIS's hands from 2012-14 had a lasting impact. ISIS had sophisticated financial accounting and saving systems. As late as February 2019, according to a U.S. government report, ISIS continued to hold onto amounts of

"stockpiled cash." Moreover, the cement that Lafarge handed over to ISIS was durable, by its very nature. The tunnels and infrastructure ISIS built with Lafarge's cement would have lasted past 2014. Defendants' admitted material support for ISIS in 2014 foreseeably contributed to ISIS's long-term savings and its ability to commit attacks multiple years later; material support in subsequent periods to which Defendants have not admitted contributed to ISIS's ability to commit attacks even later.

199. ISIS's fundraising apparatus was organized and centralized, meaning that there was a strong link between Defendants' payments and ISIS's terrorist attacks. Terrorism scholars Dr. Colin Clarke and Dr. Phil Williams explain that "[m]uch like its predecessor, AQI, [ISIS] . . . adopted a top-down approach that maintained hierarchical control over and a high degree of accountability for its financial assets as it worked to keep an ironclad grip over the money it earned from a series of rackets." The U.N. Security Council's ISIS panel notes that ISIS's "core leadership" in Syria and Iraq exercised "systematic financial direction" over its provinces' financing. Such systematic financial direction ensured that Defendants' money in Syria supported ISIS's terrorist attacks in other areas in which it operated.

200. Defendants' payments of course had an especially close nexus to ISIS's acts in Iraq and Syria. ISIS, which originally formed in Iraq before becoming primarily centralized around Raqqa in Syria, controlled all of the territory around the Cement Plant. Because of ISIS's structure and organization, Defendants' payments were specifically funneled to certain cells. The following ISIS cells played a key role in both handling Defendants' money and planning or committing the attacks that targeted Plaintiffs and their family members.

### A. At Least 20% Of Lafarge's Money Was Used To Harm Plaintiffs

201. **ISIS's Leadership Cell**, also called the "Shura Council," "Governance Council," or "Delegated Committee," was, during relevant periods, a unified leadership group that approved

new ISIS membership, expansion plans, and strategy. ISIS's Leadership Cell was composed of Al-Baghdadi and several advisors. It ensured that all major ISIS actions were in accord with Islamic law and ISIS's overall strategy. ISIS's predecessor ISI's known funding structures required that 20% of all income derived from its taxation went to Al-Baghdadi and his Leadership Cell for use in planning and committing attacks, and ISIS continued the same practices. According to terrorism scholar Brian Fishman, the "provinces," or geographic areas under its control, "carefully tracked both revenue and expenditures and passed 20 percent of their income to the national-level ISI [al-Baghdadi and the group's leadership], which redistributed the funds as needed." ISIS was a remarkably centralized group, with the Leadership Cell commanding specific areas to expand or stop sending fighters, as with the establishment of ISIS's province Libya, and with all fighters loyal to the same authority under Al-Baghdadi. According to multiple sources, including its magazine Daqbiq and a guide to its "tax" practices, ISIS mandated payment amounts depending on its interpretation of Islamic law. This interpretation specified that twenty percent of goods such as spoils of war and of underground or mineral wealth be paid to ISIS's central funds. Non-Muslims permitted to remain in ISIS territory paid greater amounts than Muslim under ISIS's control. Thus, it is likely that twenty percent of the funds Defendants have admitted to paying ISIS went to Al-Baghdadi and the Leadership Cell (over $1.1 million U.S. dollars), to plan and execute the acts that harmed Plaintiffs. Specifically, the funding supported the following acts of international terrorism:

202. **Attacks on U.S. Servicemembers in Syria and Iraq**: Al-Baghdadi and the Leadership Cell planned and authorized ISIS's attacks against the United States and its servicemembers inside ISIS's territory in Syria and Iraq from 2014-17, including the attacks that killed or injured Chief Petty Officer Jason Finan, Senior Chief Petty Officer Scott Cooper Dayton,

Chief Petty Officer Charles Keating IV, and Plaintiff Senior Chief Petty Officer Kenton Stacy. The Leadership Cell's role included: (1) financing ISIS's cells and operatives to commit such attacks; (2) ordering ISIS's members to specifically target and attack the United States within Syria and Iraq; (3) supervising ISIS's strategies and tactics to target the United States in Syria and Iraq; (4) deploying a strategy to leverage American deaths and injuries to pressure others to submit to ISIS; and (5) using American deaths and injuries to increase ISIS's influence, recruit members and maintain and expand its control over territory and markets.

203. **Attacks Outside Iraq and Syria**: Al-Baghdadi and the Leadership Cell directed and therefore participated in the expansion of ISIS's territory in Iraq and Syria, by (1) deciding where and at what time ISIS would establish a new branch; (2) deploying ISIS operatives to the geography or battalion in question; (3) transferring finances to the geography; (4) targeting the United States through ISIS's external attacks; and (5) supplying logistical, training, and financial support for ISIS's external attacks. Together, these acts of support enabled the deaths or injuries of Plaintiffs and their family members. ISIS's Leadership Cell directed ISIS's expansion to Libya, including the attack that killed U.S. Marine David Berry. It accepted Imad Ahmad Jomaa's pledge of loyalty in July 2014, and sent fighters to join his brigade in Lebanon, leading to the capture and killing of Ali El Hajj Hassan, whose family members are Plaintiffs.

204. **Human trafficking of children and fighters**: Al-Baghdadi and the Leadership Cell were aware that having a large population under their control was a critical element of running a successful "state" in Iraq and Syria. They also approved of children being taught to fight and being armed. Because of their role as a religious and governmental authority, the Leadership Cell would have to approve (1) payments and support to foreign fighters and their families who emigrated to ISIS territory, including if they switched allegiances from another group such as

ANF; (2) methods and means of weapons distribution, including those for women and families; and (3) family law issues, such as the age of permissible marriage and whether consent was required. For these reasons, the Leadership Cell was responsible for and accountable for the acts of trafficking, military training, forced marriage, forced pregnancy, and other horrors inflicted on Plaintiff Leyla Ekren.

### B. Lafarge Channeled Funds Into ISIS's Center In Raqqa, Which Used The Money To Harm Plaintiffs

205. The Cement Plant was in Raqqa, one of the first cities to fall to opposition groups during Syria's civil war. ISIS's Raqqa Cell attained prominence within ISIS itself because of its central location and the large population under its control. It became critical to planning ISIS's outward reach, and ISIS leadership flocked there. While ISIS was founded and led by Al-Baghdadi in Iraq, its expansionary military strategy and much of its operations and planning were centered in Raqqa. Al-Baghdadi declared that Raqqa would be the seat of his state, due to its proximity to both Iraq and Syria. According to LCS's former risk manager, Lafarge negotiated with ISIS's representatives in Raqqa.

206. As the capital, ISIS's leadership and strategy were set in Raqqa. Secretary of State John Kerry stated in 2015 that Raqqa was "the core where they're [ISIS] planning" attacks. A Pentagon spokesperson likewise confirmed that ISIS's militant administration and leadership were based in Raqqa. As described by the Commander of U.S. Central Command, Raqqa was "where [ISIS's] plotting takes place. . . . Raqqa is recognized as the financial, leadership and external ops center of the Islamic State."

207. ISIS's Raqqa Cell was led by Abu Luqman, also known as Ali Musa Al-Shawakh, from early 2014 until his death in an airstrike in 2018. Abu Luqman had been a powerful ANF terrorist but then switched his allegiance to ISIS and recruited several hundred ANF fighters to

join ISIS's ranks in Raqqa. He served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell. Abu Luqman was head of ISIS's Directorate of General Security, which was responsible for intelligence gathering, detentions, state security, and external intelligence. Public reports state that Abu Luqman served on a "shadow board" of the Cement Plant. Abu Luqman also controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.

208. In December 2014, Abu Luqman himself was present, alongside Lafarge's agent Taleb, to facilitate ISIS's purchase of remaining materials in Lafarge's factory, worth $11.5 million. The next month, at Defendants' expense, Taleb visited Lafarge's headquarters in Paris to report on the ongoing negotiations with Abu Luqman to re-open the plant under Lafarge's supervision.

209. The Raqqa Cell and Abu Luqman not only coordinated with Defendants or their agents and directly received their material support, but directly participated in the acts of international terrorism that injured Plaintiffs.

210. **Attacks on U.S. Servicemembers in Syria and Iraq**: Abu Luqman and the Raqqa Cell participated in planning and authorizing ISIS's attacks against the United States and its servicemembers inside ISIS's territory from 2014-17. Abu Luqman, commander of the Directorate of General Security, collected intelligence and developed plans to commit attacks specifically targeting Americans. The Raqqa Cell provided funds, fighters, training, resources, and propaganda, and aided in planning and training the fighters who committed the attacks that killed or injured Chief Petty Officer Jason Finan, Senior Chief Petty Officer Scott Cooper Dayton, Chief Petty Officer Charles Keating IV, and Plaintiff Senior Chief Petty Officer Kenton Stacy.

211. **Attacks Outside Iraq and Syria**: As the de facto capital, Raqqa was likewise the center of ISIS's training and planning. Raqqa was "where ISIS plans their external operations,"

stated the commander of U.S. Central Command. Abu Luqman and the Raqqa leadership therefore participated in the expansion of ISIS's territory beyond Iraq and Syria. The Raqqa Cell was critical to determining when and how to recruit or accept additional members, where to expand, and how to commit attacks outside Raqqa by (1) vetting, recruiting, and establishing new ISIS "provinces" beyond Iraq and Syria, including in Libya; (2) serving as the bridge between ISIS's Leadership Cell and local cells on the ground in other geographies and (3) supplying logistical, training, and financial support for ISIS's external attacks. ISIS's Raqqa Cell planned and executed ISIS's expansion to Libya, including the attack that killed U.S. Marine David Berry. On information and belief, the Raqqa Cell accepted Imad Ahmad Jomaa's pledge of loyalty in July 2014, and sent fighters and support to join his brigade, enabling the capture and killing of Ali El Hajj Hassan, whose family are Plaintiffs.

212. **Human trafficking of children and fighters**: Abu Luqman and the Raqqa Cell were aware that having a large population under their control was a critical element of running a successful "state" in Iraq and Syria. ISIS's governance began with establishing military power, but then extended to "religious police, stricter punishments, and a concerted educational system" that require significant funding. It also would have paid fighters' salaries, and additional stipends for wives and children. Because of its role as the *de facto* local government, the Raqqa Cell would have had to approve (1) the salaries and stipends of families within its province; (2) the training of women and girls as soldiers; and (3) marriage policies and stipends for wives and children of ISIS fighters. For these reasons, the Raqqa Cell was responsible and accountable for the acts of trafficking, military training, forced marriage, forced pregnancy, and other horrors inflicted on Plaintiff Leyla Ekren.

## XI. DEFENDANTS' UNLAWFUL CONDUCT HAD A SUBSTANTIAL NEXUS TO NEW YORK AND THE UNITED STATES

213. Defendants' scheme to finance ISIS and ANF relied on substantial touchpoints with New York and the United States. In pleading guilty to conspiring to provide material support to ISIS and ANF, Lafarge and LCS admitted that their "offense occurred in part within the United States."[10] That concession reflected several U.S. contacts that Defendants formed in effectuating their scheme. Those U.S. contacts included: (1) Defendants' intentional use of New York banks to clear their U.S.-dollar transactions; (2) Defendants' use of U.S.-based email services; and (3) Defendants' conspiracy with ISIS and ANF, designated terrorist groups that purposefully targeted the United States and reached into U.S. territory to further the scheme.

### A. Defendants Purposefully Used New York Banks To Clear The U.S.-Dollar Transactions They Used To Finance Terrorism

214. Defendants purposefully availed themselves of New York's banking system by executing wire transfers they intentionally caused to clear through New York banks.

#### 1. Defendants Executed U.S.-Dollar Transactions Using New York Correspondent Banks

215. Defendants' payments to terrorists relied on correspondent and intermediary banks located in New York. Correspondent banking is often defined as "an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks."[11] Such arrangements are needed when a sender seeks to transfer funds to a recipient whose bank lacks a direct relationship with the sender's

---

[10] Plea Agreement ¶ 3, *United States v. Lafarge S.A.*, No. 22-cr-444-WFK (E.D.N.Y. Oct. 18, 2022), Dkt. 10. On information and belief, this Plea Agreement was heavily negotiated by Lafarge's lawyers and does not disclose every U.S. contact supporting personal jurisdiction.

[11] Bank for International Settlements Committee on Payments and Market Infrastructures, *Correspondent Banking* at 9 (July 2016).

bank. In that scenario, the sender must rely on additional banks – typically called "correspondent" or "intermediary" banks – to establish a chain of banking relationships that can complete the transfer from sender to recipient. Correspondent banking is "an essential component of the global payment system, especially for cross-border transactions."[12]

216. New York banks are vital to this global system of correspondent banking. As the Treasury Department reported in 2006, most cross-border transactions depended on "major funds transfer payment and messaging systems" located in New York.[13] Those systems used a "relatively small number of major money center banks" that "specialize in facilitating international funds transfers" and thus "form a key link in the vast majority of all international funds transfers."[14] The large money center banks that facilitate international U.S.-dollar transactions are based predominantly in New York. Thus, when a company like Lafarge wires U.S. dollars to a recipient with which its bank lacks a direct banking relationship, it typically relies on New York correspondent banks to ensure that its dollars reach the intended recipient.

217. New York banks typically perform the *clearing* process for U.S.-dollar wire transfers. "Clearing" generally refers to the process of transmitting, reconciling, and confirming payment on electronic-funds transfers. The Clearing House Interbank Payments System ("CHIPS") is the dominant electronic-funds-transfer system for clearing U.S.-dollar transfers among international parties. Defendants' U.S.-dollar wires relied on CHIPS, which handled both the transmission of interbank messages and the settlement of payment for the wires.

---

[12] *Id.* at 6.

[13] U.S. Dep't of Treasury, Financial Crimes Enforcement Network ("FINCEN"), *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act* at 57 (Oct. 2006).

[14] *Id*. at 57.

218. To use CHIPS's clearing services, a foreign money sender must involve a U.S. bank that is subject to supervision by U.S. banking regulators. As the Treasury Department explained, access to CHIPS "is conditional upon a financial institution's U.S. presence," in part to ensure that U.S. law will govern cross-border U.S.-dollar transactions.[15] And given New York's status as a global financial hub, the major U.S. banks responsible for clearing transactions through CHIPS reside overwhelmingly in New York. For that reason, as *Reuters* reported, "[t]o legally transact (clear) the U.S. dollar globally, correspondent banks are required to maintain a New York branch and comply with U.S. [anti-money-laundering] regulations."[16]

219. Defendants relied on New York banks to clear many of their transactions supporting ISIS and ANF. That reliance reflected Defendants' choice to transact in U.S. dollars. As Pescheux wrote in a June 30, 2013 email to Tlass, Defendants' "preferred option" for paying Tlass was to make "bank transfer[s] in USD to the account of a duly registered company" – and "USD" meant U.S. dollars.[17] Consistent with that preference, Defendants specified in their contracts with Tlass that they would pay him in U.S. dollars.[18] Defendants also often paid Taleb in U.S. dollars, knowing he would in turn use the U.S. dollars to pay ISIS.[19] And Defendants at

[15] *Id*. at 62.

[16] Joshua Fruth (Thomson Reuters Regulatory Intelligence), *'Crypto-Cleansing:' Strategies To Fight Digital Currency Money Laundering And Sanctions Evasion*, Reuters (Feb. 14, 2018), https://tinyurl.com/4p27pwzs.

[17] Plea Statement ¶ 60; *see* Ex. 1 (7/1/2013 Tlass-Pescheux Email String) ("Preferred Option Email"). Citations to exhibits ("Ex.") in this Complaint refer to the exhibits attached to the August 5, 2024 Amended Complaint in *Foley et al. v. Lafarge S.A. et al.*, 1:23-cv-05691.

[18] Ex. 2 ("2009 Tlass Agreement," ATA0020920 at -922) art. 4 ("US Dollars"); Ex. 3 ("2010 Tlass Agreement," ATA0010207 at -211) art. 4 ("US Dollars"); Ex. 4 ("Feb. 2014 Tlass Agreement," ATA0021426 at -427) art. 4 ("75,000USD"); Ex. 5 (Oct. 2014 Tlass Agreement) § 3.1 ("210,000US$").

[19] *E.g.*, Plea Statement ¶ 63; Ex. 6 (ATA0000244) (paying Taleb "USD 4,836.00").

all times considered it a business imperative to combat the "scarcity of USD" in Syria, going to extreme lengths to ensure LCS's liquidity in U.S. dollars specifically.[20]

220. Defendants' decision to transact in U.S. dollars led them to use New York banks. That is the ordinary practice for sophisticated companies executing cross-border U.S.-dollar transactions. Indeed, CHIPS estimated in 2015 that it "process[ed] more than 95 percent of U.S. dollar-denominated cross-border transactions."[21] The dominance of a U.S. clearing center in processing U.S.-dollar wires was no accident. As a practical matter, at the time of Defendants' unlawful conduct, "any financial institutional doing business in dollars need[ed] to hold accounts in correspondent U.S. banks in order to complete transactions."[22] Because typically "all dollar transactions are cleared via the American banking system,"[23] nearly all U.S.-dollar wires necessarily passed "through correspondent accounts" in New York.[24]

221. Defendants chose to follow the norm and exploit New York banks in orchestrating the U.S.-dollar wire transfers on which their conspiracy depended. Plaintiffs have identified at least 15 such transfers that Defendants executed in connection with their terrorist-funding scheme. All cleared through New York banks. The chart below depicts each one:

---

[20] Ex. 7 (ATA0009139); *see infra* ¶¶ 235-37.

[21] U.S. Dep't of Treasury, *National Money Laundering Risk Assessment* at 35 (2015).

[22] Christian Caryl et al., *Pocketbook Policing: Washington Has Finally Found A Strategy That Is Putting Real Pressure On The Regime – Going After Its Sources Of Cash, All Across The World*, Newsweek Int'l (Apr. 10, 2006), 2006 WLNR 5632771.

[23] Economist, *Digital Currencies: A New Species* (Apr. 13, 2013), 2013 WLNR 8890628.

[24] *Role of U.S. Correspondent Banking in International Money Laundering: Hearings Before the Permanent Subcomm. on Investigations of the S. Comm. on Governmental Affairs*, 107th Cong. 287 (Mar. 6, 2001) (quoting Minority Staff, *Report on Correspondent Banking: A Gateway For Money Laundering* (Feb. 5, 2001)).

| Date | Category | Originating Bank (Swift) | Beneficiary Bank (Swift) | NY Bank(s) (Swift) | USD Amount |
|---|---|---|---|---|---|
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $8,454,183 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $5,714 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $2,857 |
| 1/18/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $2,857 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $12,710,000 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $8,592 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $4,296 |
| 2/28/11 | Upstream Equity | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $4,296 |
| 4/14/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $20,000,000 |
| 7/7/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $5,000,000 |
| 8/8/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Lebanon (AUDBLBB) | **Citibank N.A.** (CITIUS33) **JPM NY** (CHASUS33) | $10,000,000 |
| 8/15/11 | Upstream Loan | Citi UAE (CITIEAD) | Audi Syria (BASYSYDA) | **Citibank N.A.** (CITIUS33) | $5,000,000 |
| 9/12/13 | LMEA | Unknown | NSGB Egypt (NSGBEGC) | **BNY Mellon** (IRVTUS3) | $200,000 |
| 9/26/13 | LMEA | Al Baraka (ABRKEGCA) | NSGB Egypt (NSGBEGC) | **BNY Mellon** (IRVTUS3) | $299,810 |
| 10/24/14 | Tlass | BNPP Paris (BNPAFRPP) | Abu Dhabi Islamic Bank (ABDIAED) | **BNPP NY** (BNPAUS3) **JPM NY** (CHASUS33) | $210,000 |

222. This chart is based on Defendants' bank records, SWIFT messages, and other transaction data and documents they maintained in the ordinary course of business. The "Date" column describes the transaction's value date. The "Category" column describes the transaction types: "Upstream Equity" means Lafarge's equity contributions to LCS through four affiliated LCS shareholders; "Upstream Loan" means loan disbursements by Lafarge (through Lafarge Cyprus) to LCS; "LMEA" means payments LCS accepted into its illegal bank account in Egypt; and "Tlass" means payments to Firas Tlass. The "Originating Bank" is the bank that initiated the wire transfer on the sender's behalf. The "Beneficiary Bank" is the bank that received the wire transfer on the recipient's behalf. And the "NY Bank" is the New York correspondent bank (or banks) that cleared the wire transfer. All were material to Defendants' terrorist payoffs.

223. **Tlass Payments.** Tlass was an original LCS shareholder and Lafarge's first business partner in Syria.[25] Defendants initially transacted with Tlass through his Syrian company, MAS Group ("MAS"), with which LCS executed a Local Project Support Agreement on February 15, 2009.[26] The next year, LCS amended the contract and agreed to pay Tlass "One Million and Five Hundred Thousand (1,500,000) US Dollars per annum" for his work in 2009 and 2010.[27] In exchange, Tlass provided "overall advisory services," helping Defendants with "the smooth operation" of the Jalabiyeh plant and cultivating a "[r]elationship with stakeholders and relevant regulators."[28] Tlass acted under this Local Project Support Agreement when paying terrorists on Defendants' behalf. It remained in force until February 2014, when Defendants renegotiated to pay Tlass $75,000 per month under a similar agreement with his new front company, North

[25] Ex. 8 (ATA0031879) (detailing Tlass's equity contributions to LCS since inception).

[26] 2009 Tlass Agreement at -920.

[27] 2010 Tlass Agreement art. 4. Starting in 2011, the contract called for LCS to pay Tlass in an amount equal to 1% of LCS's annual net sales. *Id.*

[28] 2010 Tlass Agreement arts. 1, 1(d).

Logistics Consultancy Service JLT ("North Logistics").[29] Under both contracts, which continuously governed Tlass's work during the conspiracy, Defendants' payments to Tlass were "explicitly conditioned on [his] continuing to make payments on LAFARGE's and LCS's behalf to armed groups, which included ISIS and ANF."[30]

224. Early in the scheme, Defendants used MAS – Tlass's company – to pay Tlass his annual fees and to funnel him money to distribute onward to terrorists.[31] To that end, Defendants regularly transferred money into MAS's bank account, including in U.S. dollars. On January 17, 2011, LCS used its U.S.-dollar account at Bank Audi Syria S.A. ("Audi Syria") to send $375,000 to MAS's account.[32] That payment compensated Tlass for his "advisory" work and served as an inducement for him to continue providing LCS the same services under the contract moving forward.[33] LCS made this payment under the same contract that governed most of Tlass's terrorist payoffs giving rise to Plaintiffs' claims, and LCS funded the payment through the upstream dollars it sourced via New York banks, alleged below (*infra* ¶¶ 229-43).

225. The final entry in Paragraph 221 depicts a payment to Tlass that Defendants cleared through New York. In late 2014, Jolibois directed Tlass to issue a $210,000 invoice from North Logistics for his services negotiating with ISIS.[34] To provide cover for that illegal payment,

---

[29] Plea Statement ¶ 61; Feb. 2014 Tlass Agreement art. 4. The 2014 agreement appears to have a typo referring to Tlass's company as "Nort Logistics." *Id*. at -426.

[30] Plea Statement ¶ 61.

[31] Ex. 9 ("Project Alpha Report," ATA0004181 at -226). The Project Alpha Report was prepared by Baker McKenzie and PwC, which LafargeHolcim retained in 2016 to investigate their payments to terrorists. *Id*. at -223.

[32] Project Alpha Report at -260 (denoting "Electronic Transfer" to "Mass Co."); Ex. 10 (ATA0005778, Row 101) (describing this as a bank "Transfer" to "Mas Group," with value date of January 17, 2011 and a "Bank fee" of $5); Ex. 11 (ATA0005465, Row 19) (confirming Audi Syria executed the transfer from Account No. 02830466100200405).

[33] Ex. 10 (ATA0005778, Row 101) ("Payment against Services rendered by MAS").

[34] Plea Statement ¶¶ 97-102; Ex. 16 (ATA0000160 at -165) (identifying North Logistics).

Lafarge's senior regional counsel Jean-Jerome Khodara drafted a sham consulting contract between LCS and Tlass, which the parties executed in conjunction with a back-dated agreement purporting to terminate their prior arrangement months earlier.[35] Tlass then issued the $210,000 invoice Jolibois had requested from North Logistics. It specified a new U.S.-dollar bank account at Abu Dhabi Islamic Bank that Tlass had opened to receive U.S.-dollar wires.[36]

226. On October 24, 2014, Lafarge paid Tlass by wiring $210,000 through New York banks. To initiate payment, Khodara sent the invoice to Richard Benattar, Lafarge's accounting manager, and told Benattar the invoice "should be paid quickly if possible."[37] Upon reviewing the invoice, Benattar realized it was in U.S. dollars and thus required the use of U.S. correspondent banks. He responded to Khodara: "I just need the invoice with the original [Herrault] signature ***and the US correspondent bank of the supplier's bank (the invoice is in USD)***."[38] Benattar needed to know North Logistics' "U.S. correspondent bank" because he needed to enter North Logistics' payment details into Quantum, Lafarge's electronic payment software.[39] Benattar soon concluded that he and his accounts-payable colleague, Narkice Vaisoul, could verify the routing details themselves.[40] And once they confirmed that the money needed to go to JPMorgan Chase in New York, they initiated the wire. Benattar personally confirmed payment by signing the wire record with his initials "RB."[41]

---

[35] Plea Statement ¶¶ 97-102; Ex. 16 (ATA0000160 at -161-64); Ex. 17 (ATA0000032).

[36] Ex. 16 (ATA0000160 at -160).

[37] Ex. 18 (ATA0032474 at -474) (certified English translation).

[38] Ex. 19 (ATA0004739 at -739) (certified English translation).

[39] *Infra* ¶¶ 268-69.

[40] Ex. 18 (ATA0032474 at -474) (certified English translation) (telling Khodara and Jolibois, "We'll take care of it – we've got the supplier's email address").

[41] Ex. 20 ("210k Wire Instruction," ATA0000071 at -075).

227. Benattar effectuated payment by instructing BNP Paribas's Paris branch to originate a $210,000 wire transfer from Lafarge Cyprus to North Logistics.42 Following Lafarge's directions, BNP Paribas's Paris branch executed the wire through its New York correspondent account at BNP Paribas's New York branch, which wired the money to JPMorgan Chase's New York branch, which transmitted the money to Tlass's U.S.-dollar account at Abu Dhabi Islamic Bank.[43] As Defendants later admitted, the money passed through the "Eastern District of New York" and involved multiple "intermediary banks in New York City."[44] Once Benattar and Vaisoul verified payment, Vaisoul wrote to Khodara and Jolibois to "confirm that this invoice has just been paid," and included the full prior email chain with Benattar's discussion of "the US correspondent bank."[45] Jolibois replied: "Good."[46]

228. This $210,000 wire was instrumental to Defendants' terrorist-funding conspiracy. As Defendants admitted, "the $210,000 lump sum payment compensated [Tlass] for the work he had already performed negotiating an agreement with ISIS, and to reimburse him for making the fixed monthly 'donation' payments to armed groups, including ISIS."[47] At ISIS's and ANF's going per-attack cost, the $210,000 alone was enough to pay for every attack in this case.[48]

229. **Upstream Equity and Loan Payments.** Paragraph 221 also includes 12 upstream U.S.-dollar payments to LCS: eight equity contributions and four loan disbursements. Lafarge made the equity contributions through Lafarge Cyprus and three other Lafarge-affiliated LCS

[42] 210k Wire Instruction at -071; Ex. 21 (Interrog. Resp. No. 4).

[43] Ex. 22 (BNPP-NY 000004, Rows 2913-2915); Ex. 23 (BNPP-NY 000001, Excerpt from JPMC Subpoena Response, Row 2).

[44] Plea Statement ¶ 103.

[45] Ex. 24 (ATA0032468 at -468) (certified English translation).

[46] Ex. 24 (ATA0032468 at -468) (certified English translation).

[47] Plea Statement ¶ 101.

[48] *Supra* ¶ 196.

shareholders: Lafarge Aggregate Holdings, Cemitalia Ltd., and Lafarge Building Materials Egypt.[49] The payments occurred via eight wire transfers totaling $21,192,525. Lafarge initiated each wire from Citibank's Dubai branch, through a correspondent account maintained at Citibank's New York branch, and then to LCS's U.S.-dollar account at Audi Syria.[50]

230. Lafarge paid the four U.S.-dollar loan disbursements under an April 7, 2011 loan agreement between Lafarge Cyprus and LCS.[51] Lafarge's General Counsel and Corporate Secretary signed the loan agreement on Lafarge Cyprus's behalf and oversaw the disbursements it made.[52] As his involvement demonstrates, Lafarge Cyprus funded LCS at Lafarge's direction and subject to its control. Lafarge used Lafarge Cyprus to funnel money to LCS because the latter was LCS's majority shareholder, "through which LAFARGE held nearly all of its shares in LCS."[53] Indeed, Lafarge admitted it was responsible for the October 24, 2014 payment to Tlass, even though it structured that payment as nominally originating from Lafarge Cyprus.[54] The other Lafarge Cyprus payments similarly occurred at Lafarge's direction.

231. Lafarge Cyprus made these loan disbursements by wiring U.S. dollars from Citibank's Dubai branch, through a correspondent account maintained at Citibank's New York branch, and then to LCS's U.S.-dollar accounts in Syria and Lebanon.[55] For three of the four, Lafarge Cyprus sent the wire to LCS's account at Audi Syria.[56] For the fourth, Lafarge Cyprus

---

[49] Ex. 25 (ATA0005192 at -200); Ex. 26 (ATA0005437 at -437-39).

[50] Ex. 12 (ATA0031866 at -866-68) (SWIFT confirmations for January 2011 transfers); Ex. 26 (ATA0005437 at -442-43) (SWIFT confirmation showing routing details for February 2011 transfer); *id*. at -437 (confirming "Citibank NY" routed each wire and charged fees for doing so).

[51] Ex. 27 (ATA0000316) ("2011 Loan Agreement").

[52] 2011 Loan Agreement at -327; Project Alpha Report at -227.

[53] Plea Statement ¶ 99.

[54] Plea Statement ¶¶ 99, 103.

[55] Ex. 21 (Interrog. Resp. No. 4); Ex. 13 (ATA0000358 at -358).

[56] Ex. 21 (Interrog. Resp. No. 5, Transfer Nos. 1, 2, and 4).

sent the wire to LCS's account at Bank Audi Lebanon SAL ("Audi Lebanon"), which was cleared by both Citibank New York and JPMorgan Chase New York.[57] In each instance, Defendants obtained a SWIFT message confirming the New York banks' involvement.[58]

232. This upstream funding was vital to Defendants' terrorist-funding scheme. By injecting U.S. dollars into LCS, Lafarge enabled LCS to pay Tlass and Taleb in U.S. dollars. Indeed, the accounts LCS used to receive the upstream funding were the same ones it used to pay its terrorist intermediaries.[59] As PwC explained in a forensic review it performed at Defendants' direction after Defendants' terrorist-funding scheme became public, the "***[f]unds within the receiving bank accounts were used*** by LCS for capital expenditure and operating expenses and also ***to pay the monthly USD remuneration of Firas Tlass, make USD payments to Amro Taleb and for three alleged USD Security Payments [to ISIS].***"[60]

233. LCS routinely used the U.S. dollars it acquired to pay Tlass and Taleb. Relying in part on the upstream dollars Defendants sourced through New York banks, LCS made many downstream payments to Tlass and Taleb in U.S. dollars.[61] Nine were monthly $75,000 stipends LCS paid to Tlass via an agreement contemplating that Tlass would "retain $50,000 and the

---

[57] Ex. 21 (Interrog. Resp. No. 4, Transfer No. 3); Ex. 28 (ATA0000220 at -223-24).

[58] Ex. 13 (ATA0000358 at -358) (4/14/2011 transfer); Ex. 14 (ATA0000047 at -049-50) (7/7/2011 transfer); Ex. 28 (ATA0000220 at -223-24) (8/8/2011 transfer); Ex. 15 (ATA0000060 at -060) (8/15/2011 transfer).

[59] Project Alpha Report at -238-39.

[60] Project Alpha Report at -227.

[61] Project Alpha Report at -190-91 ("LCS maintained US dollar denominated bank accounts . . . used to make and receive numerous US dollar payments, including the monthly fee of USD 75,000 to Tlass and commission payments for Taleb, as detailed above.").

remaining $25,000 would be disbursed to armed groups."[62] Under that agreement, Defendants paid Tlass a monthly $75,000 stipend at least from November 2013 to July 2014.[63]

234. Defendants similarly used LCS's supply of U.S. dollars to make at least five "commission" payments to Taleb. As PwC's forensic review concluded, "Taleb received a small monthly commission for sales of pozzolana and heavy fuel sourced" from ISIS-linked suppliers.[64] The "total value of these commissions" was roughly "USD 10,356."[65] Defendants' financial records indicate that this $10,356 comprised five separate U.S.-dollar payments LCS made to Taleb: (1) $4,836 on February 24, 2014; (2) $3,265 on April 25, 2014; (3) $976 on July 1, 2014; (4) $597 on July 1, 2014; and (5) $682 on October 7, 2014.[66] LCS made each of these payments from its U.S.-dollar accounts at Audi Lebanon. As with the Tlass stipends, Lafarge's upstream provision of U.S. dollars helped LCS finance these commissions.

235. LCS's unique U.S.-dollar liquidity constraints amplified the nexus between Lafarge's upstream payments and LCS's downstream payments to terrorists. Starting in 2011, LCS faced a severe liquidity crunch in U.S. dollars.[67] For LCS to come up with the money to pay terrorists, therefore, Lafarge had to devise a plan to ensure that LCS had a steady supply of U.S.

[62] Plea Statement ¶ 61.

[63] Ex. 29 (ATA0000256) (Nov. 2013); Ex. 30 (ATA0000291) (Dec. 2013); Ex. 31 (ATA0000289) (Jan. 2014 #1); Ex. 32 (ATA0000288) (Jan. 2014 #2); Ex. 33 (ATA0000292) (Mar. 2014); Ex. 34 (ATA0000293) (Apr. 2014); Ex. 35 (ATA0000294) (May 2014); Ex. 36 (ATA0000290) (June 2014); Ex. 37 (ATA0032008) (July 2014).

[64] Project Alpha Report at -190.

[65] Project Alpha Report at -190.

[66] Ex. 38 (ATA0008287, In.Out Flow Tab, Rows 1838, 1840, 2550, 3143, 3144, 3195, 4194).

[67] Ex. 39 ("Feb. 2012 Exec. Presentation," ATA0059026 at -039) (describing "cash shortage" and challenges of "Foreign Currency sourcing"); Ex. 40 ("Cash Shortfall Memo," ATA0009065 at -065-67) (noting need for "additional funding" and "cash shortage"); Ex. 41 (ATA0005040 at -040) (stressing "urgency of payments" in U.S. dollars); Ex. 14 (ATA0000047 at -047) (noting need for new "Lebanon Bank account" to hold U.S. dollars to give LCS "Cash Management flexibility").

dollars.[68] But it was difficult for LCS to raise money, given sanctions affecting Syria.[69] The best way for LCS to access the capital it needed to pay terrorists was thus to obtain U.S. dollars from Lafarge Cyprus and other affiliates. In fact, had Lafarge not agreed to loan U.S. dollars to LCS in April 2011, LCS would have defaulted on its debt covenants with its senior lenders and would likely have had to shut down its Syrian plant altogether.[70]

236. U.S. and U.N. sanctions regimes targeting Syria were designed to promote just that sort of U.S. dollar scarcity, to restrict the flow of U.S. dollars to violent actors. U.S. Treasury Department officials publicly confirmed that intent. In 2011, for example, after a raft of counterterrorism sanctions, "[a] US Treasury spokeswoman said that 'designating' companies made it difficult for them to operate, especially if business involved US dollar transfers, which all passed through the New York banking system" when "payments[ ] were made in US dollars."[71] In 2014, likewise, senior Treasury official David Cohen explained how U.S. policymakers sought

[68] Ex. 42 (ATA0000938 at -938) (Pescheux emphasizing to CFO that "I really rely on you to review . . . the way we have been managing our cash so far and our practices in terms of currency conversion," stressing "need to improve our reactivity in this period of high volatility"); *id*. at -940-42 (detailing cumbersome process "to source FX to pay our foreign commitments").

[69] Feb. 2012 Exec. Presentation at -028, -039 (detailing challenges); *see* Exec. Order No. 13,573 (May 18, 2011); Exec. Order No. 13,572 (Apr. 29, 2011) (2011 sanctions orders).

[70] *E.g.,* Ex. 43 (ATA0018237 at -239) (describing need for "rapid[ ]" cash infusion "to avoid a payment default"); Ex. 15 (ATA0000060 at -067-68) (demanding "hectic" loan payment "to urgently ensure a transfer of 3 Musd ASAP" to cover "daily Cash needs" and to allow LCS "to disburse 5 Musd" in compliance with outstanding letter of credit); Cash Shortfall Memo at -065 (similarly noting "need" in February 2012 for "additional funding from Lafarge" to avoid "default under the loan repayment"). If LCS missed a repayment to its external lenders, the lenders could have cancelled their commitments and accelerated all remaining secured liabilities. *See* Ex. 44 (ATA0020635 at -726, -731-32) §§ 33.1 (default for non-payment), 35.1 (remedies, including cancellation and acceleration).

[71] Keith Wallis, *Law Firms Cautioned On Iran Sanctions British Government Warns Companies*, South China Morning Post (Jan. 26, 2011), 2011 WLNR 1534856.

to leverage the power of New York's banking system to impede terrorists from raising money and funding their operations.[72]

237. U.S. sanctions designations were similar. In 2014, for example, the Treasury Department emphasized that U.S. sanctions sought to deprive violent Syrian actors of U.S. dollars and force them to use the collapsing Syrian pound.[73] The United States reinforced that the same logic applied to ISIS when it sanctioned ISIS financiers from 2016 through 2019: allowing ISIS to access U.S. dollars through New York banks directly financed ISIS's attacks by giving ISIS more purchasing power than it would have had by using Syrian pounds.[74]

238. The 2011 upstream payments were likewise linked to Defendants' terror-financing scheme through their connection to Tlass. When Defendants decided to go into business with Firas Tlass, his father Mustafa had been Syria's long-time defense minister and confidant of Bashar al-Assad's father. Firas was himself close with the Assad family, too. The Tlass family's long-established connections with and patronage of the al-Assad regime were lucrative. Indeed, MAS's growth was largely attributable to contracts it received to supply the Syrian Arab Army with food, medicine, and clothing.[75] Those connections to the Assad regime also made Tlass and MAS attractive to Lafarge as a joint-venture partner in Syria.

---

[72] *Interview with David Cohen; Interview with Nabil Fahmy; The Sultan and the Sharia Law*, Fareed Zakaria GPS (May 4, 2014), 2014 WLNR 11967166.

[73] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions a Syrian Official Responsible for Human Rights Abuses in Syria and Syrian Regime Supporters and Officials* (Oct. 16, 2014).

[74] *See*, *e.g.*, Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Senior IsiL Financier and Two Money Services Businesses* (Dec. 13, 2016); Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Iraq-Based ISIS Financial Facilitation Network; Action Underscores Continued U.S. Collaboration with the Government of Iraq on Countering ISIS's Terrorism Financing Operations* (June 15, 2017).

[75] Ayman Aldassouky, *The Families of Rastan and the Syrian Regime: Transformation and Continuity*, Wartime and Post-Conflict in Syria, Issue 2021/14, at 8-9 (Aug. 6, 2021).

239. When Defendants made their 2011 upstream payments while in business with Tlass, they knew terrorist violence was a foreseeable consequence. From 2003 through 2014, many public sources – including U.S. and U.N. counterterrorism findings – alerted Defendants that the Syrian regime sponsored AQI attacks targeting the United States. DOD, for example, reported that Syria provided "safe haven, border transit, and limited logistical support" to "Iraqi insurgents," including AQI.[76] U.N. Security Council reports similarly highlighted the "nexus between large numbers of Al-Qaida affiliated foreign fighters and Jabhat-al-Nusrah" in Syria, which risked "new pan-Arab and pan-European networks of extremists emerg[ing]."[77]

240. Media reports also warned before 2011 that the Assad regime supported AQI attacks against the United States. As early as May 2004, the *Washington Times* reported on the "mounting body of evidence link[ing] the Assad regime with the Zarqawi network and terrorist activities in Iraq."[78] The *National Post* corroborated that point in February 2013, noting that "experts believe Mr. Assad provided critical support" for "weapons and money coming through Syria to . . . Iraq" for "extremists" who would "bring pain to the Americans."[79] As "[n]umerous

[76] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2007 Report to Congress in Accordance with the Department of Defense Appropriations Act 2007 (Section 9010, Public Law 109-289)*, at 16-17 (Mar. 2, 2007); *see* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, May 2006 Report to Congress in Accordance with the Department of Defense Appropriations Act 2006 (Section 9010)*, at 28 (May 26, 2006); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress in Accordance with the Department of Defense Supplemental Appropriations Act 2008 (Section 9204, Public Law 110-252)*, at vii, 8 (Jan. 29, 2010).

[77] U.N. Security Council, *Fifteenth Report of the Analytical Support and Sanctions Monitoring Team Submitted Pursuant to Resolution 2083 (2012) Concerning Al-Qaida and Associated Individuals and Entities* ¶ 8 (Jan. 23, 2014).

[78] *Assad's Terror Network*, Wash. Times (May 26, 2004) (Editorial), 2004 WLNR 777961; *see* Frederick W. Kagan & William Kristol, *Now Can We Fight the Enemy?*, Weekly Standard (June 4, 2007), 2007 WLNR 30043601 ("The Syrian regime permits al Qaeda terrorists to move into Iraq" to "kill as many Americans as possible.").

[79] Scott Barber, *Islamic Extremism Threatens Stability; Gaining Sympathy, Recruiting Radicals, Breeding Terrorists*, Nat'l Post (Canada) (Feb. 9, 2013), 2013 WLNR 3252489.

courts" later found after considering the evidence, "Syria supported ISIS and its predecessor organizations."[80] Defendants' U.S.-dollar financing in 2011, used to pay a notorious Syrian regime fixer, thus was linked to Syrian terrorism from the very outset.

241. The suite of U.S. and U.N. antiterrorism sanctions on Syria – which Defendants schemed to circumvent – strengthened the nexus between their 2011 payments and terrorism.[81] Because Defendants knew that Tlass was a prominent Assad ally and regime cutout facilitating Defendants' business interests in a heavily sanctioned country, it was foreseeable that their dealings with him in 2011 would enable AQI/ISIS terrorist attacks against the United States.

242. Defendants also knew Tlass personally (including through MAS) had facilitated AQI terrorism by brokering arms deals, participating in U.S.-dollar-denominated illicit Oil-for-Food program transactions, and channeling hundreds of millions in Iraqi oil revenue stranded in Syrian banks to terrorist financiers in Iraq and Syria.[82] Those dollars and illicit weapons supported the Zarqawi network, which powered AQI's regional expansion and its evolution into ANF and

---

[80] *Fields v. Syrian Arab Republic*, 2021 WL 9244135, at *3 (D.D.C. Sept. 29, 2021).

[81] *See*, *e.g.*, White House (Office of the Press Secretary), *Fact Sheet: Implementing the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003* (May 11, 2004) (sanctions designed "to address the Syrian government's support for terrorist groups" and "actions to undermine U.S." efforts to stabilize Iraq), https://tinyurl.com/mr46kwf6; U.S. Dep't of Treasury, *Treasury Designates Commercial Bank of Syria as Financial Institution of Primary Money Laundering Concern* (May 11, 2004) (designating Commercial Bank of Syria as an institution of primary money laundering concern "in response to the Syrian government's continued support of international terrorism").

[82] David Rennie, *Tough Questions For 270 Named In Iraqi Documents*, Daily Telegraph (Apr. 23, 2004), 2004 WLNR 4205658 (reporting congressional testimony identifying Tlass as being on a "list" of "non-end users" who helped evade sanctions under Oil-for-Food and observing that Mr. Tlass was on a "list" containing "someone with a lot of explaining to do"); Niles Lathem, *Syrian Bigs Conned U.N.*, N.Y. Post (July 27, 2005), 2005 WLNR 23207829 (reporting IRS report documents naming Tlass as an "intermediar[y] in many Iraq-Syrian transactions that earned [him] 10 to 15 percent commissions on each deal [he] handled").

ISIS.[83] By funding a joint venture with a notorious AQI financier, Defendants' 2011 upstream payments implemented a scheme of which terrorism was a foreseeable consequence. Had Defendants been unwilling to pay AQI or similar FTOs in Syria, they never could have hired Tlass because their ordinary due diligence would have never "cleared" him.

243. Although the specific identity of the terrorists Tlass supported evolved over the years, the core concept remained the same: Lafarge and LCS continuously paid Tlass in U.S. dollars to maintain good relations with violent Syrian actors. Those efforts focused at first on the Assad regime and AQI, and they later evolved to include ISIS and ANF. All reflected a continuous course of conduct dating back at least to 2010. When Lafarge used New York's banking system to cover LCS's payments to Tlass in 2011, therefore, it knew it was paying him to maintain LCS's relationships with Syrian terrorists. Lafarge's decision to extend that strategy to ISIS and ANF in 2013 and 2014 was a foreseeable outgrowth of the same conduct.

244. **LMEA.** The remaining two New York-cleared wires in Paragraph 221 were transfers LCS accepted into its LMEA account. Defendants opened that account in Egypt to allow LCS to make and receive illegal U.S.-dollar payments. They called it their "LMEA account" because it was held in the name of Lafarge's Egyptian subsidiary, Lafarge Middle East & Africa Building Materials.[84] But LCS was the one that controlled the money. The account's purpose, as described by Defendants' external forensic review, was to allow LCS "to receive US dollar . . . payments for sales to customers in Syria and to make payments on LCS's behalf."[85]

---

[83] *See*, *e.g.*, Daniel L. Glaser, *quoted in* U.S. Dep't of Treasury, *Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005) ("[T]he Zarqawi Network and other jihadist groups use a variety of classic al Qaida-type terrorist financing mechanisms, including: Funds provided by charities, Iraqi expatriates, and other deep pocket donors, primarily in the Gulf, but also in ***Syria***, Lebanon, Jordan, Iran, and Europe."), https://tinyurl.com/56j2r5t8.

[84] Project Alpha Report at -227.

[85] Project Alpha Report at -191.

245. Defendants opened the LMEA account to circumvent U.S. sanctions on Syria. By July 2013, U.S. sanctions had caused a rapid "devaluation of the Syrian pound."[86] The resulting foreign-exchange risks imperiled LCS's business.[87] Indeed, LCS struggled to acquire U.S. dollars – the currency in which it preferred to operate – because U.S. sanctions barred New York banks from clearing dollars for Syrian entities like LCS.[88] So LCS came up with a workaround: a U.S.-dollar account in Egypt that looked like it was for a non-sanctioned Egyptian affiliate instead.[89] It devised that workaround after Bank Audi refused LCS's request to open an Egyptian bank account in its own name. Bank Audi's refusal convinced Valery Mirakoff, LCS's CFO, that "no bank" would allow LCS to open an Egyptian account because "they would be faced with the same 'compliance' limitation that Bank Audi faced to deny us such account."[90]

246. The LMEA account offered an elegant, if illegal, solution to that problem. The Egyptian company nominally owned the account for compliance purposes, but "Lafarge Syria solely ha[d] all the rights on [the] amounts" in it.[91] The point was to allow Lafarge to transact in U.S. dollars for LCS without external correspondent banks blocking the transfers as required by international sanctions.[92] LCS and LMEA memorialized their arrangement in a July 10, 2013

[86] Ex. 45 (ATA0014297 at -302).

[87] Ex. 45 (ATA0014297 at -302) (noting "high difficulties in managing our Syrian cash exposure due to the on going devaluation of the Syrian pound"); Ex. 7 (ATA0009139) (Pescheux describing LCS's "scarcity of USD" as a "nightmare" for LCS's business).

[88] Ex. 46 ("S&S Memo," ATA0018284 at -286-88) (noting that sanctions meant that "commercial banking services by US banks, wherever located, to Syria became impermissible"); Ex. 47 (ATA0018291 at -291) (blaming "US sanctions" for inability to execute "USD transfer").

[89] Ex. 48 ("LMEA Cooperation Agreement") § 2 ("LMEA to receive and deposit in its bank account such dues on behalf, and under the disposal, of Lafarge Syria.").

[90] Ex. 45 (ATA0014297 at -302) (email from Mirakoff).

[91] LMEA Cooperation Agreement § 3.

[92] Ex. 49 (ATA0000503 at -506) ("[A] significant percentage of our wire transfer to beneficiary outside of Syria were rejected because of international sanctions and the foreign correspondent banks reluctance to operate any transfer originating from . . . a Syrian company.").

contract. The agreement enlisted LMEA's cooperation, among other things, in helping LCS satisfy its "external financial obligations."[93] It required LMEA "to receive and deposit in its bank account" incoming payments "on behalf, and under the disposal, of Lafarge Syria," and to make payments from the account to "specified third part[ies]" as LCS directed.[94]

247. Benattar personally approved the LMEA account for Lafarge and Lafarge Cyprus, after a conversation with Mirakoff.[95] Yet even then, Lafarge's Egyptian affiliate remained hesitant and demanded "Group and legal clearance" before the parties could "proceed" with the LMEA account.[96] In urging Mirakoff to obtain the necessary internal approvals, Pescheux warned him to avoid emails with his LMEA counterpart, advising him "to call him on the phone or even to meet with him, it might prove more efficient than communicating by email."[97] A few weeks later, after LCS opened the account, Mirakoff urged the Egyptian treasury employees responsible for the new account "not to copy Bruno Pescheux anymore o[n] the exchanges of [e]mails" about the payments they were making out of the LMEA account.[98]

248. LCS officially opened the "LMEA USD bank account" on July 15, 2013.[99] LCS held this U.S.-dollar-denominated account at National Societe Generale Bank's ("NSGB") branch in Egypt.[100] LCS then instructed its customers to send U.S. dollars into that account.[101]

---

[93] LMEA Cooperation Agreement at 1 (Preamble).

[94] LMEA Cooperation Agreement §§ 2, 4.

[95] Ex. 45 (ATA0014297 at -298) (LCS's CFO writing, "I spoke personally to Richard Benattar whose opinion [h]as been required by LMEA on the subject. Richard confirmed that . . . he would not object to such operation.").

[96] Ex. 45 (ATA0014297 at -297).

[97] Ex. 45 (ATA0014297 at -297).

[98] Ex. 50 (ATA0010065 at -065).

[99] Ex. 50 (ATA0010065 at -066).

[100] Ex. 50 (ATA0010065 at -066); Project Alpha Report at -237.

[101] Ex. 50 (ATA0010065 at -067) (LCS CFO asking for the LMEA "account number to be given to our customers for their deposit").

249. LCS used the LMEA account to execute hundreds of U.S.-dollar transactions. According to PwC's forensic review, LCS used the account for 73 outgoing U.S.-dollar payments totaling $13,245,747 and 111 incoming payments totaling $13,260,125.[102] "At least some of the payments in and out of the US dollar accounts," the report concluded, "were transfers that are ***likely to have been processed by a US financial institution***."[103]

250. The report was correct. NSGB Egypt maintained standard settlement instructions calling for U.S.-dollar clearing through New York. Most banks maintain such standard instructions, which describe the bank's processes for routing electronic-funds transfers in various currencies.[104] Those instructions detail the accounts a financial institution will use to complete transactions depending on the currency the institution's customer selects. For example, if a customer instructs its bank to execute a U.S.-dollar-denominated wire transfer, the bank's standard settlement instructions provide the names, locations, and account numbers of the correspondent accounts the bank will use to complete the transfer. And those standard instructions typically remain consistent from transaction to transaction. That means that, if a financial institution transacts one U.S.-dollar-denominated transfer through a particular U.S. bank account, its other U.S.-dollar-denominated transfers will likely route via the same account.

251. Before the relevant period, NSGB Egypt published its standard settlement instructions in the Bankers Almanac, an authoritative compendium of international banking

[102] Project Alpha Report at -237.

[103] Project Alpha Report at -191.

[104] *E.g.*, Ex. 51 (ATA0058827 at -827) (Lafarge deputy international treasurer verifying bank's "SSIs," or standard settlement instructions); Ex. 52 (ATA0031601 at -602) (European Investment Bank sending Lafarge its "Standard Settlement Instructions"); Ex. 53 (ATA0024767 at -767) (attaching Citibank's "SSIs").

information. Those instructions, available and well-known to Defendants,[105] specified that NSGB Egypt settled U.S.-dollar wire transfers through "The Bank of New York, New York."[106] For that reason, when Defendants directed an LCS customer to wire U.S. dollars into the LMEA account, they knew the dollars would arrive via a New York correspondent account.

252. Paragraph 221 details two examples of New York-cleared wires LCS accepted into the LMEA account. The first was a $200,000 wire sent by an LCS customer on September 12, 2013.[107] The second was a $299,810 wire sent by another LCS customer, with a September 26, 2013 value date, from an account at Al-Baraka Bank in Egypt.[108] Both cleared via New York, in accordance with NSGB Egypt's standard settlement instructions. Indeed, LCS received a SWIFT message confirming that the latter wire cleared through NSGB's account at "THE BANK OF NEW YORK MELLON" at "ONE WALL STREET NEW YORK, NY."[109]

253. The LMEA account played a key role in Defendants' terrorist-funding scheme. That account functioned as a slush fund that gave LCS a pool of U.S. dollars it could spend at will, including for its criminal conspiracy.[110] In fact, one of the first things Defendants planned for the LMEA account was to pay Tlass's monthly $75,000 stipend for July 2013. As Pescheux emailed

[105] Ex. 51 (ATA0058827 at -829) (Lafarge's deputy international treasurer writing to ask "[d]o we still have the Bankers Almanac" so he could verify "the USD correspondent" for a counterparty); *id*. at -827 (after subordinate says he is unaware of Almanac, deputy international treasurer "contact[s] [bank] directly to get the [standard settlement instructions]").

[106] Ex. 54 (Bankers Almanac at 3216 (Vol. 2, 2008)) (identifying NSGB's "USD" standard settlement instructions as routing through "The Bank of New York, New York").

[107] Ex. 55 (ATA0035605) (referring to "swift of the USD 200k transfer"); Ex. 56 (ATA0008289, In.Out Flow Tab, Rows 120-21) (recording incoming $200,000 transfer and associated $8 bank fee charged by NSGB). NSGB charged "USD 8" on "incoming transfers" involving a foreign "correspondent bank." Ex. 57 (ATA0035592 at -592).

[108] Ex. 58 (ATA0024362 at -362-64); Ex. 57 (ATA0035592 at -592-93).

[109] Ex. 58 (ATA0024362 at -364).

[110] *See*, *e.g.*, Ex. 49 (ATA0000503 at -507-09) (identifying "cash pooling" via the "LME account in Egypt" as one key way to "secure our FX needs").

Herrault on August 5, 2013, Defendants intended to cover "the recently agreed remuneration of FT" (*i.e.*, Firas Tlass) by wiring U.S. dollars "directly to his offshore account from an account LCS is having through LMEA in Egypt."[111] The reason for using the LMEA account was simple. Routing U.S. dollars from the LMEA account was how Defendants "intend[ed] to proceed in the future to sever[ ] any suspicion in connecting LCS and FT."[112]

254. Defendants considered the $75,000 payment to Tlass to be "very critical to be finalized urgently."[113] So LCS initiated a U.S.-dollar wire transfer from its LMEA account, which was "in process by the bank" and which was going to clear through New York.[114] But LCS was foiled by "a problem with the compliance department in the bank to transfer the USD" – stemming from requirements imposed by New York clearing banks – and so had to re-issue the wire in Euros.[115] Lafarge Egypt's head of treasury circulated a SWIFT message confirming that LCS had paid the wire from its LMEA account to Tlass's account at Audi Lebanon.[116]

255. Defendants did not like paying in Euros and so immediately reverted to paying Tlass's monthly $75,000 stipend in U.S. dollars. But because New York banks would not clear U.S.-dollar wires from Egypt to Tlass's account at Audi Lebanon,[117] Defendants had to come up with another way to pay him. So they devised a new workaround in which LCS paid Tlass through an internal book transfer between Audi Lebanon accounts[118] and then reimbursed itself on the

[111] Ex. 59 (8/5/2013 Pescheux-Herrault Email) ("Suspicion Email").

[112] Suspicion Email at 1.

[113] Ex. 60 (ATA0004874 at -876).

[114] Ex. 60 (ATA0004874 at -875).

[115] Ex. 60 (ATA0004874 at -875).

[116] Ex. 60 (ATA0004874 at -874, -878).

[117] Ex. 47 (ATA0018291 at -291-92) (noting that "US sanctions prohibit Syrian persons and organizations to enter the US Financial System, i.e. no USD transfer involving Lafarge Cement Syria can be made," so "USD may probably not be received in our bank account in Lebanon").

[118] *E.g.*, Ex. 32 (ATA0000288) (example of Jan. 2014 payment instruction).

back-end out of the LMEA account. PwC's forensic review identified two such intracompany transfers coded as "Adv to Mr. Bruno/LMEA Acc."[119] Those transfers used the U.S. dollars stockpiled in the LMEA account to finance Pescheux's payments to Tlass.[120]

256. More broadly, LCS repeatedly used its LMEA slush fund to preserve its U.S.-dollar liquidity and cover its U.S.-dollar expenses, including by making large interest payments to its lenders.[121] Without the supply of U.S. dollars from this account, LCS would have had a harder time covering its expenses and freeing up the U.S.-dollar cash it needed to pay Tlass, Taleb, and the terrorists they were paying. Paying LCS's operating expenses from the LMEA account also enabled the Jalabiyeh plant to manufacture the cement LCS sold to ISIS.[122] And the U.S.-dollar wires LCS routed into that account – relying on NSGB's correspondent account with BNY Mellon – were vital to sourcing the U.S. dollars on which the whole scheme depended.

### 2. Defendants Instructed Their Banks To Execute These U.S.-Dollar Transactions Knowing They Would Clear Through New York

257. When Defendants ordered the U.S.-dollar transfers in Paragraph 221, they instructed their banks to execute the wires knowing they would clear through New York.

258. Defendants' internal documents reflected their understanding that U.S.-dollar wires typically require New York clearing. In November 2011, Bank Audi sent a memo from Shearman & Sterling to several LCS executives, including Pescheux, Mirakoff, and LCS's treasury manager,

---

[119] Project Alpha Report at -237-38; *see* Ex. 61 (ATA0003037, Rows 7510, 7511) (recording both transfers in Defendants' master bank file).

[120] *See e.g.*, Project Alpha Report at -230, -237-38.

[121] Ex. 62 (ATA0003359, In.Out Flow Tab, Rows 120, 238, 268, 928, 964, 1138, 1183, 1194, 1248, 1625, 1739, 1952, 2016, 2105, 2244, 2387, 2416, 2502).

[122] *E.g.*, Ex. 63 (ATA0018621 at -623) ("It is critical for us to receive money from abroad and manage our cash flows in an efficient manner if we want to be able to continue paying our loan.").

addressing LCS's loan-repayment obligations.[123] The memo conveyed the widely held understanding that U.S.-dollar wires clear through New York, warning LCS: "[b]ecause the proposed repayment[s] to the Lenders ***are in US dollars***, ***they would be processed through some New York correspondent bank***."[124] Lafarge emails echoed the same theme. Defendants often expressed the view that U.S. sanctions blocked LCS from wiring U.S. dollars because "***USD transfer[s]***" necessarily required LCS "***to enter the US Financial System***."[125]

259. Defendants also revealed that understanding in other contexts. Benattar conveyed his knowledge of U.S. correspondent banks when wiring Lafarge's October 2014 payment to Tlass, informing his colleagues that he "need[ed]" to know "***the US correspondent bank*** of the supplier's bank" because "***the invoice is in USD***."[126] The year before, BNP Paribas – Lafarge's main bank – had similarly clarified to Benattar and others that "***USD flows transit through our subsidiary BNP Paribas New York***."[127] And a few months after, Lafarge's International Treasurer told a counterparty that, "to properly execute [a] payment" "in USD," Lafarge's "Back Office will need the ***intermediary bank & its details for a USD transfer***."[128] Lafarge did not think a "European" bank could process a U.S.-dollar wire, he explained, which is "***why we expect it [to]***

[123] Ex. 64 (ATA0018518 at -518) (Bank Audi sending memo to Valery Mirakoff and copying Pescheux and Alzaim); *see id*. at -540-46.

[124] S&S Memo at -287.

[125] Ex. 47 (ATA0018291 at -291); *see*, *e.g.*, Ex. 65 (ATA0002153 at -153) (LCS treasury manager telling counterparty, "As you for sure are aware, all payments in USD from Syria are being blocked."); Ex. 66 (ATA0005162 at -167) (same LCS official emphasizing that "[d]ue to US sanctions no more payments in US Dollars are possible from Syria" given the compliance policies followed by "the correspondent banks"); Ex. 67 (ATA0002227 at -229) (attributing foreign-currency challenges to "political restriction on usage of US financial system").

[126] Ex. 19 (ATA0004739 at -739) (certified English translation).

[127] Ex. 68 (ATA0032337 at -337) (certified English translation).

[128] Ex. 69 (ATA0025059 at -060) (certified English translation).

***work with a partner bank in the USA***."[129] Lafarge thus recommended using "Bank of NY Mellon" as the intermediary bank to clear U.S. dollars through New York.[130]

260. Defendants' experience with failed U.S.-dollar wires cemented that understanding. In late 2011, for example, LCS tried to pay U.S. dollars to an affiliate's account at HSBC Singapore, but the affiliate warned that the funds would "be blocked" due to sanctions because they would have to go through "HSBC USA (USD)."[131] The same month, LCS tried to send U.S. dollars to an Indian company's account at Standard Chartered New Delhi. The SWIFT message confirmed that Standard Chartered used its New York branch as the correspondent, which had "reject[ed]" the transfer.[132] Mirakoff explained the reason: "the rejected transfer went through SCB New York" and "a US bank will not transfer funds to a Syrian bank," leading him to worry that "the funds could be blocked in NY forever."[133] Likewise, in 2015, Lafarge's Treasury Back Office team had a U.S.-dollar wire fail because of an error using "SCB [Standard Chartered] Frankfurt" as the "USD correspondent bank."[134] Lafarge quickly discerned that "the issue is fully related to the correspond[e]nt, as it should be SCB NY."[135] So Lafarge's treasury team corrected the payment by "adding USD Correspondent bank SWIFT of SCB NY."[136]

261. Defendants fared better in executing other U.S.-dollar transactions through New York correspondent accounts. Lafarge often received invoices calling for U.S.-dollar execution

[129] *Id.*

[130] *Id.*

[131] Ex. 70 (ATA0002267 at -275).

[132] Ex. 71 (ATA0002156 at -156); *see id.* at -157 (using SWIFT code SCBLUS33XXX for intermediary bank).

[133] Ex. 72 (ATA0002286 at -286).

[134] Ex. 73 (ATA0024796 at -796).

[135] Ex. 73 (ATA0024796 at -796).

[136] Ex. 73 (ATA0024796 at -796).

through New York, such as a Jordanian consultant's April 2012 invoice calling for U.S.-dollar payment to "Jordan National Bank" in Amman "[t]hrough: JP Morgan Chase, New York – USA."[137] Lafarge also periodically received Standard Settlement Instructions from the European Investment Bank instructing it to use BNY Mellon in New York as the correspondent bank.[138] Lafarge even made regulatory filings in a foreign jurisdiction that demanded filing fees be paid through a "Correspondent Bank" at "111 Wall Street" in "New York, USA."[139] Benattar, Vaisoul, and Khodara all had similar experiences with New York clearing. Each of them – the people most involved in the mechanics of wiring Tlass money through New York – was intimately familiar with using New York correspondent banks in other contexts.[140]

262. Lafarge's outside consultants had the same understanding. LafargeHolcim retained Baker McKenzie and PwC in 2016 to review Lafarge's payments to Syrian terrorists, and they produced a report for Lafarge entitled "*Project Alpha* Forensic Transaction Review."[141] That report further manifested the view that U.S.-dollar transfers virtually always clear through U.S. correspondent banks. Indeed, without knowing the precise routing details of several "bank transfer[s]," Baker McKenzie opined: "PwC's review reflects that these payments were ***made in USD and it is therefore presumed that they were processed through the US financial system***."[142] Defendants shared that same presumption at all relevant times.

[137] Ex. 74 (ATA0032118 at -219).

[138] *E.g.*, Ex. 52 (ATA0031601 at -602).

[139] Ex. 75 (ATA0009182 at -185).

[140] Ex. 76 (ATA0032717 at -717, -719-20) (certified English translation) (Benattar); Ex. 77 (ATA0027565 at -565, -569) (Benattar); Ex. 78 (ATA0039494 at -494, -503) (Vaisoul); Ex. 79 (ATA0060118 at -118, -121) (Vaisoul); Ex. 80 (ATA0023925 at -925) (Khodara).

[141] Project Alpha Report at -223.

[142] Project Alpha Report at -190.

263. Non-privileged client alerts by Defendants' counsel also alerted them that their transactions used the U.S. banking system. For example, while Shearman & Sterling LLP was advising Lafarge, it published an alert warning its clients that U.S. courts endorsed an "expansive assertion of territorial jurisdiction over non-U.S. defendants," extending to "overseas financial transactions involving US dollars, premised on the fact that virtually all such transactions clear through correspondent banking accounts in the U.S."[143] Similarly, Baker & McKenzie represented Lafarge during and after the scheme, and in the earlier period published a "client alert" warning that "a wire transfer from or to a U.S. bank or otherwise using the U.S. banking system" could confer U.S. jurisdiction based on "the use of correspondent bank accounts."[144]

264. Syrian government decrees likewise alerted Defendants that their U.S.-dollar transactions depended on the U.S. banking system. For example, in February 2006, the Syrian government issued Circular Number 810/15, requiring that all foreign-currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros, specifically to avoid U.S.-dollar clearing by New York banks. That decision, of which Defendants knew, reflected the widespread understanding in Syria that "US laws stipulate that any dollar transfers must pass through the US banking system."[145]

---

[143] Shearman & Sterling LLP (Philip Urofsky, Stephen Fishbein, Danforth Newcomb, Patrick D. Robbins, Paula Howell Anderson, Richard Kreindler, Markus S. Rieder, Richard Kelly, Jo Rickard, Brian G. Burke & Brian C. Wheller), *Shearman & Sterling Client Publication: The New FCPA Guide: The DOJ and the SEC Do Not Break New Ground But Offer Useful Guidance and Some Ominous Warnings* at 3 (Nov. 15, 2012), https://tinyurl.com/5dx8mndc.

[144] Baker & McKenzie LLP (Paul J. McNulty, Joan E. Meyer, Robert W. Kent, Jr., John P. Cunningham, Crystal R. Jezierski, Peter B. Andres, and Erica C. Spencer), *Baker & McKenzie Client Alert: Inside the U.S. Government's Highly-Anticipated FCPA Resource Guide* at 2 (Nov. 16, 2012), https://tinyurl.com/5n7xus77.

[145] BBC International Reports (Middle East), *Syria Replaces Dollar With Euro For State Transactions* (Feb. 24, 2006) ("Text of report by Hayam Ali headlined 'The euro used in state transactions', published by Syrian newspaper Al-Thawrah website on 13 February [2006]").

265. Defendants also received confirmations specific to the transactions in Paragraph 221. Those confirmations typically took the form of SWIFT MT103 messages.[146] SWIFT, which stands for the Society for Worldwide Interbank Financial Telecommunication, is the standard communications system for sending wire-transfer messages between financial institutions. An MT103 (or Message Type 103) is a standard message confirming the details of an executed transaction. Fields 53, 54, and 56 in an MT103 typically disclose the correspondent and intermediary banks involved. Defendants' "usual" practice in executing a wire transfer was to request from their banks the "swift message" identifying the correspondent banks involved.[147]

266. Defendants have produced the SWIFT confirmations they received for 10 of the 15 New York-cleared wires identified in Paragraph 221; each informed Defendants that a specific New York bank had processed their payment.[148] Defendants likely once had, but have since destroyed, the SWIFT confirmations for the other five that also indicated the participation of a New York bank.

[146] *See*, *e.g.*, Ex. 28 (ATA0000220 at -220) (LMEA treasury employee informing LCS that a U.S.-dollar "transfer is being done now, will provide you with the swift within the coming hour"); *id*. at -223-24 (also providing MT103 for earlier transfer wired into LCS account).

[147] Ex. 81 (ATA0060033 at -034) (certified English translation) (Lafarge's back-office team telling BNP Paribas that Lafarge "received an amount of 32,519.64USD . . . of which we do not have any details" and asking bank to "send us a swift message regarding this receipt" consistent with "usual support"); *see id.* at -033-34 (providing SWIFT message); Ex. 82 (ATA0032366 at -367-68) (sharing "MT 103 confirming the transmission of funds" through New York); Ex. 83 (ATA0021482 at -483-84) (SWIFT message for New York wire); Ex. 84 (ATA0032193 at -193, -197) (attaching "transfer swift" confirming wire through "BNP PARIBAS U.S.A-NEW YORK BRANCH"); Ex. 85 (ATA0001916 at -916) (requiring "SWIFT letter so I can trace the transfer with our bank"); Ex. 28 (ATA0000220 at -226) ("will send you the swift once [I] get it").

[148] Ex. 12 (ATA0031866 at -866-68) (four 1/18/2011 transfers); Ex. 26 (ATA0005437 at -442-43) (2/28/2011 transfer); Ex. 13 (ATA0000358 at -358) (4/14/2011 transfer); Ex. 14 (ATA0000047 at -049-50) (7/7/2011 transfer); Ex. 28 (ATA0000220 at -223-24) (8/8/2011 transfer); Ex. 15 (ATA0000060 at -060) (8/15/2011 transfer); Ex. 58 (ATA0024362 at -364) (9/26/2013 transfer).

267. Defendants sometimes obtained the MT103 as part of their approval process for the transaction. For example, Pescheux specifically "[a]pproved" the August 8, 2011 upstream loan disbursement to LCS's Audi Lebanon account after receiving the SWIFT message disclosing that JPMorgan Chase's and Citibank's New York branches had routed the payment.[149]

268. Defendants also typically verified the correspondent-bank routing before ordering a wire. They did so through Quantum, Lafarge's electronic-payment software. As explained by Lafarge's Deputy International Treasurer, before wiring money to a counterparty, Lafarge "need[ed] to create" the counterparty "as [a] beneficiary in Quantum to be able to make a transfer."[150] And that process of adding information to be "created in Quantum" required Lafarge to enter the payment currency, beneficiary bank, correspondent bank, and correspondent bank address.[151] As Lafarge's International Treasurer confirmed, "***[n]ormally there is an intermediary bank to be entered in Quantum***," which was "necessary for international payments in a currency other than that of the beneficiary's country."[152] Defendants thus investigated the correspondent "bank accounts' information" before setting up new "counter-parties in our system" for wire transfers.[153] It was what Lafarge's back office demanded: "to properly execute [a] payment," Lafarge "***need[ed] the intermediary bank & its details for a USD transfer***."[154]

[149] Ex. 28 (ATA0000220 at -221) (Pescheux's approval); *id.* at -223 (MT103 confirming that Citi and JPM Chase New York branches were involved).

[150] Ex. 86 (ATA0050870 at -870).

[151] Ex. 86 (ATA0050870 at -870) (listing fields).

[152] Ex. 69 (ATA0025059 at -059) (certified English translation).

[153] Ex. 87 (ATA0024476 at -476); *see* Ex. 51 (ATA0058827 at -833) ("To be able to create in Quantum the bank accounts below, can you please tell us the swift code of the intermediary bank for the USD accounts?"); Ex. 88 (ATA0025152 at -152); Ex. 89 (ATA0000383 at -383).

[154] Ex. 69 (ATA0025059 at -060) (certified English translation); *see* Ex. 51 (ATA0058827 at -833) ("To be able to create in Quantum the bank accounts below, can you please tell us the swift code of the intermediary bank for the USD accounts?").

269. A Quantum screenshot, taken from a Lafarge email, illustrates the point.[155] As the screenshot demonstrates (red boxes added), Quantum provided an interface for Lafarge to enter its "Approved Counterparty Delivery Instructions." The interface required Defendants to select the payment currency and to choose whether to follow the beneficiary bank's "Standard Settlement Instruction." The interface also contained a tab called "Intermediary Bank:"




For each of the U.S.-dollar wires described in Paragraph 221, Defendants used this interface to execute the wire. That required Defendants to type into Quantum the "Intermediary Bank" that would clear the wire – ***including its New York address*** – before they executed the first transfer to any payee, and to rely again on that same set of instructions for each subsequent transfer.

270. Even apart from Quantum, Defendants had bank-specific knowledge of the New York financial system's role in clearing their 15 suit-related U.S.-dollar wires.

[155] Ex. 90 (ATA0050876 at -876).

271. **BNP Paribas Paris.** Defendants specifically knew that BNP Paribas's Paris branch – which originated the $210,000 wire to Tlass in October 2014 – used BNP Paribas's New York branch to clear Lafarge's U.S.-dollar wires. Lafarge was telling its own counterparties as early as 2012 that Lafarge's account with "BNP Paribas, Paris" used a "USD correspondent bank : BNP NEW YORK (SWIFT code :BNPAUS3N)."[156] In early 2013, Lafarge's International Treasurer reiterated that the "Lafarge SA bank account reference for USD remains unchanged," with a "Correspondent bank" of "BNP NEW YORK."[157] In July 2013, BNP Paribas reminded Lafarge's International Treasurer – copying Benattar and Lafarge's entire Treasury Back Office team – that ***"USD flows transit through our subsidiary BNP Paribas New York***."[158] And in 2015, Benattar told a law firm that the "bank address for the USD transfer to Lafarge SA" must use "BNP NEW YORK" as the "Correspondent bank."[159] So when Benattar and his colleagues instructed BNP Paribas to send Tlass a U.S.-dollar wire, they had no doubt where it was going: through the same BNP Paribas New York account they always used.

272. BNP Paribas's use of its New York branch to clear U.S.-dollar transfers also tracked its standard settlement instructions. Before the relevant period, BNP Paribas published its standard settlement instructions for its Paris branch in the Bankers Almanac, which specified that it typically settled "USD" transfers through "BNP Paribas SA, New York."[160]

273. **Bank Audi.** Defendants likewise knew their U.S.-dollar transfers through Bank Audi relied on New York correspondent banks. For the upstream payments Lafarge made into

[156] Ex. 91 (ATA0058766).
[157] Ex. 92 (ATA0057787 at -787).
[158] Ex. 68 (ATA0032337 at -337) (certified English translation).
[159] Ex. 93 (ATA0032069 at -069).
[160] Ex. 54 (Bankers Almanac at 1424 (Vol. 1, July 2008)).

LCS's Audi Syria accounts, they received SWIFT MT103 confirmations specifically reporting that each cleared through Citibank New York.[161]

274. Defendants gained even more precise knowledge that their Audi Lebanon account relied on a New York correspondent bank. The account-opening process made that clear. In July 2011, LCS became uncomfortable with Audi Syria, viewing the continued reliance on a Syrian bank as posing risks to LCS's "Cash Management flexibility."[162] So LCS set out to open a new Lebanese account from which it could more freely send and receive U.S. dollars. It initiated that process on July 12, 2011, when Mirakoff met with the "Audi Lebanon Team" to discuss the new account.[163] A few weeks later, on July 28, Bank Audi approved LCS for a new "US Dollar Operating Account with Bank Audi SAL – Audi Saradar Group" in Lebanon.[164]

275. Audi Lebanon immediately informed LCS that its new account would use JP Morgan Chase's New York branch as the U.S.-dollar correspondent. Once the account was officially approved, LCS's treasury manager asked for the "account's references as soon as available."[165] Bank Audi responded by emailing LCS the account "coordinates" as follows:

> Correspondent Bank Name: JP Morgan Chase
> Address: New York
> SWIFT of Correspondent Bank: CHASUS333
> BANK Name: Bank Audi SAL – Audi Saradar Group
> BANK Account No with Correspondent: 544-7-29027
> SWIFT of BANK: AUDBLBBX[166]

---

[161] *Supra* ¶¶ 229-31 (citing SWIFT messages, each referencing Citi NY's SWIFT code).
[162] Ex. 14 (ATA0000047 at -047).
[163] Ex. 14 (ATA0000047 at -047).
[164] Ex. 94 (ATA0002147 at -148-49).
[165] Ex. 94 (ATA0002147 at -148).
[166] Ex. 94 (ATA0002147 at -247).

276. Roughly two weeks after opening the Audi Lebanon account, Lafarge wired $10 million (via Lafarge Cyprus) into that account, using the designated JP Morgan Chase correspondent account in New York. The SWIFT message confirming the transfer, which Defendants circulated internally, described JP Morgan Chase's involvement.[167] LCS's treasury manager forwarded the SWIFT confirmation to two LCS accountants, while also attaching the "Lebanon Account references."[168] Those references reiterated to both LCS employees that the "***Correspondent Bank Name***" was "***JP Morgan Chase***" in "***New York***."[169]

277. Audi Lebanon's use of JPMorgan Chase to route U.S.-dollar wires also matched its public settlement instructions. Before the relevant period, Audi Lebanon published its standard instructions in the Bankers Almanac, which specified that it typically settled U.S.-dollar wire transfers through correspondent accounts at "The Bank of New York" and "JPMorgan Chase Bank, National Association," which is JPMorgan's New York branch.[170]

278. U.S. government findings also alerted Defendants that Bank Audi relied on U.S. correspondent banks. On February 17, 2011, for example, the Treasury Department published findings that "[t]here are 66 banks incorporated in Lebanon, and all major banks" – which included Bank Audi – "have correspondent relationships with U.S. financial institutions."[171]

279. **NSGB Egypt.** Defendants had similar knowledge about their LMEA account at NSGB Egypt. Shortly after LCS opened the account, it received a SWIFT message about an

---

[167] Ex. 95 (ATA0000186 at -187) (field 56A).

[168] Ex. 95 (ATA0000186 at -186).

[169] Ex. 95 (ATA0000186 at -192).

[170] Ex. 54 (Bankers Almanac at 772 (Vol. 1, 2008)).

[171] U.S. Dep't of Treasury (FinCEN), *Finding That the Lebanese Canadian Bank SAL Is a Financial Institution of Primary Money Laundering Concern*, 76 Fed. Reg. 9403, 9404 (Feb. 17, 2011) (footnote omitted), https://tinyurl.com/b2tpah7r.

incoming U.S.-dollar wire disclosing that BNY Mellon in New York had routed the money.[172] Once again, that confirmation tracked NSGB's standard settlement instructions, which publicly alerted Defendants to NSGB's practice of routing U.S. dollars through BNY Mellon.[173]

280. As these transactions demonstrate, all three Defendants were intimately involved in directing and routing the U.S.-dollar transfers they executed. They did not simply leave the routing decisions to their banks; the details were too important to Lafarge.[174] Defendants belonged to a sophisticated multinational conglomerate that employed large treasury and back-office teams to supervise their banks and to manage their currency exposure across several markets.[175] For that reason, Defendants regularly communicated with their banks about how to route their money, including with respect to the correspondent banks used.[176]

281. Defendants were not indifferent to the choice of correspondent banks. LCS knew its struggles to source "USD" were "mainly depend[ent] on the banks emitting the transfer."[177] That recognition led LCS to observe, for all transactions touching Syria: "***we have to cho[o]se***

---

[172] Ex. 58 (ATA0024362 at -364).

[173] *Supra* ¶ 251.

[174] *Compare*, *e.g.*, Ex. 94 (ATA0002147 at -147) (LCS describing plan to open a new Lebanese bank account to wire U.S. dollars instead of Syrian account) *with* Ex. 41 (ATA0005040 at -040) (LCS instructing Lafarge Egypt to "transfer the amount to the Syrian Account" rather than Lebanon account, to avoid "additional useless days" in routing).

[175] *See*, *e.g.*, Ex. 69 (ATA0025059 at -059-60) (certified English translation) (copying "treasury.backoffice@lafarge.com" and informing counterparty that "Back Office" needed to verify "intermediary bank").

[176] *See*, *e.g.*, Ex. 96 (ATA0035568 at -568) (detailing "our pressure on Audi Lebanon to by themselves practice continuous pressure on the foreign banks," to ensure that correspondent banks "process the payments" despite the "embargo . . . effected by the US"); Ex. 97 (ATA0021174 at -176) (Lafarge finance personnel noting urgent need to funnel "fresh cash" into LCS and to "channel the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria").

[177] Ex. 47 (ATA0018291 at -292).

***wisely the bank correspondant***."[178] Defendants thus often took steps to verify the "correspond[ent] USD bank" clearing their wires, so they could "pass it on to our [own] correspondents" to facilitate the smooth flow of currency across geographic jurisdictions.[179]

282. When Defendants instructed their banks to process U.S.-dollar wires, they intended to (and did) cause their banks to wire money through New York correspondent accounts. And when Defendants' banks carried out those instructions, they did so as Defendants' agents. In a cross-border wire transfer, the originating bank – the bank that first receives the order from the wire originator – carries out the transfer on the originator's behalf. The originator also exercises substantial control over the originating bank. Among other things, Defendants here specified each transfer's date, amount, and currency denomination. Each time, Defendants' originating bank had to follow Defendants' instructions. Those instructions effectively mandated that the banks rely on New York's financial system, on Defendants' behalf.

283. Defendants also had the right to dictate the use of specific correspondent or intermediary banks.[180] Defendants sometimes exercised that control by dictating to their originating bank a particular intermediary Defendants wanted to use.[181] Lafarge also routinely

[178] Ex. 47 (ATA0018291 at -292).

[179] Ex. 68 (ATA0032337 at -337-38) (certified English translation); *see* Ex. 98 (ATA0005043 at -046) (supplying "details of the correspondent bank"); Ex. 66 (ATA0005162 at -167) (verifying that transfer was workable for "all the correspondent banks involved"); Ex. 63 (ATA0018621 at -627) (promising to "communicate" with counterparty about "the transfer process and route"); Ex. 99 (12/5/2013 Khayer-ElAnsary-Sandook Email String at 2) (identifying "correspondent bank to be transferred through"); Ex. 100 (ATA0018698 at -701) (instructing counterparty to provide new account "that will accept transfers from Syria going through Commerzbank Frankfurt as Correspondent"); Ex. 101 (ATA0014184 at -186-88) (describing laborious process to find workable transfer route from Syria to India).

[180] Ex. 69 (ATA0025059 at -059) (certified English translation) (describing Lafarge's right to "impos[e] an intermediary bank on the issuing bank (BNPP in this case)").

[181] Ex. 102 (ATA0024755 at -755) (LCS treasury manager "called Sandra/Audi Lebanon Bank and told her that we can not execute the payment through JP Morgan Chase Bank," instead

instructed its counterparties to send money to its chosen U.S.-dollar correspondent account at BNP Paribas, New York.[182] Thus, for each of their U.S.-dollar transactions that cleared in New York, Defendants could have dictated use of a non-U.S. correspondent bank but consciously declined to do so. More often, Defendants simply instructed their banks – using Quantum's Counterparty Delivery Instructions interface – to follow their standard settlement protocol.[183] Defendants understood that those instructions here dictated the use of New York banks.

284. Defendants' control extended still further over their outgoing wires, including for the $210,000 they wired to Tlass in October 2014. For example, Defendants input into Quantum North Logistics' U.S.-dollar correspondent bank – JPMorgan Chase, New York – and instructed BNP Paribas to execute through that intermediary, thus requiring the use of New York's clearing services.[184] In addition, Defendants knew BNP Paribas would route the money to JPMorgan Chase via its own New York branch, consistent with its standard settlement instructions.

285. Defendants also paid banking fees to the New York banks that cleared their transactions. Correspondent banks typically charge a fee for each wire transfer that they process. Those fees can be paid in three ways; the specific payment mechanism is typically reported at Field 71A of the SWIFT MT103. Option one – denoted by "OUR" – has the originator cover the fees separately, on top of the amount transferred. Option two, denoted by "BEN," covers the fees by deducting them from the amount transferred. Option three, denoted by "SHA," is a mix of the two. In each scenario, the sender wires the money to the intermediary or correspondent bank to

---

requesting use of "another bank account"); Ex. 103 (ATA0008980 at -985-87) (discussing strategy to avoid "designated intermediary" bank); Ex. 101 (ATA0014184 at -190) (rejecting designation of "Bank of America" and demanding "Commerz Bank" as "correspondent bank").

[182] *E.g.*, Ex. 104 (ATA0032527 at -548) (Benattar signing payment form that included in the "Payment Instructions" field: "Correspondent bank : BNP New York").

[183] *Supra* ¶ 268.

[184] *Supra* ¶¶ 226, 268-69.

compensate that bank for the service of processing the transaction. Thus, when Defendants relied on New York banks to clear their transactions, they knowingly sent money into New York to compensate those banks for the service.

286. Defendants paid New York banking fees to clear every U.S.-dollar wire for which they have produced a SWIFT confirmation. For 11 of those wires, the SWIFT message designated "SHA" in Field 71A, meaning that the sender and recipient split the banking fees.[185] In all but one of those 11 transfers, Defendants were on both sides of the wire, so Lafarge or Lafarge Cyprus split the fees with LCS. For two more, Field 71A stated "OUR," meaning that the sender – in both cases, Lafarge Cyprus – covered the fees.[186] In every instance, therefore, at least one Lafarge entity paid some of the fee the New York bank charged for its service clearing the wire. And Defendants were aware of those fees, observing in March 2011 that their upstream equity contributions had yielded "differences between the credited amount and the transferred amounts" due to "***bank charges from Citibank NY***."[187] They made a similar observation for the September 2013 LMEA transfer, noting they had to pay "the ***charges deducted by the remitter and the correspondent bank***"[188] – in that case, BNY Mellon in New York.

**3. Defendants Purposefully Benefited From New York Clearing**

287. Defendants' New York contacts enhanced the potency of the aid they gave to ISIS and ANF. Not every payment made was in U.S. dollars. But Defendants' preference was to pay in U.S. dollars when possible, and using U.S. dollars (even if not exclusively) was critical to the conspiracy. Indeed, Defendants' ability to reliably transfer U.S. dollars – which depended on their

---

[185] Ex. 12 (ATA0031866 at -866-68); Ex. 26 (ATA0005437 at -437-42); Ex. 13 (ATA0000358 at -358); Ex. 14 (ATA0000047 at -050); Ex. 58 (ATA0024362 at -364).

[186] Ex. 28 (ATA0000220 at -224); Ex. 15 (ATA0000060 at -060).

[187] Ex. 26 (ATA0005437 at -437).

[188] Ex. 57 (ATA0035592 at -592).

access to New York's banking system – was vital to the scheme's success. Defendants' conscious choice to use U.S. dollars and New York banks offered at least three benefits.

288. *First*, transacting in U.S. dollars through U.S. banks helped Defendants legitimize their payments and reduce unwanted scrutiny from outside auditors. Given the deteriorating security situation in Syria, and the resulting U.S. and international sanctions, Lafarge's Syrian operations faced significant financial scrutiny.[189] To continue making payments to terrorists in that environment, Defendants had to design a system to "arouse less suspicion by LCS's external auditors and conceal the purpose of the payments."[190] U.S. dollars helped Defendants avoid such suspicion. At the time, Syria's financial system was in severe distress, plagued by rapidly spreading black markets for illicit financial activity. By contrast, the U.S. dollar was the global reserve currency for legitimate transactions among established, multinational businesses. Lafarge's "preferred option" was thus to make "bank transfer[s] in USD," so that its wire transfers would have the imprimatur of legitimacy associated with U.S.-dollar transactions.[191]

289. Defendants' contract machinations confirm the point. Until July 2013, LCS was paying Tlass in Syrian pounds by making so-called "turnover" payments equal to 1% of LCS's net revenue.[192] But as Defendants' unlawful payments escalated, they grew uncomfortable with that arrangement.[193] Defendants thus insisted on a new contract – not with Tlass personally, but with

---

[189] *E.g.*, Ex. 105 (ATA0009218 at -218) (Herrault telling Tlass that his preferred method of paying dollars in his "Account in Beirut" was "put[ting] the company at risk at it has to stop").

[190] Plea Statement ¶ 56.

[191] *Id.* ¶ 60; Preferred Option Email at 2.

[192] 2010 Tlass Agreement art. 4 ("Service Fees shall be 1% of the net sales of LCS"). In addition to the "turnover" payments, Defendants also "pa[id] him a monthly donations which normally is supposed to be entirely distributed" to terrorists. Ex. 106 (ATA0000541 at -541).

[193] Preferred Option Email at 2 ("As discussed many times, we cannot continue the way we are settling the turnover invoices.").

a Tlass-controlled shell company in Dubai – calling for payment in U.S. dollars. And rather than structure those payments as a percentage of net revenue, they agreed on a flat $75,000 monthly fee, denominated in U.S. dollars.[194] Pescheux explained the logic in an August 5, 2013 email to Herrault, a Lafarge executive and his direct report. As Pescheux wrote, wiring $75,000 in "USD" from the "LMEA Account" to Tlass's "offshore account" was how Defendants wanted "to proceed in the future to sever[ ] any suspicion in connecting LCS and FT."[195]

290. Defendants' use of U.S. dollars to mask their activities matched their broader concealment efforts. Among other things, Defendants funneled their payments through a web of 54 different bank accounts, which PwC called "[un]usual[ ] and excessive."[196] By using so many accounts, Lafarge made it more difficult for others to detect the scheme.

291. *Second*, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk. Due to international sanctions and Syria's civil war, the value of the Syrian pound plummeted during Defendants' scheme.[197] When Defendants' arrangement with Tlass began, the Syrian pound was trading against the U.S. dollar at roughly 47:1. By the middle of 2013, it had depreciated to roughly 220:1 (having lost roughly 3/4 its value).[198] The Syrian pound's rapid "depreciation" prompted Tlass to demand payment from LCS in U.S. dollars.[199]

---

[194] Feb. 2014 Tlass Agreement at -426 (contract with "Nort Logistics Consultancy Service JLT"); *id*. art. 4 ("From July 1, 2013, the Employer shall pay a monthly remuneration of 75,000USD."); Ex. 107 (ATA0009228 at -228) (Pescheux demanding new contract with "company you control").

[195] Suspicion Email at 1; *see* Plea Statement ¶ 62.

[196] Project Alpha Report at -227.

[197] Ex. 7 (ATA0009139) (identifying "swift depreciation of the Syrian Pound" as a "nightmare" that ranked among LCS's "major problems").

[198] Ex. 106 (ATA0000541 at -541).

[199] Ex. 106 (ATA0000541 at -541) ("remuneration based on turnover is now challenged by FT" in part due to "depreciation of the Syrian Pound vs USD").

Indeed, in a meeting with Pescheux in August 2013, Tlass "***ended by saying he would prefer a fixed monthly fee in USD***."[200] And Defendants – which constantly monitored the USD-SYP exchange rate[201] – had similar preferences, going to great lengths to hold as much of LCS's cash as possible in U.S. dollars.[202] LCS became so desperate for U.S. dollars that it was even willing to buy them on the Syrian "grey market" at exorbitant exchange rates.[203]

292. *Third*, Defendants' payments satisfied ISIS's and ANF's general preference for U.S. dollars. Real-time public reports linked ISIS's fundraising prowess – and its recruiting success – to its stockpile of U.S. dollars. As *Business Insider* reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money. ***After joining [ISIS], people are paid in US dollars instead of Syrian liras***. . . . ISIS members receive additional incentives to fight for the group. "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said]. "It cost $50 per month. [ISIS] paid for the house, the electricity. Plus, I was married, so I got an ***additional $50 per month*** for my wife. If you have kids, you get ***$35 for each***. If you have parents, they pay ***$50 for each parent***. This is a welfare state." And ***those financial benefits are not just limited to the organization's fighters.***[204]

293. Investigative reports sourced to witnesses from inside ISIS's territory reinforce that connection. For example, according to the *Independent*, a leading British newspaper that has covered ISIS extensively since its inception, the "Islamic State was already known to pay its recruits in [U.S.] dollars, sell[ ] oil and looted antiques for dollars, and accept extorted taxation and

---

[200] Ex. 106 (ATA0000541 at -541).

[201] Ex. 108 (ATA0022737 at -738) ("LCS observes and determines USD/SYP rate as the parallel market is driven by the USD/SYP exchange rate.").

[202] Ex. 109 (ATA0020481 at -487) ("To alleviate the risk relating to currency devaluation, LCS attempts to maximize the cash denominated in USD and EUR.").

[203] Cash Shortfall Memo at -066 ("As we cannot get Fx currency from the Central Bank of Syria, we buy it either on the grey market or from the commercial banks.").

[204] Jeremy Bender, *An ISIS Defector Explained A Key Reason People Continue Joining The Group*, Bus. Insider (Nov. 18, 2015), https://tinyurl.com/3ced6xs5.

hostage money in dollars."[205] ISIS "promoted the idea that it was hitting the US economy by issuing its own currency but the organisation on the ground is doing exactly the opposite, having ***built a financial system entirely dependent on the US dollar***."[206]

294. Defendants' reliance on New York banks helped them capture all these benefits of their U.S.-dollar payments. New York is the global hub of cross-border U.S.-dollar transfers for good reason: companies that wire their U.S. dollars through New York gain from the legitimacy, reliability, and speed offered by New York clearing. Transacting through other clearing centers is possible – there are other ways to move U.S. dollars in theory – but all present operational risks that New York clearing avoids. By routing the payments identified in Paragraph 221 through New York, Defendants maximized the potency of their terrorist funding.

295. New York clearing enhanced the legitimacy of Defendants' U.S.-dollar payments and helped Defendants conceal their scheme from auditors. As noted above, Defendants chose to transact in U.S. dollars in part to make their payments look like ordinary "bank transfer[s]."[207] New York clearing helped achieve that effect. That is because the vast majority of U.S.-dollar transactions clear through CHIPS and flow through New York banks – so routing a U.S.-dollar payment through New York correspondent accounts would have represented business as usual for a legitimate company making legitimate business payments. Had Defendants routed their U.S.-dollar payments some other way, it would have stood out as unusual – risking the very type of outside attention from auditors and regulators Defendants were striving to avoid.

---

[205] Lizzie Dearden, *ISIS' Attempt To Topple US Economy With Own Currency 'Failing' As Reliance On American Dollars Increases*, Indep. Online (UK) (Mar. 26, 2016), 2016 WLNR 9336286.

[206] *Id*.

[207] Preferred Option Email at 2.

296. Defendants worried constantly about satisfying their "external auditors."[208] In 2012, Pescheux began discussing with Tlass the need to "draft invoices that would not raise red flags,"[209] warning him that Tlass's sloppy invoices meant that "our financial statements for 2012 cannot be approved."[210] Pescheux thus demanded that Tlass form a company "in Dubai" and present new invoices from that company "with a minimum of formalism."[211] Defendants requested such formalism "even if we continue to settle the invoices in Syrian Pounds."[212] But as Pescheux repeatedly made clear, settlement in Syrian pounds was not his preference. He knew that shifting into U.S. dollars offered a safer course for satisfying LCS's auditors.[213] "The best solution," he concluded, was for Lafarge to pay Tlass "***in foreign currency on a foreign account to a foreign entity***" – which is exactly what then happened, via a New York wire.[214]

297. Defendants' ensuing efforts to pay Tlass demonstrate the value they ultimately reaped from New York clearing. On agreeing to pay Tlass in U.S. dollars, LCS first attempted to pay him by wire originated from its LMEA account, through New York, but was stymied by the bank's "compliance department."[215] So LCS was forced to wire Tlass his July 2013 payment in Euros instead.[216] That was neither side's preference, and Defendants reverted to paying U.S.

[208] Ex. 110 (ATA0009234 at -234).

[209] Plea Statement ¶ 58.

[210] Ex. 110 (ATA0009234 at -234)

[211] Ex. 110 (ATA0009234 at -234).

[212] Ex. 110 (ATA0009234 at -234).

[213] Ex. 111 (ATA0015463) (Pescheux telling Tlass, copying Mirakoff, that "we cannot continue to pay these amounts in Syrian p[o]unds"); Preferred Option Email at 2 (Pescheux reminding Tlass that "we cannot continue the way we are settling the turnover invoices" and that he "preferred" to make "a bank transfer in USD"); Suspicion Email at 1 (ordering U.S.-dollar "transfer[ ]" to Tlass's "offshore account" to "sever[ ] any suspicion in connecting LCS and FT");

[214] Ex. 111 (ATA0015463).

[215] Ex. 60 (ATA0004874 at -875).

[216] Ex. 60 (ATA0004874 at -874-75).

dollars in future months. At the time, however, Tlass had not created a bank account capable of receiving U.S.-dollar wires from outside Lebanon, so Defendants had to devise a convoluted workaround. First, they sourced U.S. dollars into LCS's own account at Audi Lebanon – sometimes from LCS's illegal LMEA account,[217] other times by approaching grey-market foreign-exchange dealers to convert Euros or Syrian pounds into dollars.[218] Then, Defendants instructed Audi Lebanon to engage in an internal book transfer through which it moved the U.S. dollars from LCS's account into what Tlass called "my account" at the same bank.[219] Finally, Tlass had an associate come withdraw the U.S. dollars out of his account in Lebanon.[220]

298. Defendants expressed grave concerns about this book-transfer procedure and repeatedly pressured Tlass to change it. On March 15, 2014, Pescheux told Tlass he had just "given the instruction for paying the monthly fee of February to your personal bank account in Lebanon," but reiterated that "***this situation is putting us at risk*** . . . as the confidentiality of the transaction is an illusion."[221] Pescheux warned Tlass that he was "not in favor to continue the way we currently use for the March payment."[222] Herrault replied by offering to "intervene with Firas" and remarking of the payment process: "This is becoming ridiculous."[223]

299. Pescheux followed up two weeks later, reminding Tlass that the continuing non-wire U.S.-dollar payments were "putting me in a difficult situation" with Defendants' "[e]xternal

---

[217] *Supra* ¶¶ 253-56.

[218] *Infra* ¶ 305.

[219] Ex. 112 (ATA0021127 at -128) (certified English translation); *see*, *e.g.*, *supra* ¶ 233 & n.62 (collecting bank instructions).

[220] Ex. 112 (ATA0021127 at -128) (certified English translation).

[221] Ex. 113 (ATA0021905) (certified English translation).

[222] Ex. 113 (ATA0021905) (certified English translation).

[223] Ex. 113 (ATA0021905) (certified English translation).

auditors."[224] Any solution, Pescheux stressed, could no longer rely on book transfers into Tlass's "personal bank account."[225] Although Tlass continued to pay off terrorists – updating Pescheux about "[o]ur negotiations with ISIS" – he resisted opening a non-Lebanese bank account capable of receiving normal U.S.-dollar wires.[226] His delay prompted Defendants to withhold payment. A few months later, Herrault reminded Tlass that Lafarge would not continue with the "monthly payment plan" because the convoluted payment process "***puts the company at risk and it has to stop***."[227] By July 2014, when Tlass expressed frustration that he had not "received the payment of $75000 in my account in Beirut," Pescheux responded tersely: "We are still waiting for any progress in the opening of your company's bank account."[228]

300. By early September, Lafarge and LCS had begun to devise "a way of remunerating FT in different manners."[229] While those discussions continued, Defendants announced "we no longer wish" to make "the USD payment" to Tlass "from our account in Beirut."[230] Although Tlass still requested payment into "his personal account in Beirut," Lafarge refused. On the advice of Khodara and Lafarge's General Counsel, Lafarge emphasized that LCS could "no longer pay" through Audi Lebanon and "need[ed] to find a new way of operating."[231] And any solution, Lafarge insisted, must involve a transfer into a new "company" account.[232] The pressure worked.

[224] Ex. 114 (ATA0009220).
[225] Ex. 114 (ATA0009220).
[226] Ex. 115 (ATA0009216 at -216).
[227] Ex. 105 (ATA0009218 at -218).
[228] Ex. 115 (ATA0009216 at -216-17).
[229] Ex. 116 (ATA0022824 at -824) (certified English translation).
[230] Ex. 117 (ATA0000166 at -167) (certified English translation).
[231] Ex. 117 (ATA0000166 at -166) (certified English translation).
[232] Ex. 117 (ATA0000166 at -166) (certified English translation).

On September 29, 2014, Jolibois reported to Khodara and a Lafarge Senior Finance VP that Tlass had "finally [been] able to open an account in Dubai."[233]

301. Defendants immediately prepared to wire U.S. dollars into Tlass's new North Logistics account in Dubai. But they realized they could not send the payments from Syria or Lebanon. After opening the North Logistics account, Tlass asked LCS to promptly "transfer [the] overdue amounts" into his new "bank account" in Dubai.[234] Herrault exclaimed: "This can no longer be done from Syria!"[235] And just a week earlier, Jolibois had reminded his colleagues that LCS could no longer reliably pay U.S. dollars "from our account in Beirut."[236]

302. That led Lafarge to send a bank wire through New York's financial system, described above.[237] Having convinced Tlass to create a shell company outside Syria, Defendants finally made good on their desire to effect payment through "a bank transfer in USD to the account of a duly registered company."[238] Their machinations had solved their auditor problem: Defendants could now pay Tlass with an ordinary bank wire flowing through ordinary New York banking channels, rather than LCS's convoluted and highly suspicious book-transfer process. They had also solved their U.S. sanctions problem: by wiring money between Cypriot and Dubai companies, Lafarge duped BNP Paribas and JP Morgan Chase into processing the wire.[239] Nobody else knew it was an illegal U.S.-dollar payment between two Syrian entities.[240]

---

[233] Ex. 117 (ATA0000166 at -166) (certified English translation).

[234] Ex. 118 (9/29/2014 Jolibois-Block-Herrault Email String at 1).

[235] Ex. 118 (9/29/2014 Jolibois-Block-Herrault Email String at 1).

[236] Ex. 117 (ATA0000166 at -167) (certified English translation).

[237] *Supra* ¶¶ 225-28.

[238] Preferred Option Email at 2.

[239] Ex. 22 (BNPP-NY 000004, Rows 2913-2915); Ex. 23 (BNPP-NY 000001, Excerpt from JPMC Subpoena Response, Row 2).

[240] Plea Statement ¶¶ 96-103.

303. New York clearing also enhanced the speed and reliability of Defendants' U.S.-dollar transactions. During Defendants' scheme, a limited number of non-U.S. banks were able to clear cross-border U.S.-dollar wire transfers. These alternative U.S.-dollar clearing centers were in Tokyo, Hong Kong, Singapore, and Manila. But each presented extra cost and risk. Indeed, those banks were not commonly used by Western financial institutions, and the Federal Reserve allowed them to clear U.S.-dollar transfers only because of the time-zone difference with East Asia. That arrangement did not permit Defendants to wire money from France into Dubai, Lebanon, Syria, or Egypt. Had Defendants routed those transactions through non-U.S. banks, rather than New York banks, they would have exposed themselves to credit and operational risk, and likely would have had to pay higher banking fees as well.

304. Defendants experienced those operational risks first-hand. By August 2011, U.S. sanctions were substantially constricting Defendants' ability to route U.S. dollars in and out of Syria. Defendants strongly preferred to transact in U.S. dollars: that is how Lafarge made its upstream payments until August 2011, and it is how Defendants wanted to proceed even after President Obama ratcheted up sanctions in August 2011. But U.S. sanctions effectively blocked Lafarge and LCS from continuing "to wire USD to Syria" because they stopped New York banks from clearing the wires.[241] In 2012, therefore, Lafarge had to start paying LCS by wiring money in Euros, after which LCS would "buy USD on shore."[242]

[241] Ex. 89 (ATA0000383 at -392) ("We understand that due to recent restrictions on Syria, it is today very difficult and almost impossible to wire USD to Syria. We are still having discussions with some banks but at this stage, the only route that we can eventually considered is to wire EUR via LBMHE (to be confirmed).").

[242] Ex. 89 (ATA0000383 at -392); *see id.* at -383 ("We've ascertained that we can transfer EURO to Lafarge Cement Syria," even while Lafarge would "book" the loan "in USD").

305. The need for LCS to buy U.S. dollars on shore in Syria created operational headaches. For one thing, the currency conversion process was complex, forcing LCS personnel to devote significant time to managing it.[243] For another, it was expensive: LCS (and thus Lafarge and Lafarge Cyprus) was forced to pay high prices to convert Euros and Syrian pounds into U.S. dollars by buying them from Syria's Central Bank, commercial banks, or private currency dealers on the grey market.[244] All this together compounded the financial challenges faced by Lafarge's Syrian business during the criminal conspiracy. As Pescheux told Herrault in June 2013, the "scarcity of USD" in Syria was "really a nightmare."[245] Wiring dollars through New York banks – which Defendants did whenever they could – was easier, faster, and cheaper.

306. Defendants knew from public U.S. enforcement actions that the sanctions regime they were flouting was designed to prevent U.S. banks from helping finance attacks by FTOs.[246] In 2015, moreover, the Treasury Department confirmed that FTOs like ISIS and ANF relied on their ability to leverage the U.S. financial system to facilitate U.S.-dollar transfers:

> Given the ***central role U.S. banks play in facilitating global payments***, ***the United States is vulnerable to the movement of funds associated with [terrorist financing]*** through the banking system. To address this, the U.S. government has focused on developing and implementing preventive measures to reduce the vulnerability of these institutions to [terrorist financing], used additional tools and authorities to more effectively target [terrorist financing], and ***imposed substantial financial penalties on noncompliant institutions***. Even with these measures, the U.S. banking system is exposed to residual [terrorist financing] risk, such as from

[243] Ex. 49 (ATA0000503 at -505-14) (describing complex, five-phase "Forex Management Process"); Cash Shortfall Memo at -069 (similar); Ex. 42 (ATA0000938 at -938).

[244] Ex. 63 (ATA0018621 at -621) ("Since the application of US sanctions, we bear heavy exchange losses when effecting any transfer from or to our USD Operating Account."); Cash Shortfall Memo at -069-72 (detailing parallel-market FX deals); Ex. 49 (ATA0000503 at -507) (noting LCS "ha[s] to add the spread demanded by the trader"). By mid-2013, even the Syrian Central Bank refused to sell U.S. dollars to LCS "at the official rate" and demanded pricing "at the 'intervention' rate, close to the pa[r]allel market." Ex. 119 (ATA0005001 at -001).

[245] Ex. 7 (ATA0009139).

[246] *See*, *e.g.*, U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment* at 49 (Aug. 24, 2015).

> foreign correspondents that may not have effective AML/CFT [i.e., Anti-Money Laundering/Countering the Financing of Terrorism] programs.[247]

307. The Treasury Department repeated a similar warning on October 16, 2014, eight days before Defendants' $210,000 wire to Tlass, when it sanctioned a violent, Syrian-regime-affiliated actor. The designation emphasized that U.S. sanctions on Syria sought to deprive violent Syrian-related actors of U.S. dollars and force them to instead use a collapsing Syrian pound, reducing their ability to fund the kidnapping and murder of innocent victims in Syria.[248]

308. New York prosecutors also pursued enforcement actions alerting Defendants that terrorist groups sought to leverage multinational corporations' choice to use the New York banking system. In 2009, for example, after New York regulators announced counterterrorism-related enforcement actions against European banks, the Manhattan District Attorney told Bloomberg that New York was prosecuting "big cases," including "[o]ne involving Lloyd's [of London], where they were taking Iranian money, stripping the identification, and then sending it to U.S. . . . correspondent banks to get dollars to buy equipment for weapons" and observed that "[p]eople" – even terrorists – "still want to be paid in dollars," which was "the reason they go through U.S. banks."[249] In 2014, likewise, the Manhattan District Attorney warned multinational corporations that, "if you are going to use the American banking system, particularly New York, for your dollar clearing transactions, you are going to have to abide by [America's] rules."[250]

---

[247] *Id.* at 60.

[248] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions a Syrian Official Responsible for Human Rights Abuses in Syria and Syrian Regime Supporters and Officials* (Oct. 16, 2014).

[249] Robert Morgenthau, *quoted in* Margaret Brennan, *Manhattan District Attorney Robert Morgenthau on Bloomberg TV*, CEO Wire (Sept. 11, 2009), 2009 WLNR 17857284.

[250] Cyrus Vance, Jr., *quoted in Manhattan DA Cyrus Vance Jr. Intvd on Bloomberg TV*, Bloomberg TV (Aug. 6, 2014), 2014 WLNR 21514304.

309. Defendants also witnessed the difference between speedy New York execution and unreliable foreign execution. In March 2013, for example, a Taleb subcontractor sought payment in U.S. dollars through Bank of America, prompting LCS to warn Taleb that "we can't transfer to Bank of America, or any bank in USA," and to ask instead for a new "bank account" designating "Commerz Bank" as the correspondent.[251] But the parties were unable to find an alternative execution route, despite exploring everything from Turkish banks to Chinese banks to Western Union.[252] The resulting payment delays led the subcontractor to complain, spurring Taleb to explain that "we did transfer the payments but all the way failed" to clear through the subcontractor's preferred Bank of America correspondent account.[253] Eventually, Taleb had to personally pay the subcontractor out of his own funds and then collect the money from LCS via "Audi Bank in Lebanon"[254] – the same risky process Lafarge later refused to continue with Tlass. These delays nearly ruined the project and ruptured Lafarge's relationship with Taleb.[255]

310. When Defendants were able to exploit New York clearing, New York banks solved these problems for them.[256] And Defendants valued the speed New York clearing delivered. On many occasions, LCS's precarious cash position sparked a sense of urgency in demanding speedy upstream payment.[257] And in October 2014, after Khodara had negotiated Defendants' illegal contract with Tlass, he too demanded urgency by instructing Benattar to effect payment

[251] Ex. 101 (ATA0014184 at -190).
[252] Ex. 101 (ATA0014184 at -186-88).
[253] Ex. 101 (ATA0014184 at -187).
[254] Ex. 101 (ATA0014184 at -185).
[255] Ex. 120 (ATA0009942 at -942-43).
[256] *Supra* ¶¶ 215-56 (detailing New York-cleared transactions).
[257] Ex. 41 (ATA0005040 at -040) (conveying "urgency of payments" and stressing need to avoid "days" of delay); Ex. 28 (ATA0000220 at -222) (requesting fast transfer because of need to cover outgoing payment "urgently"); *id.* at -227 ("you are kindly requested to urgently ensure a transfer of 3 Musd ASAP allowing us to cover the daily Cash needs").

"quickly."[258] New York routing allowed Lafarge to achieve that objective. Had Defendants tried to execute their U.S.-dollar wire transfers through some other means, their scheme would have become less effective, more expensive, and harder to conceal.

### B. Defendants Relied On U.S.-Based Email Providers To Carry Out Their Terrorist-Financing Scheme

311. In carrying out their scheme to pay ISIS and ANF, Defendants also reached into the United States to avail themselves of U.S.-based email services. Defendants' use of those services formed additional U.S. touchpoints and allowed Defendants to reap the benefit of their email providers' U.S. presence. Those U.S.-driven benefits also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists.

312. As Lafarge and LCS have admitted, their executives "used personal email accounts serviced by U.S-based email service providers, instead of their LAFARGE corporate email addresses, to carry out some aspects of the conspiracy."[259] Mainly, that was Gmail. During at least 2013 and 2014, Defendants regularly used U.S.-based Gmail accounts to plan their conspiracy. On information and belief, Defendants sent and received hundreds of scheme-related communications through these and other such accounts:

| Account Owner | Role of Account Owner | Email Address |
|---|---|---|
| Bruno Pescheux | CEO of LCS until July 2014 | brunopescheux@gmail.com |
| Firas Tlass | Defendants' agent and intermediary who paid ISIS on their behalf | Firastlass01@gmail.com |
| Mamdouh al-Khaled | LCS Purchasing Manager | Mamdouh.lafarge@gmail.com |
| Hassan al-Saleh | LCS Plant Manager | Hassan.cement65@gmail.com |
| Ahmad Jamal | ISIS representative who supplied materials to LCS | Ahmad.jamal1966@gmail.com |

[258] Ex. 24 (ATA0032468 at -468) (certified English translation).

[259] Plea Statement ¶ 18.

313. Defendants and their agents routinely advanced their scheme to pay terrorists by sending emails to and from these U.S.-based accounts. Plaintiffs set forth a few examples of these communications below. These examples are illustrative, not exhaustive, and again reflect information without discovery. On information and belief, discovery will uncover many additional email communications using these and other U.S.-based accounts:

**a.** Pescheux (Gmail) to Tlass (Gmail), July 2, 2013: Pescheux emailed Tlass to provide "clarifications" regarding Tlass's payments to armed groups in and around Jalabiyeh. The email identified more than 10 groups Tlass was paying on Defendants' behalf – including ANF specifically – and conveyed Pescheux's understanding that "you are dealing with a lot of different people and I have no problem with that." Pescheux sent this email from his Gmail account to Tlass's Gmail account.

**b.** Tlass (Gmail) to Pescheux (Gmail), July 3, 2013: Tlass responded by providing Pescheux a "road map to know how we pay" the armed groups in and around the Jalabiyeh plant, listing at least 14 such groups, including ANF. Tlass sent this email from his Gmail account to Pescheux's Gmail account.

**c.** Tlass (Gmail) to Pescheux (Gmail), March 31, 2014: Tlass emailed Pescheux, among others, describing the "security situation in and around the plant area." In his email, Tlass described the "Skype" calls he conducted with ISIS's "Amir Minbej or Raqa" [likely a reference to Abu Luqman] and noted that Lafarge made "$2 million profit" per month while "pay[ing] less than 1/4 for protection," including to ISIS. Tlass sent this email from his Gmail account to, among other addresses, Pescheux's Gmail account.

**d.** Tlass (Gmail) to Pescheux (Gmail), July 14, 2014: Tlass wrote to Pescheux updating him on Tlass's "negotiations with ISIS" and expressing "confiden[ce] that we can reach to a logical agreement with them." Tlass sent this email from his Gmail account to Pescheux's Gmail account.

314. Defendants' use of these email accounts was purposeful. As Lafarge and LCS admitted, their executives and agents used "U.S.-based email service providers," rather than their "corporate email addresses," in a conscious effort "to conceal their conduct from others within and outside of LAFARGE and LCS."[260] That strategy implemented Lafarge's directive, conveyed by Khodara, to avoid creating discoverable email records of terrorist payoffs. As Pescheux wrote in

[260] *Id.* ¶ 18.

a September 8, 2014 email from his Gmail address to Jolibois's personal email address, Khodara had instructed him not to email Herrault "at his professional address."[261] That instruction followed Khodara's broader dictate that he not "receive anything" about the conspiracy "by email."[262] That is why Pescheux used Gmail to communicate about the ISIS payoffs. It reflected a conscious choice, in line with guidance from Lafarge's headquarters.

315. Defendants' decision to carry out their criminal conspiracy via Gmail, rather than corporate email, matched standard practice among terrorists and their funders. According to security analysts quoted by the *Associated Press*, "super-encrypted corporate emails are unlikely to be used by militants, ***who prefer more anonymous technologies, like Gmail***."[263]

316. Defendants' and their agents' use of these U.S.-based email accounts also entailed substantial U.S. contacts. In both opening and using those accounts, Defendants and their agents reached into the United States in several ways.

317. **Defendants Transacted With A U.S. Counterparty.** Defendants' agents relied on an email service owned and operated out of the United States by a U.S.-headquartered company. When they used their Gmail accounts, they agreed to Google's Terms of Service, which in 2013 made clear that Gmail was "provided by Google, Inc. ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States." Defendants thus knew that they were carrying out their conspiracy using a U.S.-based service "provided by" a U.S.-based company. Defendants also agreed that the "laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services," including

[261] *Id.* ¶ 88; *see* Ex. 121 (9/12/2014 Herrault-Veillard Email String) (certified English translation).

[262] Ex. 121 (9/12/2014 Herrault-Veillard Email String) (certified English translation).

[263] Assoc. Press, *republished in* Hamilton Spectator, *RIM Averts BlackBerry Ban In India* (Aug. 31, 2010).

Gmail. Defendants further agreed that they would not "misuse" Gmail and that they would use Google's services "only as permitted by law." Defendants conveyed those agreements into the United States as a condition of accessing Gmail's U.S.-based service.

318. Defendants also obtained Gmail's services by sending their data to Google in the United States. In using Gmail, Defendants knowingly allowed their data to be transferred into the United States for Google's data-mining activities, which were used in the United States for (among other things) targeted search suggestions and ad sales. Defendants did so in part by agreeing that Google could scan the contents of their emails – a process directed by engineers in the United States – to "provide customized advertising to its email users."[264]

319. Defendants knew they were providing their valuable data to an American company because it was widely reported at the time. In one example, CNN reported in April 2014 that, although Google "may not charge for its Gmail accounts," it was "still collecting payment in the form of massive amounts of personal information about the people who use it."[265] Thus, when Defendants signed up for Gmail and used it to carry out their scheme, they knew they were paying an American company for the American service they were using. But rather than sending a wire transfer delivering cash to their U.S. counterparty, they delivered their data.

320. **Defendants' Email Communications Relied On U.S. Infrastructure.** By using Gmail to carry out and conceal their scheme, Defendants and their agents exploited a service that was created, engineered, and maintained in the United States. During the time of Defendants' conspiracy, Google operated the majority of its data centers in the United States, which enabled

[264] Anna Bernasek, *Encryption Protects Gmail From Everyone But Google*, Newsweek (July 4, 2014).

[265] Heather Kelly (CNN Money Reporter), *Why Gmail And Other E-mail Services Aren't Really Free*, CNN Business (Apr. 1, 2014), https://tinyurl.com/39jtbv83.

Defendants' conspiracy-related emails to reach their destinations securely and reliably. Those U.S.-based servers were important in part because they provided Google with the ability to back up Gmail customers' data in the United States, which minimized outages and enhanced reliability. On information and belief, the bulk of Defendants' conspiracy-related Gmail communications traveled through or were stored at least in part on U.S.-based servers.

321. **Defendants' Use Of U.S. Email Servers Offered Them The Benefits Of U.S. Law.** Gmail's status as a U.S.-owned and -operated service also afforded Defendants protection from foreign law enforcement, including French prosecutors. That is because U.S. law placed constraints on U.S.-based communications providers like Google when releasing customer data to foreign governments. As one British paper explained, European law enforcement officials generally could not "get[ ] access to the secret Gmail . . . messages of terrorists" because, "[c]urrently, US internet giants are banned from handing over emails and private messages to foreign law enforcement officials in all but a tiny number of cases."[266] That restriction was in place "[b]ecause Google is a US-based company," which meant that requests for Gmail data "f[ell] squarely under US law."[267] Defendants thus knew that, had they chosen to use non-U.S.-based email, their communications would have been more susceptible to surveillance by French law enforcement – the authority otherwise most likely to discover their scheme, stop it, and bring

[266] Ben Riley-Smith, *Britain On The Brink Of Gaining Access To Terrorists' Facebook And Gmail Messages For First Time*, Telegraph Online (Mar. 22, 2018), 2018 WLNR 8844426; *see* Daily Telegraph, *Net Closes On Terror As US Law Lifts Lid On Messaging* (Mar. 23, 2018), 2018 WLNR 8865323 ("[c]urrently, US internet giants hand over" "secret Gmail . . . messages sent by terrorists" "to foreign law enforcement bodies only in exceptional cases").

[267] Zack Whittaker, *What Google Does When A Government Requests Your Data*, ZDNet (Jan. 28, 2013), https://tinyurl.com/4ydf7v7j; *see id.* (when requests originated from "outside the US," Google "[didn't] really have the same level of requirement to hand over data to foreign governments or law-enforcement");

criminal charges against the individuals involved. Indeed, Lafarge and several of the executives outlined above are currently facing criminal charges in France for having funded terrorists.

322. The experience of India's counterterrorism agencies was typical of how terrorists leveraged Gmail's U.S. presence to stymie foreign law enforcement. According to Indian officials, "since Google servers are based in US and their IP addresses are masked, it takes a long time to get the real IP addresses and log details of the culprits" who used Gmail for criminal purposes.[268] For that reason, "Indian security agencies" had a "tough time in catching criminals and terrorists who are [customers] of Google-owned Gmail." On information and belief, similar logic applied in France, Dubai, and Syria – where Defendants and their agents used Gmail to communicate about their criminal conspiracy with added protection from local law enforcement.

323. These well-known features made Gmail especially attractive for terrorists and their funders. In 2013, for example, the *Washington Post* published a high-profile story with the headline, "***Former NSA and CIA director says terrorists love using Gmail***."[269] The article then quoted General Michael Hayden observing, "***Gmail is the preferred Internet service provider of terrorists*** worldwide," and noting, "I don't think you're going to see that in a Google commercial, but it's free, it's ubiquitous, so of course it is" a frequently used platform for terrorist communications.[270] As the *Post* reported, General Hayden also described "the Internet's origins in the United States" and stated, "We built it here, and it was quintessentially American."[271] When

[268] Economic Times, *Orkut Won't Let Cops Hack Terrorists* (Dec. 12, 2006), 2006 WLNR 27469168.

[269] Andrea Peterson, *Former NSA And CIA Director Says Terrorists Love Using Gmail*, Washington Post (Sept. 15, 2013) (emphasis added).

[270] *Id*.

[271] *Id*.

Defendants used Gmail to advance their scheme, therefore, they knowingly exploited an iconic American service commonly used by terrorists around the globe.

### C. Defendants Entered A Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States

324. As alleged above (*supra* ¶¶ 25-26), Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within those countries.

325. ISIS was good for Lafarge's business in Syria. Most fundamentally, ISIS's terrorist activities helped drive from Syria virtually every other Western company, leaving Lafarge with minimal competition for the Syrian market.[272] So long as the terrorists remained in power, Lafarge's unusual willingness to do business with them gave it a unique opportunity to seize market share. ISIS's protection racket also delivered Lafarge a more specific benefit: the ability to partner with terrorists who were willing and able to threaten Lafarge's competitors. That is why Defendants "commit[ted] to revenue sharing with ISIS" and sought to "incentivize the terrorist group to act in LCS's economic interest."[273] Their commitment worked, at least for a time. Defendants' Syrian business was profitable in part because ISIS "agreed to impose costs on, and in some cases block the importation of, competing cement."[274]

326. The existence of a Lafarge-ISIS conspiracy – reflected in Defendants' purposeful "agreements with ISIS"[275] – is undisputed and apparent on the face of Lafarge's guilty plea. The plea confirmed, among other things, that Lafarge and LCS executives sought to actively partner with ISIS and "***share the 'cake'***" of their mutual enterprise – with Lafarge executives reasoning

[272] *Supra* ¶¶ 90-91.
[273] Plea Statement ¶ 73.
[274] *Id.* ¶ 15.
[275] *Id.* ¶ 18.

that it was important for ISIS to have a "vested interest to have the [Jalabiyeh] plant run well."[276] That sentiment reflected Lafarge's recognition that ISIS could be good for business. As LCS's former risk manager admitted, Lafarge expected that "Nusra Front, later ISI[S]," would use their "effective and disciplined fighters" to "bring order to the chaos of corruption that reigned in northern Syria." The resulting relationship went beyond passive payments. As Deputy Attorney General Monaco stated, Lafarge "***partnered with ISIS***, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share."[277]

327. Terrorist violence was vital to that agreement. For Lafarge to reap the benefits of its conspiracy with ISIS, two things had to be true: (1) ISIS had to retain control of its territory; and (2) ISIS's protection rackets had to remain effective against Lafarge's would-be competitors. Neither could work without terrorist violence and coercion. For example, as *Janes*, the iconic defense industry publication, observed, ISIS "relies on informants and operatives who threaten and pressure the local population to pay extortion money. Islamic State's ***frequent small arms and improvised explosive device (IED) attacks*** . . . ***act as a reminder*** of the imminent threat and presence of the militants."278 Violence thus was crucial to the racket, because it lent credence to ISIS "intimidation" and "pressure" on local entities to "pay levies" the group demanded.279

328. ISIS religious doctrine confirmed that violence underpinned the conspiracy Defendants joined. For example, official ISIS propaganda notified the public, including Defendants, that ISIS would spend protection payments to "support[] jihad"; and that ISIS's

---

[276] *Id.* ¶ 73 (emphasis added).

[277] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022) (emphasis added).

[278] Shady Alkhayer, *Money Flow: Islamic State Continues To Finance Operations In Central Syria Through Extortion And Intimidation*, Janes (Sept. 2, 2022), 2022 WLNR 27802943 (emphasis added).

[279] *Id*.

maintenance of the racket was backed by the threat of violence against others, including the potential to execute ISIS's enemies. Similarly, ISIS offered a purported religious mandate for its taxes, with punishments (including execution) threatened against those who did not pay. When Defendants cooperated with ISIS in advancing this protection racket, they joined a conspiracy whose stated rationale revolved around the perpetration of terrorist violence.

329. In furtherance of this conspiracy, ISIS engaged in numerous overt acts both in and expressly aimed at the United States. In building their territorial control and strengthening their protection racket, ISIS committed many terrorist attacks aimed at the United States. As Deputy Attorney General Monaco stated in connection with Lafarge's and LCS's guilty plea, during the Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families whose loved ones were brutally murdered by ISIS."[280] ISIS publicly celebrated those acts and made clear, both before and during Defendants' conspiracy, that its efforts to grow its caliphate relied on an ongoing terrorist campaign aimed at the United States.

330. ISIS's specific attacks on Plaintiffs also furthered the conspiracy. For example, ISIS captured and beheaded James Foley and Steven Sotloff to send a message of intimidation and control, including by publicizing the brutal murders in videos titled "A Message to America" and "A Second Message to America," respectively. The capture of these American journalists helped ISIS's conspiracy with Defendants by strengthening ISIS's territorial control and bolstering the credibility of ISIS's threats against others, including Lafarge's competitors.

[280] U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing A Guilty Plea By Lafarge On Terrorism Charges* (Oct. 18, 2022).

331. Scholarly analyses confirm that connection. As terrorism scholars Clarke and Williams wrote, "Da'esh . . . used kidnapping as a weapon against its enemies—particularly the United States" given that the U.S. government "refused to pay[] ransoms for the release of its citizens" and therefore ISIS believed that attacks that targeted Americans could serve as "an important fund-raising method" like "was done with U.S. journalist James Foley" because "***the great virtue of kidnapping is that it can be used symbolically*** to spread fear and deliver a message of defiance." They continued:

> This was done with U.S. journalist James Foley who was captured in 2012; a video of his execution was released in August 2014. Although Da'esh in an e-mail communication with Foley's family had demanded millions for his release, how serious this was remains uncertain. After Foley was executed, Da'esh, in what Cragin and Padilla contend was an attempt to ***embarrass and humiliate the United States***, claimed that Obama was to blame. Yet the profit motive might also have been present: the ***killing of Foley certainly increased the pressure to pay for the release of hostages*** from other countries to ensure they did not share the same fate.[281]

As that analysis illustrates, protection rackets work only if the threat of violence is credible. And ISIS could make good on its promise block competing cement only if it convinced Lafarge's competitors that there would be consequences if they said no.

332. There was no more effective way for ISIS to accomplish those goals than to publicly kill and maim Americans. Given the United States' status as the sole global superpower, ISIS's public attacks on Americans conveyed unique credibility to its enemies. For example, as Dr. Daniel Byman explained in 2014, ISIS perpetrated "[a]cts of senseless violence and unspeakable brutality" that targeted the United States because:

> Videos showing the beheadings of captured US . . . citizens in particular are ***designed to send a message to American . . . people***: stay out of our business. . . . Islamic State believes that the people in [America] are reluctant to become entangled in yet another war in the Middle East and that savagely

[281] Clarke & Williams, *Da'esh In Iraq And Syria* at 33 (emphasis added).

> murdering an American . . . each time the US . . . government starts to get involved will make them even more so. They [believe] that the United States does not have the stomach for a tough fight and will pull out of a conflict as soon as Americans start getting killed.[282]

333. Given the United States' unique military credibility, ISIS's attacks on U.S. servicemembers in Syria and Iraq, including Plaintiffs, likewise furthered the conspiracy. As Secretary of Defense Ashton Carter publicly observed in 2016, "ISIL has demonstrated a clear intent to target U.S. servicemembers and facilities."[283] Nowhere was this more true than in Syria and Iraq, where ISIS, and AQI before it, long touted the unique symbolic value of its attacks on U.S. servicemembers, which the terrorists used to amplify their broader message to everyone in Syria and Iraq that ISIS remained a threat and that America was weak.[284]

334. ISIS's attacks targeting the United States, including its attacks seeking to kill and maim Americans in the Middle East and Africa, including Plaintiffs, also uniquely powered ISIS's recruitment of jihadists to commit attacks because ISIS relied upon a recruitment narrative centered upon ISIS's purported jihad against America. For example, as President Obama observed in 2015, "Al Qaeda and ISIL . . . are desperate for legitimacy" and "try to portray themselves as . . .

[282] Daniel Byman, *Al Qaeda, The Islamic State, And The Global Jihadist Movement: What Everyone Needs To Know* 175-77 (Oxford Univ. Press 2015).

[283] Secretary of Defense Ash Carter, *quoted in* Federal News Service Transcripts, *Secretary Of Defense Ash Carter Delivers Remarks At The NORAD And U.S. Northern Command Change-Of-Command Ceremony* (May 13, 2016), 2016 WLNR 14688349.

[284] *See*, *e.g.*, Daily Telegraph (UK), *Four US Troops Killed As ISIL Shows It Is Still Deadly Threat In Syria* (Jan. 17, 2019), 2019 WLNR 1580204 (reporting that ISIS's murder of "four American servicemen," who "were killed in an ISIL suicide bombing in northern Syria" had "put[] into question" whether "the Islamist group ha[d] been defeated" and quoting "Charles Lister, director of countering terrorism and extremism at the Washington-based Middle East Institute" that the "attack show[ed] to all concerned . . . that the reality on the ground" in Syria and Iraq was such that "the battle against ISIL [was] far from over").

holy warriors in defense of Islam": "That's why ISIL . . . propagate[s] the notion that America . . . is at war with Islam. That's how they recruit."[285]

335. ISIS also reached into the United States to further the conspiracy. For example, ISIS transmitted threats to Plaintiffs inside the United States, including to the Foley, Sotloff, and Mueller families, as part of its strategy to intimidate the United States. Other acts involved former residents of this District. For example, on May 24, 2022, a federal jury in this District convicted Mirsad Kandic – a former Brooklyn resident – of providing material support to ISIS, including by assisting ISIS's media department and facilitating travel for ISIS terrorists.[286] On February 7, 2023, another federal jury in this District convicted Ruslan Asainov, a former Brooklyn resident, of similar crimes for providing sniper training to ISIS fighters.[287] ISIS also sought to finance other attacks in the United States including by sending thousands of dollars to Maryland resident Mohamed Elshinawy in 2016 to encourage terror attacks.

336. ISIS also enticed hundreds of U.S. citizens to join its ranks by targeting the United States for recruitment. Roughly 300 U.S. citizens joined or attempted to join ISIS, in part because ISIS tailored its propaganda to U.S. audiences. For example, ISIS members sought to capitalize on unrest in Ferguson, Missouri and Baltimore, Maryland, asking protestors in those cities to join ISIS. ISIS also sent money to U.S. citizens to fund terror attacks on U.S. soil and sought and received funding from U.S. citizens to finance operations in Syria and Iraq.

[285] President Barack Obama, *Remarks by the President in Closing of the Summit on Countering Violent Extremism*, White House (Feb. 18, 2015), https://tinyurl.com/mr3ek3zz.

[286] Jury Verdict, *United States v. Kandic*, No. 17-cr-00449-NGG (E.D.N.Y. May 24, 2022), Dkt. 321.

[287] Jury Verdict, *United States v. Asainov*, No. 19-cr-00402-NGG (E.D.N.Y. Feb. 7, 2023), Dkt. 167.

337. The U.S. government has recognized, on a bipartisan basis, that ISIS specifically targeted the United States and Americans for attack. For example, in 2022, the White House observed that "ISIS has directed terrorist operations targeting Americans . . . in the Middle East, Africa, and in South Asia,"[288] which echoed a White House observation in 2018 that "ISIS remain[ed] the . . . primary transnational terrorist threat to the United States" . . . "and its senior leaders continue to call for attacks against the United States,"[289] similar to the view expressed by the U.S. government, in 2015, that ISIS's "strength and expansionist agenda pose an ongoing threat to . . . U.S. facilities and personnel in [] the Middle East."[290]

338. ISIS's contacts with the United States were foreseeable to Defendants. Defendants were aware that the U.S. government had designated ISIS as an FTO because of its shocking acts of violence against U.S. citizens. As Assistant Attorney General Olsen explained, Defendants partnered with ISIS and ANF "at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."[291] And Defendants were aware of ISIS's desire to eject U.S. forces from the region and of their frequent acts of violence to that end.[292] That knowledge came in part from Defendants' long awareness of AQI, which they knew had conducted a brutal terrorist campaign against U.S. citizens in the Middle East. Indeed, Defendants specifically understood – in part through Tlass and LCS's former risk manager – that ISIS and ANF were

[288] President Joseph R. Biden, Jr., *quoted in* White House, *Remarks by President Biden on a Successful Counterterrorism Operation* (Feb. 3, 2022), https://tinyurl.com/4vcfbsd6.

[289] White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 1, 2018).

[290] U.S. Dep't of Treasury, *National Terrorist Financing Risk Assessment*, at 12 (Aug. 24, 2015).

[291] U.S. Dep't of Justice, *Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations* (Oct. 18, 2022).

[292] *Supra* ¶¶ 53-59.

AQI's successors and were continuing AQI's terrorist campaign against the United States. The attacks on Plaintiffs and their families, as well as ISIS's other U.S. contacts, were a foreseeable outgrowth of the conspiracy that Defendants voluntarily joined.

339. Given Defendants' knowledge of AQI's (and later ANF's and ISIS's) practice of targeting of U.S. nationals, including U.S. servicemembers, based on multiple U.S. government statements and warnings to that effect, Defendants' illegal payments directly to those groups independently constituted conduct that was expressly aimed at the United States.

## XII. ACTS OF INTERNATIONAL TERRORISM THAT RESULTED IN PLAINTIFFS' INJURIES

### A. Attacks On U.S. Servicemembers In Iraq And Syria

340. The millions of dollars Defendants gave as material support to FTOs substantially assisted four sophisticated ISIS attacks against U.S. servicemembers in Syria and Iraq. Each of the attacks occurred during or after Defendants' payments to ISIS and thus benefited directly from these payments. Defendants' material support was linked directly to each of these attacks targeting the United States and U.S. servicemembers in Syria and Iraq through the participation of ISIS's Leadership Cell, Raqqa Cell, and Abu Luqman, as well as its sale and delivery of cement to ISIS.

**The Finan Family**

341. Chief Petty Officer Jason Finan was a member of the Navy's Explosive Ordinance Disposal Mobile Unit 3, and domiciled in the state of California. He was killed by an ISIS-planted IED near Mosul, Iraq on October 20, 2016.

342. Chief Petty Officer Finan was killed while he was attached to an elite SEAL unit that was assisting Iraqi forces with training and with the re-capture of Mosul, a major ISIS urban center, when his vehicle hit an IED.

343. The device had been planted by ISIS members to explode in an attack that was committed in furtherance of ISIS's campaign of terrorism targeting American service members.

344. Plaintiff Chariss Finan is a citizen of the United States and domiciled in the state of California. She is the widow of Chief Petty Officer Finan.

345. Plaintiff Gloria Finan-Bacon is a citizen of the United States and domiciled in the state of California. She is the mother of Chief Petty Officer Finan.

346. Plaintiff Shawn Bacon is a citizen of the United States and domiciled in the state of California. He is the stepfather of Chief Petty Officer Finan. Plaintiff Bacon cohabited with Chief Petty Officer Finan and raised him since he was a young child. Shawn Bacon and Gloria Finan-Bacon remain married.

347. As a result of the attack, and the death of Chief Petty Officer Finan, Plaintiffs Chariss Finan, Gloria Finan-Bacon, and Shawn Bacon have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, income, comfort, advice, and counsel.

**The Dayton Family**

348. Senior Chief Petty Officer Scott Cooper Dayton was a member of the Navy's Explosive Ordinance Disposal Mobile Unit 2, and domiciled in the state of Virginia. He was killed by an ISIS-planted IED near Ayn Issa, Syria, within ISIS's Raqqa province, on November 24, 2016.

349. Senior Chief Petty Officer Dayton was killed while he was serving in Operation Inherent Resolve, an American mission to thwart ISIS terrorist attacks planned in Raqqa.

350. The device had been planted by ISIS members to explode in an attack that was committed in furtherance of ISIS's campaign of terrorism targeting American service members.

351. Plaintiff Kristin Dayton is a citizen of the United States and domiciled in the state of Virginia. She is the widow of Senior Chief Petty Officer Dayton.

352. Plaintiff Hailey Dayton is a citizen of the United States and domiciled in the state of Florida. She is the daughter of Senior Chief Petty Officer Dayton.

353. Plaintiff Cole Dayton is a citizen of the United States and domiciled in the state of Virginia. He is the son of Senior Chief Petty Officer Dayton.

354. As a result of the attack, and the death of Senior Chief Petty Officer Dayton, Plaintiffs Kristin Dayton, Hailey Dayton, and Cole Dayton have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, income, comfort, advice, and counsel.

**The Stacy Family**

355. Plaintiff Senior Chief Petty Officer (Ret.) Kenton Stacy is a former Navy Explosive Ordinance Disposal technician who had deployed four times with multiple units. He is domiciled in the state of California. He was severely wounded by an IED while working to clear a hospital of ISIS explosives in Raqqa, Syria, on November 9, 2017. Raqqa was ISIS's de facto capital.

356. Senior Chief Petty Officer Stacy was severely wounded while he was serving in Operation Inherent Resolve, an American mission to thwart ISIS terrorist attacks planned in Raqqa. Senior Chief Petty Officer Stacy is now quadriplegic.

357. The device had been planted by ISIS members to explode in an attack that was committed in furtherance of ISIS's campaign of terrorism targeting American service members.

358. Plaintiff Lindsey Stacy is a citizen of the United States and domiciled in the state of California. She is the wife of Senior Chief Petty Officer Stacy.

359. Plaintiff L.S. is a citizen of the United States and domiciled in the state of California. He is the minor son of Senior Chief Petty Officer Stacy.

360. Plaintiff M.S. is a citizen of the United States and domiciled in the state of California. He is the minor son of Senior Chief Petty Officer Stacy.

361. Plaintiff S.S. is a citizen of the United States and domiciled in the state of California. She is the minor daughter of Senior Chief Petty Officer Stacy.

362. Plaintiff A.S. is a citizen of the United States and domiciled in the state of California. She is the minor daughter of Senior Chief Petty Officer Stacy.

363. As a result of the attack, and the injury of Senior Chief Petty Officer Stacy, Plaintiffs Kenton Stacy, Lindsey Stacy, L.S., M.S., S.S., and A.S. have experienced economic injuries, severe mental anguish and extreme emotional pain and suffering.

**The Keating Family**

364. Chief Petty Officer Charles Keating IV was a Navy SEAL domiciled in the state of California. He was killed by direct ISIS fire during a firefight in Tel Askuf, Iraq, on May 3, 2016.

365. Chief Petty Officer Keating was serving as part of a training and assistance team to the Kurdish Peshmerga when 300 ISIS fighters, driving armored cars and accompanied by a bulldozer, attempted to invade the area in a planned attack on American and Kurdish forces.

366. ISIS fighters attempted to invade Tel Askuf specifically to target the U.S. training and assistance team that was aiding the Peshmerga in Tel Askuf.

367. Plaintiff Charles Keating III is a citizen of the United States and domiciled in the state of California. He is the father of Chief Petty Officer Keating.

368. Plaintiff William Keating is a citizen of the United States and domiciled in the state of Texas. He is the brother of Chief Petty Officer Keating.

369. Plaintiff Cassandra Keating is a citizen of the United States and domiciled in the state of California. She is the sister of Chief Petty Officer Keating.

370. As a result of the attack, and the death of Chief Petty Officer Keating, Plaintiffs Charles Keating III, William Keating, and Cassandra Keating have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice, and counsel.

**B. Attacks Outside Iraq And Syria**

Defendants' aid substantially assisted and provided material support for two sophisticated "external" ISIS attacks that aimed to expand ISIS's "caliphate." Both attacks occurred either during or after Defendants began giving millions of dollars to ISIS and so benefited directly from Defendants' payments. Defendants' material support was linked directly to these two attacks, including through the involvement of ISIS's Leadership Cell and Raqqa Cell.

**The Berry Family**

371. Former United States Marine David Berry was a twelve-year combat veteran domiciled in the state of Virginia. He was killed by an ISIS attack on the Corinthia Hotel, a prominent hotel known to host American and European visitors in Tripoli, Libya, on January 27, 2015. The attack also killed nine other individuals.

372. In January 2015, Berry was in Libya working for a security and logistics company.

373. ISIS members in Libya who had pledged allegiance to ISIS leader Abu Bakr Al-Baghdadi attacked the hotel with gunfire and detonated an explosive device that killed hotel guests and staff as they fled.

374. Plaintiff Elizabeth Berry Jacek[293] is a citizen of the United States and domiciled in the state of Arizona. She is the widow of David Berry.

[293] Ms. Berry Jacek changed her name from Elizabeth Berry to Elizabeth Berry Jacek after the original Complaint in this action was filed.

375. Plaintiff Andrew Berry is a citizen of the United States and domiciled in the state of Arizona. He is the son of David Berry.

376. Plaintiff Nathan Berry is a citizen of the United States and domiciled in the state of Arizona. He is the son of David Berry.

377. Plaintiff A.B. is a citizen of the United States and domiciled in the state of Arizona. She is the daughter of David Berry.

378. Plaintiff N.B. is a citizen of the United States and domiciled in the state of Arizona. She is the daughter of David Berry.

379. As a result of the attack, and the death of David Berry, Plaintiffs Elizabeth Berry, Andrew Berry, Nathan Berry, A.B., and N.B. have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/father's society, companionship, income, comfort, advice, and counsel.

**The Hajj Hassan Family**

380. Ali El Hajj Hassan served as a soldier in the Lebanese Armed Forces, the secular military run by the Lebanese government. He was kidnapped and held hostage by ISIS in August 2014 in Arsal, Lebanon, near the Syrian border.

381. ISIS and ANF joined together to invade Arsal and free ISIS leader Imad Ahmad Jomaa. Dozens were killed in the invasion.

382. On August 30, 2014, ISIS posted videos of nine soldiers, including Ali El Hajj Hassan, begging for their lives. After tentative negotiations collapsed, the hostages' families, including the family of Ali El Hajj Hassan, did not learn the whereabouts of the hostages for several years, believing that ISIS had killed them.

383. In August 2017, Lebanese authorities found the bodies of the eight remaining soldiers buried near the Syrian border, including that of Ali El Hajj Hassan.

384. Plaintiff Mohamad El Hajj Hassan is a citizen of the United States and is domiciled in the state of Michigan. He is the brother of Ali El Hajj Hassan.

385. Plaintiff Zeinab El Hajj Hassan is a citizen of the United States and is domiciled in the state of Michigan. She is the niece of Ali El Hajj Hassan and lived in the same household with him for approximately ten years.

386. Plaintiff Ayda Ahmad is a citizen of the United States and is domiciled in the state of Michigan. She is the sister-in-law of Ali El Hajj Hassan and lived with him in the same household for approximately ten years.

387. Ali El Hajj Hassan lived with Plaintiffs Mohamad El Hajj Hassan, Zeinab El Hajj Hassan and Ayda Ahmad in Lebanon for an extended period.

388. As a result of the attack, and the death of Ali El Hajj Hassan, Plaintiffs Mohamad El Hajj Hassan, Zeinab El Hajj Hassan and Ayda Ahmad have experienced economic injuries, severe mental anguish, extreme emotional pain and suffering, and loss of their family member's society, companionship, income, comfort, advice, and counsel.

### C. Human Trafficking, Torture, And Rape

389. Defendants' aid supported ISIS's operations overall, including its payment of numerous fighters and administration of millions of people. ISIS's rule was brutal, and heavily restrictive of women. Defendants' material support allowed ISIS to pay fighters, pay additional stipends for dependents, and maintain a repressive regime that forced children into marriage and to become soldiers, with the approval of ISIS's Leadership Cell and Raqqa Cell.

**Leyla Ekren**

390. Plaintiff Leyla Ekren is a citizen of the United States and is domiciled in the state of Kansas.

391. Plaintiff Leyla Ekren is the daughter of deceased ISIS sniper and leader Volkan Ekren and ISIS leader and convicted criminal terrorist Allison Fluke-Ekren. Plaintiff Ekren was first brought to Syria in 2012 when Volkan Ekren and Allison Fluke-Ekren joined ANF. She was then brought to Raqqa after they joined ISIS.

392. Plaintiff Ekren's parents were both employed and supported by ANF and ISIS as fighters and organizers.

393. Plaintiff Ekren was subject to cruel and inhumane conditions as a child, including exposure to war, forced combat as a child soldier, and medical neglect. When she was thirteen years old in or around 2015, ISIS forced Plaintiff Ekren to marry an ISIS soldier, after which she was repeatedly raped for two years. She was forced to take cycle-regulating medication to become pregnant, and to carry the pregnancy to term. Plaintiff Ekren escaped when she was fifteen years old and was brought back to the United States in 2017.

394. Plaintiff Ekren was subjected to human trafficking, forced to serve as a child soldier, sold into forced marriage, raped, forced into pregnancy and birth, and subjected to other criminal acts and acts of international terrorism.

395. As a result of these acts, Plaintiff Leyla Ekren has been diagnosed with Complex Post-Traumatic Stress Disorder. She has experienced physical harm, economic damages, severe mental anguish, and extreme emotional pain and suffering.

## COUNT ONE: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)
## (JASTA, Aiding and Abetting Liability)

396. Plaintiffs incorporate their allegations above.

397. Lafarge S.A. and LCS pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

398. The United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

399. The United States has designated ANF as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2012.

400. ISIS and ANF committed acts that were violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, and that would be a criminal violation if committed within the jurisdiction of the United States or of any State; including the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, rape, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, forced labor, and trafficking. ISIS's and ANF's acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), 2339D, 1589, and 1590. Defendants, ISIS, and ANF structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A. Defendants knew that their substantial assistance and material support would be used by FTOs in the preparation for, or in carrying out, the above acts.

401. ISIS's and ANF's acts appeared to be intended to intimidate or coerce civilian populations of Syria, Iraq, Libya, Lebanon, and the United States, among others, to influence the policy of the Syrian, Iraqi, Libyan, Lebanese, American, and other governments by intimidation or coercion, and to affect the conduct of a government by mass destruction, assassination, or kidnapping.

402. ISIS's and ANF's attacks occurred primarily outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they are accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

403. Defendants aided and abetted ISIS's and ANF's acts of international terrorism by knowingly providing substantial assistance, including by making cash and covert payments through the U.S. financial system and foreign shell companies and intermediaries, purchasing raw material from, and making anti-competitive agreements with, the FTOs, and by failing to safely shut down and evacuate the Cement Plant, thereby placing tons of valuable cement and raw materials in the hands of ISIS and ANF. Defendants knew that their material support was paid to FTOs and would be used to commit acts of international terrorism.

404. Defendants provided substantial support to ISIS and ANF, knowing that the reasonable and foreseeable risk—and occurrence in fact—was that the FTOs would in turn perform numerous wrongful acts including the murder of thousands of civilians, among them U.S. citizens and relatives of Plaintiffs. Defendants were generally and specifically aware of FTOs' tortious, terrorist scheme, and their role in it. Defendants were generally and specifically aware that their actions would put further resources into FTOs' hands to commit further terrorist acts. Defendants therefore knowingly and substantially aided and abetted the FTOs, including ISIS, in committing the acts of international terrorism that injured Plaintiffs.

405. The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria, Iraq, the United States, Turkey, Lebanon, and Libya; to influence through intimidation or coercion the policy of the governments of Syria, Iraq, the United States, Turkey, Lebanon, and Libya; and to affect the conduct of the governments of Syria,

Iraq, the United States, Turkey, Lebanon, and Libya by means of mass destruction, assassination, and kidnapping.

406. The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

407. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors, or heirs of U.S. nationals who suffered such injuries; or both.

408. As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

**COUNT TWO: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)**
**(JASTA, Conspiracy Liability)**

409. Plaintiffs incorporate their allegations above.

410. Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory, in violation of (among other statutes) 18 U.S.C. §§ 2339A, 2339B, and 2339C.

411. ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy and were a foreseeable consequence of that conspiracy.

412. Continuously since 2004, the United States has designated ISIS and ANF as FTOs, under various names, under 11 U.S.C. § 1189.

413. Lafarge and LCS pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to provide material support to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1).

414. The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by ISIS and/or ANF. They were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the territorial jurisdiction of the United States or of the States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.

415. The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria, Iraq, the United States, Turkey, Lebanon, and Libya; to influence through intimidation or coercion the policy of the governments of Syria, Iraq, the United States, Turkey, Lebanon, and Libya; and to affect the conduct of the governments of Syria, Iraq, the United States, Turkey, Lebanon, and Libya by means of mass destruction, assassination, and kidnapping.

416. Defendants also entered a related conspiracy with ISIS and ANF with the overall goal of providing material support for those organization in violation of 18 U.S.C. § 2339B. Defendants, ISIS, and ANF also structured their transactions to disguise the nature of their support, in violation of 18 U.S.C. § 2339A. These FTOs foreseeably attacked civilians, including U.S. civilians, throughout the conspiracy, with Defendants' knowledge.

417. The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

418. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the estate, survivors or heirs of U.S. nationals who suffered such injuries; or both.

419. As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and noneconomic damages, including solatium damages.

## JURY DEMAND

420. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

(a) Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b) Award Plaintiffs compensatory damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(d);

(c) Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(d);

(d) Award Plaintiffs prejudgment interest; and

(e) Award Plaintiffs any such further relief the Court deems just and proper.

Dated: March 4, 2026

Respectfully submitted,

By: /s/ Lee Wolosky

Lee Wolosky
Andrew J. Lichtman
Kathryn Bolas
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-3098
lwolosky@willkie.com
alichtman@willkie.com
kbolas@willkie.com

Katya Jestin
Todd C. Toral
Jason P. Hipp
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 891-1628
Fax: (212) 891-1699
kjestin@jenner.com
ttoral@jenner.com
jhipp@jenner.com

J.E. Shreve Ariail
Kyle N. Tramonte (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue
Washington, DC 20001
202-639-6871
sariail@jenner.com
ktramonte@jenner.com

Brent Caslin
JENNER & BLOCK LLP
515 S. Flower Street
Los Angeles, CA 90071
213-239-5100
bcaslin@jenner.com

*Attorneys for Plaintiffs*