**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHARISS FINAN, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:22-cv-07831-NGG-PK |
| DIANE FOLEY, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:23-cv-05691-NGG-PK |
| NADIA MURAD, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:23-cv-09186-NGG-PK |
| ESTATE OF AVRAHAM GOLDMAN, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:24-cv-01043-NGG-PK |
| JASON BLACK, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:24-cv-08901-NGG-PK |
| SUSAN SHIRLEY, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:25-cv-04248-NGG-PK |
| CHRISTINE STALLTER, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:25-cv-06749-NGG-PK |

# DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS

## TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. Before 2016, No Allegations Had Been Raised .......... 3

B. In 2016, Payment Allegations Prompted Project Alpha .......... 4

C. In 2016, Defendants Promptly Preserved Relevant Data .......... 4

D. Project Alpha's Collection Thoroughly Targeted Then-Existing Allegations .......... 5

E. Project Alpha Confirmed Misconduct And LafargeHolcim Took Action .......... 6

F. Criminal Investigations Prompted Further Preservation And Collection .......... 7

G. New ATA Claims Prompted Additional Preservation And Collection .......... 8

H. Defendants Have Preserved, Collected, And Produced Relevant Evidence .......... 8

LEGAL STANDARD .......... 10

ARGUMENT .......... 10

I. Plaintiffs Cannot Establish Duty, Unreasonable Preservation, Or Loss .......... 11

A. No Duty Extended To The Disputed Materials Before These Cases .......... 11

1. Plaintiffs Cannot Establish A Pre-2022 Preservation Duty .......... 11

2. Defendants Lacked Control Over Personal Accounts And Devices .......... 14

B. Defendants Took Reasonable Preservation Steps .......... 16

1. Defendants Reasonably Addressed Personal Email And Mobile Data .......... 17

2. Defendants Reasonably Preserved Personnel Files And Bank Records .......... 19

C. Plaintiffs Cannot Show The Allegedly Spoliated Evidence Is Lost .......... 20

II. Plaintiffs Cannot Show Defendants Acted With Specific Intent To Deprive .......... 21

III. Plaintiffs' Requested Sanctions Far Exceed Any Permissible Remedy .......... 24

A. Plaintiffs' Requested Adverse Inference Is Untethered To Any Proven Loss .......... 24

B. Plaintiffs' Additional Sanctions Would Create Prejudice, Not Cure It .......... 25

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Allergan, Inc. v. Revance Therapeutics, Inc.*,
2025 WL 984792 (M.D. Tenn. Mar. 17, 2025) ........................................................15

*Arista Records LLC v. Usenet.com, Inc.*,
608 F.Supp.2d 409 (S.D.N.Y. 2009)........................................................................16

*Barnett v. Deere & Co.*,
2016 WL 4544052 (S.D. Miss. Aug. 31, 2016).......................................................12

*Brigham Young Univ. v. Pfizer, Inc.*,
282 F.R.D. 566 (D. Utah 2012) ..............................................................................13

*Cash v. Laurens County, South Carolina*,
2026 WL 278825 (D.S.C. Feb. 3, 2026)..................................................................23

*Centrifugal Force, Inc. v. Softnet Commc'ns, Inc.*,
783 F.Supp.2d 736 (S.D.N.Y. 2011)........................................................................21

*Chepilko v. Henry*,
722 F.Supp.3d 329 (S.D.N.Y. 2024)...................................................10, 20, 21

*Chin v. Port Auth. of New York & New Jersey*,
685 F.3d 135 (2d Cir. 2012)....................................................................................25

*Easterwood v. Carnival Corp.*,
2020 WL 6781742 (S.D. Fla. Nov. 18, 2020).........................................................11

*Europe v. Equinox Holdings, Inc.*,
592 F.Supp.3d 167 (S.D.N.Y. 2022)........................................................................11

*Fertilizantes Tocantins S.A. v. TGO Agric. (USA) Inc.*,
2023 WL 4536354 (M.D. Fla. July 13, 2023) ................................................15, 16

*FTC v. Lights of Am. Inc.*,
2012 WL 695008 (C.D. Cal. Jan. 20, 2012) ............................................................13

*Fujitsu Ltd. v. Fed. Express Corp.*,
247 F.3d 423 (2d Cir. 2001)....................................................................................12

*Garrit v. City of Chicago*,
2018 WL 11199008 (N.D. Ill. Mar. 6, 2018)...........................................................15

*Gill v. JUS Broad. Corp.*,
2023 WL 7412275 (E.D.N.Y. Nov. 9, 2023) ... 20, 21

*Halabu Holdings, LLC v. Old Nat'l Bancorp*,
2020 WL 12676263 (E.D. Mich. June 9, 2020) ... 15

*Hart v. Suffolk Cnty.*,
2023 WL 5720075 (E.D.N.Y. Sept. 5, 2023) ... 14

*Hoffer v. Tellone*,
128 F.4th 433 (2d Cir. 2025) ... 3, 10, 21, 22

*In re 650 Fifth Ave. & Related Props.*,
830 F.3d 66 (2d Cir. 2016) ... 11

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
770 F.Supp.2d 1299 (N.D. Ga. 2011) ... 12

*In re Pfizer Inc. Sec. Litig.*,
288 F.R.D. 297 (S.D.N.Y. 2013) ... 13

*Jacquety v. Baptista*,
538 F.Supp.3d 325 (S.D.N.Y. 2021) ... 12

*James v. US Bancorp*,
2021 WL 1890787 (C.D. Cal. May 11, 2021) ... 15

*Johns v. Gwinn*,
503 F.Supp.3d 452 (W.D. Va. 2020) ... 11

*Kronisch v. United States*,
1997 WL 907994 (S.D.N.Y. Apr. 14, 1997), *vacated in part on other grounds*, 150 F.3d 112 (2d Cir. 1998) ... 24

*Leidig v. Buzzfeed, Inc.*,
2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017) ... 20, 21

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) ... 17, 21, 25

*Lujan v. Cabana Mgmt., Inc.*,
284 F.R.D. 50 (E.D.N.Y. 2012) ... 15

*M & T Mortgage Corp. v. Miller*,
2007 WL 2403565 (E.D.N.Y. Aug. 17, 2007) ... 13

*Mastr Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*,
295 F.R.D. 77 (S.D.N.Y. 2013) ... 11

*Minnie Rose LLC v. Yu*,
2023 WL 2386608 (S.D.N.Y. Mar. 7, 2023) ....................16, 23

*Oakley v. MSG Networks, Inc.*,
792 F.Supp.3d 377 (S.D.N.Y. 2025)....................15, 23

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
328 F.R.D. 543 (N.D. Cal. 2018)....................12

*Point Blank Sols., Inc. v. Toyobo Am., Inc.*,
2011 WL 1456029 (S.D. Fla. Apr. 5, 2011) ....................12

*Prelvukaj v. Naselli*,
2023 WL 3570659 (E.D.N.Y. May 18, 2023) ....................10

*R.F.M.A.S., Inc. v. So*,
271 F.R.D. 13 (S.D.N.Y. 2010) ....................21

*Reynolds v. City of Rochester*,
2026 WL 1145810 (W.D.N.Y. Apr. 28, 2026) ....................16

*Rockman Co. (USA), Inc. v. Nong Shim Co.*,
229 F.Supp.3d 1109 (N.D. Cal. 2017) ....................12

*Shim-Larkin v. City of New York*,
2019 WL 5198792 (S.D.N.Y. Sept. 16, 2019)....................16

*Stanfill v. Talton*,
851 F.Supp.2d 1346 (M.D. Ga. 2012) ....................25

*Taylor v. City of New York*,
293 F.R.D. 601 (S.D.N.Y. 2013) ....................13

*Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*,
494 F.Supp.2d 161 (E.D.N.Y. 2007) ....................20

*Turner v. Hudson Transit Lines, Inc.*,
142 F.R.D. 68 (S.D.N.Y. 1991) ....................10, 24

*United States v. Lafarge S.A.*, No. 22-cr-444 (E.D.N.Y. Oct. 18, 2022) ....................3, 7

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) ....................12, 17

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 37(e) .................... *passim*

Pub. L. No. 114-222, 130 Stat. 852 ....................12

## INTRODUCTION

Plaintiffs' motion asks Rule 37(e) to supply, by adverse inference, proof that years of governmental investigations, criminal proceedings in two countries, and extensive discovery have failed to yield. But Rule 37(e) is a remedial rule for lost electronically stored information ("ESI") in litigation, not a substitute for proof. It restores a party to the position it would have occupied absent loss; it does not manufacture evidence that never existed. That request should be rejected.

What occurred here was the opposite of spoliation. When February 2016 press reports alleged that Lafarge's Syrian subsidiary had made payments to armed groups, the company—newly acquired by a Swiss company with no connection to the underlying events—retained counsel and forensic professionals to conduct Project Alpha. Project Alpha investigated and confirmed unlawful payments through intermediaries—not Plaintiffs' later theory that Defendants conspired with terrorists to support attacks. Under its new Swiss ownership, LafargeHolcim publicly announced the findings, terminated responsible executives, and disclosed the findings to U.S. authorities; Lafarge and its Syrian subsidiary later pleaded guilty to a conspiracy involving the fired executives. That is not spoliation; it is a good-faith effort to preserve relevant documents, determine the truth, and take responsibility for criminal misconduct.

Plaintiffs' motion treats the fired executives' criminal conduct as an effort to thwart these cases before the claims were conceived. That is fiction. The pre-2016 conduct Plaintiffs highlight occurred before payment allegations surfaced, before Lafarge was acquired by new Swiss owners, before the U.S. guilty plea, before Congress amended the Anti-Terrorism Act ("ATA") to enable Plaintiffs' actions, and long before Plaintiffs filed these actions. From 2016 to 2022, Defendants preserved and collected evidence relevant to the allegations then known; after these civil ATA cases were filed, they issued litigation-specific holds, expanded custodians and time frames, restored backup media, and produced millions of pages of relevant documents, including personal

communications seized by law enforcement. Plaintiffs identify no post-2022 act or omission that destroyed anything. Instead, they ask the Court to blur the timeline and sanction Defendants for not preserving evidence for claims no one suggested or pleaded until years later.

Plaintiffs' spoliation theory fails every threshold requirement of Rule 37(e). First, Plaintiffs cannot establish a duty to preserve the allegedly spoliated material. These civil ATA cases were not reasonably foreseeable until late 2022, and in any event the disputed personal accounts and devices were outside Defendants' possession, custody, or control. Plaintiffs' current theory differs from anything Project Alpha, the U.S. and French criminal proceedings, or the U.S. Department of Justice ("DOJ") investigated or established. Those proceedings addressed payments made through intermediaries in response to terrorist threats; they did not investigate, find, or plead an agreement with terrorists to perpetrate or further the specific attacks at issue here.

Second, once the payment allegations arose, Defendants took reasonable preservation steps. They issued holds directing custodians to preserve personal email accounts, text messages, and mobile devices; suspended auto-deletion; preserved backup media; collected and reviewed more than 21.5 terabytes; conducted a forensic review of the company's accounting system; and interviewed dozens of witnesses and custodians. Those efforts confirmed the payment allegations that Project Alpha was designed to investigate—not Plaintiffs' later civil ATA claims—and Defendants later expanded preservation and collection after U.S. and French authorities investigated and these civil cases were filed. Rule 37(e) therefore applies to what Defendants did to preserve evidence for these cases once they existed, not to earlier proceedings conducted years before for different purposes.

Third, Plaintiffs have not shown that any relevant ESI has been lost. Personal emails were obtained and produced through law enforcement; mobile-device data was preserved where

collected; and personnel and bank records have been searched, produced, supplemented, and remain subject to continuing searches. Plaintiffs offer only speculation that additional material has been lost. But Rule 37(e) sanctions cannot rest on speculation, much less on theoretical loss occurring years before any conceivable litigation duty arose in these cases.

Plaintiffs' request for an adverse inference fails for another independent reason: Rule 37(e)(2) requires a "stringent and specific" showing of intent to deprive. *Hoffer v. Tellone*, 128 F.4th 433, 440 (2d Cir. 2025). Defendants' conduct under new ownership was the opposite. They undertook a documented preservation effort, conducted an internal investigation, publicly disclosed Project Alpha's findings, entered the U.S. guilty plea, and later restored preserved materials, collected additional evidence, and produced millions of pages in these cases. That record is incompatible with intent to deprive Plaintiffs of evidence.

Finally, even if some remedy could be warranted, Rule 37(e) authorizes only measures "no greater than necessary to cure the prejudice." Plaintiffs' requests far exceed that limit: They would instruct the jury that Defendants "intentionally destroyed" evidence and invite inferences contradicting the record developed by Project Alpha, French and U.S. law enforcement, and the guilty plea. That would create prejudice rather than cure it. Rule 37(e) does not authorize a remedy that supplies merits proof the record does not provide.

## BACKGROUND

### A. Before 2016, No Allegations Had Been Raised

Lafarge Cement Syria S.A. ("LCS"), a subsidiary of the French company Lafarge S.A. ("Lafarge"), operated the Jalabiyeh cement plant in Syria from 2010 until its abandonment in September 2014. Statement of Facts ("SOF") ¶2, Dkt.10-1, *United States v. Lafarge S.A.*, No. 22-cr-444 (E.D.N.Y. Oct. 18, 2022). In 2013 and 2014, Lafarge and LCS executives conspired among themselves to make unlawful payments to armed groups, including ISIS and ANF, and made those

payments through intermediaries. Holcim Ltd. ("Holcim"), a Swiss company, acquired Lafarge on July 10, 2015—making Lafarge part of the combined group, LafargeHolcim—after the plant was abandoned and the payments had ended. SOF ¶¶1, 106. Throughout the pre-2016 period in which Plaintiffs allege evidence was destroyed, there were no public allegations, no investigation, and no litigation.

### B. In 2016, Payment Allegations Prompted Project Alpha

In February 2016, public reports alleged that LCS had made payments to ISIS in Syria. SOF ¶108; Mot., Ex.16 at -273. LafargeHolcim's new Swiss owners responded by retaining Baker McKenzie ("Baker") to conduct Project Alpha, supported by PricewaterhouseCoopers ("PwC") on data collection and forensic accounting. Mot., Ex.16 at -273, Ex.21 at 4, 14. DOJ's Statement of Facts confirms that chronology: Holcim's head of compliance learned of the allegations in February 2016 and informed Holcim's Chief Legal and Compliance Officer, who engaged a U.S. law firm; the firm collected documents, electronic correspondence, and other business records from Syria and France, interviewed key employees and executives, and presented its findings to Holcim's Board of Directors. SOF ¶¶109-10. Project Alpha investigated the 2016 payment allegations—not Plaintiffs' later theory, first asserted six years later, that Lafarge conspired with terrorists to support their attacks.

### C. In 2016, Defendants Promptly Preserved Relevant Data

As part of Project Alpha, LafargeHolcim and Baker promptly undertook broad preservation efforts. Beginning May 12, 2016, LafargeHolcim's IT department overrode ordinary retention and deletion policies for historic mailboxes and Google Drive data, preserved Syria-related documents on company servers and third-party repositories, disabled auto-deletion, preserved backup tapes and other storage, and created full backups of custodian email, directories, local and non-local data,

and hard drives. Bowker Decl., Ex.1 at 19, 21-23; Mot., Ex.18 at -691. Defendants continue to preserve this data. Bowker Decl., Ex.1 at 22-23.

LafargeHolcim and Baker also issued litigation-hold notices ("Hold Notices") directing relevant personnel to preserve Syria-related documents dating back to 2011, including correspondence, "text messages and instant messages," financial records, mobile phones, non-company devices used for work, and work-related email accounts. Mot., Ex.18 at -688-89. The Hold Notices separately directed custodians to preserve materials stored outside company systems, including personal email accounts and mobile devices used for work. *Id*.

### D. Project Alpha's Collection Thoroughly Targeted Then-Existing Allegations[1]

On the heels of LafargeHolcim's and Baker's preservation directives, Baker and PwC collected and reviewed extensive data to test the 2016 payment allegations. Practical, legal, privacy, and data-protection constraints bore on collection, including as to sources outside company IT systems such as personal communications and devices. Those sources were less readily available because of those burdens and privacy laws, including the French Blocking Statute and Articles 226-15 and 226-16 of the French Criminal Code, but were collected and reviewed in some instances. Bowker Decl., Ex.1 at 10.

Baker identified 60 custodians, assigned them to three priority tiers, interviewed 30 custodians, and collected available hard-copy documents during in-person interviews between July and September 2016. Bowker Decl., Exs.2 at -168-72; 1 at 10; Mot., Ex.16 at -274, -277-78. From July to November 2016, Baker and PwC collected email systems, cloud storage, corporate server data, employee hard drives and devices, financial records, and paper files from 60 custodians and other repositories, totaling more than 21.5 terabytes. Bowker Decl., Ex.2 at -165-66. Baker

[1] Defendants preserve privilege protections over collection and review judgments.

collected mobile-device data from five custodians—Ahmad Jaloudi, Mazen Sheikh Awad, Frédéric Jolibois, Valery Mirakoff, and Ali Suleiman—and 28 of the 33 agreed-upon custodians in these cases were also Project Alpha custodians, underscoring Project Alpha's broad investigative net. Bowker Decl., Ex.1 at 8-10.

PwC reviewed LCS's Enterprise Resource Planning ("ERP") accounting system for January 2010 through October 2016. Mot., Ex.16 at -254, -274, -294-96. Roughly 266,000 documents were loaded into the Project Alpha review platform, and Defendants preserved those materials and the broader Project Alpha collection. Bowker Decl., Ex.2 at -166-67; Mot., Ex.21.

The Project Alpha report also disclosed that LafargeHolcim engaged Swiss counsel to ensure compliance with Swiss legal and procedural requirements, as well as French counsel to ensure compliance with French data privacy laws. Mot., Ex.16 at -254, -273.

Project Alpha's scope matched its purpose: determining whether the 2016 allegations were true—i.e., whether Lafarge and LCS had made unlawful payments to armed groups through intermediaries. SOF ¶¶15-17. Nothing in Project Alpha's investigation of the 2016 payment allegations suggested a basis for Plaintiffs' later theory that Lafarge conspired with terrorists to support attacks. That theory had not been alleged when Project Alpha began, Congress did not enact the ATA secondary-liability provisions until September 2016, and no civil ATA case was filed until December 2022.

### E. Project Alpha Confirmed Misconduct And LafargeHolcim Took Action

In April 2017, LafargeHolcim publicly announced the conclusion of Project Alpha, disclosing that Defendants' executives had made payments to armed groups through intermediaries. SOF ¶110. Under new ownership, LafargeHolcim fired the responsible executives who had not already been terminated, and overhauled Defendants' compliance programs and sanctions

screening procedures. SOF ¶¶107, 115-17. LafargeHolcim disclosed Project Alpha's payment-related findings to U.S. law enforcement. SOF ¶¶110, 115-17.

### F. Criminal Investigations Prompted Further Preservation And Collection

After LafargeHolcim publicly disclosed Project Alpha's findings, French and U.S. authorities investigated Defendants' payments to armed groups through intermediaries. LafargeHolcim and Defendants responded by taking additional preservation, collection, and production steps to supplement Project Alpha and respond to law-enforcement requests, adding to the terabytes of data preserved in 2016.

On October 18, 2022, Lafarge and LCS pleaded guilty to one count of conspiracy to provide material support to foreign terrorist organizations ("FTOs") based on a scheme by former Lafarge and LCS executives to make illicit payments to armed groups through intermediaries. The plea and Statement of Facts confirmed the payment scheme Project Alpha had revealed and LafargeHolcim had publicly disclosed in 2017. Lafarge and LCS also agreed to improve internal controls and continue cooperating with DOJ. Plea Agreement ¶¶14-15, Dkt.10, *United States v. Lafarge S.A.* (E.D.N.Y. Oct. 18, 2022). The plea addressed only the admitted payment conspiracy. After years of investigation, DOJ did not charge, find, or establish Plaintiffs' theory that Defendants conspired with terrorists to support attacks or other terrorist objectives. To the contrary, DOJ's Statement of Facts states that the admitted conduct was undertaken "for the specific purpose of protecting LAFARGE's and LCS's employees, assets, and future economic opportunities in Syria," and that "[n]either LAFARGE nor LCS made payments to ISIS or ANF because they supported the terrorist organizations' ideology or methods." SOF ¶¶16-17. It further stipulated that the government's evidence "does not establish that LAFARGE or LCS, or any of their employees, shared or supported the terrorist ideologies or goals of ISIS, ANF or any other FTO." SOF ¶111.

### G. New ATA Claims Prompted Additional Preservation And Collection

The first of the civil ATA actions was filed in December 2022. *See Finan v. Lafarge S.A.*, No. 1:22-cv-07831 (E.D.N.Y.). Unlike Project Alpha and the criminal investigations, these actions allege that Defendants conspired directly with terrorists to support attacks and other terrorist objectives. Defendants responded by retaining new counsel and issuing updated litigation-hold notices in French and English to remaining 2016 custodians, Board members, and IT personnel. Bowker Decl., Ex.1 at 3, 19-23. All agreed-upon custodians either received a hold notice or had their data placed on hold. *Id.*

Defendants also expanded collection and production for these civil cases. In addition to preserving the Project Alpha database and materials from the U.S. and French criminal proceedings, Defendants restored data for the 33 agreed-upon custodians and added materials outside the original review set, including LCS server backups, ERP data, financial records collected in 2018 and 2020, additional bank records, and the French criminal file. Bowker Decl., Ex.1 at 3, 7-8, 15-16, 19, 24-25. The "Global" source of enterprise-level and financial records alone contains more than one million files. Mot., Ex.21 at 16. To date, Defendants have collected and reviewed roughly nine million documents and produced over 600,000 documents comprising over 2.5 million pages.

### H. Defendants Have Preserved, Collected, And Produced Relevant Evidence

Against that record, Plaintiffs' claimed "missing" evidence falls into four categories: personal emails, mobile-device data, personnel records, and bank records. As explained below, Defendants have preserved, collected, produced, supplemented, or continue to search for available materials in each category.

1. *Personal emails*. Personal emails outside Defendants' systems were not within Defendants' possession, custody, or control during Project Alpha and, where subject to French

privacy restrictions, could not be freely reviewed. The Project Alpha Hold Notices nevertheless directed custodians to preserve responsive personal emails, including "any email accounts used for work related communications." Mot., Ex.18 at -689; Bowker Decl., Ex.2. Personal emails were later obtained from service providers through the Mutual Legal Assistance Treaty ("MLAT") process and produced here, including emails Plaintiffs attach to their motion. Mot.19; Bowker Decl., Ex.1 at 24.

2. *Mobile devices*. The Project Alpha Hold Notices also directed custodians to preserve responsive materials on mobile devices, including "non-company devices used for work purposes." Mot., Ex.18 at -688-89. Baker collected mobile-device data from five custodians, Bowker Decl., Ex.1 at 8-10, and Defendants preserved that data for review, *id.*; Mot., Ex.21.

3. *Personnel records*. Defendants collected and reviewed relevant HR files, produced responsive personnel records for 14 of the 15 individuals Plaintiffs identified, and committed to produce additional records located through continuing searches. Bowker Decl., Ex.3 at 2-3. Discipline arising from Project Alpha necessarily post-dated the 2016-2017 collection; those later HR files were preserved, reviewed, and produced here.

4. *Bank records*. During Project Alpha, PwC collected and reviewed bank statements, extracts, payment instructions, internal working documents, and LCS's ERP accounting data, including a forensic review of 54 bank accounts that could have been used for illicit payments. Mot., Ex.16 at -294-96, -298, -303. Defendants supplemented those materials with records from relevant financial institutions. Bowker Decl., Exs.1 at 16; 4. Bank Audi Lebanon produced 2011-2015 statements for three accounts, which Defendants produced to Plaintiffs on August 14, 2026, *id.* Exs.5, 6, 7—ten days before Plaintiffs filed this motion, contrary to their assertion that Defendants "recovered none and produced none" of the bank records, Mot.6.

## LEGAL STANDARD

Rule 37(e) governs sanctions for allegedly lost ESI. The Court must first determine whether the Rule's threshold requirements are satisfied: The moving party must show that the opposing party had a duty to preserve the ESI, failed to take reasonable steps to preserve it, and that the ESI cannot be restored or replaced because it is lost. *Chepilko v. Henry*, 722 F.Supp.3d 329, 338 (S.D.N.Y. 2024); *Prelvukaj v. Naselli*, 2023 WL 3570659, at *7 (E.D.N.Y. May 18, 2023) (Kuo, M.J.). The movant bears the burden to prove each requirement by a preponderance. *Chepilko*, 722 F.Supp.3d at 338.

Rule 37(e)(2) reserves adverse-inference sanctions for cases where the court finds that the party "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). The Second Circuit describes that standard as "stringent and specific": It requires "not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Hoffer*, 128 F.4th at 440. Negligence, gross negligence, and even knowing deletion are not enough without specific intent to deprive a party of evidence in litigation.

Without that finding, the Court may order only curative measures "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Any remedy must be tied to the information actually lost and reasonably likely to have been contained in the missing evidence. *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 77 (S.D.N.Y. 1991).

## ARGUMENT

Plaintiffs' motion fails at every step of Rule 37(e). They cannot establish a duty to preserve the disputed material because these cases were not reasonably foreseeable until 2022 and, in any event, the personal accounts and devices were outside Defendants' control. Nor can they show unreasonable preservation steps or prove relevant ESI was lost. Those threshold failures defeat

sanctions. And even if Plaintiffs could clear them, they have not shown that Defendants acted with specific intent to deprive them of evidence. Any remedy thus must be limited to curing proven prejudice, not manufacturing merits inferences unsupported by the record.

## I. Plaintiffs Cannot Establish Duty, Unreasonable Preservation, Or Loss

### A. No Duty Extended To The Disputed Materials Before These Cases

"Identifying the boundaries of the duty to preserve evidence involves two related inquiries: when does the duty to preserve attach, and what evidence must be preserved?" *Europe v. Equinox Holdings, Inc.*, 592 F.Supp.3d 167, 176 (S.D.N.Y. 2022) (quotation marks and brackets omitted). Each inquiry defeats Plaintiffs' motion: These civil ATA cases were not reasonably foreseeable years before they were filed, and any duty did not reach materials outside Defendants' control.

#### *1. Plaintiffs Cannot Establish A Pre-2022 Preservation Duty*

A defendant's duty to preserve for litigation "most commonly" begins when "suit has already been filed." *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 105 (2d Cir. 2016). A pre-suit duty arises only in exceptional circumstances, when objective indicia show the relevant litigation is probable—not merely possible. *Id.*; *Mastr Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, 295 F.R.D. 77, 82 (S.D.N.Y. 2013). Those indicia typically include a discovery request, demand letter, preservation request, complaint, threat of litigation, or similar notice that litigation is likely. *Easterwood v. Carnival Corp.*, 2020 WL 6781742, at *5 (S.D. Fla. Nov. 18, 2020); *Johns v. Gwinn*, 503 F.Supp.3d 452, 465 (W.D. Va. 2020).

No such notice existed before late 2022. The first civil ATA case was filed in December 2022, shortly after the U.S. guilty plea and pre-suit contact from counsel for some Plaintiffs. Before that period, Defendants had received no demand letter, preservation request, complaint, or threat of civil ATA litigation from Plaintiffs. Nor could Plaintiffs' claims have been foreseeable in 2013 or April 2016, as they contend. The Justice Against Sponsors of Terrorism Act ("JASTA")

secondary-liability provisions on which those claims depend were not enacted until September 28, 2016. *See* Pub. L. No. 114-222, §4, 130 Stat. 852, 854. Some attacks also had not yet occurred.

Plaintiffs stretch foreseeability beyond recognition by treating generalized litigation risk as enough. But Rule 37(e) asks whether a party should have preserved information for "the litigation," not litigation in the abstract. Fed. R. Civ. P. 37(e)(2). The preservation duty is case-specific and turns on objective notice that *these* Plaintiffs were likely to bring *these* cases, not on a generalized fear that someone might sue someday.

That case-specific rule follows from Rule 37(e) and common law. The duty reaches only information relevant to the claims and defenses in the reasonably anticipated proceeding. *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217-18 (S.D.N.Y. 2003). And because "a duty is owed to a *specific party*," Plaintiffs cannot invoke duties owed to others in other proceedings. *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, 2011 WL 1456029, at *24 (S.D. Fla. Apr. 5, 2011) (emphasis added). Courts therefore reject preservation duties based on generalized future litigation risk or earlier proceedings involving related subject matter. *Barnett v. Deere & Co.*, 2016 WL 4544052, at *3 & n.3 (S.D. Miss. Aug. 31, 2016); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F.Supp.2d 1299, 1308 (N.D. Ga. 2011); *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 328 F.R.D. 543, 551 (N.D. Cal. 2018).

The earlier investigations and proceedings Plaintiffs invoke did not trigger a preservation duty for these cases. A foreign prosecution "does not equate to reasonable anticipation that litigation would ensue in the United States." *Jacquety v. Baptista*, 538 F.Supp.3d 325, 343 (S.D.N.Y. 2021). Nor does a criminal investigation "create a duty to preserve evidence with respect to later civil litigation," *Rockman Co. (USA), Inc. v. Nong Shim Co.*, 229 F.Supp.3d 1109, 1123 (N.D. Cal. 2017), and an internal investigation does not itself put a company on notice of

later civil litigation, *FTC v. Lights of Am. Inc.*, 2012 WL 695008, at *3 (C.D. Cal. Jan. 20, 2012). That is especially true here: Project Alpha, the French judgment, the U.S. criminal case, the guilty plea, and DOJ's findings all concerned illicit payments to armed groups through intermediaries. None charged, found, pleaded, or established Plaintiffs' later theory that Defendants conspired directly with terrorists to support attacks or other terrorist objectives.

Plaintiffs' reliance on *Taylor v. City of New York*, 293 F.R.D. 601 (S.D.N.Y. 2013), does not solve their timing problem. Mot.8. There, the plaintiff was known, there were circumstances from which litigation "invariably ensue[d]," and the pre-suit duty arose only months before suit. 293 F.R.D. at 610-11. That decision does not support imposing a duty years earlier based on a theory no plaintiff, prosecutor, court, or investigator had advanced.

Plaintiffs cite no case imposing a preservation duty anywhere near a decade before suit. Their best authorities involve duties arising months before litigation or a later suit closely tracking an already-filed complaint. *See, e.g.*, *Taylor*, 293 F.R.D. at 610-11; *M & T Mortgage Corp. v. Miller*, 2007 WL 2403565, at *5 (E.D.N.Y. Aug. 17, 2007). Even the three-year duty in *M & T* rested on a "strikingly similar" earlier complaint before the defendant destroyed evidence central to both cases. 2007 WL 2403565, at *5. Later decisions limit *M & T* to its facts and reject preservation duties based on "some distantly related litigation that may arise years into the future." *Brigham Young Univ. v. Pfizer, Inc.*, 282 F.R.D. 566, 572 (D. Utah 2012); *see also In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 316-17 (S.D.N.Y. 2013).

Nothing before late 2022 triggered a preservation duty for these civil ATA cases. Before then, Plaintiffs had made no demand, filed no complaint, asserted no JASTA claim, and provided no notice that these suits were likely. Defendants could not have anticipated Plaintiffs' current

theory until Plaintiffs articulated and brought it. Any earlier preservation obligations were tied to the allegations and proceedings then known—and Defendants fulfilled them.

### *2. Defendants Lacked Control Over Personal Accounts And Devices*

Regardless of when any duty arose, it did not extend to materials outside Defendants' possession, custody, or control. Rule 37(e) applies only where a party has "'access and the practical ability to obtain [the] documents.'" *Hart v. Suffolk Cnty.*, 2023 WL 5720075, at *5-6 (E.D.N.Y. Sept. 5, 2023). In Syria and France in 2016 and 2017, Defendants had neither. French law barred access to personal email accounts, U.S. courts consistently reject employer control over employees' personal devices, and Syria remained a warzone, making travel practically impossible. Even for the custodians employed in Paris with company phones, Mot.15; Mot., Ex.49, Defendants lacked access to personal accounts and materials whose collection would have been burdensome, costly, intrusive, and legally constrained.

French law presented substantial obstacles. It prohibits an employer, on pain of civil and criminal liability, from accessing an employee's personal email account, even where messages are work-related. Declaration of Stéphane de Navacelle ("Navacelle Decl.") ¶¶16, 25-28, Dkt.85, *Foley v. Lafarge S.A.*, No. 1:23-cv-05691 (E.D.N.Y. Nov. 27, 2024). The French Supreme Court has excluded messages from an employee's personal account even where the employer believed they showed unfair competition, holding that the professional subject matter "did not change the fundamental personal nature of the email account or make it accessible to the employer." *Id.* ¶19.

Contrary to Plaintiffs' assertion, Defendants do not "disclaim" reliance on French law. Mot.22 n.10. They disclaimed only the argument that French law barred *preservation*; indeed, the Hold Notices directed custodians to *preserve* personal accounts and devices. But preservation is not collection or review, and French law impeded those later steps. Plaintiffs' motion nowhere addresses the Navacelle declaration or disputes that French law prohibited such access, and any

argument raised in reply would come too late, *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 62 (E.D.N.Y. 2012).

Plaintiffs are also wrong that Lafarge's internal policies displaced French law. Mot.13, 15. They did not: Any policy purporting to grant employer access to employees' personal email would violate French law, not displace it. Navacelle Decl. ¶33. In any event, Lafarge's policy reached only "documents belonging to Lafarge," and its email guidelines covered only accounts "provided by the company" and messages "sent from or received from a company email account." *Id.* ¶¶34-36. The information-security directive Plaintiffs invoke confirms the same point: "local laws, rules, and regulations hold precedence over this directive." Mot., Ex.53 at -902.

U.S. courts likewise reject the premise that an employer controls employees' personal devices merely because employees used them for work. "[D]istrict courts have held that 'a company does not possess or control the text messages from the personal phones of its employees.'" *Halabu Holdings, LLC v. Old Nat'l Bancorp*, 2020 WL 12676263, at *1-2 (E.D. Mich. June 9, 2020). Work-related use does not give an employer "a 'legal right' to its employees' personal devices," *Allergan, Inc. v. Revance Therapeutics, Inc.*, 2025 WL 984792, at *7-9 (M.D. Tenn. Mar. 17, 2025), and Rule 37 does not "create an obligation … to preserve the messages on [an employee's] personal phone upon or after his departure," *Fertilizantes Tocantins S.A. v. TGO Agric. (USA) Inc.*, 2023 WL 4536354, at *2 (M.D. Fla. July 13, 2023).

Plaintiffs identify no authority showing that Defendants had the right or ability to access employees' personal accounts or devices. Their cases, Mot.14-15, involve a party's spoliation of evidence on his or her own device, *see Oakley v. MSG Networks, Inc.*, 792 F.Supp.3d 377, 385-87 (S.D.N.Y. 2025); *Garrit v. City of Chicago*, 2018 WL 11199008, at *2-3 (N.D. Ill. Mar. 6, 2018); a company's internal messaging platform, *James v. US Bancorp*, 2021 WL 1890787, at *5 (C.D.

Cal. May 11, 2021); or an express finding that the employer "had control over the contents of [the] text messages," *Shim-Larkin v. City of New York*, 2019 WL 5198792, at *9-10 (S.D.N.Y. Sept. 16, 2019). None involved personal accounts or devices the employer had no legal right to access, and none supports Plaintiffs' theory that Defendants controlled French and Syrian employees' personal repositories.

One court in this Circuit has applied a multifactor test for control over such repositories, considering "(1) whether the employer issued the devices; (2) how frequently the devices were used for business purposes; (3) whether the employer had a legal right to obtain communications from the devices; and (4) whether company policies address access to communications on personal devices." *Reynolds v. City of Rochester*, 2026 WL 1145810, at *14 (W.D.N.Y. Apr. 28, 2026). Each factor favors Defendants. Defendants did not issue the personal devices; the billing records Plaintiffs invoke reflect message volume, not business use, and begin only in 2014, Mot., Appx.A-B; French law gave Defendants no legal right to access personal repositories; and the information-security directive disclaims responsibility for retaining or retrieving "non-corporate data." Mot., Ex.53 at -908. The relevant custodians also left the company years before these claims arose, further diminishing any purported control. *See Fertilizantes*, 2023 WL 4536354, at *2.

**B. Defendants Took Reasonable Preservation Steps**

Plaintiffs cannot "show that [Defendants] failed to take 'reasonable steps' to preserve [ESI]." *Minnie Rose LLC v. Yu*, 2023 WL 2386608, at *5 (S.D.N.Y. Mar. 7, 2023). A party need only "preserve what it knows, or reasonably should know" is "reasonably likely to be requested during discovery." *Arista Records LLC v. Usenet.com, Inc.*, 608 F.Supp.2d 409, 433 (S.D.N.Y. 2009).

Defendants' preservation efforts, detailed above, satisfied any Rule 37(e) obligation. *See supra* Background §§C-H. In response to the 2016 payment allegations and later civil ATA claims,

Defendants issued broad holds, suspended auto-deletion, preserved backup media, collected and reviewed Project Alpha materials, supplemented those efforts during the U.S. and French investigations, expanded preservation and collection again in these cases, and pursued relevant third-party sources.

Plaintiffs' cover-up theory makes no sense against that record. It ignores that new owners arrived in 2016, preserved the evidence they could reasonably gather, conducted an investigation that confirmed the illicit-payment allegations, publicly announced that finding, and fired the wrongdoers. The SOF confirms all that. SOF ¶¶107, 109-10, 115. Plaintiffs fault Defendants for not doing still more. But as Plaintiffs recognize when defending their own discovery practices, perfection is not the standard. Hr'g Tr.11-12, 25-26, Dkt.208, *Foley* (E.D.N.Y. July 30, 2026). Rule 37(e) asks whether Defendants took reasonable steps based on what was known at the time—not whether Plaintiffs, years later, can imagine further steps with the benefit of hindsight. Creative counsel can always posit *something* more, but Rule 37(e) "'does not call for perfection,'" *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *11 (S.D.N.Y. Mar. 12, 2018), or require a party to "retain every document in its possession," *Zubulake*, 220 F.R.D. at 217.

#### *1. Defendants Reasonably Addressed Personal Email And Mobile Data*

Reasonableness under Rule 37 did not require imaging every personal account and device in 2016 and 2017 regardless of cost, burden, legal constraint, or likely benefit. The advisory committee notes emphasize preservation costs and "less costly" alternatives. *Lokai*, 2018 WL 1512055, at *11. As explained above, Defendants reasonably addressed personal accounts and devices through hold notices, company-system preservation, feasible mobile-device collection, law-enforcement productions, and civil-case discovery. *See supra* Background §§C-H.

Plaintiffs' reliance on Jean-Claude Veillard's 2017 severance agreement does not prove spoliation. The provision they cite required Veillard to return company materials and delete

remaining copies from his electronic devices and personal email boxes; it did not authorize destruction of evidence. Mot.5. By then, the Hold Notices had been in effect for more than a year and separately directed Veillard to preserve "any email accounts used for work related communications." Mot., Ex.18 at -689, -692. A substantial volume of Veillard's corporate and personal-account materials was preserved and produced. Bowker Decl., Ex.1 at 21-23. The MLAT seizure also captured emails from the very accounts Plaintiffs say were emptied. Mot., Ex.57.

Plaintiffs say personal emails and devices should have been collected in 2016. But that ignores that Project Alpha established the payment allegations then known using extensive company data, business and accounting records, hard-copy files, custodial interviews, and feasible mobile-device collection. *See supra* Background §D. Additional personal-device and personal-account collection—likely only cumulative of the evidence already reviewed—would have been costly, burdensome, intrusive, and constrained by French law and privacy requirements.

Plaintiffs' real complaint is not unreasonable preservation; it is that the existing record does not prove their later ATA conspiracy theory. But Rule 37(e) does not let Plaintiffs use spoliation to supply missing merits proof. The U.S. guilty plea, Statement of Facts, company records, and personal-account messages Plaintiffs cite show a payment scheme routed through intermediaries—not an agreement with FTOs to further terrorist objectives. SOF ¶¶15-17, 55-65; Mot., Exs.5-7. Plaintiffs' other examples do not fill that gap: One exhibit reflects an instruction to stay in contact by SMS while traveling through ISIS-held territory, not a conspiracy with FTOs, Mot., Ex.71; the purported agreement is a handwritten Arabic document, not ESI, Mot., Ex.67; and voice calls generate no text record to preserve or lose under Rule 37(e).

Plaintiffs' mobile-phone statistics do not show otherwise. They invoke all 60 Project Alpha custodians to assert that Defendants preserved "no responsive mobile-phone data from any of those 60 custodians." Mot.5. But their appendices profile only 22 people, and focus on the nine individuals identified in the Statement of Facts, whose corporate email and business records were collected and reviewed during Project Alpha. Mot., Appx.A-B; SOF ¶¶3-11.

Nor does anything turn on the 17 custodians Plaintiffs say "used company-issued phones." Mot.15. The Hold Notices expressly reached those devices, Mot., Ex.18 at -689, and the billing records underlying that designation begin only in 2014, Mot., Appx.B. Those custodians were Paris headquarters personnel, Mot., Ex.49, which is why neither Pescheux nor Jolibois—both LCS chief executives in Syria—appears among them, notwithstanding Plaintiffs' assertion that the 17 include "all six executives identified in the guilty plea," Mot.15.

#### *2. Defendants Reasonably Preserved Personnel Files And Bank Records*

Plaintiffs' objections regarding personnel files and bank records are not evidence of spoliation. They are disputes about production status and ongoing searches. Personnel files were covered by Defendants' holds, searched, and produced, and Defendants have committed to produce any additional responsive records located through continuing searches. Disciplinary records arising from Project Alpha necessarily post-date the 2016-2017 collection and so could not have been collected as part of it. Bank records likewise have been collected, produced, and supplemented through continuing searches, including the recent Bank Audi Lebanon production. Bowker Decl., Ex.8; Mot., Ex.21.

Plaintiffs' expert does not bridge the gap. Ms. Runge opines that a forensic examiner would want bank-issued statements—a proposition Defendants need not dispute. Runge Decl. ¶¶3-4. She offers no opinion—and Plaintiffs identify no evidence—that any bank statement or record present in Defendants' files in 2016 is absent today. That is the question Rule 37(e) asks.

### C. Plaintiffs Cannot Show The Allegedly Spoliated Evidence Is Lost

Plaintiffs also fail to show loss. Sanctions may issue "only when the party seeking such sanctions demonstrates that relevant evidence has been 'lost,'" *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017), meaning it "cannot be entirely restored or replaced," *Chepilko*, 722 F.Supp.3d at 338. The movant also must "ma[k]e some good-faith attempt to explore its alternatives." *Gill v. JUS Broad. Corp.*, 2023 WL 7412275, at *6 (E.D.N.Y. Nov. 9, 2023). Plaintiffs cannot make that showing here. *See supra* Background §H.

Personal emails are not lost. Plaintiffs concede they "succeeded" in obtaining certain personal emails through law-enforcement channels, Mot.19, and their own exhibits include such emails. *See* Mot., Exs.4, 36, 67; Branson Decl. ¶¶6, 38, 69. Exhibit 57 also catalogs over a thousand additional items seized from custodians' personal accounts. Plaintiffs' speculation that other emails may have escaped seizure does not show loss. *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F.Supp.2d 161, 177 (E.D.N.Y. 2007).

Nor have Plaintiffs shown that mobile-device data is irretrievably lost. As discussed above, Defendants preserved Project Alpha mobile-device data and relevant former employees are being deposed. *See supra* Background §H. Rule 37(e) requires proof of loss, not speculation that some additional text or message might once have existed.

Plaintiffs' bank-record theory has the same problem. As discussed above, bank records have been collected, produced, and supplemented through continuing efforts, including the Bank Audi Lebanon production. *See supra* Background §H. Plaintiffs' expert says a forensic examiner would want bank-issued statements, but she does not identify any bank statement or record that existed in Defendants' files in 2016 and is absent today. That is the loss inquiry Rule 37(e) requires.

Plaintiffs also have not exhausted available alternatives. They "subpoenaed one of Defendants' former employees directly seeking the production of communications held by that

employee but never pursued to enforce that subpoena." Dkt.81 at 24, *Foley* (E.D.N.Y. Nov. 27, 2024). Nor have they used the Hague Convention or similar mechanisms. *Cf. Gill*, 2023 WL 7412275, at *7.

As for personnel records, Plaintiffs still cannot show loss. As discussed above, personnel files have been searched, produced, supplemented, and remain subject to continuing searches. *See supra* Background §H. Plaintiffs infer particular documents must once have existed, but Rule 37(e) requires proof that ESI was actually lost. *See Chepilko*, 722 F.Supp.3d at 338. Some records may never have been created; others may remain subject to ongoing searches. Neither is spoliation. *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 40 (S.D.N.Y. 2010). Calling production "inadequate" does not show evidence "has been lost." *Leidig*, 2017 WL 6512353, at *7.

## II. Plaintiffs Cannot Show Defendants Acted With Specific Intent To Deprive

Plaintiffs' adverse-inference request fails twice over. They have not shown relevant ESI was lost. And even if they had, Rule 37(e)(2) reserves that "particularly harsh" remedy for "extreme" circumstances, *Lokai*, 2018 WL 1512055, at *8, where the movant proves "intent to deprive" it of the lost information, *Hoffer*, 128 F.4th at 436-37. Negligence, gross negligence, and even knowing conduct are not enough. *Id.* at 438. Plaintiffs have no such evidence.

Defendants' conduct is incompatible with intent to deprive. As detailed above, under new ownership, Defendants preserved evidence, investigated and disclosed the 2016 payment allegations, responded to U.S. and French law-enforcement requests, and expanded preservation and collection once these civil ATA cases were filed. *See supra* Background §§C-H; Argument §I.B. Whatever Plaintiffs may say about scope or timing, a documented preservation and investigation program directed at the allegations then known is not evidence of intent to deprive; it is evidence of the opposite. *See Centrifugal Force, Inc. v. Softnet Commc'ns, Inc.*, 783 F.Supp.2d 736, 742-43 (S.D.N.Y. 2011).

The post-merger corporate context reinforces that point. Holcim's new management had every incentive to identify, disclose, and remediate legacy Lafarge misconduct—and did so, *see supra* Background §§D-F, as confirmed by the DOJ-stipulated chronology, SOF ¶¶109-10.

Plaintiffs offer three supposed indicia of intent. None satisfies Rule 37(e)(2). First, Plaintiffs say employees sometimes used personal email and personal phones before 2016. Mot.21-22. But a custodian's use of a personal account or device is not a preservation decision, much less evidence of intent to deprive *these* Plaintiffs of evidence in *these* 2022-filed cases. When the Hold Notices issued in 2016, they expressly directed custodians to preserve personal accounts and devices. Second, Plaintiffs assert that preservation failures themselves prove intent. Mot.22-23. That collapses Rule 37(e)'s two tiers: If failure to preserve established intent to deprive, Rule 37(e)(1) would have no work to do and *Hoffer*'s "stringent and specific" standard, 128 F.4th at 440, would be a nullity. At most, Plaintiffs describe a dispute about whether particular records should have been collected or produced—possibly negligence, but not specific intent. *Id.* at 438-39. Third, Plaintiffs invoke the guilty plea as evidence of a broader effort to suppress evidence. Mot.23. But the plea admitted payment-related misconduct; it did not address preservation. None of this supports the finding Rule 37(e)(2) requires.

Nor does Guillaume Roux's Fifth Amendment invocation show intent. Mot.21-23. Roux did not decline the document-destruction question specifically; his counsel applied a date-based cutoff, refusing every question concerning events after that date—which is why Defendants moved to compel him to invoke, if at all, question by question. Dkt.223, *Finan* (E.D.N.Y. Sept. 10, 2026). An invocation keyed to a date says nothing about the content of any particular answer. Moreover, Defendants understand—based on communications with Roux's counsel and consistent with his testimony—that he would have answered that he does not recall the relevant information. *Id.* at 5.

Cases finding intent to deprive involve far more culpable conduct than anything Plaintiffs identify. In *Oakley*—cited by Plaintiffs—a party expressly instructed to preserve text messages took "affirmative acts" mid-litigation that caused the texts to be lost, and its explanation was "simply not credible." 792 F.Supp.3d at 391. Cases rejecting intent are equally instructive. In *Cash v. Laurens County, South Carolina*, 2026 WL 278825 (D.S.C. Feb. 3, 2026), defendants received a preservation letter but never passed it to IT or key custodians, allowed devices seized in a related investigation to be destroyed, and allowed emails and texts to be deleted. *Id.* at *1-2. That "amount[ed] to negligence" or "maybe … recklessness," but did "not rise to intent as required … under Rule 37(e)(2)." *Id.* at *8. Plaintiffs allege nothing comparable to *Oakley*, and *Cash* shows that even serious preservation failures do not establish specific intent.

Plaintiffs' theory is especially strained given counsel's own role in the French proceedings. Willkie Farr & Gallagher (counsel for the *Finan*, *Murad*, and *Shirley* Plaintiffs) represented, and still represents, Bruno Lafont, Lafarge's CEO during the relevant period, in defending those proceedings. Plaintiffs' allegations here—that Lafont joined an intentional evidence-destruction scheme—are difficult to reconcile with Willkie's defense of Lafont in France and call into question the accusations Willkie now advances in this Court.

In sum, Plaintiffs do not come close to establishing spoliation. They identify no act or omission after December 2022—when the duty to preserve for these cases arose—that evinces intent to deprive them of evidence. Decisions made before then could not have been aimed at depriving unknown litigants of evidence for claims no one had suggested. At minimum, Defendants' documented preservation, investigation, and disclosure efforts provide a credible alternative explanation that defeats any intent inference. *See Minnie*, 2023 WL 2386608, at *6.

## III. Plaintiffs' Requested Sanctions Far Exceed Any Permissible Remedy

### A. Plaintiffs' Requested Adverse Inference Is Untethered To Any Proven Loss

An adverse inference must be tied to what the movant proves was actually lost. It must be "commensurate with information that was reasonably likely to have been contained in the destroyed evidence," *Turner*, 142 F.R.D. at 77, and it "does not operate to create evidence where no evidence exists," *Kronisch v. United States*, 1997 WL 907994, at *23 (S.D.N.Y. Apr. 14, 1997), *vacated in part on other grounds*, 150 F.3d 112 (2d Cir. 1998). Plaintiffs' requested inference fails that requirement.

Plaintiffs defer the "precise content" of their requested instruction, but their proposed order sets an impermissible floor. They would have the jury told that Defendants "intentionally destroyed emails, text messages, and other information they had a legal obligation to preserve"; that that information "was relevant to the claims and defenses in this case"; and that "the lost evidence would have supported Plaintiffs' claims and would have undermined Defendants' defenses." PO ¶2. That instruction would not cure proven loss; it would supply findings Plaintiffs have not established: intent, destruction, duty, relevance, and merits support.

The inference is especially improper because Plaintiffs would use it to prove a theory the record does not support. The record shows payments through intermediaries that ultimately reached FTOs, not an agreement with FTOs to further terrorist objectives. *See supra* Background §§D-F; Argument §I.B.1. DOJ's Statement of Facts underscores the point. SOF ¶¶16-17, 111. So does the French judgment, which "established" that Defendants were "not suspected of having had any ideological motivation or even any desire to support [terrorist] objectives." Bowker Decl., Ex.9 at -426. This Court, moreover, dismissed Plaintiffs' aiding-and-abetting claims for want of a concrete nexus to specific attacks. Order 37-43, Dkt.97, *Foley* (E.D.N.Y. Aug. 29, 2025). An adverse inference is not "free rein to advance elaborate theories, unsupported by the available

evidence, of what the spoliated evidence may have shown." *Stanfill v. Talton*, 851 F.Supp.2d 1346, 1367 (M.D. Ga. 2012).

**B. Plaintiffs' Additional Sanctions Would Create Prejudice, Not Cure It**

Plaintiffs' further demand—to bar Defendants from "submitting evidence about or characterizing the contents of the missing documents," PO ¶3—is not curative relief. It would create the prejudice Rule 37(e) is meant to cure: Plaintiffs could tell the jury what they think the allegedly missing evidence would have shown, while Defendants could not respond. That is not "restoring the part[ies] … to where the[y] … would have been in the absence of spoliation." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). It is an evidentiary windfall. Plaintiffs' remaining request—to present evidence and argument to the jury about alleged spoliation, PO ¶4—would compound that prejudice by converting a discovery dispute into a trial within a trial on a subject bearing on no element of Plaintiffs' claims.

Rule 37(e) requires the Court to "impose the 'least harsh sanction that can provide an adequate remedy'" and cautions against potentially "case-dispositive sanctions," which are appropriate "only in extreme circumstances." *Lokai*, 2018 WL 1512055, at *8. Plaintiffs' requests go far beyond that limit. If any curative measure is warranted, it should be limited to proven prejudice and deferred until the close of discovery, when the completeness of Defendants' production and the availability of the underlying materials can be assessed.

There is also a practical reason to defer. Plaintiffs seek to require determinations about admissible evidence, permissible argument, and the jury charge. Those issues should be resolved by Judge Garaufis at trial on a developed evidentiary record—not now, in the middle of discovery, on Plaintiffs' speculative account of what allegedly missing materials might have shown.

**CONCLUSION**

Plaintiffs' motion should be denied. At minimum, any remedy should be sharply limited.

October 2, 2026

Respectfully submitted,

*/s/ David W. Bowker*

DAVID W. BOWKER
JONATHAN E. PAIKIN
ALBINAS PRIZGINTAS (*pro hac vice*)
MICHAELA S. WILKES KLEIN (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 663-6000 (t)
(202) 663-6363 (f)
david.bowker@wilmerhale.com
jonathan.paikin@wilmerhale.com
albinas.prizgintas@wilmerhale.com
michaela.wilkesklein@wilmerhale.com

ALYSON ZUREICK
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8875 (t)
(212) 230-8888 (f)
alyson.zureick@wilmerhale.com

*Attorneys for Lafarge S.A., Lafarge Cement Holding Limited, and Lafarge Cement Syria S.A.*

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this brief complies with the word limit set forth in Local Civil Rule 7.1(c). According to the word-processing system used to prepare this brief, the total word count for all printed text exclusive of the material omitted under Rule 7.1(c) is 7,565. This brief also complies with the 25-page limit referenced in Plaintiffs' August 4, 2026 letter to the Court.

October 2, 2026

*/s/ David W. Bowker*
DAVID W. BOWKER

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record by ECF.

October 2, 2026

*/s/ David W. Bowker*
DAVID W. BOWKER