WILMERHALE

**June 1, 2026**

**Alyson Zureick**

+1 212 937 7529 (t)
+1 212 230 8888 (f)
alyson.zureick@wilmerhale.com

Joshua D. Branson, Esq.
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036

Counsel,

In accordance with the Court's instruction to meet and confer and provide "[i]nformation about preservation and production of responsive documents," Minute Entry and Order, Apr. 14, 2026, Defendants provide the following responses to the questions in Plaintiffs' April 17, 2026 letter. This letter incorporates and updates Defendants' letter sent May 20, 2026.

As the Court explained at the May 11, 2026 conference, questions regarding document collection and preservation are not well-suited to "interrogatory type" responses and are better addressed through an iterative exchange of information among the parties. Tr. 7:14–20. Plaintiffs' April 17 letter posing 51 written questions (with more than 100 written subparts) is inconsistent with the Court's instructions. Recognizing that inconsistency and preserving Defendants' right to object to these and other written questions that impose unreasonable burdens or otherwise run afoul of the Court's direction, Defendants provide these responses in the interest of transparency and with the hopes of addressing and resolving Plaintiffs' expressed concerns. At the very least, these written responses will facilitate an exchange and advance the parties' shared understanding of the structure, development, and contents of the database, without conceding that Plaintiffs' interrogatory-style questions are an appropriate mechanism for addressing these issues. These responses are based on Defendants' current understanding following an investigation of information reasonably available to them. Given the scope and complexity of the issues raised, Defendants reserve the right to supplement, modify, or clarify these responses as necessary and appropriate. Moreover, given the mounting burdens and costs of continuing to address these issues, Defendants expressly reserve—and do not waive—their right to oppose Plaintiffs' further requests for information on these issues, including but not limited to privilege, work-product protection, undue burden, and unreasonable cost.[1]

## <u>Background</u>

In 2016, the Finance and Audit Committee of the Board of Directors of the company then known as LafargeHolcim Ltd. initiated an internal investigation in response to reports of alleged

[1] In providing these responses, Defendants do not waive, and expressly preserve, any applicable privileges and protections, including the attorney-client privilege, attorney work-product protections, and any other applicable privileges or protections under applicable law. The inclusion of any information herein—including information derived from or relating to attorney-directed investigative efforts—is not intended to, and does not, waive any such privilege or protection, and Defendants expressly reserve all rights to assert privilege or other applicable protections or objections with respect to any materials, information, or subject matter.

payments by Lafarge S.A. and Lafarge Cement Syria ("LCS") through intermediaries to foreign terrorist organizations in Syria. The global law firm Baker & McKenzie LLP ("Baker McKenzie") was engaged to lead the investigation and was given broad investigative authority. Baker McKenzie assembled a team of attorneys and other professionals, led by attorney Ryan Fayhee, to oversee the identification, collection, and review of relevant data. Counsel engaged the global professional services and auditing firm, PricewaterhouseCoopers ("PwC"), to provide data collection, processing, and hosting services. LafargeHolcim Ltd. engaged the French law firm, Darrois Villey Maillot Brochier ("Darrois Villey"), and the Swiss law firm, Bär & Karrer, to provide French and Swiss legal and compliance advice. In addition, LafargeHolcim Ltd. engaged the French law firm, Idea.Avocats, to ensure compliance with applicable data privacy laws.

LafargeHolcim Ltd.'s internal investigation was extensive and comprehensive, lasting from roughly May 2016 through roughly April 2017. Beginning in May 2016, LafargeHolcim's IT department, under the direction of legal counsel, implemented robust, wide-ranging preservation measures, and Baker McKenzie and PwC initiated large-scale data collection efforts. On the basis of information obtained by counsel, including from custodial interviews and other investigative steps, Baker McKenzie and PwC collected vast amounts of company data, including data from approximately 60 custodians, shared files, and a broad set of non-custodial repositories. The forensic collection effort was intentionally broad and yielded millions of documents, which comprise much of the massive repository database used now by undersigned counsel to search for responsive documents in this litigation.

From that larger body of data, Baker McKenzie identified a subset of approximately 280,000 documents for detailed review as part of the internal investigation. Following that review, Baker McKenzie took additional investigative steps, analyzed the facts, and produced a privileged, detailed 114-page report, with sixteen appendices, addressing the situation in Syria, the conduct of the companies and their respective personnel in relation to operations in Syria, the nature and scope of payments to armed groups, the conduct of intermediaries, and other related issues. All the materials related to the investigation—including the millions of documents collected, plus the 280,000 documents subject to detailed analysis by Baker McKenzie—were preserved in the database.

In July 2017, French authorities formally initiated a judicial investigation into Lafarge's Syria-related conduct. Thereafter, U.S. authorities initiated a parallel investigation into the same conduct. The U.S. investigation led to a criminal plea agreement in October 2022, and the French investigation led to a conviction in France in April 2026, which is currently under appeal. LafargeHolcim Ltd., and then Holcim, engaged counsel and PwC to collect additional documents and data in connection with the criminal investigations and related proceedings. Those additional collections of data were properly preserved, retained, and incorporated into the master database containing the internal investigation documents and data.

Given the comprehensive internal investigation and subsequent criminal investigations, Defendants long ago identified, preserved, gathered, and retained data and information relevant to, or even potentially relevant to, Defendants' Syria-related operations and conduct. This data and information comprise the historical database, which was created and preserved before anyone had reason to anticipate U.S. civil litigation.

Following the initiation of this litigation, Defendants retained the law firms Loeb & Loeb LLP and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") (together, "Prior Counsel"). Prior Counsel and Defendants worked together to comply with their document preservation and discovery-related obligations under U.S. law and the Federal Rules of Civil Procedure. Among many other things they did, Prior Counsel and Defendants coordinated the transfer of the full corpus of the database—not merely the 280,000-document review subset—from PwC to Consilio, which continues to host and manage the database. Prior Counsel also oversaw supplemental custodial collections, as described in Defendants Responses and Objections to Plaintiffs' Interrogatory No. 21(a).

In late 2025 and 2026, undersigned counsel undertook additional collection efforts in connection with Plaintiffs' Requests for Production, including further custodial collections for the agreed-upon custodians and non-custodial corporate policies, the French investigative file, LMEA data, and Defendants' communications with the U.S. Department of Justice, as well as other materials responsive to specific requests for production. To capture custodial documents created after the original collection efforts for the agreed-upon custodians, Defendants collected materials preserved on legacy backup sources. These collection efforts are ongoing, and Defendants continue to evaluate and collect additional materials as appropriate. Throughout the litigation, Defendants' counsel has worked closely with Defendants to properly preserve, gather, review, and produce documents and data in accordance with U.S. law and the Federal Rules of Civil Procedure.

**Questions 1 & 2: What sources did Defendants consult to establish the factual bases for Defendants' Responses to Interrogatory Nos. 21–23, and which persons have personal knowledge of those factual bases?**

As described above, the database has been developed through successive, counsel-directed collection efforts over an extended period. Those efforts related first to an internal investigation and then subsequent criminal investigations by French and U.S. authorities; and those efforts have continued in connection with these litigations. As a result, the database is comprised of a massive, comprehensive, and growing body of materials drawn from multiple collection phases and sources. No single individual has complete knowledge of all aspects of its contents, organization, or development across its entire existence. Defendants' responses

therefore reflect information obtained from multiple sources and participants with knowledge of different aspects of those efforts.

In preparing their responses to Interrogatory Nos. 21–23, Defendants relied principally on information compiled by or at the direction of counsel during (a) the 2016 internal Project Alpha investigation led by Baker McKenzie and (b) subsequent collection, processing, and review efforts undertaken in connection with internal follow up to Project Alpha, criminal investigations and proceedings, and now these litigations.

To draft responses to Interrogatory Nos. 21–23, undersigned counsel consulted with Defendants, Prior Counsel, other French and U.S. counsel to Defendants, PwC, and Consilio. Individuals involved also reviewed a broad range of internal materials. These individuals also reviewed materials maintained in the database itself, including both custodial and non-custodial sources and analysis thereof by vendors. These individuals further consulted records reflecting the scope and execution of collection and processing efforts, including collection summaries, custodian and source tracking materials, processing documentation, related logs maintained by PwC and Consilio, the Project Alpha report, and privileged materials associated with that report. These answers neither reveal privileged or protected materials nor waive any privilege or protection.

Given the passage of time, the scope of the internal investigation, the number of entities and people involved, and the departure of personnel with relevant knowledge, Defendants do not have a comprehensive list of all individuals who participated in the document preservation or collection. To the best of Defendants' knowledge, individuals at the institutions listed below have or are likely to have firsthand knowledge regarding certain aspects of the preservation process, creation of the database, and related efforts:

- Ryan Fayhee and members of his team at Baker McKenzie
- LafargeHolcim's then-General Counsel, Xavier Dedullen, and other members of LafargeHolcim's legal and compliance functions in 2016
- LafargeHolcim information technology personnel involved in data preservation and collection in 2016
- Current and former Holcim legal, compliance, and information technology personnel involved in responding to discovery and managing ongoing collection efforts in this litigation and related criminal investigations and proceedings
- PwC personnel involved in the collection, processing, and preservation of data
- Counsel in relevant foreign jurisdictions, including Darrois Villey Maillot Brochier, Bär & Karrer, and Idea.Avocats
- Consilio personnel involved in database hosting and management
- Attorneys at Hughes, Hubbard, and Reed LLP
- Attorneys at Skadden, Arps, Slate, Meagher & Flom LLP

- Attorneys at Loeb & Loeb LLP
- Attorneys at WilmerHale LLP

**Question 3: How did You select the custodians and Repositories identified in Your Response to Interrogatory No. 21(a)–(b) from which Data were collected, and who performed the selection?**

As discussed above, the LafargeHolcim Board of Directors retained the law firm Baker McKenzie to lead the Project Alpha investigation. Baker McKenzie assembled a team of attorneys and other professionals, led by attorney Ryan Fayhee, to oversee the identification, collection, and review of relevant data.

Further information regarding the selection of custodians and Repositories is protected by the attorney-client privilege and the attorney work-product doctrine. As stated in Defendants' response to Interrogatory No. 21(c): "The selection of specific data sources, including the criteria, analysis, and deliberations underlying those decisions, is protected by the attorney-client privilege and the attorney work-product doctrine because it reflects counsel's legal judgments and mental impressions." As explained, and without waiving any applicable privilege or protection, the selection of sources from which data was collected was determined by counsel through custodial interviews and other investigative steps.

**Question 4: On what date(s) were Data collected from each custodian and Repository identified in Your Response to Interrogatory No. 21(a)–(b)?**

As described in Defendants' Original and Supplemental responses to Interrogatory No. 21(a), the majority of the data that formed the corpus of the Project Alpha collection was collected between July 2016 and November 2016. Additional collections occurred in 2018, 2020, 2024, 2025, and 2026.

As described above and in Defendants' May 20, 2026 letter, in late 2025 and 2026, undersigned counsel undertook additional collection efforts in connection with Plaintiffs' Requests for Production, including further custodial collections for the agreed-upon custodians. To capture custodial documents created after the original collection efforts for the agreed-upon custodians, Defendants collected materials preserved on legacy backup sources.

**Question 5: Confirm that no search terms, date ranges, or other limiters were used in collecting or processing Data from the Repositories identified in Your Response to Interrogatory Nos. 21(a)–(b).**

As set forth in their Responses and Objections to Interrogatory No. 21(f), Defendants confirm that no search terms, date ranges, or other limiters were used in collecting or processing Data from the Repositories identified in Defendants' Responses to Interrogatory Nos. 21(a)–(b).

**Question 6: For what time periods did Defendants collect Data for each custodian and Repository identified in Your Response to Interrogatory No. 21(a)–(b)?**

Data collected as part of the Project Alpha investigation generally covered the period from January 1, 2011 through September 2016.

As described above, Defendants have subsequently undertaken additional collection efforts in multiple phases following the initial Project Alpha collection. The 2018 and 2020 collections related to financial records and covered the period from 2011 through 2015 or 2016, depending on the specific records collected.

The 2024, 2025, and 2026 collections covered varying time periods depending on the nature of the materials sought and the applicable Requests for Production. For custodial collections—including efforts to supplement the original Project Alpha collection for the agreed-upon custodians through legacy backup sources—Defendants sought to collect all available data from 2011 through the present.

For non-custodial collections undertaken in 2025 and 2026—such as corporate policies, the French investigative file, LMEA general ledger data, and communications with the U.S. Department of Justice—the time periods covered varied based on the scope of the particular Request for Production to which the collection was responsive.

**Question 7: From which custodians did you collect data from "tablets" as referenced in Your Response to Interrogatory No. 21(b); when did You collect those "tablets"; what were those "tablets"; what Data were collected from those "tablets"; and were those Data processed and included in the Database?**

As set forth in Defendants' response to Interrogatory No. 21(b), Defendants are aware of two tablets collected in connection with the 2016 custodial collection: a Samsung Galaxy tablet associated with custodian Frederic Jolibois and an iPad associated with custodian Nermine Safraou.

The device associated with Jolibois was collected on or about July 22, 2016, as part of the broader custodial collection process directed by Baker McKenzie, and a forensic image of the device was obtained at that time.

Data collected from the device included the following categories: Summary, Audio, Calendar, Call Log, Contacts, Device Info, Images, Instant Messages (SMS), Videos, Location View, and Timeline.

Of these categories, Voicemails (a subset of Audio), Calendar, Call Logs, Contacts, and Instant Messages (SMS) were processed and loaded into the database based on the likelihood of obtaining relevant, potentially relevant, or responsive information. The remaining extracted data was preserved.

The device associated with Safraou was collected on or about July 14, 2016, as part of the broader custodial collection process directed by Baker McKenzie, and a forensic image of the device was obtained at that time. Because Safraou is not an agreed-upon custodian the data has not been processed but has been preserved.

**Question 8: Is Valery Mirakoff the only custodian from whom You collected a USB drive or key? If not, from which other custodians did you collect USB drives or keys? Is all data You collected from these USB drives or keys processed and included in the Database? What steps did You take to determine which custodians had USB drives or keys with potentially relevant Data?**

Valery Mirakoff is the only custodian for which a USB key was collected. Two additional USB keys were collected and processed for the Global custodian.

Further information regarding the selection of custodians and Repositories is protected by the attorney-client privilege and the attorney work-product doctrine. As explained, and without waiving any applicable privilege or protection, the selection of sources from which data was collected was determined by counsel through custodial interviews and other investigative steps.

**Question 9: What is the "[u]nderlying data used in LCS's JD Edwards Enterprise One system" listed in Your Response to Interrogatory No. 21(b)?**

JD Edwards Enterprise One was at one time LCS's enterprise resource planning ("ERP") system, which is software used to manage certain business functions and information, including financial and accounting data.

In July 2016, at the direction of counsel, LafargeHolcim IT personnel generated a data extract of the JD Edwards Enterprise One accounting system for LCS and transferred that data to

PwC. PwC subsequently restored that data to an Oracle database environment for purposes of review and analysis in connection with the 2016–17 internal investigation.

The "underlying data" referenced in Defendants' interrogatory response refers to the data extracted from the JD Edwards Enterprise One system as described above. That data was preserved and is maintained as part of the broader collection undertaken during the internal investigation. Defendants are in the process of readying LCS's ERP data for review and production and will produce responsive, nonprivileged ERP data in the coming weeks.

**Question 10: What time periods were covered in the "[e]xternal backups of the LCS server" identified in Your Response to Interrogatory No. 21(b)?**

The phrase "external backups of the LCS server" in Defendants' Response to Interrogatory No. 21(b) refers to a hard disk drive containing a backup of the LCS server that was housed in Damascus, Syria. The files on that backup fall within the 2010 to 2015 time period.

**Question 11: For the five custodians listed in Your Response to Interrogatory No. 21(a) for whom You collected mobile phone Data, what Data did you collect? In particular, did you collect call records, photos, PDFs, Word Documents, iMessages, SMS or other text messages, WhatsApp messages, or any other messages?**

Mobile device data was collected from five custodians during the Project Alpha investigation: Ahmad Jaloudi, Frederic Jolibois, Mazen Sheikh Awad, Valery Mirakoff, and Ali Suleiman.

For each of these custodians, the categories of data collected and processed were as follows:

- ***Ahmad Jaloudi*:**
  - Data Collected: Call History; Contacts; Instant Messages (SMS); WhatsApp Messages Reports
  - Data Processed: Call History; Contacts; Instant Messages (SMS); WhatsApp Messages Reports
- ***Mazen Awad Sheikh***
  - Data Collected: Summary; Applications; Archives; Audio; Autofill; Calendar; Call Log; Configurations; Contacts; Cookies; Databases; Device Info; Images; Installed Applications; Instant Messages (SMS); Locations; Network

Connections; Passwords; Searched Items; Text; User Accounts; Videos; Web History; Locations View; Timeline.

- Data Processed: Voicemails (subset of Audio); Calendar; Call Log; Contacts; Instant Messages (SMS).

- ***Frederic Jolibois***

  - Data Collected: Summary; Audio; Calendar; Call Log; Contacts; Device Info; Images; Instant Messages (SMS); Videos; Locations View; Timeline.

  - Data Processed: Voicemails (subset of Audio); Calendar; Call Log; Contacts; Instant Messages (SMS).

- ***Valery Mirakoff***

  - Data Collected: Summary; Audio; Calendar; Call Log; Chats; Configurations; Contacts; Cookies; Databases; Device Connectivity; Device Info; Device Notifications; Documents; Emails; Images; Installed Applications; Instant Messages (SMS); Journeys; Locations; Log Entries; Network Connections; Notes; Passwords; Recordings; Searched Items; Text; User Accounts; Videos; Voicemails; Web Bookmarks; Web History; Locations View; Timeline.

  - Data Processed: Voicemails (subset of Audio); Calendar; Call Log; Chats; Contacts; Documents; Instant Messages (SMS); Notes; Recordings.

**Question 12: For any mobile phones from which You collected Data, how were those Data collected?**

Mobile device data was collected in a manner deemed by reputable vendors to be forensically sound in light of available technology at that time.

**Question 13: For the 55 custodians listed in Your Response to Interrogatory No. 21(a) for whom You did not collect or process mobile phone Data, why did you not collect or process mobile phone Data for those custodians?**

As previously stated, information regarding the selection of custodians and Repositories is protected by the attorney-client privilege and the attorney work-product doctrine.

**Question 14: What efforts did You undertake at the time of the original investigation and Data collection to determine whether any of the 60 custodians listed in Your Response to Interrogatory No. 21(a) used their mobile phones for their work in the Relevant Period?**

As previously stated, information regarding the selection of custodians and Repositories is protected by the attorney-client privilege and the attorney work-product doctrine.

Without waiving any applicable privilege, Defendants state that as one step to determine where data relevant to the investigation might be located, Baker McKenzie, Darrois Villey, and Bär & Karrer AG, conducted custodial interviews with employees as part of the Project Alpha investigation. Counsel's determinations regarding which devices to collect were informed by the totality of information available at the time, including the practical and legal feasibility of collection, including applicable data-privacy restrictions.

**Question 15: Confirm that Bruno Lafont, Christian Herrault, Jean-Claude Veillard, and Guillaume Roux had mobile phones issued by Lafarge S.A., that they used those mobile phones in the Relevant Time Period, and that You did not collect or retain those mobile phones or their Data.**

Records reviewed and produced by Defendants, in connection with this litigation reflect that Bruno Lafont, Christian Herrault, Jean Claude Veillard, and Guillaume Roux received notices by email in 2014 indicating that they would receive monthly invoices associated with company-issued mobile phone plans. Defendants have also produced phone bills that appear to reflect usage of company-issued mobile phones by these individuals during the relevant period. Following a reasonable investigation, Defendants are unable to confirm when (if at all) those mobile phones were issued or whether Bruno Lafont, Christian Herrault, Jean Claude Veillard, and Guillaume Roux had mobile phones issued by Lafarge S.A. prior to 2014.

As reflected in Defendants' prior responses, however, Defendants do not have mobile phone data for these custodians in the database. Based on Defendants' current understanding following a review of available records, Defendants' mobile phone data for these custodians was not collected as part of the Project Alpha investigation.

Defendants continue to investigate whether additional information may exist and will supplement this response as appropriate.

**Question 16: For each of the other 56 custodians listed in Your Response to Interrogatory No. 21(a) (i.e., other than Mr. Lafont, Mr. Herrault, Mr. Veillard, and Mr. Roux), did the**

**custodian have a mobile phone issued or paid for by You? What steps did you take to ascertain the answer to that question?**

As described in Defendants' response to Questions 1 and 2 regarding the drafting of responses to Interrogatory Nos. 21–23, in responding to questions regarding the collection of mobile phone data, undersigned counsel consulted with Defendants, and individuals involved in the original collection efforts, including at Baker McKenzie, Prior Counsel, PwC, and Consilio, reviewed documents maintained in the database, and a broad range of privileged internal materials.

In responding to this question specifically, in addition to consulting individuals at the institutions listed above, undersigned counsel conducted targeted searches of the database for records relating to mobile phone issuance and/or usage, and reviewed billing records that appear to relate to company-issued mobile phones, internal correspondence regarding phone plans, and other documents produced in this litigation and maintained in the database.

Documents produced to Plaintiffs on April 25, 2026 at ATA-M00377996–ATA-M00378000 reflect that the following individuals received an email notice in 2014 that they would receive monthly phone plan invoices for a company issued mobile phone: Sonia Artinian, Valerie Bazin, Stephanie Billet, Jean-Claude Block, Bi Yong Chungunco, Neil Curtis, Christian Herrault, Jean-Jerome Khodara, Gerard Kuperfarb, Bruno Lafont, Atilla Pars, Alexandra Rocca, Guillaume Roux, Helene Seguin, Jean-Yves Trochon, Nicolas Vaniet, and Jean-Claude Veillard. Following a reasonable investigation, Defendants are unable to confirm when (if at all) those mobile phones were issued or the individuals listed had company-issued mobile phones prior to 2014.

Defendants have also identified billing records and phone records from the 2014–2016 period that appear to reflect company-issued mobile phone usage by the following individuals: Mazen Shiekh Awad, Valerie Bazin, Stephanie Billet, Jean-Claude Block, Bi Yong Chungunco, Neil Curtis, Eliane Fourmond, Hala Fweity, Christian Herrault, Frederic Jolibois, Jean-Jerome Khodara, Gerard Kuperfarb, Bruno Lafont, Valery Mirakoff, Atilla Pars, Alexandra Rocca, Guillaume Roux, Nermine Safraou, Helene Seguin, Jean-Yves Trochon, Nicolas Vaniet, and Jean-Claude Veillard.

Defendants continue to review available information and will supplement this response as appropriate.

**Question 17: For each of the other 56 custodians listed in Your Response to Interrogatory No. 21(a) (i.e., other than Mr. Lafont, Mr. Herrault, Mr. Veillard, and Mr. Roux), did the custodian have a mobile phone that contained any information or "documents pertaining**

**to the company's business?" ATA0021140. What steps did you take to ascertain the answer to that question?**

For custodians from whom mobile phone data was not collected, Defendants cannot confirm whether those individuals' mobile phones contained information or documents pertaining to company business. To the extent any custodian used a personal device for company business, Defendants had no legal right or practical ability to collect data from that device, particularly in light of data privacy restrictions under applicable French and/or European law. Mobile phone data for the four agreed-upon custodians contained in the database will be searched and responsive documents will be produced.

To the extent this question seeks further information regarding the basis for counsel's decisions about which devices to collect, those decisions reflect counsel's judgment and are protected by applicable privileges.

**Question 18: Did You take any steps to collect or preserve Skype messages, Skype call logs, Skype invoices, or other data from Skype accounts used by any custodian listed in Your Response to Interrogatory No. 21(a) during the period from January 1, 2011, through the present? If so, what were the steps? If not, why not?**

Based on Defendants' present knowledge, there is no indication in the available records that any agreed-upon custodian used Skype for communications relevant to this litigation, and Plaintiffs have not identified any such indication. The database does not contain Skype data.

To the extent this question seeks further information regarding counsel's decisions regarding which communication platforms to collect, those decisions reflect counsel's professional judgment and are protected by applicable privileges.

**Question 19: Did You take any steps to collect or preserve any phone call records for any of the 60 custodians listed in Your Response to Interrogatory No. 21(a) during the period from January 1, 2011, through the present? If so, what were the steps? If not, why not?**

As reflected in Defendants' responses to Question No. 11, Defendants collected mobile phones from Ahmad Jaloudi, Frederic Jolibois, Mazen Sheikh Awad, Valery Mirakoff, and Ali Suleiman. Jaloudi, Jolibois, Awad, and Mirakoff's phone call records are preserved in the database. Data from Suleiman's device has been preserved but has not been processed, as he is not an agreed-upon custodian. For custodians from whom mobile phone data was not collected, Defendants do not have phone call records.

**Question 20: Why do Defendants have Frederic Jolibois's call log only for June–July 2016 and not the full requested period of January 1, 2012, through December 31, 2017? Does the call log for the full requested period exist?**

Mobile phone data for Jolibois was obtained through a forensic image of the device. The call log data reflects the data that was present on the device at the time of collection. Defendants are not aware that call log data for any additional period exists within the Defendants' possession.

**Question 21: Why do Defendants have Ahmad Jaloudi's call log only for October 2015–August 2016 and not the full requested period of January 1, 2012, through December 31, 2017? Does the call log for the full requested period exist?**

Mobile phone data for Jaloudi was obtained through a forensic image of the device. The call log data reflects the data that was present on the device at the time of collection. Defendants are not aware that call log data for any additional period exists within the Defendants' possession.

**Question 22: For the periods for which Defendants have call records for Mr. Jolibois and Mr. Jaloudi, what types of calls (e.g., phone, WhatsApp, Viber, Skype, etc.) do the records contain?**

As reflected in Question 11, both the Jaloudi and Jolibois call records contain phone calls from the "Call Log" of the device. See response to Question 11 *supra*.

**Question 23: Confirm that Defendants do not possess call logs for Bruno Lafont, Bruno Pescheux, Jean-Claude Veillard, Christian Herrault, Guillaume Roux, or Jacob Waerness, and that those call records no longer exist or cannot be obtained.**

Defendants do not currently have possession, custody, or control of call logs for Lafont, Pescheux, Veillard, Herrault, Roux, or Waerness, to the extent those call logs exist.

**Question 24: What are the "certain financial and enterprise records" included in the "Global custodial file" that Defendants searched? Dkt. 159 at 33. Specifically:**

a. **What criteria were used in determining whether a financial or enterprise record was retained in the "Global" custodial file?**

The "Global" custodial designation was applied to certain non-custodial or centrally collected materials, including data drawn from shared or enterprise-level sources and other repositories not organized on an individual user basis. Consistent with Defendants' collection practices, materials that could be reasonably attributed to a specific individual custodian were

associated with that custodian, while materials collected from shared or centralized repositories or otherwise not maintained within individual user accounts were designated as “Global.” Such materials include, for example, data from the Lafarge S.A. server, external backups of the LCS server, hard copy and scanned document collections gathered as part of the investigation, and other centrally maintained records collected during the 2016–17 internal investigation.

**b. Which companies’ data is housed in the “Global custodial file?”**

“Global” is not a company-specific designation. Rather, it reflects the source of the materials within any company—i.e., from centralized or non-custodial sources, as described above—rather than materials from a particular corporate entity to which the underlying documents may relate. Materials assigned to “Global” may include records from Lafarge, S.A., Lafarge Cement Holding Limited, LCS, and Sabelfi SNC / Sofimo SAS—and are not maintained or organized on a company-by-company basis.

**c. What types of financial or enterprise records are not preserved in the “Global custodial file?”**

The “Global” custodial designation does not depend on the type of record, but on whether the material can be attributed to a shared source or an individual custodian. Accordingly, financial or enterprise records that can be attributed to a particular individual are not included in “Global” and are instead associated with that individual. Financial or enterprise records collected from shared or non-custodial sources—such as centralized finance repositories, server data, or document collections maintained outside individual custodians—are assigned to “Global.”

**Question 25: Confirm that You did not collect records from Lafarge’s Egyptian affiliate (“LMEA”) in the investigation that created the Database and that the Database contains no such records. If the Database does contain records collected from LMEA, explain what records it contains and why.**

Defendants are not aware of any direct collection of records from LMEA as part of the original 2016–17 investigation. However, the database or data housed in ERP systems contain certain records reflecting information about LMEA.

- The LCS ERP system (JD Edwards Enterprise One) contains transactional data to the extent there were transactions between that entity and LMEA.

- As part of the 2018 supplemental collection described above, certain LMEA records including balance sheets, cash flow statements, income statements, and

financial statements and audit reports were collected for the period 2012 through 2014.

- In connection with this litigation, undersigned counsel collected the LMEA general ledger and manual journal entries, which have been produced to Plaintiffs.

- Defendants have also identified and produced information relating to the LMEA bank account identified in the Project Alpha report as being maintained by LCS.

**Question 26: Confirm that You did not collect any original bank statements in the investigation that created the Database, and that the Database contains no such records. If the Database does contain original bank records, explain what records it contains and why.**

Multiple types of records could be described as "original" depending on usage. Defendants respond below based on their understanding of the financial records reflecting banking activity contained in the database.

During the 2016–17 investigation, PwC, at the direction of counsel, collected what PwC categorized as two categories of financial records reflecting banking activity.

- **Category I:** Records characterized by PwC as an original bank statement, an extract from an original bank statement, or an original payment instruction. To the extent such records have been identified, they have been produced to Plaintiffs.

- **Category II:** Records characterized by PwC as internal working documents, typically in spreadsheet or similar format, that incorporate, summarize, or reference information derived from banking records or payment instructions. These documents were maintained within custodial and non-custodial sources collected during the investigation, including within the Finance Folder and other centralized repositories.

In addition, as part of the 2020 supplemental collection, PwC collected records from Lafarge S.A.'s legacy BNP Paribas USD account for the period January 2012 through December 2015. These records were collected in .txt format.

As Defendants have previously communicated to Plaintiffs, Defendants have also undertaken efforts to obtain additional banking records directly from relevant banking institutions. Defendants cannot provide assurances regarding the timing or completeness of any responses from those institutions.

**Question 27: What are the "certain financial statements and records from Lafarge S.A. and related entities in connection with tracing analysis and in response to specific requests from the Paris Tribunal," Ltr. from A. Zureick to K. Bolas at 3 (Feb. 20, 2026), that PwC collected in 2018? How were those sources identified and what was collected and from whom?**

In June 2018, PwC, at the request of counsel, collected financial statements and records from Lafarge Group entities in connection with a counsel directed tracing analysis. The obtained records related to the following entities: LCS, Lafarge Cement Holding, Sofino SAS, Sabelfi SNC, Cemitalia Limited, and Lafarge MEA Building Materials S.A.E. These records generally consist of financial statements and related documents.

**Question 28: What "limited set of financial and banking records" did PwC collect in 2020? How were those records identified and what was collected and from whom?**

In 2020, at the request of counsel, PwC:

- Collected records from the BNP Paribas account discussed in Question 26.
- Collected Lafarge SA financial records referring to North Logistics
- Extracted financial records from data tables of LCS' instance of JD Edwards ERP system regarding other Lafarge entities and added those records to the Relativity database.

**Question 29: What dates were each of the individuals listed in Your Response to Interrogatory No. 21(a) employed by You?**

Defendants have identified employment dates for certain custodians in their response to Interrogatory No. 1 and are working to supplement that response. For many custodians, however, precise dates of employment are unknown and gathering this information is extremely burdensome—and in some cases impossible—given the age of the records and the fact that certain employment records were maintained only in Syria and are no longer accessible.

In any event, the specific dates of a custodian's employment are not relevant to the preservation and collection of responsive documents. Responsive documents were preserved and collected based on the relevant time period for the underlying events, not the specific dates of any individual custodian's employment. As discussed above, collection efforts were scoped to the relevant time period for the underlying events, and the temporal scope of those collections did not depend on when any particular individual started or ended their employment.

**Question 30: For each of the following custodians, which custodial files (if any) do you currently possess and for what time periods, and which custodial files do you no longer possess and for what time periods?**

**a. Abou-Eita, Tarek**
**b. Al-Maaytah, Montaser**
**c. Al-Shabab, Thanaa Shiekh**
**d. Alkhayer (Khayer), Ammar**
**e. Anderson, Magail**
**f. Andre, Isabelle**
**g. Benyakhlef, Rachid**
**h. Bisiaux, Michel**
**i. Hammerl, Klaus**
**j. Hashish, Mahmoud**
**k. Lisnic, Dan**
**l. Seoudy, Ahmed**
**m. Werder, Beat**

None of the individuals identified in this question is an agreed-upon custodian. The parties negotiated and agreed upon a set of 33 custodians whose data would be collected (to the extent not previously collected), reviewed, and produced in this litigation, and Defendants do not understand this question to fall within the scope of the Court's directive regarding the exchange of information about preservation and production of responsive documents. To the extent their communications are relevant, those communications would be expected to appear in the files of agreed-upon custodians with whom they corresponded.

Notwithstanding the foregoing, and in the interest of transparency, undersigned counsel states that they have conferred with their client and understand that custodial data for the custodians identified above exists on backup tapes maintained by Holcim. The fact that Defendants have provided information in response to this question should not be construed as a concession that these individuals' custodial files are relevant to any issue in this litigation or that Defendants have any obligation to collect, review, or produce documents beyond the agreed-upon custodian set.

**Question 31: For any of the above-mentioned custodians for whom you have not retained all of their custodial files, why were those files not retained and on what date were they destroyed?**

As stated in Defendants' response to Question 30, these individuals are not agreed-upon custodians and Defendants do not understand this question to fall within the scope of the Court's directive to provide information regarding preservation and production of responsive documents.

**Question 32: For any of the above-mentioned custodians for whom you have not retained all of their custodial files, on what date (if any) did they receive a Litigation Hold?**

As stated in Defendants' responses to Questions 30 and 31, these individuals are not agreed-upon custodians and Defendants do not understand this question to fall within the scope of the Court's directive to provide information regarding preservation and production of responsive documents.

**Question 33: Confirm that You did not retain, and do not have, any custodial files for Zenaib El-Orabi, see 3/26/26 JSR at 32 n.18, or Frederic Malis, see id. at 31 n.17, and explain why.**

Zenaib El-Orabi was Legal Counsel at Lafarge Egypt, a Lafarge subsidiary that is not a defendant in this litigation. El-Orabi is not an agreed-upon custodian and therefore her custodial files are not relevant to the preservation and production of responsive documents in this litigation. To the extent El-Orabi's communications are relevant, they would be expected to appear in the files of the agreed-upon custodians with whom she corresponded. Moreover, given El-Orabi's role as in-house legal counsel, her files would be expected to contain significant volumes of privileged material. Notwithstanding the foregoing, and in the interest of transparency, undersigned counsel states that they have conferred with their client and understand that searches of available digital archives have not yielded results for El-Orabi for the 2011–2016 period.

Frederic Malis was a country security coordinator for Lafarge Iraq, a Lafarge subsidiary that is not a defendant in this litigation. As Defendants stated in their February 5 letter: "Malis was an employee of Lafarge Iraq, again a different subsidiary company that is not a defendant here. As explained, any documents that are relevant to this litigation would already be captured by existing LCS custodians because, as Plaintiffs concede, information about ISIS that relates to LCS would be 'communicated to LCS.' Plaintiffs have not articulated why they believe reviewing documents of this former Lafarge Iraq employee that were never shared with relevant individuals at LCS is necessary for the claims and defenses in a case involving the Syrian plant. In any event, because no one contemplated that Malis, who again worked at a different subsidiary that is not a defendant here, could have information of any relevance to these underlying issues when the internal investigation took place, his documents were not retained for the relevant time period." Notwithstanding the foregoing, and in the interest of transparency, undersigned counsel states that they have conferred with their client and understand that searches of available digital archives have not yielded results for Malis for the 2011–2016 period.

**Question 34: In the March 26, 2026 Joint Status Report, You represented (at 30, 31) that email data for some custodians may be available on "backup tapes." Describe the backup tapes referenced, including: (a) what data they contain, (b) for which custodians and what**

**time periods, (c) when they were created, (d) where they are currently stored, (e) whether they have been accessed or searched in connection with this litigation, (f) what steps, if any, You have taken to restore and search those backup tapes, and (g) whether you ever instructed the persons responsible for maintaining such backup tapes to preserve them and, if so, when.**

The "backup tapes" refer to internal data archives maintained within Holcim's IT infrastructure, where historical mailbox data and Google Drive data has been preserved. The data resides in what is known as "cold storage"—meaning it is not immediately searchable and must first be restored to an active environment before it can be accessed or reviewed.

In January 2026, undersigned counsel directed Holcim IT to identify and restore all available data from these legacy backup sources for the 33 agreed-upon custodians. Holcim IT undertook a systematic restoration process, which required restoring individual mailboxes available from cold storage to an active environment so that the data could be extracted. The restored data was then transferred to Consilio for processing and incorporation into the database.

Without waiving applicable privilege regarding the content of Litigation Hold notices, Defendants state that Holcim IT was instructed by in-house and outside counsel to retain potentially relevant data, including that stored on backup tapes.

**Question 35: Who are all the Persons to whom You sent a Litigation Hold, and what was the date and method of transmission of each Litigation Hold, including: (a) The "potentially relevant employees" referenced in Your Response to Interrogatory No. 23; (b) The "specific employees of interest to the investigation" referenced in Your Response to Interrogatory No. 23; (c) The "individuals involved in prior relevant investigative work" referenced in Your Response to Interrogatory No. 23.**

Defendants understand that Litigation Hold notices were transmitted to then-current employees of LafargeHolcim via email on or about June 2, 2016; July 5, 2016; August 3, 2016; August 8, 2016; and September 7, 2016. The tables below reflect Defendants' current understanding of the individuals who received a Litigation Hold as of September 10, 2016 and February 2023, respectively. In instances where an individual whose data was determined should be placed on Hold was no longer at the company, his or her data was placed on Hold by LafargeHolcim IT. The following table lists the individuals who received a Litigation Hold notice, but it does not list additional individuals whose data was placed on Hold and was thus also preserved and collected. Defendants further understand that all agreed-upon custodians were either provided with Litigation Hold notices or had their data placed on Hold by LafargeHolcim IT.

| **2016 Hold Notice** | |
|---|---|
| **Name** | **Date Received** |
| Adrian, Horia | June 2, 2016 & July 5, 2016 |
| Al-Khaled, Mamdouh | June 2, 2016 |
| Al-Saleh, Hassan | June 2, 2016 |
| Al-Shabab, Thanaa Shiekh | June 2, 2016 |
| Angulo, Jean-Carlos | June 2, 2016 |
| Bazin, Valerie | July 5, 2016 |
| Billet, Stephanie | July 5, 2016 |
| Block, Jean-Claude | July 5, 2016 |
| Burnieh, Amjad | August 3, 2016 |
| Chungunco, Bi Yong | June 2, 2016 & July 5, 2016 |
| Curtis, Neil | June 2, 2016 & July 5, 2016 |
| Daghestani, Ahmad | September 7, 2016 |
| Dombreval, Hugues Boissel | July 5, 2016 |
| Fourmond, Eliane | July 5, 2016 |
| Fweity, Hala | September 7, 2016 |
| Gauthier, Jean-Jacques | July 5, 2016 |
| Jaloudi, Ahmad | June 2, 2016 |
| Jolibois, Frederic | June 2, 2016 |
| Kasem, Basel | August 3, 2016 |
| Kuperfarb, Gerard | July 5, 2016 |
| Lafont, Bruno | July 5, 2016 |
| Malas, Fawzan | September 7, 2016 |
| Mirakoff, Valery | July 5, 2016 |
| Mistrih, Hana | September 7, 2016 |
| Mouty, Johnny | June 2, 2016 |
| Nada, Hassan | August 3, 2016 |
| Nercessian, Talin | June 2, 2016 |
| Olsen, Eric | July 5, 2016 |
| Pars, Atilla | September 7, 2016 |
| Pescheux, Bruno | June 2, 2016 |
| Safraou, Nermine | July 5, 2016 |
| Saleem, Mustafa | |
| Sandook, Nabil | June 2, 2016 & July 5, 2016 |
| Sebbar, Saad | June 2, 2016 |
| Seguin, Helene | July 5, 2016 |
| Shanin, Malik | August 3, 2016 |
| Sheikh Awad, Mazen | June 2, 2016 |

| | |
|---|---|
| Suleiman, Ali | July 5, 2016 |
| Trochen, Jean-Yves | June 2, 2016 |
| Vaniet, Nicolas | August 8, 2016 |
| Veillard, Jean Claude | June 2, 2016 & July 5, 2016 |
| Waerness, Jacob | June 2, 2016 |
| Zend, Mohammad (Mhd AlHadid) | August 3, 2016 |

| **2023 Hold Notice** | | |
|---|---|---|
| **Name** | **Title** | **Date Received** |
| Anderson, Magali | Member, LSA Board of Directors | Early February, 2023 |
| Adrian, Horia | President and CEO, Holcim Philippines | Early February, 2023 |
| Dumez, Jean-Jacques | Member, LSA Board of Directors | Early February, 2023 |
| Harler, Christoph | Holcim CCO | Early February, 2023 |
| Hess, Beat | Chairman, Holcim Board of Directors | Early February, 2023 |
| Jacques, Laurent | Member, LSA Board of Directors | Early February, 2023 |
| Malas, Fawzan | Head of IT infrastructure and operations, Holcim Australia and New Zealand | Early February, 2023 |
| Mercie, Karine Uzan | Member, LSA Board of Directors | Early February, 2023 |
| Mistrih, Hana | Holcim Bangladesh | Early February, 2023 |
| Lecerf, Charles | Member, LSA Board of Directors | Early February, 2023 |
| Oleas, Juerg | Member, Holcim Board of Directors | Early February, 2023 |
| Paponaud, Emmanuel | Head of LSA IT | Early February, 2023 |
| Pars, Atilla | Head of Group Internal Control, Holcim | Early February, 2023 |
| Picaud, Geraldine | Holcim CFO | Early February, 2023 |
| Simijonovic, Dragana | Secretary, Holcim Board of Directors | Early February, 2023 |
| Sorensen, Hanne | Vice-Chairperson, Holcim Board of Directors | Early February, 2023 |
| Studer, Lukas | Holcim GC Corporate | Early February, 2023 |

| | | |
|---|---|---|
| Suleiman, Ali | Finance and Operations Manager, Holcim | Early February, 2023 |
| Vaniet, Nicolas | Head of Financing and Treasury Front Office, Holcim | Early February, 2023 |
| Wehrling, Jochen | Holcim CIO | Early February, 2023 |
| Wright, Chrisoph | Holcim Former CCO | Early February, 2023 |

**Question 36: For each of the potentially relevant employees identified above, did You obtain any acknowledgement of receipt of the Litigation Hold(s)?**

To the best of Defendants' present knowledge, there were no automated or mandatory confirmations of receipt of Litigation Hold notices. To the extent individuals conferred with counsel and/or responded in the form of attorney-client communications, such information is privileged, not discoverable, and/or unnecessarily burdensome and costly to collect, review, and produce, especially given its lack of relevance to the claims and defenses in the case.

**Question 37: Did you identify any "potentially relevant employees" referenced in Your Response to Interrogatory No. 23 to whom You did not send any Litigation Hold(s), and, if so, why not?**

Defendants have provided the list of individuals to whom Litigation Hold notices were issued in response to Question 35. The preservation measures implemented in 2016 were designed to be broad, and based on Defendants' current understanding, Defendants believe that individuals reasonably identified as likely to possess relevant information were either issued a Hold or had their data preserved through IT-directed measures, if that individual was a former employee. To the extent this question seeks further information regarding the identification of "potentially relevant employees" or the basis for counsel's determinations regarding to whom Litigation Holds were issued, those decisions reflect counsel's legal judgment and are protected by applicable privileges.

**Question 38: For each Repository preserved pursuant to a Litigation Hold, what are the start and end dates of preservation? For each, are there any exclusions or exceptions?**

The first Litigation Hold went into effect immediately on June 2, 2016. It is Defendants' understanding that Documents and data preserved pursuant to the Litigation Holds remains on hold and continues to be preserved. Defendants are not aware of any release or termination of those Litigation Holds. There are no exclusions or exceptions to the Litigation Holds of which Defendants are presently aware.

**Question 39: Who are the individuals to whom Your "Prior Counsel issued updated Hold notices in French and English in early 2023" referenced in Your Response to Interrogatory No. 23, including the individual's: full name, job title/role, and the date and method of transmission?**

Please see the table provided in response to Question 35. As with the 2016 Litigation Hold, the 2023 Litigation Hold was transmitted via email.

**Question 40: What was the nature of the Litigation Hold update that "Prior Counsel issued" in "early 2023?"**

The 2023 document preservation notice was issued in connection with the instant U.S. civil litigations under the ATA. The specific contents of the Litigation Hold notices are privileged. *See, e.g.*, *Brandes v. Steven Madden, Ltd.*, 2026 WL 799692, at *2 (E.D.N.Y. Mar. 23, 2026) ("litigation hold notices are protected by both attorney-client privilege and the work product doctrine").

**Question 41: Were there any other subsequent re-issuance, update, reminder, expansion, narrowing, or release of any Litigation Hold? If so, when; what was the nature of the change; who or what were the affected recipients and Repositories; and what was the reason(s) for the change?**

As described above, Litigation Hold notices were issued in 2016 and in 2023. Defendants understand that multiple in-house and outside counsel have communicated with individual personnel countless times regarding documents, data, the internal investigation, the criminal investigations and proceedings, and these litigations, but have not sought to determine whether such communications may have included individualized reminders or references to document preservation or document hold obligations. Defendants are thus not presently aware of any additional reissuance, update, reminder, or expansion of any document preservation or document hold instruction. To the best of Defendants' knowledge, there has not been any narrowing or release of document preservation or document hold instructions.

**Question 42: Did any Litigation Hold expressly instruct recipients to preserve Communications stored in personal email accounts or on mobile devices? If so, identify the Litigation Hold, the date it was issued, and the specific language directing preservation of personal-account or personal-device data. If no Litigation Hold included such instructions, explain why.**

Defendants' preservation efforts, including the Litigation Holds issued in 2016 and 2023, were designed to be broad. The specific contents of the Litigation Hold notices are privileged. *See, e.g.*, *Brandes v. Steven Madden, Ltd.*, 2026 WL 799692, at *2 (E.D.N.Y. Mar. 23, 2026)

("litigation hold notices are protected by both attorney-client privilege and the work product doctrine").

**Question 43: Have You investigated whether any documents that would have been subject to the Litigation Hold(s) were deleted before June 2, 2016? If so, what did the investigation find?**

To the extent counsel investigated issues related to document preservation during the 2016–2017 investigation, the substance of those findings is protected by the attorney-client privilege and the work-product doctrine.

**Question 44: What is Your policy or practice regarding the retention or destruction of custodial files for employees who depart the company? For any employee custodian listed in Your Response to Interrogatory No. 21(a) whose custodial files were destroyed in whole or in part following their departure, identify the custodian, the date of departure, the date of destruction, and whether a Litigation Hold was in effect at the time of destruction.**

When an employee departed the company, their email data was archived within company systems. Defendants are not aware of any custodial files for any custodian listed in Defendants' response to Interrogatory No. 21(a) having been destroyed.

**Question 45: Identify each individual known to Defendants who used a personal email account to send or receive Communications relating to the subject matter of these Actions during the period from January 1, 2011, through the present, including for each: (a) the individual's name, (b) the email address(es) used, and (c) the basis for Defendants' knowledge.**

The chart below identifies individuals presently known to Defendants as of this time to have used personal email accounts to send or receive communications relating to Defendants' operations at the Jalabiyeh Cement Plant together with the associated email addresses. In assembling this chart, Defendants relied on information reflected in materials obtained by law enforcement through the Mutual Legal Assistance Treaty ("MLAT") process or other law enforcement subpoenas or processes, as well as other documents produced in this litigation. Personal emails obtained by law enforcement authorities and possessed by Defendants have been produced to Plaintiffs.

| Name | Personal Email Address |
|---|---|
| Ahmad Jaloudi | ahmadjaloudi023@gmail.com[2]<br>ahmad_rjaf@hotmail.com[3] |
| Bruno Pescheux | brunopescheux@gmail.com[4] |
| Christian Herrault | christian@herrault.net[5] |
| Eric Olsen | eolsen11@gmail.com[6] |
| Firas Tlass | firastlass01@gmail.com[7] |
| Frederic Jolibois | fredericjolibois@hotmail.com[8] |
| Hassan Al-Saleh | hassan.cement65@gmail.com[9] |
| Helene Seguin | helene.seg@free.fr[10] |
| Jacob Waerness | jacobwaerness@gmail.com[11]<br>jackpot787@hotmail.com[12] |
| Jean-Claude Veillard | jcveillard@aol.com[13]<br>hictor56@aol.com[14] |
| Mamdouh Al Khaled | mamdouh.lafarge@gmail.com[15] |
| Mazen Sheikh | mazen.lafarge@gmail.com[16] |
| Nicolas Vaniet | nvaniet@yahoo.fr[17] |
| Talin Nercessian | talinnercessian@gmail.com[18] |
| Thair Al-Saeed | thair.lafarge@gmail.com[19]<br>thairalsaeed@yahoo.com[20] |

[2] FRMLAT_00004474.
[3] FRMLAT_00005278.
[4] FRMLAT_00005321.
[5] FRMLAT_00005294.
[6] FRMLAT_00005585.
[7] FRMLAT_00006109.
[8] FRMLAT_00007124.
[9] ATA-M00291424.
[10] FRMLAT_00005631.
[11] FRMLAT_00005694.
[12] FRMLAT_00005321.
[13] FRMLAT_00005321.
[14] FRMLAT_00003814.
[15] ATA-M00126872.
[16] ATA-M00219538.
[17] ATA-M01239979.
[18] FRMLAT_00007006.
[19] ATA-M00195175.
[20] ATA-M00026967.

**Question 46: What steps, if any, did You take at any time, including during the 2016–2017 investigation, to instruct, request, or direct any current or former employee to preserve or produce Communications from their personal email accounts? If no such steps were taken, explain why.**

The selection of specific data sources and communications between counsel and current or former employees is protected by applicable privileges. As reflected in Defendants' response to Question 42, the Litigation Holds issued in 2016 and 2023 were designed to be broad. Baker McKenzie did not undertake any systematic collection of data from such accounts.

**Question 47: Your Response to Interrogatory No. 21(b) identifies "Domino servers" as a Repository from which Data was collected. What is this, and how is it distinct from "Lafarge's Google-hosted corporate email and document systems" referenced in Your supplemental response to Interrogatory No. 1?**

The Domino servers refer to legacy servers that hosted Lafarge's Lotus Notes email system. Lafarge S.A. and LCS used Lotus Notes as their primary email platform until the end of the first quarter of 2013, at which point they migrated to Google-hosted email systems.

**Question 48: What are the "Google Drives" listed in Your Response to Interrogatory No. 21(b) as a document repository from which You collected Data?**

The "Google Drives" refer to cloud-based document storage associated with individual employee's Google-hosted accounts following the transition from Lotus Notes to Google systems.

**Question 49: During the investigation that produced the Database, did you take any steps to attempt to collect emails from the personal email account of any custodian identified in response to Interrogatory No. 21(a), including by asking the custodians to voluntarily provide them? If so, what were those steps? If not, why not?**

The selection of specific data sources and communications between counsel and current or former employees are protected by applicable privileges. Baker McKenzie did not undertake any systematic collection of data from such accounts.

**Question 50: During the investigation that produced the Database, did you seek legal advice about whether French or other applicable law would permit You to collect or**

**preserve emails from the custodians' personal email accounts? If so, from which law firms and specific attorneys did You seek legal advice, and when?**

As described in the Background section of this letter, LafargeHolcim Ltd. engaged Darrois Villey Maillot Brochier to provide advice on French criminal law, Idea.Avocats to advise on French data privacy and data protection laws, and Bär & Karrer to provide Swiss legal advice. These engagements encompassed, among other things, advice regarding the legal framework applicable to the collection of data during the investigation. The substance of that legal advice is privileged and protected by the attorney-client privilege and work-product doctrine.

**Question 51: Your objection to the definition of "Relevant Time Period" says that "unless otherwise noted, any information Defendants disclose in response to the Interrogatories will be from and including January 1, 2016, through and including the present." Was Data from the period January 1, 2011, through December 31, 2015, collected, preserved, and included in the Database? If not, explain why not, and explain how this objection limits the information You provided in Your responses to Interrogatory Nos. 21–23.**

As reflected in Defendants' Responses to Interrogatories 21–23, data from the period January 1, 2011 through December 31, 2015 was collected and preserved. The temporal limitation referenced in Defendants' objection relates to the time period of Defendants' efforts to create and maintain the database—not the time period of the underlying materials. Defendants' responses to Interrogatory Nos. 21–23 focus on collection, preservation, and organizational efforts undertaken beginning in 2016, which is when the initial corpus of the database was collected and created.

**Question 52: (from L. Smith email, May 6, 2026): Confirm that Defendants will image, search, and produce responsive documents from the mobile phones you collected for Jolibois and Jaloudi, see Ltr. from A. Zureick to L. Smith at 2 (Apr. 16, 2026); and please provide the time periods for which you have data from these mobile phones.**

Defendants will search for responsive documents from the mobile devices collected for Jolibois and Jaloudi consistent with their discovery obligations, including by reviewing data from the categories of information and applications that were identified, consistent with Defendants' collection practices, as reasonably likely to contain responsive information.

**Question 53 (from L. Smith email, May 6, 2026): Was Ryan Fayhee the decisionmaker for what to collect in the Project Alpha investigation that led to the database's creation?**

The LafargeHolcim Board of Directors retained the law firm Baker McKenzie, including attorney Ryan Fayhee, to lead the Project Alpha investigation. Mr. Fayhee led the Baker

McKenzie team that oversaw and directed the collection process, which involved others, including in-house lawyers, staff, and IT officials, as well as PwC and others.

Sincerely,

*/s/ Alyson Zureick*
Alyson Zureick
Counsel for Defendants

cc: All Counsel of Record