**Paris Court of Appeal**
**Paris Judicial Court**
**16th Criminal Chamber**

**Judgment delivered on:** April 13, 2026
**Minute No.:** 1
**Prosecutor's Office No.:** 1632200114

**Hearings continued on November 18, 19, 20, 21, 24, 25, 26, 27, and 28 and December 2, 3, 4, 5, 9, 10, 11, 12, 16, 17, 18, and 19, 2025**
**Decision rendered on April 13, 2026**

# CRIMINAL JUDGMENT

WORKING COPY

At the public hearing for the **delivery of the decision** of the Paris Criminal Court on APRIL THIRTEENTH, TWO THOUSAND TWENTY-SIX,

**Before:**

Presiding Judge: Ms. Isabelle PREVOST-DESPREZ, First Vice President,

Associate Judges: Mr. Christophe VALENTE, Deputy First Vice President,
Ms. Charlotte PHELIZON, Judge,

Assisted by Ms. Sarah PANGERL and Ms. Alix LARRUE, Court Clerks,

in the presence of Ms. Olga MARTIN-BELLIARD, Deputy Prosecutor of the National Anti-Terrorism Prosecutor's Office, and Ms. Olivia FARGES, Vice Prosecutor of the National Anti-Terrorism Prosecutor's Office,

*

At the public **trial hearings** of the Paris Criminal Court on NOVEMBER EIGHTEENTH, NINETEENTH, TWENTIETH, TWENTY-FIRST, TWENTY-FOURTH, TWENTY-FIFTH, TWENTY-SIXTH, TWENTY-SEVENTH, AND TWENTY-EIGHTH and DECEMBER SECOND, THIRD, FOURTH, FIFTH, NINTH, TENTH, ELEVENTH, TWELFTH, SIXTEENTH, SEVENTEENTH, EIGHTEENTH, AND NINETEENTH, TWO THOUSAND TWENTY-FIVE,

**Before:**

Presiding Judge: Ms. Isabelle PREVOST-DESPREZ, First Vice President,

Associate Judges: Mr. Christophe VALENTE, Deputy First Vice President, Ms. Charlotte PHELIZON, Judge,

Assisted by Ms. Sarah PANGERL and Ms. Alix LARRUE, Court Clerks,

in the presence of Ms. Aurélie VALENTE, Vice Prosecutor of the National Anti-Terrorism Prosecutor's Office, and Ms. Olga MARTIN-BELLIARD, Deputy Prosecutor of the National Anti-Terrorism Prosecutor's Office,



ATTORNEYS' EYES ONLY 

The volume of cement sold by LCS between February and September 2014 amounted to a total of 518,000 metric tons, and the amount of the tax during that same period was 259 million Syrian pounds, or a total of €1,286,307, based on the average exchange rate between February and September 2014.

Accordingly, **the total amount of €1,616,307** (€1,286,307 + €330,000) should be used for the period from October 2013 to September 2014.

***

Ultimately, it was established that payments totaling **€5,593,897** were made, through intermediaries, to armed groups that successively took control of the region in which LCS operated, including the terrorist organizations AHRAR AL-SHAM, JABHAT AL-NUSRA, and the ISLAMIC STATE.

### 2. The *mens rea* element

**426.** In view of the extensive evidence gathered concerning the *actus reus* of the offense of financing terrorism, certain defense attorneys advanced three lines of defense challenging whether the *mens rea* element of the offense had been established. These arguments will also be addressed in the analysis of the liability of the defendants who rely on them.

**427.** As to the contention that, in addition to awareness of the terrorist nature of the three terrorist organizations referred to in the charge (AHRAR AL-SHAM, JABHAT AL-NUSRA, the ISLAMIC STATE /DAESH/ISIS) and receiving the financial flows, it is necessary to prove an intention to transfer funds to those terrorist organizations, knowledge that those funds would be used to commit an act of terrorism, and an intention to provide financial support for the potential commission of such acts of terrorism; this would, in fact, amount to adding a specific intent requirement to the criminal statute, namely, a terrorist intent, as stated in Bruno PESCHEUX's written submissions, whose counsel even argued at the hearing that finding him guilty would amount to declaring him a terrorist.

The Court, however, is not required to establish any form of specific intent under which the person providing the assistance must necessarily have adopted the terrorist motivations of the organizations being financed.

On the contrary, it appears that, as regards the *mens rea* element, the statute requires only the intention to transfer funds while knowing that they are intended for use by entities classified or identified as terrorist organizations, regardless of the use actually made of those funds, since those funds will necessarily have contributed to maintaining and developing their operational capabilities.

It is established in this case that the defendants are not suspected of having had any ideological motivation or even any desire to support the objectives of the three terrorist organizations concerned. Indeed, in parallel with their activities within LCS–LAFARGE SA, some of them provided the authorities with information about what they had been able to observe regarding the activities of those terrorist groups.

Under settled case law, a purely economic and financial motive must not be confused with intent, namely, awareness that one is contributing to the financing of terrorist groups while knowing the nature of their activities and, therefore, the purposes for which the funds may be used.

WORKING COPY

All of the defendants, acting with the aim of generating profit for the business entity they served, or, in some cases, direct personal profit, organized, approved, facilitated, or implemented a policy that entailed channeling financing to terrorist organizations operating around the cement plant.

The defendants' lack of adherence to jihadist ideology may, however, be taken into account in determining the sentence, in the same way as factors relating to their individual circumstances.

**428.** As to the contention that they supposedly yielded to a system of extortion, which would therefore negate the intentional element of the offense because maintaining employee safety while continuing the plant's operations was an imperative that compelled the company to provide funds to terrorist entities, it should first be noted that the often tedious review at the hearing of emails exchanged among the defendants never revealed any reference to extortion, but, at most, the use of the term "taxation." The Court did, however, identify an email from Jean-Claude VEILLARD to Bruno PESCHEUX, copying Christian HERRAULT and Jacob WAERNESS, dated October 1, 2013 (D1911/39-40), in which Jean-Claude VEILLARD stated: *"The departure of the PYD might perhaps throw us into the hands of terrorist networks such as Al-Nusra and put us in a difficult position vis-à-vis the communities, not to mention a potentially violent reaction from the authorities, who might take exception to seeing us deal with terrorist networks. I therefore believe that, despite the problems involved, it is preferable to maintain the status quo. FT must play his part with the PYD and FSA officials. If their demands were to become unacceptable tomorrow, it might be appropriate to reduce our level of activity still further, halt sales, and* ***thus deprive them of sources of revenue linked to all the extortion. There*** *is probably also an opportunity to work with the Kurdish communities, because I would be surprised if the PYD and its methods enjoyed unanimous support among the local populations who depend on the plant for their livelihood."* It should be observed that the consideration received in return for this alleged extortion must be given substantially greater weight than the coercion invoked by the defendants in their defense.

The Court did, however, note that the emails and minutes of the Security Committee referred to discussions and negotiations with the terrorist organizations.

There is no doubt that LAFARGE SA had full decision-making autonomy and could therefore have ceased operating the plant once its executives became aware of the financial demands being made by the terrorist entities. By agreeing to pay those terrorist organizations, LAFARGE SA and its representatives assessed the benefits that the company could derive in return in order to maintain its operations, such as reopening roads, ensuring the free movement of trucks and plant employees through the issuance of safe-conduct passes, and, finally, the possible neutralization of Turkish competition. Thus, by continuing until September 2014 to seek advantages from the relationship established in particular with the ISLAMIC STATE, which had become the dominant terrorist organization, LAFARGE SA demonstrated that it was not deprived of freedom of action.

**429.** Lastly, certain defendants emphasized the role and influence of French government agencies both in the decision to continue LAFARGE's operations in SYRIA and in its role as a "*source*" enabling the French intelligence services to carry out their work. The investigation and the trial proceedings established with certainty that the LAFARGE group could not have been asked to remain in SYRIA in order to act as a conduit for the French intelligence services. Nor has it been established that the diplomatic authorities asked the LAFARGE group to remain in SYRIA; indeed, the contrary was proven. This was, moreover, reflected in the

WORKING COPY

morningtrans.com

MORNINGSIDE
A Questel Company

# TRANSLATION CERTIFICATION

Date: September 26, 2026

To whom it may concern:

I, Hugh T. Robinson, a translator fluent in the French and English languages, on behalf of Morningside, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The document is designated as:

- ATA-M01370008 (excerpts)

Hugh T. Robinson

Signature

Hugh T. Robinson

Print

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300
Salt Lake City, UT 84111